Klestadt & Winters, LLP
Ian R. Winters
Joseph C. Corneau
Samir P. Gebrael
292 Madison Avenue, 17th Floor
New York, NY 10017-6314
Tel. (212) 972-3000
Fax. (212) 972-2245

*Proposed Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| ARENA MEDIA NETWORKS, LLC, | : | Case No.  10-10667(BRL) |
| | : | |
| Debtor. | : | |
| | : | |

**AFFIDAVIT OF ART WILLIAMS**
**PURSUANT TO S.D.N.Y. LOCAL BANKRUPTCY RULES 1007-2**
**AND 9077-1 AND IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS**

STATE OF NEW YORK     )
                      )     SS:
COUNTY OF NEW YORK  )

Art Williams, being duly sworn, says:

1.      I am the Chief Executive Officer of Arena Media Networks, LLC, the

above-captioned debtor and debtor in possession ("Arena" or the "Debtor").  In accordance with

S.D.N.Y. Local Bankruptcy Rules ("L.B.R.") 1007-2 and 9077-1, I submit this affidavit

("Affidavit") in connection with the voluntary petition for relief under chapter 11 of title 11 of

the United States Code (the "Bankruptcy Code") filed by the Debtor in the United States

Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), on February

1

8, 2010 (the "Petition Date"), and in support of the Debtor's First Day Motions (defined below).

2.      I am generally familiar with the business and financial condition of the Debtor.  In making any and all financial representations in this Affidavit, I am relying on financial statements and other financial information as compiled, prepared and/or submitted to me by the Chief Financial Officer of the Debtor.  Unless otherwise indicated, all financial information contained herein is presented on an estimated and unaudited basis.

3.      A copy of the resolutions of the Debtor's Board of Managers authorizing the commencement of the within chapter 11 case is annexed hereto as **Exhibit 1** and is incorporated by reference herein.

A.      **Required Contents of Affidavit**

(i)      Nature of Debtor's Business

i.      *Organizational Structure and Governance.*

4.      Arena is a limited liability company, organized under the laws of the State of New York, with its principal place of business located at 44 East 30th Street, 9th Floor, New York, New York 10016.

5.      Formed in 2003, Arena is presently governed by its Fourth Amended and Restated Limited Liability Company Agreement (the "Operating Agreement"). Pursuant to the Operating Agreement, management of Arena is vested in a six-member Board of Managers, which is presently comprised of Art Williams, Michael Martin, John Collins, Robert Kain, Mark Monaco and Peter Feigin. Certain actions, including, inter alia, the sale of the Debtor's assets, require prior written consent of the preferred unit holders.

6.      Arena currently has seventeen (17) common unit holders and two (2) preferred unit holders.

ii.     *Description of the Business*

7.      Arena places advertisements and media content such as scores, team trivia, weather updates and news headlines on digital screens at major league sports venues across the country. The advertisements and media that Arena delivers can be sold to multiple venues or customized for use in a single venue. Arena enters into agreements with sports venues to deploy, manage, operate and sell the media content and deliver advertising in exchange for a share of revenues and fixed minimum annual guarantees. Arena currently has agreements with approximately fifty major sports franchises in connection with the operation of its business.

8.      In 2004, Arena launched its original media and advertising content delivery system, called AMNds, which is comprised of fifty-inch plasma television screens that are installed in close proximity to venue entrances, concession stands, box offices, food courts, merchandise stands and luxury suites. The AMNds network eventually expanded to include over 1,000 screens. Deployment of AMNds required significant capital expenditures because Arena assumed the cost of installing and maintaining the display screens as part of its agreements with the various sports franchises.

9.      In 2008, Arena developed and launched a media network called AMNtv, which utilizes existing video infrastructure in modern sports venues and overlays live game broadcasts with content such as scores, statistics, team and player highlights as well as video commercials, banner advertising and graphic promotions. The media and advertisement component of the overlay covers a portion of the display space with live game broadcasts on the

balance of the display screen. Because it uses existing infrastructure, the cost of deploying AMNtv is significantly less than AMNds.

10.     By 2009, Arena's media network covered 47 professional sports venues with approximately 15,000 video screens.  It is estimated that the broadcasts facilitated by Arena reach approximately 130 million consumers annually.

iii.     *Events Leading Up To the Chapter 11 Filing*

11.     The Debtor's focus since its founding has been on expanding it's network. Unfortunately, this expansion necessarily required significant capital.

12.     For the three year period 2007 through 2009, the Debtor's combined earnings before interest and taxes ("EBIT") loss was approximately $16.3 million.[1]  Year to date 2010 losses are approximately $400,000.

13.     The Debtor's losses have been primarily funded by the sale of membership units in Arena as well as by secured financing provided by BNYH (described and defined below). From November 2007 through November 2008, BNYH (defined below) provided equity and debt financing to Arena.

14.     The Debtor's operating losses limited its ability to make payments to its creditors and contract counterparties as they became due.

15.     In or about November 2008, BNYH provided Arena with $3.0 million of additional financing and advised that it would not invest any additional funds in Arena or

---

[1] For year ending December 31, 2007, the Debtor's EBIT loss was approximately $2.6 million.  For year ending December 31, 2008, the Debtor's EBIT loss was approximately $5.8 million. For the year ending December 31, 2009, the Debtor's EBIT loss was approximately $7.9 million.

otherwise provide Arena with additional financing.[2] Without additional funding which was required to enable Arena to satisfy its obligations to creditors and contract counterparties, the Board determined that it was necessary to sell the business.

iv.    Debtor's Pre-Petition Efforts To Sell the Business

16.    In or about December, 2008, Arena entered into a brokerage agreement with Petsky Prunier ("Petsky"), an investment banking firm that specializes in marketing, information and digital media companies. Petsky served as Arena's exclusive broker with the objective of finding a buyer and/or investor for Arena.

17.    From December 2008 through February 2009, Petsky reached out to approximately one hundred and five (105) potential investors or buyers – ranging from financial institutions to venture funds. As a result of those efforts, approximately twenty-five (25) parties requested additional information but only four requested a management presentation.

18.    Of the four potential investors/buyers that Arena's management presented to, three submitted letters of intent which required additional due diligence. From March 2009 through July 2009, Arena supplied due diligence material and negotiated terms with each of those three parties. During the due diligence process, two of the three interested parties decided to withdraw because of the operating losses Arena was incurring and because of the perception that the deteriorating economy would negatively affect Arena's advertising revenue. The third and last potential investor identified by Petsky, a large financial institution, ultimately withdrew its offer, reportedly due to an internal reevaluation of its investment criteria. Petsky had exhausted its resources and could not complete a deal.

---

[2]Notwithstanding, at Arena's request, BNYH provided Arena with an additional $500,000 and final round

19.     Independent of Petsky's efforts, Arena's management began searching for an investor or buyer starting in July 2009.  After speaking with approximately twenty-five to thirty (25-30) potential purchasers (separate from the parties identified by Petsky), Arena's management was able to identify four additional potential purchasers.   These four interested parties did extensive due diligence on Arena from August 2009 to January 2010.  Of the four interested parties that reviewed the company's due diligence information, only Access 360 Media, Inc. ("Access 360") made an offer.

20.     In summary, after an exhaustive sale and marketing process that has lasted over 13 months, Access 360 has emerged as the only party presently willing to purchase Arena's assets.

v.     Purpose of Filing

21.     Contemporaneously with the filing of the Chapter 11 case, Arena will seek Bankruptcy Court approval to consummate a sale of substantially all of its assets to Access 360 pursuant to sections 363 and 365 of the Bankruptcy Code. Arena believes that the proposed sale to Access 360 is the only option that preserves some portion of its business as a going concern, averts a complete and swift liquidation and maximizes value for the Debtor's creditors and other parties in interest.

22.     If the proposed transaction (the "Proposed Transaction") with Access 360 is not timely consummated, Arena will not be able to satisfy certain outstanding obligations under its agreements with various Major League Baseball teams from the 2009 baseball season which must be made on March 1, 2010. If those obligations are not satisfied, Arena may not be

---

of financing in March, 2009.

permitted to sell advertising for the upcoming 2010 baseball season in many venues, which begins in early April 2010. As part of the Proposed Transaction, Access 360 has agreed to assume substantially all of the Debtor's agreements with various sports franchises. If the outstanding obligations from the 2009 baseball season are not paid, and Arena is not permitted to place advertising for the 2010 baseball season, it not only stands to lose millions of dollars in income from the 2010 baseball season, but also risks alienating its team partners, and jeopardizes the outcome of the Proposed Transaction with Access 360. In this scenario, liquidation would likely ensue, and approximately fifteen (15) employees would have to be terminated.

23. Over the last few months, Arena and Access 360, together with the Prepetition Lenders (defined below), a majority of Arena's unsecured creditors and certain key stakeholders have worked diligently to negotiate and formulate a mutually acceptable strategy to implement a prompt sale of the Debtor's business and to preserve the going concern value of Arena and return it to viability under new ownership.

24. Realizing the devastating effect that a liquidation of the business would have, after extensive negotiations among multiple parties, almost all parties involved have made important concessions in support of the Proposed Transaction. Among these concessions, BNHY has agreed to consent to the proposed sale of the Debtor's assets free and clear of its lien without requiring any payment in kind; DMG (defined below) has agreed to consent to the proposed sale of certain equipment which is the subject of its lien, free and clear of such lien, and to consent to the Debtor's assumption of its executory contract with DMG without requiring payment in full of cure claim amounts. Similarly, many sports franchises have agreed to renegotiate and restructure certain terms of their contracts with Arena in connection with the proposed

assumption and assignment of such contracts to Access 360. These concessions have enabled the Proposed Transaction to proceed.

25.     Arena and Access 360 have reached an agreement in principle and are expected to enter into an Asset Purchase Agreement ("APA") which will memorialize the Proposed Transaction.  Pursuant to the APA, among other things: (a) Arena will transfer the majority of its operating assets to New Arena LLC ("New Arena"), a newly established New York limited liability company; and (b) in exchange for those assets, New Arena will assume substantially all of the Debtor's executor contract and the various concomitant liabilities associated therewith and to provide Arena with DIP financing of up to $1 million (inclusive of the interest, fees and expenses of Access 360) to fund necessary operational and reorganization expenses until such time as the proposed asset sale can be consummated.

26.     For Arena, time is of the essence. Payments to certain of the Major League Baseball venues must be made on March 1, 2010. Critical relationships with these parties simply cannot be preserved if the sale process is not concluded quickly.  Absent a prompt sale, approved and consummated in the coming weeks, the value of the Debtor's assets will rapidly decline and the ability to achieve a going concern sale will be irretrievably lost.

(ii)     Debtor's Case Not Originally Commenced Under Chapter 7 or Chapter 13

27.     The case was not originally commenced under chapter 7 or chapter 13 of the Bankruptcy Code.  Accordingly, L.B.R. 1007-2(a)(2) is inapplicable.

(iii)     Prepetition Creditors' Committee

28.     In accordance with L.B.R. 1007-2(a)(3), to the best of the Debtor's knowledge, no pre-petition creditors' committee has been formed.

(iv)    <u>Holders of the Twenty Largest Unsecured Claims</u>

29.    In accordance with L.B.R. 1007-2(a)(4), a list setting forth the Debtor's twenty (20) largest unsecured creditors excluding those persons who constitute "insiders" under Bankruptcy Code section 101(31) of the Debtor is attached as **Exhibit 2**. As required by L.B.R. 1007-2(a)(4), Exhibit 2 includes the creditors' names, addresses, telephone numbers (for persons familiar with the account, if available), amount of each claim, and an indication of whether the claims are contingent, unliquidated, disputed, or partially secured.

(v)    <u>Holders of Five Largest Secured Claims</u>

30.    In accordance with L.B.R. 1007-2(a)(5), a list setting forth the Debtor's five (5) largest secured creditors in compliance with L.B.R. 1007-2(a)(5) is attached as **Exhibit 3**.

(a)    *BNYH AMN Holdings LLC*

31.    On October 31, 2007, Arena entered into a securities purchase and loan agreement, as amended from time to time ("<u>Securities Purchase and Loan Agreement</u>") with BNYH AMN Holdings LLC and BNYH AMN Parallel Holdings LLC (collectively referred to as "<u>BNYH</u>"). Pursuant to the Securities Purchase and Loan Agreement, BNYH agreed to buy certain membership units for a purchase price of $9,000,000, and, in addition, upon consummation of the Securities Purchase and Loan Agreement, BNYH agreed to loan Arena $3,000,000 and up to another $5,000,000.

32.    At Arena's request, BNYH has provided various loans and advances which were necessary for Arena to make the various capital expenditures required in connection with its business and to fund operating expenses incurred by Arena in the ordinary course of its

business.  As of the Petition Date, the sum of $15.6 million remains due and owing by Arena to BNYH on account of loans provided to Arena.

33.     Arena's obligations to BNYH pursuant to the Securities Purchase and Loan Agreement were secured by a pledge and security agreement ("Pledge and Security Agreement") entered into on the same date.  Pursuant to the Pledge and Security Agreement, Debtor granted BNYH a security interest in all of its assets ("BNYH Collateral").

(b)     *Diversified Media Group LLC*

34.     On or about August 18, 2008, Arena entered into a "Network Operating Services Agreement" with Diversified Media Group, LLC ("DMG," and together with BNHY, the "Prepetition Lenders"), a network company sells, leases and services media-related equipment, and on about October 3, 2008, AMN and DMG, entered into an "Ongoing Operating Agreement" (the "Ongoing Operating Agreement" and together with the "Network Operating Services Agreement," the "DMG Operating Agreements").

35.     On or about March 6, 2009 Arena and DMG entered into a Services Agreement (the "DMG Services Agreement"), whereby DMG provided certain services for Arena.  Arena's obligations to DMG under the DMG Services Agreement were secured by a security interest in collateral, specifically the equipment purchased from DMG and the equipment leased to Arena ("DMG Collateral").

36.     As of the Petition Date, the sum of $1.05 million is due and owing by Arena to DMG on account of goods sold and delivered and services rendered by DMG to Arena.

(vi)    Summary of Assets and Liabilities

37.     As required by L.B.R. 1007-2(a)(6), a summary of the Debtor's assets

10

and liabilities is attached as **Exhibit 4**.  For more detailed information, the Court and parties in interest are referred to the Debtor's schedules of assets and liabilities and statement of financial affairs (the "Schedules") filed on the Petition Date.

(vii)    Debtor's Securities

38.    As the Debtor does not have outstanding any securities that are publicly held, L.B.R. 1007-2(a)(7) is inapplicable.

(viii)    Property in Possession or Custody of Custodian

39.    In accordance with L.B.R. 1007-2(a)(8), the Debtor has no property in possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity.

(ix)    Premises Where the Debtor Conducts Business

40.    In accordance with L.B.R. 1007-2(a)(9), the Debtor is a party to a non-residential real property lease for its principal place of business located at 44 East 30th Street, 9th Floor, New York, New York 10016 (the "New York Office").   The Debtor leases the New York Office from Brook LLC pursuant to a nonresidential real property lease dated January 9, 2008. Currently, the rent and other charges for the Debtor's space is approximately $32,000 per month. The Debtor is currently in arrears to its landlord in the sum of $139,977.

(x)    Location of Debtor's Assets and Books and Records

41.    Pursuant to L.B.R. 1007-2(a)(10), the majority of the Debtor's books and records are maintained at the New York Office.  Substantially all of the Debtor's physical assets are located at the New York Office and in the venues where Arena sells media and advertising content.

(xi)     Threatened or Pending Actions Against the Debtor

42.     Pursuant to L.B.R. 1007-2(a)(11), a list of pending or threatened

actions is included in the Statement of Financial Affairs which are being filed

contemporaneously herewith.

(xii)     The Debtor's Senior Management

43.     Pursuant to L.B.R. 1007-2(a)(12), the Debtor's senior management

and a summary of their respective responsibilities and experience consists of:

Art Williams, *Chief Executive Officer*: Mr. Williams is Co-Founder and Chief Executive Officer of Arena. Mr. Williams serves various functions at the Arena, guiding its strategic direction and developing deep relationships with advertisers and team partners. He is also a member of the Board of Managers. An early pioneer of emerging media, Mr. Williams founded Spiral Media in 1993, one of the first internet consulting firms in New York City focused on strategic planning, branding and technology. Spiral Media was recognized by *AdWeek Magazine* as one of the leading internet agencies in the country. In 1997, Spiral Media merged with Agency.com. At Agency.com, Mr. Williams served on the management team as Executive Vice President of Operations. During his tenure at Agency.com, Mr. Williams managed several different areas of the company, including the general operation of eight offices and the acquisition and integration of 14 consulting firms. Mr. Williams left Agency.com in 1999 to work with Organic, Inc. as Executive Vice President of Global Operations. While at Organic, he served on the four-person executive team and had overall management responsibility of eight global offices with a staff of approximately 1,200. Mr. Williams is a well-recognized advertising and emerging media leader and serves on the board of the Out-of-Home Video Advertising Bureau. Mr. Williams graduated from the University of Buffalo with a Bachelor of Arts degree in History and Economics.

David Roberts, *Executive Vice President of Team Partnerships*: As Arena's Executive Vice President of Team Partnerships, Mr. Roberts is responsible for developing and maintaining Arena's relationships with sports franchises and venues. Prior to joining Arena, Mr. Roberts served as Director of Sales for Triangle Systems, a leading architectural wood and metal company designing retail environments for brands such as Federated Department Stores, Tommy Hilfiger and Ralph Lauren. Prior to Triangle Systems, Mr. Roberts founded an importing company specializing in cast iron products for plumbing supply companies in the U.S. Mr. Roberts graduated from George Washington University with a Bachelor of Science degree in Finance.

Corey Silverman: *Executive Vice President of Sales and Marketing*: Mr. Silverman joined Arena in November 2007 as its Executive Vice President of Sales, leading the management and development of the Company's media sales to local and national advertisers. Mr. Silverman has led numerous sales organizations at broadcast and new media companies, including serving as Senior Vice President of Sales at Current TV, a cable television network; Senior Vice President of Advertising for Fuse, a music television cable network; and Vice President of Advertising for Bravo and the Independent Film Channel. Mr. Silverman graduated from the University of Maryland with a Bachelor of Science degree in Marketing.

James McDade, *Chief Financial Officer*: Mr. McDade joined Arena in June 2007 as Chief Financial Officer and is responsible for the Company's finance and accounting functions. He has 20 years of experience in finance and management at technology and media companies. Prior to Arena, Mr. McDade served as Chief Financial Officer of Interactive Systems Worldwide, Inc., a publicly-traded software developer and operator. Mr. McDade began his career at PricewaterhouseCoopers, holding several positions in both the U.S. and the U.K., primarily as a reorganization and corporate finance consultant. Mr. McDade is a Certified Public Accountant. He earned a Masters of Business Administration in Finance from Temple University and a Bachelor of Science degree in Accounting from the Pennsylvania State University.

## B.    Additional Information Required by L.B.R. 1007-2(b)

44.    In accordance with L.B.R. 1007-2(b), the Debtor intends to continue the operation of its business and the management of its property as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Following the consummation of the Proposed Transaction, the Debtor anticipates proposing and confirming a liquidating plan pursuant to the provisions of Chapter 11.

45.    In accordance with L.B.R. 1007-2(b)(1), the estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the Petition Date is $80,337.

46.    In accordance with L.B.R. 1007-2(b)(2), the amounts paid and

proposed to be paid for the thirty (30) day period following the Petition Date for services rendered by the Debtor's officers is approximately $75,621.

47.     The Debtor has not engaged a financial or business consultant, therefore L.B.R. 1007-2(b)(2)(C) is not applicable.

48.     In accordance with L.B.R. 1007-2(b)(3), a schedule of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid is annexed hereto as **Exhibit 5**.

C.     **Additional Information In Support of First Day Motions**

49.     In order to continue operating effectively as a debtor in possession, the Debtor requires approval of certain transactions and dealings immediately.  Therefore, the Debtor is moving this Court for approval of certain "first day" matters in the instant case (collectively the "First Day Motions").  The following First Day Motions require immediate approval in order for the Debtor's business to continue uninterrupted during the immediate post-petition period.

(i)     Employee Wage Motion

50.     The gross semi-monthly payroll for all employees of the Debtor is approximately $77,979.

51.     Because the Petition Date falls within a current payroll period, a certain portion of the Debtor's employees will be owed monies by the Debtor on account of prepetition services rendered.

52.     The Debtor requests authorization to pay, in the ordinary course, and in the Debtor's discretion and exercise of its business judgment, certain prepetition fixed,

14

liquidated and undisputed claims of employee compensation, benefits, reimbursable business expenses, and related administrative costs in accordance with existing company policies ("Prepetition Payment Motion").  The Debtor believes that the payment of the aforementioned claims is necessary for its continued operation.  The payments sought to be authorized pursuant to the Prepetition Payment Motion are reasonable and necessary to the Debtor's reorganization effort.

53.     The Debtor believes that failure to make these payments to employees will damage the Debtor's relationship with its employees and, perhaps, irreparably impair the going concern value of its business.

54.     Authorizing payment of the unpaid compensation and reimbursable expenses is consistent with the policies of the Bankruptcy Code and is permitted by section 105 of the Bankruptcy Code.  The payment of the unpaid compensation and reimbursable expenses to the Debtor's employees will not significantly prejudice the other creditors in this proceeding because the vast majority of any such unpaid amounts would give rise to priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code. The Debtor is not seeking to pay any one employee in excess of $10,950 on account of unpaid compensation or reimbursable expenses.

(ii)     Sale and Bidding Procedures Motion

55.     After more than a year of exhaustively marketing the Debtor's assets for sale, the Debtor has reached terms for the sale of substantially all of its assets to Access 360, subject to higher and better offers. It is imperative for Arena to consummate the Proposed Transaction with Access 360 immediately because as set forth in greater detail above, payments to certain Major League Baseball contract counterparties for the 2009 season must be made on

March 1, 2010, and if those payments are not made, certain of those contract counterparties may not permit Arena to sell advertising in their venues for the 2010 baseball season, which begins in early April. Access 360 has agreed, as part of the consideration paid in the Proposed Transaction, to assume those obligations so that the business may continue uninterrupted. Arena has no other means to make said payments.

56.     By seeking bankruptcy protection in order to facilitate the Proposed Transaction with Access 360, subject to higher and better offers and in accordance with bidding and noticing procedures to be approved by the Court, the Debtor will be able to protect and preserve the value of its assets and business for the benefit of its creditors and employees. These proceedings will enable the Debtor to transition its business to a financially sound purchaser, maximize the value of the Debtor's goodwill, provide for the assumption and assignment of numerous executory contracts and ensure the continued fulfillment of services in connection therewith, provide continuing employment for certain of the Debtor's employees, and sustain a significant and trusted partner for its customer base.

57.     In furtherance of the Proposed Transaction, contemporaneously with the filing of the Chapter 11 case, the Debtor will file its Motion for Orders Pursuant to Sections 105(a), 363, 365 and 1146(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 And 6006:  (A) Fixing the Time, Date and Place for the Bidding Procedures Hearing; (B)(I) Establishing Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Assets of the Debtor, (II) Approving the Form and Manner of Notices, (III) Approving the Asset Purchase Agreement Subject to Higher and Better Offers and (IV) Setting A Sale Hearing Date; and (C)(I) Approving the Sale of Certain Assets of the Debtor Free

and Clear of Liens, Claims and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts and (III) Authorizing the Rejection of Non-Assumed Unexpired Leases and Executory Contracts; and (IV) Granting Related Relief (the "Sale Motion").

58.     As more fully described in the Sale Motion, the Proposed Transaction with Access 360 for which the Debtor seeks approval is the culmination of more than thirteen months of marketing efforts and accordingly, the Debtor believes that Access 360 is the only party willing to purchase the Debtor's assets and preserve the Debtor's value as a going concern. The Proposed Transaction is subject to higher and better offers, and if an interested party submits as higher and better offer than Access 360, the Sale Motion proposes that an auction be held in the Bankruptcy Court to determine the successful bidder.

59.     If Access 360 is the successful bidder at the contemplated auction, pursuant to the APA, in consideration for the Acquired Assets (as defined in the APA), Access 360 will pay (i) the obligations under the DIP Claims (defined below); (ii) the assumption of certain liabilities set forth (as set forth in the APA); and (iii) plus an amount to be agreed upon to wind up the estate and provide a minimal distribution to remaining creditors.

60.     It is contemplated that certain members of the Debtor's senior management will be offered employment agreements with New Arena, which employment agreements may include options to purchase equity in New Arena. As of the Petition Date however, no such agreements have been confirmed, finalized or memorialized in writing.

(iii)    DIP Financing/Use of Cash Collateral

61.     Access 360 has also agreed, in furtherance of the Proposed

Transaction, to provide the Debtor with Debtor in Possession Financing (the "DIP Financing").

62.     As more fully set forth in the Debtor's motion, pursuant sections 105(a), 362, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New York for the entry of interim and final orders (i) authorizing the Debtor to enter into a senior secured superpriority debtor-in-possession term loan in the aggregate principal amount of Eight Hundred Thousand Dollars ($800,000) substantially on the terms set forth in the Loan and Security Agreement between the Debtor and Access 360 Media Networks, Inc., and (ii) scheduling a final hearing pursuant to Rules 4001(b) and (c) of the Bankruptcy Rules, (the "DIP Financing Motion") Access 360 has agreed to loan the Debtor up to Eight Hundred Thousand Dollars ($800,000) (the "DIP Claims") pursuant to the terms of the Loan and Security Agreement for which the DIP Financing Motion seeks approval.

63.     Without the DIP Financing, the Debtor does not have sufficient available sources of working capital to carry on the operation of its business and the payment of Chapter 11 administrative expenses.

64.     Accordingly, in order to be able to minimize disruption of its business, and avoid immediate and irreparable harm, the Debtor is seeking approval for the DIP Financing from Access 360 and the use of cash collateral ("Cash Collateral") of the Prepetition Lenders.

65.     The Debtor's management has formulated a budget (the "Budget") for the use of the DIP Financing and Cash Collateral that includes estimated expenses of the Debtor for the 13-week period following the Petition Date. The Debtor believes that the Budget includes

all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course in connection with the operation of its business, as well as Chapter 11 administrative expenses, for the period set forth in the Budget. The Debtor also believes that the DIP Financing and authorization to use Cash Collateral in accordance with the Budget will provide the Debtor with sufficient liquidity to pay administrative expenses as they become due and payable during the period covered by the Budget.

66.     As security for the Debtor's obligations and indebtedness in respect of the DIP Financing and subject to a carveout for fees  pursuant to 28 U.S.C. § 1930 and the allowed professional fees and expenses of Debtor's counsel, (the "Carveout"), the Debtor proposes to grant the DIP Lender a first priority, priming, perfected lien pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code upon all assets of the Debtor, including a senior lien to that of the Prepetition Lenders (the "DIP Liens"), and the DIP Claims shall have superpriority administrative expense status under section 364(c)(1) of the Bankruptcy Code.  Subject to the Carve Out, such administrative claim shall have priority over all other claims, costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of the Debtor, its estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code (the "Superpriority Claim").

67.     Both BNYH and DMG have consented to the proposed DIP Financing on the terms and conditions set forth in the DIP Financing Motion.

68.      Given the current financial situation of the Debtor, the fact that

19

substantially all of the Debtor's assets are subject to a lien, and the Debtor's immediate need for the use of cash, the Debtor was unable to obtain credit from any other financial institution. Under the circumstances, no other source of financing exists on terms more favorable than those offered by the Access 360.

69.     The funds provided by the use of the DIP Financing and Cash Collateral are essential to the successful outcome of the Debtor's Chapter 11 case. The Debtor must be able to provide comfort to its vendors, its employees, and others that it will be able to pay in the ordinary course for all postpetition purposes. Authorization of the DIP Financing and use of Cash Collateral will provide the Debtor with the liquidity necessary to operate its business and to pay the wages, salaries, rent, utilities and other expenses associated therewith. Without authorization of the DIP Financing and utilization of the Cash Collateral, the Debtor will likely be forced to terminate its operations and liquidate immediately.

**D.**     **Conclusion**

        70.       The Debtor believes the protections afforded by chapter 11 will enable it to complete the Proposed Transaction with Access 360 economically and efficiently, thereby maximizing the value of the Debtor for the benefit of its creditors and its estate. Accordingly, the Debtor believes that chapter 11 will preserve the value of its assets for the benefit of its creditors.

                                      _/s/ Art Williams_____
                                          Art Williams
                                          Chief Executive Officer
                                          Arena Media Networks LLC

Sworn to before me this
8th day of February, 2010

_/s/ Terry Roberts_____
Terry Roberts
Notary Public
No. 01R06078669
Expires 8/5/2010

**Exhibit 1**

Arena Media Networks LLC
(a New York Limited Liability Company)

RESOLUTIONS

We, a majority of the members of the Board of Managers (the "Board") of Arena Media

Networks LLC ("Arena"), a New York Limited Liability Company, do hereby certify that at a

duly called meeting of the Board held on February 8, 2010, that (a) the following resolutions

were adopted by Board as of February 8, 2010, in accordance with the requirements of

applicable law, and (b) said resolutions have not been amended, modified or rescinded and are in

full force and effect as of the date hereof:

> WHEREAS, the Board of Managers has evaluated the alternatives in connection with a possible restructuring and have determined that the filing of a voluntary petition (the "Petition") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") is in the best interests of Arena;

> RESOLVED, that Arena shall be, and hereby is, authorized to file a Petition for relief under the Bankruptcy Code, in the United Stated Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and perform any and all such acts as are reasonable, advisable, expedient, convenient, proper or necessary to effect any of the foregoing;

> FURTHER RESOLVED, that Art Williams, as chief executive officer of Arena, shall be, and hereby is authorized, directed and empowered on behalf of, and in the name of, Arena to: (a) execute and verify the Petition and all other ancillary documents, and cause the Petition to be filed with the Bankruptcy Court and make or cause to be made prior to execution thereof any modifications to the Petition or ancillary documents, in his discretion, that he deems necessary or desirable to carry out the intent and accomplish the purposes of these resolutions; (b) execute, verify and file or cause to be filed all petitions, schedules, statements, lists, motions, applications and other papers or documents necessary or desirable in connection with the foregoing; and (c) execute and verify any and all other documents necessary or appropriate in connection therewith or to administer Arena's chapter 11 case in such form or forms as he may approve;

> FURTHER RESOLVED, that the Art Williams, as Chief Executive Officer, shall be, and is, authorized, directed and empowered to retain, on behalf of Arena, Klestadt & Winters, LLP, as general bankruptcy counsel and such additional professionals, accountants and financial advisors as in the his judgment may be necessary in connection

1

with Arena's chapter 11 case and other related matters, on such terms as he may approve;

FURTHER RESOLVED, that the firms set forth above and any additional professionals selected by the Chief Executive Officer, shall be, and hereby are, authorized, empowered and directed to represent Arena, as debtor and debtor in possession, in connection with any chapter 11 case commenced by or against it under the Bankruptcy Code;

FURTHER RESOLVED, that all acts lawfully done or actions lawfully taken or to be taken by the Chief Executive Officer, in connection with the implementation of these resolutions in all respects are hereby ratified, confirmed and approved.

IN WITNESS WHEREOF, the undersigned has caused this consent to be executed as of February 8, 2010.

_____
Art Williams

_____
Michael Martin

_____
John Collins

_____
Robert Kain

_____
Mark Monaco

_____
Peter Feigin

Consented to:

BNYH AMN Holdings LLC
BNYH AMN Parallel Holdings LLC

_____
By:
Its:

with Arena's chapter 11 case and other related matters, on such terms as he may approve;

FURTHER RESOLVED, that the firms set forth above and any additional professionals selected by the Chief Executive Officer, shall be, and hereby are, authorized, empowered and directed to represent Arena, as debtor and debtor in possession, in connection with any chapter 11 case commenced by or against it under the Bankruptcy Code;

FURTHER RESOLVED, that all acts lawfully done or actions lawfully taken or to be taken by the Chief Executive Officer, in connection with the implementation of these resolutions in all respects are hereby ratified, confirmed and approved.

IN WITNESS WHEREOF, the undersigned has caused this consent to be executed as of February ___, 2010.

_____
Art Williams

_____
Michael Martin

_____
John Collins

_____
Robert Kain

_____
Mark Monaco

_____
Peter Feigin

Consented to:

BNYH AMN Holdings LLC
BNYH AMN Parallel Holdings LLC

_____
By:
Its:

2

FURTHER RESOLVED, that the firms set forth above and any additional professionals selected by the Chief Executive Officer, shall be, and hereby are, authorized, empowered and directed to represent Arena, as debtor and debtor in possession, in connection with any chapter 11 case commenced by or against it under the Bankruptcy Code;

FURTHER RESOLVED, that all acts lawfully done or actions lawfully taken or to be taken by the Chief Executive Officer, in connection with the implementation of these resolutions in all respects are hereby ratified, confirmed and approved.

IN WITNESS WHEREOF, the undersigned has caused this consent to be executed as of February 8, 2010.

_____
Art Williams

_____
Michael Martin

_____
John Collins

_____
Robert Kain

_____
Mark Monaco

_____
Peter Feigin

Consented to:

BNYH AMN Holdings LLC, Michael Martin, as Unitholder of Arena
BNYH AMN Parallel Holdings LLC, Media Network, LLC, Michael
as Unitholder of Arena Martin, as authorized
Media Networks, LLC Member
Michael Martin, pursuant
By: to proxy dated
Its: November 14, 2008

2

with Arena's chapter 11 case and other related matters, on such terms as he may approve;

FURTHER RESOLVED, that the firms set forth above and any additional professionals selected by the Chief Executive Officer, shall be, and hereby are, authorized, empowered and directed to represent Arena, as debtor and debtor in possession, in connection with any chapter 11 case commenced by or against it under the Bankruptcy Code;

FURTHER RESOLVED, that all acts lawfully done or actions lawfully taken or to be taken by the Chief Executive Officer, in connection with the implementation of these resolutions in all respects are hereby ratified, confirmed and approved.

IN WITNESS WHEREOF, the undersigned has caused this consent to be executed as of February 8, 2010.

_____
Art Williams

_____
Michael Martin

_____
John Collins

_____
Robert Kain

_____
Mark Monaco

_____
Peter Feigin

Consented to:

BNYH AMN Holdings LLC
BNYH AMN Parallel Holdings LLC

_____
By:
Its:

2

FURTHER RESOLVED, that the firms set forth above and any additional professionals selected by the Chief Executive Officer, shall be, and hereby are, authorized, empowered and directed to represent Arena, as debtor and debtor in possession, in connection with any chapter 11 case commenced by or against it under the Bankruptcy Code;

FURTHER RESOLVED, that all acts lawfully done or actions lawfully taken or to be taken by the Chief Executive Officer, in connection with the implementation of these resolutions in all respects are hereby ratified, confirmed and approved.

IN WITNESS WHEREOF, the undersigned has caused this consent to be executed as of February ⟨8⟩, 2010.

_____
Art Williams

_____
Michael Martin

_____
John Collins

_____
Robert Kain

_____
Mark Monaco

_____
Peter Feigin

Consented to:

BNYH AMN Holdings LLC
BNYH AMN Parallel Holdings LLC

_____
By:
Its:

2

**Exhibit 2**

# United States Bankruptcy Court
## Southern District of New York

**IN RE:**

Arena Media Networks LLC

Debtor(s)

Case No. **10-10667**

Chapter **11**

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [or chapter 9] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

| (1)<br>Name of creditor and complete mailing address including zip code | (2)<br>Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | (3)<br>Nature of claim (trade debt, bank loan, government contract, etc.) | (4)<br>Indicate if claim is contingent, unliquidated, disputed or subject to setoff | (5)<br>Amount of claim (if secured also state value of security) |
|---|---|---|---|---|
| BNYH AMN Holdings LLC<br>717 Fifth Avenue, 16th Floor<br>New York, NY 10022 | (212) 310-6900 | | | 15,826,441.13<br>Collateral:<br>4,679,907.73<br>Unsecured:<br>11,146,533.40 |
| Petsky Prunier LLC<br>40 Wall Street<br>New York, NY 10016 | (212) 842-6000 | | Contingent<br>Disputed | 526,185.60 |
| New York Mets<br>Citi Field<br>Flushing, NY 11368 | (718) 507-6387 | | | 312,500.00 |
| Golden State Warriors<br>1011 Broadway<br>Oakland, CA 94607 | (510) 986-2200 | | | 300,000.00 |
| Chicago Bulls<br>1901 W. Madison Ave.<br>Chicago, IL 60612 | (312) 455-4000 | | | 281,250.00 |
| Creative Realities, LLC<br>22 Audrey Place<br>Fairfield, NJ 07004 | (973) 244-9911 | | | 270,311.37 |
| Chicago Cubs<br>P.O. Box 98537<br>Chicago, IL 60693-8537 | (773) 404-2827 | | | 262,500.00 |
| Atlanta Braves<br>755 Hank Aaron Drive<br>Atlanta, GA 30315 | (404) 522-7630 | | | 225,000.00 |
| ICON International Inc.<br>107 Elm Street, Four Stamford Plaza<br>Stamford, CT 06902 | (203) 328-2300 | | | 215,065.50 |
| New York Yankees<br>Yankee Stadium<br>Bronx, NY 10451 | (718) 293-4300 | | | 180,000.00 |
| Pacer's Sports and Entertainment<br>P.O. Box 663708<br>Indianapolis, IN 46266 | (317) 917-2727 | | | 166,666.71 |
| Boston Red Sox Baseball Company<br>P.O. Box 414889<br>Boston, MA 02241-4889 | (617) 226-6000 | | | 150,000.00 |
| Verizon Center<br>PO Box 630442<br>Baltimore, MD 21263-0442 | (301) 808-3091 | | | 140,000.00 |
| Chicago White Sox, LTD.<br>4107 Paysphere Circle<br>Chicago, IL 60674 | (312) 674-5408 | | | 125,000.00 |

© 1993-2009 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

| | | |
|---|---|---|
| **Madison Square Garden L.P.**<br>**Two Pennsylvania Plaza**<br>**New York, NY  10121** | **(212) 465-6331** | **116,662.00** |
| **Brook LLC**<br>**489 Fifth Avenue, 7th Floor**<br>**New York, NY  10017** | **(212) 371-5050** | **108,332.03** |
| **Los Angeles Dodgers**<br>**1000 Elysian Park Ave**<br>**Los Angeles, CA  90012-1199** | **(323) 224-1500** | **107,429.00** |
| **China Basin Ballpark Company, LLC**<br>**24 Willie Mays Plaza**<br>**San Francisco, CA  94107** | **(415) 972-2463** | **105,000.00** |
| **Detroit Tigers Inc.**<br>**2100 Woodward Avenue**<br>**Detroit, MI  48201-3474** | **(313) 962-4000** | **105,000.00** |
| **Berdon LLP**<br>**360 Madison Avenue**<br>**New York, NY  10017** | **(212) 832-0400** | **103,541.85** |

### DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF A CORPORATION OR PARTNERSHIP

I, [the president *or* other officer *or* an authorized agent of the corporation][*or* a member *or* an authorized agent of the partnership] named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date: **February  8, 2010**          Signature: _____

**Art Williams, Chief Executive Officer**
(Print Name and Title)

© 1993-2009 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

**Exhibit 3**

**IN RE** Arena Media Networks LLC      Case No. **10-10667**

_____
Debtor(s)                                                        (If known)

## SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is the creditor, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H – Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim Without Deducting Value of Collateral" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion, if Any" on the Statistical Summary of Certain Liabilities and Related Data.

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

© 1993-2009 EZ-Filing, Inc. [1-800-998-2424] - Forms Software Only

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE AND ACCOUNT NUMBER. *(See Instructions Above.)* | CODEBTOR | HUSBAND, WIFE, JOINT, OR COMMUNITY | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | CONTINGENT | UNLIQUIDATED | DISPUTED | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| ACCOUNT NO.<br><br>**BNYH AMN Holdings LLC**<br>**717 Fifth Avenue, 16th Floor**<br>**New York, NY  10022** | | | | | | | 15,826,441.13 | 11,146,533.40 |
| | | | VALUE $ **4,679,907.73** | | | | | |
| ACCOUNT NO.<br><br>**Diversified Media Group**<br>**385 Market Street**<br>**Kenilworth, NJ  07033** | | | | | | | 1,173,980.53 | |
| | | | VALUE $ **1,176,831.00** | | | | | |
| ACCOUNT NO. | | | | | | | | |
| | | | VALUE $ | | | | | |
| ACCOUNT NO. | | | | | | | | |
| | | | VALUE $ | | | | | |

**0** continuation sheets attached

Subtotal
(Total of this page)    $ **17,000,421.66**    $ **11,146,533.40**

Total
(Use only on last page)    $ **17,000,421.66**    $ **11,146,533.40**

(Report also on Summary of Schedules.)      (If applicable, report also on Statistical Summary of Certain Liabilities and Related Data.)

**Exhibit 4**

**Arena Media Networks LLC**
**Balance sheet**
**January 31, 2010**

|  | **January 31, 2010** |
|---|---:|
| ASSETS | |
| Cash | $15,287 |
| Accounts receivable, net of provision | 230,405 |
| NBC and unbilled receivables | 250,119 |
| Capitalized transaction costs | 369,595 |
| Prepaid expense and other | 83,008 |
|     Total current assets | 948,413 |
| | |
| Computer equipment, net | 41,160 |
| Development costs, net | 85,983 |
| Equipment, net | 3,816,713 |
| Furniture & fixtures, net | 160,323 |
| Leasehold improvements, net | 43,894 |
|     Total fixed assets, net | 4,148,074 |
| Loans and advances | 147,915 |
| Rent security deposit | 352,000 |
|     Total assets | $5,596,401 |
| | |
| LIABILITIES & EQUITY | |
| Accounts payable | $5,217,656 |
| Accrued expenses and other payables | 776,743 |
| Accrued team fees | 991,488 |
| Deferred income | 591,547 |
|     Total current liabilities | 7,577,434 |
| | |
| BNYH note - principal | 15,656,807 |
| BNYH note - PIK interest | 169,634 |
|     Total liabilities | 23,403,875 |
| Equity | |
|     Capital | 8,109,526 |
|     Accumulated deficit | (25,313,546) |
|     Net loss | (603,454) |
|     Total equity | (17,807,474) |
|     Total liabilities and equity | $5,596,401 |

**Exhibit 5**

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

| | ACTUAL WE 2/5 | WE 2/12 | WE 2/19 | WE 2/26 | WE 3/5 | WE 3/12 | WE 3/19 | WE 3/26 |
|---|---|---|---|---|---|---|---|---|
| Receipts | 728.12 | 0.00 | 10,000.00 | 110,500.00 | 196,128.12 | 0.00 | 28,000.00 | 461,666.66 |
| | | | | | | | | |
| **Disbursements** | | | | | | | | |
| Payroll, commissions and other employee costs | 2,293.97 | 81,015.29 | 2,293.97 | 79,693.11 | 1,356.47 | 72,305.63 | 1,356.47 | 43,615.00 |
| Vendor and team payments | 0.00 | 59,765.00 | 0.00 | 0.00 | 540,210.70 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 970.00 | 32,000.00 | 18,885.10 | 931.61 | 33,000.00 | - | 18,885.10 | 931.61 |
| Travel and other office expenses | 15,823.63 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 |
| Debtor's counsel | 5,000.00 | 35,000.00 | - | - | 35,000.00 | - | - | - |
| US Trustee fees | - | - | - | - | - | - | - | - |
| DIP interest and fees | - | - | - | - | 2,771.85 | - | - | - |
| **Total cash disbursements** | 24,087.60 | 216,780.29 | 26,679.07 | 89,624.72 | 617,839.02 | 81,305.63 | 25,741.57 | 53,546.61 |
| | | | | | | | | |
| Net cashflow | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| | | | | | | | | |
| Beginning cash balance | 15,286.68 | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) |
| Net cashflow | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| **Ending cash balance (DIP borrowing)** | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) | (313,294.94) |

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

| | WE 4/2 | WE 4/9 | WE 4/16 | WE 4/23 | WE 4/30 |
|---|---|---|---|---|---|
| **Receipts** | 20,728.12 | 0.00 | 20,000.00 | 0.00 | 81,666.66 |
| | | | | | |
| **Disbursements** | | | | | |
| Payroll, commissions and other employee costs | 72,584.10 | 1,078.00 | 72,584.10 | 0.00 | 72,584.10 |
| Vendor and team payments | 557,921.95 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 33,000.00 | - | 18,885.10 | 931.61 | 1,000.00 |
| Travel and other office expenses | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 |
| Debtor's counsel | 50,000.00 | - | - | - | - |
| US Trustee fees | 6,500.00 | - | - | - | - |
| DIP interest and fees | 10,940.95 | - | - | - | - |
| **Total cash disbursements** | 736,447.01 | 10,078.00 | 96,969.20 | 9,931.61 | 79,084.10 |
| | | | | | |
| **Net cashflow** | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| | | | | | |
| **Beginning cash balance** | (313,294.94) | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) |
| Net cashflow | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| **Ending cash balance (DIP borrowing)** | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) | (1,123,410.07) |