Klestadt & Winters, LLP
Ian R. Winters
Joseph C. Corneau
Samir P. Gebrael
292 Madison Avenue, 17th Floor
New York, NY 10017-6314
Tel. (212) 972-3000
Fax. (212) 972-2245
*Proposed Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ARENA MEDIA NETWORKS, LLC, | : | Case No.  10-10667(BRL) |
| | : | |
| Debtor. | : | |
| | : | |

**DEBTOR'S MOTION FOR ORDER (I) AUTHORIZING DEBTOR TO
OBTAIN INTERIM POSTPETITION FINANCING AND TO GRANT
SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d);
(II) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C § 362; AND
(III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

Arena Media Networks, LLC, the above-captioned debtor and debtor-in-possession (the

"**Debtor**"), by and through its undersigned counsel, respectfully submits this motion (the

"**Motion**"), pursuant sections 105(a), 362, 364 and 507 of title 11 of the United States Code, 11

U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules

of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern

District of New York (the "**Local Rules**") for the entry of interim (the "**Interim Order**") and

final orders (the "**Final Order**" and together with the Interim Order, the "**DIP Orders**"), *inter*

*alia*, (i) authorizing the Debtor to enter into a senior secured superpriority debtor-in-possession

term loan in the aggregate principal amount of Eight Hundred Thousand Dollars ($800,000) (as

amended, modified and otherwise in effect from time to time, the "**DIP Loan**") substantially on the terms set forth in the DIP Loan and Security Agreement between the Debtor and Access 360 Media Networks, Inc. ("**Lender**" or "**Buyer**"), annexed hereto as <u>Exhibit A</u>[1] (as amended, supplemented, or otherwise modified and in effect from time to time, the "**DIP Loan and Security Agreement**" and, together with any and all schedules thereto and other related documents, notes and agreements entered into in connection with or related to the DIP Loan, the "**DIP Documents**"), and (ii) scheduling a final hearing pursuant to Rules 4001(b) and (c) of the Bankruptcy Rules. In support of this Motion, the Debtor respectively represents as follows:

<u>**Jurisdiction and Venue**</u>

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      The statutory predicates for the relief sought herein are sections 105(a), 362, 364 and 507 of Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

<u>**Background**</u>

3.      On the date hereof (the "**Petition Date**"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 the Bankruptcy Code.

4.      The Debtor has continued in possession of its properties and is operating and managing its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Loan and Security Agreement. All obligations under the DIP Loan and Security Agreement are hereinafter referred to as the "**DIP Obligations**."

5.     No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in this case.

6.     The Debtor is a limited liability company, organized under the laws of State of New York, with its principal place of business located at 44 East 30th Street, 9th Floor, New York, New York 10016.  The Debtor is engaged in the business of broadcasting and utilizing sports-related media content through the operation of a digital media network at professional sports venues in the United States and related activities as currently conducted.

7.     In connection with this bankruptcy case and as a condition of the DIP Loan, the Debtor seeks to consummate the sale of certain of its assets pursuant to the *Motion for Orders Pursuant to Sections 105(a), 363, 365 and 1146(c) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 (A) Fixing the Time, Date, and Place for the Bidding Procedures Hearing; (B)(i) Establishing Bidding Procedures and Bid Protections in Connection with the Sale of Certain of the Assets of the Debtor, (ii) Approving the Form and Manner of Notices, (iii) Approving the Asset Purchase Agreement Subject to Higher and Better Offers and (iv) Setting a Sale Hearing Date, and (C)(i) Approving the Sale of Certain Assets of the Debtor Free and Clear of Liens, Claims and Encumbrances, (ii) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts and (iii) Authorizing the Rejection of Non-Assumed Unexpired Leases and Executory Contracts, and (iv) Granting Related Relief* (the "**Sale Motion**"), filed contemporaneously herewith or promptly following the date hereof, and the Asset Purchase Agreement (as defined in the Sale Motion), subject to higher and better offers as outlined in the Sale Motion and as may be prescribed by the Court in the Bidding Procedures Order (as defined in the Sale Motion).

## A. Capital Structure

8. Formed in 2003, Debtor is presently governed by its Fourth Amended and Restated Limited Liability Company Agreement (the "**Operating Agreement**"). Pursuant to the Operating Agreement, management of Debtor is vested in a six-member Board of Managers, which is presently comprised of Art Williams, Michael Martin, John Collins, Robert Kain, Mark Monaco and Peter Feigin. Debtor currently has seventeen (17) common unit holders and two (2) preferred unit holders.

## B. Events Leading to Restructuring

9. Debtor's focus since its founding has been on expanding its network. Unfortunately, this expansion necessarily required significant capital.

10. For the three year period 2007 through 2009, the Debtor's combined earnings before interest and taxes ("**EBIT**") loss was approximately $16.3 million. Year to date 2010 losses are approximately $400,000.

11. Debtor's losses have been primarily funded by the sale of membership units in Arena as well as by secured financing provided by BNYH (described and defined below). From November 2007 through November 2008, BNYH provided equity and debt financing to Debtor.

12. Debtor's operating losses limited its ability to make payments to its creditors and contract counterparties as they became due.

13. In or about November 2008, BNYH provided Debtor with $3.0 million of additional financing and advised that it would not invest any additional funds in Debtor or otherwise provide Debtor with additional financing. Without additional funding which was required to enable Debtor to satisfy its obligations to creditors and contract counterparties, the Board determined that it was necessary to sell the business.

C. **The Proposed Sale**

14.     Based on the foregoing, the Debtor has determined that an expeditious sale of the operating assets of the Debtor's Business is necessary to maximize available value, and that a reorganization is not a viable option due to the Debtor's liquidity constraints and failing business model.

15.     In or about December, 2008, Debtor entered into a brokerage agreement with Petsky Prunier ("**Petsky**"), an investment banking firm that specializes in marketing, information and digital media companies. Petsky served as Debtor's exclusive broker with the objective of finding a buyer and/or investor for Debtor.

16.     From December 2008 through February 2009, Petsky reached out to approximately one hundred and five (105) potential investors or buyers – ranging from financial institutions to venture funds. As a result of those efforts, approximately twenty-five (25) parties requested additional information but only four requested a management presentation.

17.     Of the four potential investors/buyers that Debtor's management presented to, three submitted letters of intent which required additional due diligence. From March 2009 through July 2009, Debtor supplied due diligence material and negotiated terms with each of those three parties. During the due diligence process, two of the three interested parties decided to withdraw because of the operating losses Debtor was incurring and because of the perception that the deteriorating economy would negatively affect Debtor's advertising revenue. The third and last potential investor identified by Petsky, a large financial institution, ultimately withdrew its offer, reportedly due to an internal reevaluation of its investment criteria. Petsky had exhausted its resources and could not complete a deal.

18.     Independent of Petsky's efforts, Debtor's management began searching for an investor or buyer starting in July 2009.  After speaking with approximately twenty-five to thirty (25-30) potential purchasers (separate from the parties identified by Petsky), Debtor's management was able to identify four additional potential purchasers.   These four interested parties did extensive due diligence on Debtor from August 2009 to January 2010.  Of the four interested parties that reviewed the company's due diligence information, only Buyer made an offer.

19.     In summary, after an exhaustive sale and marketing process that has lasted over 13 months, Buyer has emerged as the only party presently willing to purchase Debtor's assets.  Ultimately, Buyer was the only viable option that allowed for continuation of the Debtor's business.  In or about December 2009, the Debtor and the Lender agreed to the terms and conditions contained in the form of Asset Purchase Agreement[2] pursuant to which the Debtor proposed to sell nearly all of its assets to the Buyer and the Buyer agreed to assume certain liabilities of the Debtor.

20.     On February 8, 2010, and after consideration of all options, the Debtor's Board of Managers held a meeting and voted to accept the Buyer's bid to purchase the Acquired Assets (as defined in the Asset Purchase Agreement) through the Buyer as the best and highest bid.

21.     The Debtor and the Buyer entered into further negotiations regarding the terms of the Buyer's proposed transaction documents, including the terms for the final Asset Purchase Agreement and for provision of a debtor-in-possession loan from the Buyer. Negotiations of the Purchase Agreement and the DIP Documents in connection with the DIP

---

[2]  The Debtor reserves the right to revise the Asset Purchase Agreement prior to the commencement of the Auction.

Loan for which the Debtor is seeking approval herein, continued with Buyer up until the Petition Date.

22.     The Debtor's estate is out of money and the value of the Purchased Assets will rapidly diminish if a sale is not quickly consummated.  Thus, the Debtor believes that the competitive bidding process for certain of its assets (the "**Sale**"), as contemplated in the Sale Motion, must take place on an expedited schedule to ensure that the value thereof is maximized.  The Debtor has negotiated with Buyer as Lender under the DIP Documents and pursuant to the Asset Purchase Agreement to present this Motion on a consensual basis in order to expedite this process and achieve the highest value possible for creditors.

**D.     The Proposed DIP Loan and Security Agreement**

23.     Subject to the approval of the Bankruptcy Court, the Debtor proposes to enter into a debtor-in-possession financing facility to fund the administration of this bankruptcy case post-petition.  The DIP Loan will provide the Debtor with up to $800,000 in liquidity to fund operations and the administration of this bankruptcy case through the closing date of the sale of the Debtor's assets and transfer of certain liabilities to Lender under the Asset Purchase Agreement or to a higher or better bidder for the assets, in accordance with and as outlined in the Sale Motion.

24.     The principal terms for the DIP Documents are as follows:[3]

| Borrowers: | The Debtor |
|---|---|
| **DIP Lender:** | Access 360 Media, Inc. |
| **DIP Loan Amount:** | $800,000, plus Lender's interest, fees and expenses.  Upon the entry of the Interim Order, but prior to the entry of the Final Order, the Debtors will be authorized to obtain financing, pursuant to the terms |

---

[3]  This summary is qualified in its entirety by the actual terms of the DIP Documents.

| | |
|---|---|
| | of the Interim Order and the DIP Documents, equal to $280,000 (the "**Interim Advance**"). |
| **Maturity Date:** | The DIP Loan shall mature on earlier of (a) the closing date of the sale of certain of the assets of the Debtor (the "**Sale Transaction**"), and (b) March 31, 2010. |
| **Funding Dates:** | The Debtors shall be funded with Interim Advance after entry of the Interim Order and will receive the remaining portion of the DIP Loan after entry of the Final Order, in each case, in accordance with the Budget and the terms and conditions of the DIP Loan and Security Agreement. |
| **Use of Proceeds:** | The Debtor will use the proceeds of the DIP Loan solely (a) to pay fees and expenses related to the consummation of the Bankruptcy Case and the consummation of this agreement and (b) for other general corporate purposes of the Debtor for the purposes set forth in the Budget. No portion of the DIP Loan or any cash collateral shall be available for any fees or expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against (i) the Lender or (ii) in connection with challenging the DIP Loan or the Sale Motion, including fees and expenses applicable to the Debtor soliciting or negotiating a sale of the Assets for a higher and better amount. |
| **Reimbursement of Lender's Professionals:** | The Debtor will pay all reasonable and actual fees and expenses of the Lender's professionals in connection with the DIP Loan. |
| **Interest Rate:** | The interest rate applicable to the DIP Loan shall be equal to the prime rate published in the Wall Street Journal as of the date of the DIP Agreement *plus* 175 basis points, calculated on a 360 day year for the actual days elapsed. |
| **Security and Priorities:** | Subject to the Carve Out and the Diversified Senior Lien (each as defined below), Lender will receive a valid and perfected first-priority lien on all now owned and hereafter acquired Collateral (as defined in the DIP Loan and Security Agreement), in the following: all of the Debtor's right, title and interest in, to and under all real, personal, tangible, intangible, or mixed property, whether now owned or hereafter acquired in fee simple or leased by the Debtor, including, without limitation all bank accounts, deposits and cash, wherever located, and all proceeds (including the proceeds of any asset sales to third parties), products, rents, revenues and profits of any of the foregoing, all causes of action (except causes of action of Debtor's estate under Chapter 5 of the Bankruptcy Code), and including, but not limited to the following, in each case now owned or at any time hereafter acquired by the Debtor or in which the |

| | |
|---|---|
| | Debtor now has or at any time in the future may acquire any right, title or interest: (i) all Accounts; (ii) all Inventory; (iii) all Equipment; (iv) all Contract Rights; (v) all Chattel Paper, (vi) Instruments and Documents; (vii) all Intellectual Property; (viii) all General Intangibles; (ix) all Deposit Accounts; (x) all Goods; (xi) all Investment Property; (xii) all Letter of Credit Rights; (xiii) all Commercial Tort Claims; (xiv) to the extent not otherwise included, all rights, proceeds and payments under insurance with respect to any of the Collateral or otherwise of which the Debtor is the beneficiary; (xv) all other goods and real or personal property whether tangible or intangible, including without limitation, all other rights to payment not specified above, and whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, the Debtor and wherever located; (xvi) all books and records relating to any of the foregoing; and (xvii) to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing.  Notwithstanding the foregoing, the Lender's lien shall be subject to the existing first priority lien in certain equipment of Diversified Media Group ("**Diversified**") up to the amount of $565,293 (the "**Diversified Senior Lien**").[4] |
| **Superpriority Claims:** | Pursuant to section 364(c) of the Bankruptcy Code and the Interim and Final Orders, all obligations of the Debtor under the DIP Documents (including any exposure of the Lender in respect of cash management or hedging transactions incurred on behalf of the Debtor) at all times shall constitute allowed super-priority administrative expense claims in the Bankruptcy Case having priority over all administrative expenses of the kind specified in section 503(b) or section 507(b) of the Bankruptcy Code, subject only to the Carve-Out and the Diversified Senior Lien. |
| **Carve-Out:** | The following amounts shall be payable from the DIP Loans and chargeable against the Collateral prior to the liens and security interests that are granted to the Lender hereunder:  (i) the unpaid fees due and payable to the Clerk of the Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, and (ii) the allowed professional fees and expenses of Debtor's counsel, as set forth in the Budget. |
| **Affirmative and Negative Covenants:** | The DIP Documents contain usual and customary affirmative and negative covenants for facilities of this type and nature, including, |

---

[4] Diversified Media Group has consented to a fifty percent reduction of its secured debt in the total amount of $1,130,586.

| | without limitation: |
|---|---|
| | (i) affirmative covenants of the Debtor to (a) furnish to Lender on each Monday after the date of the DIP Loan and Security Agreement a 6-week budget in form, detail and substance acceptable to the Lender that covers the projected expenses, disbursements, receipts and revenues for each week during such 6-week period immediately subsequent to such date, (b) furnish to Lender written notice of an Event of Default, (c) use the proceeds in accordance with the DIP Loan and Security Agreement, (d) pay the proceeds of (i) the sale or other disposition of Collateral, (ii) any issuance of equity securities by the Debtor, or (iii) any incurrence of indebtedness (other than in the ordinary course of business), to the Lender to be applied to reduce the Obligations; (e) execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that the Lender may reasonably request, in order to effectuate the transactions contemplated by the DIP Documents, (f) use its best efforts to obtain an order of the Court authorizing the Debtor to enter into the DIP Documents and the sale related motions, and (g) keep the Lender informed at all times on all matters related to the sale and auction process of its assets under section 363 of the Bankruptcy Code. |
| | (ii) negative covenants of the Debtor not to sell all or any portion of the Collateral without the prior written consent of the Lender. |
| **Conditions Precedent:** | Customary for credit facilities of this nature, including the delivery of certain documents to Lender. |
| **Section 506(c):** | It shall be considered an Event of Default under the DIP Documents if any claims under section 506(c) of the Bankruptcy Code are asserted against the Lender. |
| **Modification of the Automatic Stay:** | Subject solely to any requirement of the giving of notice by the terms of the Interim Order or the Final Order, the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court, and the Lender, upon three business days' written notice to the Debtor, shall be entitled to exercise all of their respective rights and remedies under the DIP Documents, including all rights and remedies with respect to the Collateral. |
| **Releases:** | Lender, subject to the entry of a Final Order, shall be released by the Debtor from any and all claims, liens, priority, actions or inactions arising hereunder or in any other manner, with such releases being |

| | |
|---|---|
| | satisfactory to the Lender its discretion. |
| **Events of Default:** | Each of the following events shall be an "Event of Default" under the DIP Loan and Security Agreement:<br><br>(a) The Debtor shall fail to pay any and all outstanding Obligations on or before the Maturity Date;<br><br>(b) A breach by the Debtor, in any material respect, of the Financial Covenant or any other provision, covenant, agreement, representation or warranty under this Security Agreement, or any Financing Order;<br><br>(c) Reversal, modification, rescission, amendment or vacating of any Financing Order;<br><br>(d) An Event of Default (as defined in the APA) has occurred and is continuing under the APA;<br><br>(e) The filing of a Chapter 11 Plan for the Debtor which does not provide for the consummation of the transactions contemplated by the APA or the payment in cash in full of the Secured Obligations on or before the Maturity Date;<br><br>(f) Dismissal of the Chapter 11 Case, conversion of the Chapter 11 Case to a chapter 7 liquidation, or the appointment of a chapter 11 trustee or an examiner in the Chapter 11 Case with expanded powers;<br><br>(g) The Bankruptcy Court shall not have entered the Final DIP Order on or before February 26, 2010;<br><br>(h) The APA is terminated for any reason other than a default of the Lender under the APA;<br><br>(i) The Debtor shall use the proceeds of the Loans in a manner not provided for under Section 7 hereof;<br><br>(j) The filing of a motion to approve post-Petition financing that will be secured by Liens on the Collateral that are equal or senior to the Liens granted to Lender in connection herewith;<br><br>(k) The Debtor shall fail to provide a Budget on a Budget Date, which failure is not cured by the Debtor within two (2) business days of the applicable Budget Date;<br><br>(l) Any challenge in a legal proceeding to the validity or |

| | enforceability of this Agreement, or any Financing Order or any term hereunder or thereunder; |
| | (m) The Bidding Procedures Order (as defined in the APA) shall not have been entered by the Bankruptcy Court on or prior to February 19, 2010; |
| | (n) The Sale Order approving the Sale to Buyer shall not have been entered by the Bankruptcy Court on or prior to March 19, 2010; and |
| | (o) (i) the Bankruptcy Court authorizes or approves an Alternative Transaction (as defined in the APA), or (ii) the Debtor withdraws or seeks authority to withdraw its motion seeking approval of the transactions contemplated by the APA. |

E. **Cash Management System and Use of DIP Loan**

25.     The Debtor proposes to use its cash and the proceeds of the DIP Loan to fund operations and maintain the "ordinary course" of the Business, and to administer the bankruptcy case up to the date of closing on the Sale (and to utilize the proceeds of the Sale to prepare and propose a plan).  The continued performance of the ordinary course operations of the Debtor at least through the closing of a Sale is critical to ensure the Debtor's ability to provide a distribution to creditors out of the proceeds of such Sale.  As set forth above, prior to the Petition Date, the Debtor had no loan facilities or other secured debt, except debt owed to Diversified and secured by certain equipment in the amount of approximately $1.1 million, and the secured loan of BNYH AMN Holdings, LLC and BNYH AMN Parallel Holdings, LLC (collectively, "**BNYH**") in the aggregate amount of $15,826,441.13 as of January 31, 2010.   BNYH has agreed to subordinate its secured lien to the lien of the Lender. Accordingly, the Debtor respectfully asserts that all or substantially all of the Debtor's cash, including cash in deposit and/or operational accounts, may be used by the Debtor in the administration of this bankruptcy case and in the ordinary course of the Debtor's Business without the need for approval of the Court pursuant to section 363 of the Bankruptcy Code.

26.     The use of cash and the DIP Loan post-petition, shall be in accordance with and pursuant to the cash management system outlined in the attached budget (the "**DIP Budget**") attached hereto as <u>Exhibit B</u>.

**F.      Compliance with Rule 4001-2 of the Local Rules**

27.     Rule 4001-2 of the Local Rules requires that certain provisions contained in the financing documents and/or Interim Order be highlighted, and that the Debtor must provide justification for the inclusion of such highlighted provision(s).  The Debtor believes that certain provisions of the DIP Loan implicate Local Rule 4001-2, and that such provisions are justified and necessary in the context and circumstances of this bankruptcy case.  Accordingly, the Debtor has set forth each of the sub-sections of Rule 4001-2 of the Local Rules and have detailed whether or not the DIP Documents, this Motion and/or DIP Orders contain or contemplate provisions which would fall within the ambit thereof:

- <u>Local Rule 4001-2(1)</u>:  This Motion and the DIP Orders sets forth the amount of credit the Debtor seeks to obtain, including any committed amount under the DIP Loan and Security Agreement.

- <u>Local Rule 4001-2(2)</u>:  This Motion describes all material conditions to closing and borrowing, including budget provisions.

- <u>Local Rule 4001-2(3)</u>:  This Motion describes all material pricing and economic terms, including letter of credit fees, commitment fees, any other fees, and the treatment of costs and expenses of the lender, any agent for the lender, and their respective professionals, in each case to the extent applicable.

- <u>Local Rule 4001-2(4)</u>:  The DIP Documents do not contemplate any effect on existing liens of the granting of collateral or adequate protection provided to the lender and any priority or superpriority provisions.

- <u>Local Rule 4001-2(5)</u>: This Motion describes any applicable carve-outs from liens or superpriorities;

- <u>Local Rule 4001-2(6)</u>:  The DIP Documents do not contemplate any cross-collateralization provision that elevates prepetition debt to administrative expense (or higher) status or that secures prepetition debt with liens on postpetition assets

(which liens the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law).

- <u>Local Rule 4001-2(7)</u>: The DIP Documents to not contemplate any roll-up provision which applies the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise has the effect of converting prepetition debt to postpetition debt.

- <u>Local Rule 4001-2(8)</u>: The DIP Documents to not contemplate any provision that would limit the Court's power or discretion in a material way, or would interfere with the exercise of the fiduciary duties, or restrict the rights and powers, of the trustee, debtor in possession, or a committee appointed under § 1102 or § 1114 of the Bankruptcy Code, or any other fiduciary of the estate, in connection with the operation, financing, use or sale of the business or property of the estate, but excluding any agreement to repay postpetition financing in connection with a plan or to waive any right to incur liens that prime or are pari passu with liens granted under § 364.

- <u>Local Rule 4001-2(9)</u>: This Motion describes the implementation and restrictions on the Debtor with respect to the use of proceeds under DIP Loan and Security Agreement as reflected in the DIP Budget.

- <u>Local Rule 4001-2(10)</u>: This Motion describes applicable events of default, any effect of termination or default on the automatic stay or the lender's ability to enforce remedies, any cross-default provision, and any events on which the availability of credit will cease.

- <u>Local Rule 4001-2(11)</u>: The DIP Documents do not contemplate any change-of-control provisions.

- <u>Local Rule 4001-2(12)</u>: This Motion describes any applicable provision establishing a deadline for, or otherwise requiring, the sale of property of the estate.

- <u>Local Rule 4001-2(13)</u>: The DIP Documents do not contemplate any provision that affects the debtor's right or ability to repay the financing in full during the course of the chapter 11 reorganization case.

- <u>Local Rule 4001-2(14)</u>: This rule is not applicable.

- <u>Local Rule 4001-2(15)</u>: This rule is not applicable.

## **Requested Relief and Basis Therefor**

28.     The Motion requests, pursuant to sections 105, 362, 364 and 507 of the

Bankruptcy Code and Rules 4001 and 9014 of the Bankruptcy Rules, entry of the proposed

Interim Order, attached as Exhibit C hereto, and Final Order, attached as Exhibit D hereto, authorizing (i) borrowing, with priority over administrative expenses (other than the Carve-Out as defined in the Security Agreement) and secured by liens on property of the Debtor's estate, on an interim basis in an amount up to $280,000, and on a final basis in the aggregate committed amount of $800,000, plus interest, fees and expenses of the Lender; (ii) modifying the automatic stay; and (iii) giving notice of the final hearing on the motion (the "**Final Hearing**").  Pending the Final Hearing, the DIP Loan will be implemented on an interim basis pursuant to the terms of the DIP Documents attached hereto as Exhibit A and the proposed Interim Order attached hereto as Exhibit C.

29.     The "**Collateral**" securing the DIP Loan shall include (each as defined in the Security Agreement) (i) all Accounts; (ii) all Inventory; (iii) all Equipment (subject to the Diversified Senior Lien); (iv) all Contract Rights; (v) all Chattel Paper, (vi) Instruments and Documents; (vii) all Intellectual Property; (viii) all General Intangibles; (ix) all Deposit Accounts; (x) all Goods; (xi) all Investment Property; (xii) all Letter of Credit Rights; (xiii) all Commercial Tort Claims; (xiv) to the extent not otherwise included, all rights, proceeds and payments under insurance with respect to any of the Collateral or otherwise of which the Debtor is the beneficiary; (xv) all other goods and real or personal property whether tangible or intangible, including without limitation, all other rights to payment not specified above, and whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, the Debtor and wherever located; (xvi) all books and records relating to any of the foregoing; and (xvii) to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing.

30.     The credit provided under the DIP Loan will enable the Debtor to continue to operate its Businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all parties in interest pending confirmation of a plan under section 1129 of the Bankruptcy Code.  The availability of credit under the DIP Loan will also provide confidence to the Debtor's creditors and counterparties that will enable and encourage them to continue their relationships with the Debtor.

31.     Finally, the implementation of the DIP Loan will be viewed favorably by the Debtor's remaining employees, dealers and vendors, thereby promoting consummation of a sale of all or substantially all of the Debtor's assets pursuant to and in accordance with the Sale Motion and, in turn, enabling the Debtor to provide a distribution to the Debtor's remaining creditors thereafter.   Accordingly, the timely approval of the relief requested herein is imperative.

### A.      The DIP Loan Should be Approved

32.     Bankruptcy Code section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in Bankruptcy Code section 503(b) or 507(b); (ii) secured by a lien on property of the estate that is not otherwise subject to a lien; or (iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

33.     The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See also In re Crouse Group Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).  Courts

have applied the following three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code:

> (i)     the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;
>
> (ii)    the credit transaction is necessary to preserve the assets of the estate; and
>
> (iii)   the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*Crouse Group*, 71 B.R. at 549.  As discussed below, each of these elements is satisfied.

### a.     <u>The Debtor is Unable to Obtain Unsecured Credit</u>

34.     The Debtor requires working capital financing, beyond the small amount of cash available to it from current operations, in order to preserve and maintain its Business during the bankruptcy case up to the date on which it consummates the Sale pursuant to the Sale Motion.  In making the decision to sell its assets under section 363 of the Bankruptcy Code, and seek financing as a part of that transaction, the Debtor considered many factors.

35.     First, in order to complete a sale of its assets and create value for the Debtor's creditors, the Debtor would need financing.  The only parties willing to discuss and negotiate the terms of financing for the continued operation of the Debtor's Business and to fund the administration of a bankruptcy case so as to preserve value for creditors were those parties who had an interest in purchasing the Debtor's assets.  As explained above, prior to and simultaneously with exploring the possibility of selling its assets, the Debtor sought additional financing without having to sell assets.  The Debtor was not able to secure any such "stand-alone" financing.

36.     Second, in light of the Debtor's inability to obtain alternative post-petition financing proposals from other lenders through credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under sections 364(a) and 364(b) of the Bankruptcy Code, or credit secured by liens on the Debtor's assets junior to the pre-petition liens, as is contemplated by section 364(c)(3) of the Bankruptcy Code, the Debtor does not believe that any lender would be willing to loan new money to the Debtor other than on terms similar to (or worse than) those contained in the DIP Loan and Security Agreement

37.     In short, the Debtor determined that a consensual DIP Loan with the proposed Buyer will save expense, time, and costly valuation litigation at the outset of this chapter 11 cases, thereby allowing the Debtor to preserve value and focus on the Sale of its assets in an effort to provide a distribution to those creditors who are not otherwise satisfied as part of the assumption of liabilities by Lender pursuant to the Asset Purchase Agreement.  Moreover, the obligations of the Debtor under the DIP Loan will be released upon consummation of the Sale and automatic satisfaction of the amounts owed thereunder.

38.     Accordingly, the Debtor has determined that the DIP Loan offered by the Lender as part of its overall bid for the Debtor's assets is the best and only option for post-petition financing.

   **b.     The Transactions Under the DIP Documents are Necessary to Preserve the Estate**

39.     Without access to post-petition financing, the Debtor will be unable to operate the Business as a going concern, which would, in turn, significantly impair the value of the Debtor's assets and jeopardize the Debtor's ability to sell its assets to the detriment of all

creditor constituencies. The Debtor has very little cash and, as described above, almost no liquidity with which to consummate the Sale.

40. By obtaining the DIP Loan, the Debtor will be in a position to preserve the value of its assets during the chapter 11 process for the benefit of all creditors and work towards confirming a plan. It is vital to the success of the bidding process outlined under the Sale Motion and confirmation of a plan that the Debtors obtain approval to immediately access the DIP Loan, on an interim and final basis, as contemplated by the DIP Loan and Security Agreement.

41. Absent approval of the relief sought herein, the Debtor faces a substantial risk of irreparable damage to the value of its assets and the probability of conversion of the bankruptcy case to a case under chapter 7 without the ability to sell its assets in an orderly manner for the benefit of the Debtor's creditors. *See In re Sun Healthcare Group, Inc.*, 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to "permit the Debtors to continue to operate to preserve their estates"). Accordingly, the Debtor needs sufficient liquidity to avoid a forced liquidation of their assets on a "fire-sale" basis to the detriment of all creditors.

c.      **The Terms of the DIP Loan are Fair and Reasonable**

42. Moreover, the terms of the DIP Loan are fair and reasonable under the circumstances, particularly given the current economic and lending environment. As discussed above, the Debtor made efforts to obtain credit on the most favorable terms available while simultaneously considering whether the bid made by the potential lender (and buyer) for its assets was the highest and best during the pre-petition process, in order to maximize return for the creditors of the Debtor.

43.     Against this backdrop, the Debtor engaged in negotiations with the Lender regarding the proposed terms, worked with its advisors to obtain the best possible terms from the Lender and, eventually, reached an agreement with the Lender, not only for the provision of the DIP Loan, but also for the Sale of the Debtor's assets and for a consensual competitive bidding process as outlined in the Sale Motion and Asset Purchase Agreement.  Thus, the terms and conditions of the DIP Loan and Security Agreement were negotiated by the parties in good faith and at arms' length and, as outlined above, were instituted for the purpose of enabling the Debtor to meet ongoing operational expenses while in chapter 11 to preserve the going concern status of the Debtor as well as the value of the Collateral for the Sale of the assets pursuant to the Sale Motion.

44.     A debtor need only demonstrate that, notwithstanding its good faith efforts, credit was unavailable without the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.  *See Bray v. Shenandoah Fed. Savs. & Loan Assoc.* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (noting that, although "the debtor must make an effort to obtain credit" it does not need "to seek alternate financing from every possible lender.").  In short, the Debtor concluded that adequate alternative financing terms more favorable than those to be provided under the DIP Documents by the Lender as part of an overall Sale transaction, are currently unavailable.

45.     Moreover, the Debtor believes that, in its business judgment, entry into the DIP Documents is in its best interests.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  *See, e.g., Trans World*

*Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994), *rev'd on other grounds* by 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *see also Funding Sys. Asset Mgmt. Corp. v. Key Capital Corp. (In re Funding Sys. Asset Mgmt. Corp.)*, 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

46.     Accordingly, the Debtor respectfully asserts that its has satisfied the requirements of sections 364(c) and (d) of the Bankruptcy Code, that alternative credit on more favorable terms was and is unavailable to the Debtor, and requests that the Court enter the Interim Order approving the DIP Loan and Security Agreement and related DIP Documents to immediately preserve the Debtor's estate, and enter the Final Order to ensure that the Debtor's estate is maintained through the consummation of the Sale.

**B.      The Debtor is Not Required to Provide Adequate Assurance Payments**

47.     As stated above, there are only a few discrete assets of the Debtor which are subject to existing liens and secured claims, including specifically computer and media equipment owned by the Debtor and valued at significantly more than the $565,293 DMG Lien.

48.     The Lender has agreed that it will be given a lien on these discrete assets which is junior in priority to any existing lien thereon. Accordingly, the Debtor respectfully

asserts that the lienholders on such assets do not require adequate assurance payments or other forms of adequate protection with respect to their interested therein since no senior lien is sought to be placed thereon pursuant to this Motion.

49.     BNYH has a secured lien on all assets of the Debtor, but has agreed to subordinate its lien, allow the Lender to purchase the Assets, and ultimately waive its debt entirely upon entry of the Final Order and a Sale Order in favor of the Buyer.

## C.     The Automatic Stay Should Be Modified on a Limited Basis

50.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.  The Debtor further requests that the automatic stay be vacated and modified, to the extent necessary, to permit the Lender, to exercise, immediately upon the occurrence of an Event of Default or otherwise as prescribed therein, all rights and remedies under the DIP Documents or the Interim Order or Final Order, as applicable.[5]

51.     Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

---

[5]   In any hearing regarding the Lender's exercise of rights or remedies in accordance with the DIP Documents, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtor hereby waives any right to seek relief, including without limitation, under Bankruptcy Code section 105, to the extent such relief would in any way impair or restrict the rights and remedies of the Lender set forth in the Interim Order or Final Order, as applicable, or the DIP Documents.

**D.** **Interim Approval Should Be Granted**

52.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

53.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtor requests that the Court conduct an expedited preliminary hearing on this motion and (i) authorize the Debtor to borrow up to $280,000 under and subject to the terms of the DIP Loan and Security Agreement on an interim basis, pending entry of a final order, in order to (a) maintain and finance the ongoing operations of the Debtor; (b) fund the administration of this case; and (c) avoid immediate and irreparable harm and prejudice to the Debtor's estate, business operations and all parties in interest, and (ii) schedule the Final Hearing.

54.     The Debtor has an urgent and immediate need for cash to continue to operate. Currently, the Debtor does not have sufficient funds with which to operate its business on an ongoing basis.  Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtor will be immediately and irreparably harmed.  The availability of interim loans under the DIP Loan and Security Agreement will provide necessary assurance of the Debtor's ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtor's Business, to the detriment of all parties in interest.  Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating its reorganization efforts.

## Notice

55.     The Debtor shall serve notice of this Motion on the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee for the Southern District of New York; (ii) Access 360 Media, Inc., as Lender; (iii) Sheppard, Mullin, Richter, & Hampton (Attn: Carren B. Shulman), as counsel for the Lender; (iv) the holders of the 20 largest unsecured claims as set forth in the consolidated list filed with the Debtor's petitions, including BNYH and Diversified; (v) any known party interested in purchasing the Debtor's assets; (vi) the Office of the United States Attorney General for the Southern District of New York; (vii) the Internal Revenue Service and all other applicable federal, state and local taxing authorities; and (viii) all known holders of liens, encumbrances, or security interests in the Collateral.  The Debtor submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

## No Prior Request

56.     No prior request for the relief sought in this Motion has been made to this or any other court.

## Conclusion

WHEREFORE, the Debtor respectfully requests that the Court enter the Interim Order, substantially in the form attached hereto as <u>Exhibit C</u>, (i) approving the Debtor's post-petition financing; (ii) authorizing the Debtors' use of cash collateral; (iii) granting adequate protection; (iv) modifying the automatic stay; (v) scheduling a Final Hearing; and (vi) granting such other and further relief as the Court deems appropriate.

Dated:   February 8, 2010
        New York, NY

KLESTADT & WINTERS, LLP

*/s/ Ian R. Winters*
Ian R. Winters, Esq.
Klestadt & Winters, LLP
292 Madison Avenue, 17th Floor
New York, NY 10017-6314
Tel. (212) 972-3000 ext. 101
Fax. (212) 972-2245

*Proposed Counsel for the Debtor and Debtor-in-Possession*

**<u>Exhibit A</u>**

**(DIP Loan and Security Agreement)**

# LOAN AND SECURITY AGREEMENT

This **LOAN AND SECURITY AGREEMENT** (this "**Agreement**"), dated as of February __, 2010, by and between Arena Media Networks, LLC, a New York limited liability company and debtor and debtor-in-possession ("**Borrower**"), and Access 360 Media Networks, Inc., a New York corporation ("**Lender**").

## R E C I T A L S:

**WHEREAS**, on February 8, 2010 (the "**Petition Date**"), the Borrower filed in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") a voluntary petition (the "**Petition**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and is continuing in the possession of its assets and in the management of its business pursuant to sections 1107 and 1108 of the Bankruptcy Code (the "**Chapter 11 Case**");

**WHEREAS**, the Borrower, BNYH AMN Holdings, LLC ("**BNYH1**") and BNYH AMN Parallel Holdings, LLC ("**BNYH2**" and together with BNYH1, "**BNYH**") are parties to a Securities Purchase and Loan Agreement dated October 31, 2007, as amended, modified or supplemented from time to time (the "**BNYH Loan Documents**", pursuant to which BNYH has made various loans and advances to Borrower in an aggregate amount (including principal, accrued interest and fees) of $15,826,441.13 as of January 31, 2010 (the "**Prepetition Loan**")

**WHEREAS**, the Prepetition Loan is secured by a blanket lien on substantially all of the Borrower's assets pursuant to the terms and conditions of the BNYH Loan Documents;

**WHEREAS**, the Borrower and Diversified Media Group, LLC ("**Diversified**") are parties to an agreement dated March 6, 2009, pursuant to which Borrower granted to Diversified a lien and security interest the equipment listed on Schedule 1 hereto owned by the Borrower to secure payment for certain amounts due and owing by Borrower to Diversified on account of goods sold and delivered and services rendered by Diversified (the "**Diversified Lien**");

**WHEREAS**, as of the Petition Date, the sum of $1,130,586 remains due and owing by Borrower to Diversified on account of such goods sold and delivered and services rendered;

**WHEREAS**, the Borrower desires to sell, and the Lender desires to purchase, certain assets and assume certain obligations associated with the ownership and operation of the Borrower's business free and clear of all liens, claims and encumbrances (the "**363 Sale**"), all in the manner and subject to the terms and conditions set forth in the Asset Purchase Agreement, dated as of February 8, 2010, by and between the Borrower and the Lender (the "**APA**"), and in accordance with, among other provisions, section 363 of the Bankruptcy Code;

**WHEREAS**, the Borrower has requested that the Lender provide a senior priority, perfected secured term loan (the "**Loans**") in an aggregate principal amount not to exceed $800,000 (the "**Commitment Amount**") (such amount, or so much thereof as may be

outstanding from time to time under this Note, the "**Principal Amount**") at any time outstanding;

   **WHEREAS**, in order to induce the Lender to enter into this Agreement, the Borrower is willing to enter into the 363 Sale and make certain representations and warranties to, and covenants and agreements with, the Lender; and

   **WHEREAS**, the Lender is willing to make the Loans available to the Borrower for the purposes specified herein, only on the terms and subject to the conditions set forth in this Agreement (as the same may from time to time be amended, modified or supplemented).

   **NOW, THEREFORE**, in consideration of the premises and in order to induce Lender to make the Loans to the Borrower, the parties agree as follows:

  1.  **Definitions**.

   1.1  <u>Definitions</u>.  Capitalized words and terms used herein and not otherwise defined shall have the following meanings:

   "**363 Sale**" shall have the meaning assigned to such term in the recitals.

   "**Account Debtor**" means any "account debtor," as such term is defined in the applicable section of the UCC.

   "**Accounts**" means any "account," as such term is defined in the applicable section of the UCC, now owned or hereafter acquired by the Borrower and, in any event, shall include, without limitation, all accounts receivable, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to the Borrower (including, without limitation, under any trade name, style or division thereof) whether arising out of goods sold or services rendered by the Borrower or from any other transaction, whether or not the same involves the sale of goods or services by the Borrower (including, without limitation, any such obligation which may be characterized as an account or contract right under the UCC) and all of the Borrower's rights in, to and under all purchase orders or receipts now owned or hereafter acquired by it for goods or services, and all of the Borrower's rights to any goods represented by any of the foregoing (including, without limitation, unpaid seller's rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), and all moneys due or to become due to the Borrower under all purchase orders and contracts for the sale of goods or the performance of services or both by the Borrower (whether or not yet earned by performance on the part of the Borrower or in connection with any other transaction), now in existence or hereafter occurring, including, without limitation, the right to receive the proceeds of said purchase orders and contracts, and all collateral security and guarantees of any kind given by any person with respect to any of the foregoing.

   "**Agreement**" shall have the meaning assigned to such term in the preamble.

   "**APA**" shall have the meaning assigned to such term in the recitals.

"**Approved Sale**" shall mean a sale of Collateral by the Borrower and consented to by the Lender in its sole discretion.

"**Bankruptcy Code**" shall have the meaning assigned to such term in the recitals.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals.

"**BNYH**" shall have the meaning assigned to such term in the recitals.

"**BNYH Loan Documents**" shall have the meaning assigned to such term in the recitals.

"**Borrower**" shall have the meaning assigned to such term in the preamble.

"**Budget**" shall have the meaning assigned to such term in the Section 8 hereof.

"**Budget Date**" shall have the meaning assigned to such term in the Section 8 hereof.

"**Carve Out**" shall mean the following amounts which shall be payable from the Loans and chargeable against the Collateral prior to the liens and security interests that are granted to the Lender hereunder: (i) the unpaid fees due and payable to the Clerk of the Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, and (ii) the allowed professional fees and expenses of Borrower's counsel, as set forth in the Budget.

"**Chapter 11 Case**" shall have the meaning assigned to such term in the recitals.

"**Chapter 11 Plan**" shall have the meaning assigned to such term in the Section 15.2(h) hereof.

"**Chattel Paper, Instruments and Documents**" shall mean any and all chattel paper, instruments, securities, bills of lading, warehouse receipts and other documents of title (all as defined in the applicable UCC sections, if any) and documents of any kind now existing or hereafter acquired or arising, whether arising from or related to the disposition of Inventory, Equipment, or otherwise, and all rights now or hereafter existing in and to all security agreements, leases, securities, letters of credit and other contracts, documents and instruments securing or otherwise relating to any such accounts, rights or instruments (all as defined in the applicable UCC sections, if any).

"**Collateral**" shall have the meaning assigned to such term in Section 15.1 hereof.

"**Commercial Tort Claims**" shall have the meaning given to it in the applicable section of the UCC. The Borrower represents that there are no pending or threatened Commercial Tort Claims as of the date hereof.

"**Commitment Amount**" shall have the meaning assigned to such term in the recitals.

"**Contract Rights**" means any and all of the Borrower's right, title, estate and interest in and to all contracts, contract rights, undertakings, or other agreements, whether written or oral (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which the Borrower may now or hereafter have any right, title or interest, including, without limitation, with respect to an Account, any agreement relating to the terms of payment or the terms of performance thereof.

"**Default**" shall mean an event which, with the giving of notice, lapse of time or both would become an Event of Default.

"**Deposit Accounts**" shall mean any and all "deposit accounts," as such term is defined in the applicable section of the UCC, now owned or hereafter acquired by the Borrower. On the Petition Date, the Borrower will close all deposit accounts in existence on the date hereof and transfer all amounts held in such deposit accounts and all Loan proceeds hereunder to a debtor-in-possession deposit account.

"**Diversified**" shall have the meaning assigned to such term in the recitals.

"**Equipment**" means any "equipment," as such term is defined in the applicable section of the UCC, now owned or hereafter acquired by the Borrower and used by the Borrower at any location.

"**Event of Default**" shall have the meaning assigned to such term in <u>Section 16</u> hereof.

"**Final DIP Order**" shall have the meaning assigned to such term in <u>Section 14.1</u> hereof.

"**Financial Covenant**" shall have the meaning assigned to such term in the <u>Section 12</u>.

"**Financing Orders**" shall have the meaning assigned to such term in <u>Section 14.1</u> hereof.

"**General Intangibles**" shall have the meaning given to it in the applicable section of the UCC.

"**Goods**" shall have the meaning given to it in the applicable section of the UCC.

"**Instruments**" means any "instrument," as such term is defined in the applicable section of the UCC now owned or hereafter acquired by the Borrower, including, without limitation, all notes, certificated securities, and other evidences of indebtedness.

"**Initial Loans**" shall have the meaning assigned to such term in the <u>Section 14.2</u> hereof.

"**Intellectual Property**" means any and all of the Borrower's right, title, estate and interest, whether now existing or hereafter acquired, in and to all corporate and other business records in any form, including in form for use by computers or data processing machines; royalties, patents, inventions, copyrights, trade secrets and other confidential information relating to the business of the Borrower, including, without limitation, each and every kind of know-how practiced by the Borrower and its employees; licenses, customer lists, advertising, marks, designs, logos, slogans, indicia, corporate names, company names, business names, fictitious business names, trade names, trade styles and registrations issued with respect to any of the foregoing used in the Borrower's business or in which the Borrower otherwise has an interest; and all other information of any kind or character, whether or not reduced in writing, with respect to the conduct by the Borrower of its businesses not generally known by the public; and the goodwill associated with the foregoing, including, without limitation, all Intellectual Property identified in the APA.

"**Interim DIP Order**" shall have the meaning assigned to such term in Section 14.1 hereof.

"**Internal Revenue Code**" shall have the meaning assigned to such term in the Section 11.

"**Inventory**" means any "inventory," as such term is defined in the applicable section of the UCC, wherever located, now or hereafter owned or acquired by, the Borrower and, in any event, shall include, without limitation, all inventory, merchandise, goods and other personal property which are held by or on behalf of the Borrower for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process or materials used or consumed or to be used or consumed in the Borrower's business, or the processing, packaging, promotion, delivery or shipping of the same, and all finished goods, whether or not such inventory is listed on any schedules, assignments or reports furnished to the Agent from time to time and whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of the Borrower or is held by the Borrower or by others for the Borrower's accounts, including, without limitation, all goods covered by purchase orders and contracts with suppliers and all goods billed and held by suppliers and all inventory which may be located on premises of the Borrower or of any carriers, forwarding agents, truckers, warehousemen, vendors, selling agents or other persons.

"**Investment Property**" shall have the meaning given to it in the applicable section of the UCC.

"**Lender**" shall have the meaning assigned to such term in the preamble.

"**Letter of Credit Rights**" shall have the meaning given to it in the applicable section of the UCC.

"**Lien**" shall mean any lien, mortgage, encumbrance, pledge, charge, lease, easement, servitude, right of others or security interest of any kind, including any thereof arising under any conditional sale or other title retention agreement.

"**Loan Documents**" shall have the meaning assigned to such term in the <u>Section 14.3</u> hereof.

"**Loan Request**" shall have the meaning assigned to such term in the <u>Section 2</u> hereof.

"**Loans**" shall have the meaning assigned to such term in the recitals.

"**Maturity Date**" shall have the meaning assigned to such term in the <u>Section 3</u> hereof

"**Permitted Liens**" shall have the meaning assigned to such term in the <u>Section 15.4(a)</u> hereof.

"**Petition**" shall have the meaning assigned to such term in the recitals.

"**Petition Date**" shall have the meaning assigned to such term in the recitals.

"**Prepetition Loan**" shall have the meaning assigned to such term in the recitals.

"**Principal Amount**" shall have the meaning assigned to such term in the recitals.

"**Proceeds**" means "proceeds," as such term is defined in the applicable section of the UCC and, in any event, shall include, without limitation, (i) any and all accounts, chattel paper, deposit accounts, instruments, cash and other proceeds, payable to the Borrower from time to time in respect of the Collateral, (ii) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Borrower from time to time with respect to any of the Collateral, (iii) any and all payments (in any form whatsoever) made or due and payable to the Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), (iv) any claim of the Borrower against third parties (a) for past, present or future infringement of any patent or patent license or (b) for past, present or future infringement or dilution of any trademark or trademark license or for injury to the goodwill associated with any trademark, trademark registration or trademark licensed under any trademark license, (v) any recoveries by the Borrower against third parties with respect to any litigation or dispute concerning any of the Collateral including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral, and (vi) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral. In addition, the term "Proceeds" shall include, without limitation, all accounts, chattel paper, deposit accounts, instruments, equipment, inventory, consumer goods, farm products, documents, general intangibles and other proceeds which arise from the sale, lease, transfer or other use or disposition of any kind of Collateral or proceeds and all proceeds of any type described above acquired with cash proceeds.

"**Secured Obligations**" means all indebtedness and other liabilities and obligations (performance or otherwise) of the Borrower to Lender hereafter arising pursuant to this Agreement, each as amended, modified, restated, refinanced, renewed or extended from time

-6-

to time, including, without limitation, the indebtedness evidenced thereby and hereby. The term includes, without limitation, all principal, interest, fees, premiums, charges, expenses, reasonable attorneys' fees and any other sums owing by the Borrower under this Agreement.

"**UCC**" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of the Lender's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions related to such provisions.

2.      **Borrowings**.  Borrower shall provide written request (a "**Loan Request**"), together with telephonic notice thereof, to Lender on or before 12:00 noon (Eastern time) at least two (2) business days prior to the requested date of any borrowing stating the amount requested and containing a certification of the chief executive officer of Borrower stating that no Event of Default (as defined below) has then occurred and is continuing.  Lender shall advance the amount requested in such Loan Request provided that (a) no Event of Default has occurred and is continuing at the time the Loan Request is made and at the time the advance is made, (b) the aggregate Principal Amount outstanding under this Note, after giving effect to the requested advance in such Loan Request, does not exceed the Commitment Amount, (c) the amount of the Loan requested in such Loan Request does not exceed the difference between (i) the amount needed by the Borrower to satisfy its expenditures for the ten (10) business day period following the date of such Loan Request, as set forth in the then current Budget, and (ii) the amount of the Borrower's cash balance as of the date of such Loan Request and (d) all of the conditions precedent for Initial Loan and each successive Loan set forth in Section 14 have been satisfied.  .

3.      **Repayment**.  Subject to the acceleration and termination provisions set forth in Section 15, the Obligations shall be due and payable in full on the earlier of March 31, 2010 or the Closing Date (as defined in the APA) (the "**Maturity Date**").

4.      **Interest**.  The outstanding principal balance of this Note shall bear interest at a per annum rate equal to (i) the prime rate published in the Wall Street Journal (Eastern Edition) as of the date hereof *plus* (ii) 175 basis points, computed on the basis of a 360-day year, actual days elapsed, payable in full on the Maturity Date.

5.      **Place of Payment**.  All amounts payable hereunder shall be payable by wire transfer to Lender in accordance with wire transfer instructions to be separately provided to Borrower in writing, unless another manner of payment shall be specified in writing by Lender.

6.      **Application of Payments**.  Payment on the Secured Obligations shall be applied first to accrued interest, if any, second, to fees and expenses of the Lender, third, to the outstanding Principal Amount, and thereafter to any other Secured Obligations.

7.      **Use of Proceeds**.  The Borrower covenants that, without the prior written consent of the Lender (which may be withheld in its sole discretion), the funds from the Loans shall be used solely for working capital needs, general corporate purposes, the costs and expenses

(including expenses of administration) associated with the Chapter 11 Case, and the payment of fees and expenses of the Lender payable hereunder, in each case, in accordance with the Budget.

8.      **Budget**.  On the date hereof and on each Monday after the date hereof (each such date, a "**Budget Date**"), the Borrower shall provide the Lender with a 6-week budget in form, detail and substance acceptable to the Lender (the "**Budget**"), that covers the projected expenses, disbursements, receipts and revenues for each week during such 6-week period immediately subsequent to such Budget Date.  The Borrower covenants and agrees that, subject to the receipt of the prior written consent of the Lender, no payments shall be made by the Borrower that exceed ten percent (10%) of any line-item amount set forth in the Budget.  The initial 6-week Budget is attached hereto as Exhibit A.

9.      **Fees and Expenses**.  The Borrower shall pay for all reasonable costs and expenses incurred by Lender in connection with the Loans, the Loan Documents, the enforcement or preservation of rights and remedies under the Loan Documents, and the prosecution or defense of any investigation, litigation or proceeding arising out of, related to, or in connection with the Secured Obligations, this Agreement, the other Loan Documents, and any Financing Orders.  Such fees and expenses shall be included in the Loans payable on the Maturity Date, but shall not count against the aggregate DIP Commitment.

10.     **Collateral Sales, Equity Issuance and Indebtedness Proceeds**.  The Borrower will not sell, assign, transfer, hypothecate or encumber all or any portion of the Collateral without the prior written consent of the Lender.  The proceeds of (a) the sale or other disposition of Collateral (including the sale or other disposition of property, whether directly or indirectly and including by way of a sale of the Borrower's business (including by way of a Section 363 sale or as part of a Chapter 11 Plan), that had been included in the Collateral (even if the Loans have been repaid) (subject only to the final sentence of this Section 10)); (b) any issuance of equity securities by the Borrower; or (c) any incurrence of indebtedness for borrowed money, in each case, net only of the expenses directly attributable thereto excluding any commission, incentive or similar fee payable to any broker or investment banker in connection therewith ("**Net Proceeds**"), shall, upon the Borrower's receipt, be paid to the Lender to be applied pursuant to Section 5 to reduce the Secured Obligations.  For the avoidance of doubt, while no Event of Default exists, Collateral consisting of cash accounts receivable and inventory created in the ordinary course of business may be used by the Borrower in the ordinary course of its business.

11.     **Existing Ownership**.  The Borrower shall not, without the prior express written consent of the Lender, (a) issue any equity securities, (b) cancel any authorized equity securities or (c) alter existing membership structure, or take any other action, so as to further or cause an ownership change within the meaning of Section 382 of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**").  Upon acquiring information or knowledge that any person or entity may take action to become a "5% shareholder" within the meaning of Section 382 of the Internal Revenue Code, the Borrower shall immediately advise the Lender of such circumstance, shall consult in good faith with the Lender as to any commercially reasonable actions that the Borrower may take to prevent such person or entity becoming a "5% shareholder," and shall take any and all such commercially reasonable actions mutually agreed upon with the Lender.

12.      **Financial Covenants**.  The Borrower must maintain its cash receipts and disbursements in accordance with the Budget (the "**Financial Covenant**") as provided for in Section 8 hereof.

13.      **Access to Books and Records**.  The Borrower shall permit any authorized representative of the Lender to inspect any of their properties and books and records, including financial and accounting records, and to make copies and take extracts therefrom, all upon reasonable notice at such reasonable times and as often as may be reasonably requested; provided, that the Lender shall not unreasonably interfere with the Borrower's operations.

14.      **Conditions Precedent**.  The Lender's obligation to make the initial and each successive Loan hereunder is subject to the satisfaction of the following conditions precedent:

14.1      Interim and Final Orders.  (a) With respect to Lender's obligation to fund the Initial Loans (as defined below), the Bankruptcy Court shall have entered the Interim DIP Order in the form of Exhibit B attached hereto (the "**Interim DIP Order**"), with such modifications as are acceptable to Lender in its sole and absolute discretion, on or before February 10, 2010; (b) with respect to Lender's obligation to fund additional Loans hereunder, the Bankruptcy Court shall have entered the Final DIP Order in the form of Exhibit C attached hereto (the "**Final DIP Order**"), with such modifications as are acceptable to Lender in its sole and absolute discretion, on or before February 26, 2010; and (c) the Bankruptcy Court shall have entered such other financing orders requested by the Lender authorizing the Borrower to enter into this Agreement and to perform all of its obligations set forth therein, all in form and substance satisfactory to Lender (collectively, the "**Financing Orders**").  Such Financing Orders shall be in full force and effect and shall not have been amended, stayed or vacated.

14.2      Initial Loans.  Upon entry of the Interim DIP Order but prior to the entry of the Final DIP Order, subject to the terms and conditions herein, the Borrower may request one or more initial Loans ("**Initial Loans**") in an aggregate amount not to exceed Two Hundred Eighty Thousand Dollars ($280,000.00).

14.3      Loan Documents.  The Borrower shall have executed and delivered to the Lender this Agreement and such other documents necessary to grant to the Lender a perfected first priority security interest in and lien on the Collateral (which liens shall prime all other liens as set forth in detail in Section 6), and such other documents, instruments and agreements reasonably requested by the Lender, all in form and substance satisfactory to the Lender (collectively, the "**Loan Documents**").

14.4      Subsequent Loans.  Upon entry of the Final DIP Order, and subject to the terms and conditions herein, the Borrower may borrow subsequent Loans in an aggregate amount, together with the Initial Loans advanced, not to exceed the Commitment Amount.  As conditions to borrowing subsequent Loans, (i) the Final DIP Order shall approve and authorize Loans in the aggregate amount of Eight Hundred Thousand Dollars ($800,000.00), plus the interest, fees and

expenses of the Lender, (ii) the Borrower shall have submitted a Loan Request to the Lender requesting the Lender to make Loans in the amount of such subsequent Loan, or such other amount equal to the Lender's expenses incurred to the date of the Loan Request, which Loans shall be used by the Borrower to reimburse the Lender for such expenses, and (iii) the Borrower shall be in compliance with the Financial Covenant.

14.5    No Defaults.  No Default or Event of Default shall have occurred and be continuing or would result from the proposed borrowing.

14.6    Representations and Warranties.  All representations and warranties contained herein shall be true and correct in all material respects on and as of the date of each Loan Request and each related subsequent advance (or if such representation or warranty expressly relates to an earlier date, then as of such earlier date).

15.    **Security Agreement**.

15.1    Grant of Security Interest.  As security for the prompt and complete payment and performance when due of all the Secured Obligations, the Borrower hereby assigns, conveys, mortgages, pledges, hypothecates and transfers to the Lender, and hereby grants to Lender a security interest in and continuing lien on, all of the Borrower's right, title and interest in, to and under all real, personal, tangible, intangible, or mixed property, whether now owned or hereafter acquired in fee simple or leased by the Borrower, including, without limitation all bank accounts, deposits and cash, wherever located, and all proceeds (including the proceeds of any asset sales to third parties), products, rents, revenues and profits of any of the foregoing, all causes of action (except causes of action of Borrower's debtor estate under Chapter 5 of the Bankruptcy Code), and including, but not limited to the following, in each case now owned or at any time hereafter acquired by the Borrower or in which the Borrower now has or at any time in the future may acquire any right, title or interest (collectively, the "**Collateral**"), which assignment, conveyance, mortgage, pledge, hypothecation, transfer and security interest shall be subject to the priorities set forth in Section 2.2 hereof and the Interim DIP Order and, when applicable, the Final DIP Order:

(a)    all Accounts;

(b)    all Inventory;

(c)  all Equipment (except that the security interest granted hereunder on the Equipment subject to the Diversified Lien shall be subordinate to the Diversified Lien[1] in an amount up to $565,293.00 (the "**Diversified Senior Lien**"));

(d)  all Contract Rights;

(e)  all Chattel Paper, Instruments and Documents;

(f)  all Intellectual Property;

(g)  all General Intangibles;

(h)  all Deposit Accounts;

(i)  all Goods;

(j)  all Investment Property;

(k)  all Letter of Credit Rights;

(l)  all Commercial Tort Claims;

(m)  to the extent not otherwise included, all rights, proceeds and payments under insurance with respect to any of the Collateral or otherwise of which the Borrower is the beneficiary;

(n)  all other goods and real or personal property whether tangible or intangible, including without limitation, all other rights to payment not specified above, and whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, the Borrower and wherever located;

(o)  all books and records relating to any of the foregoing; and

(p)  to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing.

15.2  Certain Bankruptcy Matters; Superpriority of Obligations; Priming Liens.  Except to the extent otherwise provided in the Financing Orders, as the case may be, the Borrower hereby agrees as follows:

(a)  The Secured Obligations shall be secured by a Lien against the Collateral pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, senior

---

[1] Diversified has consented to reduce the amount of Borrower's indebtedness from $1,130,586 by fifty percent to $565,293 upon entry of a Sale Order in favor of the Lender as Buyer.  Pending entry of the Sale Order Diversified has consented to subordinate such amount of the indebtedness to Lender's lien.

to all other Liens including, without limitation, those granted to the Prepetition Lender in connection with the Prepetition Loan), other than the Carve Out and the Diversified Senior Lien.

(b) The Secured Obligations shall have the status in the Chapter 11 Case of superpriority administrative expenses under section 364(c)(1) of the Bankruptcy Code. Subject to the Carve Out and the Diversified Senior Lien, such administrative claim shall have priority over all other claims, costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of the Borrower, its estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code.

(c) The Lender's Lien on the Collateral under sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, for the benefit of the Lender, and the superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code afforded the Secured Obligations shall be subject only to the Carve Out and the Senior Diversified Lien.

(d) Subject to the provisions of this <u>Section 15.2</u>, the Borrower shall be permitted to pay in accordance with the Budget as the same may become due and payable and the Lender shall fund (i) administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code incurred in the ordinary course of Borrower's business and (ii) compensation and reimbursement of expenses to professionals allowed or otherwise permitted to be paid by the Bankruptcy Court and payable under sections 330 and 331 of the Bankruptcy Code.  Except for the Carve Out, no costs or expenses of administration shall be imposed against Lender or any of the Collateral under sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and, subject to entry of the Final DIP Order, The Borrower hereby waives, for itself and on behalf of its estate in bankruptcy, any and all rights under sections 105, 506(c) or 552, or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the Lender.

(e) On behalf of itself and its estate, and for so long as any Secured Obligation shall be outstanding, the Borrower hereby irrevocably waives any right, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the Secured Obligations or to approve a claim of equal or greater priority than the Secured Obligations (other than the Carve Out and the Diversified Senior Lien).

(f) Upon the maturity (whether by acceleration or otherwise) of any of the Secured Obligations under this Agreement, the Lender shall be entitled to immediate payment of such Secured Obligations without further application to, or order of, the Bankruptcy Court.

(g) Upon entry by the Bankruptcy Court of the Interim DIP Order, Lender's Lien on the Collateral shall be deemed to be a legal, valid and perfected Lien, senior to all other prior Liens other than the Carve Out and the Diversified Senior Lien.  Upon the entry by the Bankruptcy Court of the Interim DIP Order, no additional filings or recordings shall be necessary to perfect the security interests created in the Collateral under the Security Agreement

and Lender shall not be required to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Lien on the Collateral granted pursuant to the Security Agreement or any other Loan Document.

(h)     The Borrower agrees that unless the Secured Obligations are paid and otherwise satisfied in full on for before confirmation of the Borrower's plan under chapter 11 of the Bankruptcy Code ("**Chapter 11 Plan**") (i) the Secured Obligations hereunder shall not be discharged by the entry of an order confirming a Chapter 11 Plan in the Chapter 11 Case (and the Borrower, pursuant to section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the superpriority administrative claims granted to Lender pursuant to the Interim DIP Order and Final DIP Order shall not be affected in any manner by the entry of an order confirming a Chapter 11 Plan in the Chapter 11 Case.

15.3     <u>Grantor Liable.</u>

(a)     It is expressly agreed by the Borrower that, anything herein to the contrary notwithstanding, the Borrower shall remain liable under each of its agreements included in the Collateral to observe and perform all the conditions and obligations to be observed and performed by it thereunder and the Borrower shall comply and perform with or pursuant to the terms and provisions of each such agreement.  The Lender shall not have any obligation or liability under any agreement included in the Collateral by reason of or arising out of this Agreement or the granting to the Lender of a security interest therein or the receipt by the Lender of any payment relating to any agreement included in the Collateral pursuant hereto, nor shall the Lender be required or obligated in any manner to perform or fulfill any of the obligations of the Borrower under or pursuant to any agreement included in the Collateral, or to make any payment, or to make any inquiry as to the nature or the sufficiency of any payment received by it or the sufficiency of performance by any party under any agreement included in the Collateral, or to present or file any claim, or to take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.  Upon entry of the Interim DIP Order, the Borrower waives any rights under section 506(c) of the Bankruptcy Code respecting the Collateral.

(b)     The Borrower agrees that, from time to time at its own expense, the Borrower will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or that Lender may reasonably request, in order to perfect, preserve and protect any security interest granted or purported to be granted hereby in Collateral.  With respect to the foregoing and the grant of the security interest hereunder, the Borrower hereby authorizes Lender to file one or more financing or continuation statements (including the description of the Collateral as "all assets" or "all personal property" of the Borrower), and amendments thereto, relative to all or any part of the Collateral without the signature of (or by signing on behalf of) the Borrower.  A carbon, photographic or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

15.4    Perfected Lien and Security Interest.

(a)    The Borrower hereby represents and warrants that, upon entry of the Interim DIP Order, this Agreement and the pledge of the Collateral pursuant hereto creates a valid, perfected and first priority Lien on and security interest in all now or hereafter acquired of the Collateral, securing payment of the Secured Obligations, subject only to the Carve Out and Diversified Senior Lien.  The Collateral is not subject to any other Lien other than (i) the Diversified Senior Lien in the equipment identified on Schedule 1 up to the amount of $565,293.00 and (ii) Liens arising under the Prepetition Loan in favor of BNYH, which Liens shall be released in connection with the 363 Sale pursuant to the APA (collectively, the "**Permitted Liens**").  All action by the Borrower reasonably necessary or desirable to protect and perfect such Liens on each item of the Collateral has been duly taken upon entry of the Interim DIP Order.  Until the Secured Obligations have been paid in full, the security interests and Liens granted to Lender hereunder shall remain in full force and effect and shall not be subordinated to or made pari passu with any other Lien or security interest, other than the Carve Out and the Diversified Senior Lien.  The Borrower hereby agrees to cooperate with the Lender to make all filings and take all other actions necessary or desirable to perfect and protect such security interest.

(b)    Except as expressly provided in the Financing Orders, the Borrower shall not incur, create, assume, suffer to exist or permit any claim to have administrative priority which is pari passu with or senior to the administrative priority granted to Lender under the Financing Orders.

(c)    The Borrower represents and warrants that it owns its Collateral free and clear of any Lien other than Permitted Liens, and that it has all rights in and the power to transfer each item of Collateral upon which it purports to grant a Lien hereunder.

15.5    Place of Payment.  All payments to be made by the Borrower to the Lender hereunder shall be made in lawful currency of the United States of America and in immediately available funds by wire to an account specified from time to time by the Lender to the Borrower.  Such payments shall be made without setoff or deduction of any kind.

15.6    Further Assurances.  The Borrower agrees that from time to time, at its expense, it will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Lender may request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

16.    **Default**.  Each of the following events shall be an "**Event of Default**" hereunder:

16.1    The Borrower shall fail to pay any and all outstanding Obligations on or before the Maturity Date;

16.2    A breach by the Borrower, in any material respect, of the Financial Covenant or any other provision, covenant, agreement, representation or warranty

under this Security Agreement, or any Financing Order;

16.3    Reversal, modification, rescission, amendment or vacating of any Financing Order;

16.4    An Event of Default (as defined in the APA) has occurred and is continuing under the APA;

16.5    The filing of a Chapter 11 Plan for the Borrower which does not provide for the consummation of the transactions contemplated by the APA or the payment in cash in full of the Secured Obligations on or before the Maturity Date;

16.6    Dismissal of the Chapter 11 Case, conversion of the Chapter 11 Case to a chapter 7 liquidation, or the appointment of a chapter 11 trustee or an examiner in the Chapter 11 Case with expanded powers;

16.7    The Bankruptcy Court shall not have entered the Final DIP Order on or before February 26, 2010;

16.8    The APA is terminated for any reason other than a default of the Lender under the APA;

16.9    The Borrower shall use the proceeds of the Loans in a manner not provided for under Section 7 hereof;

16.10   The filing of a motion to approve post-Petition financing that will be secured by Liens on the Collateral that are equal or senior to the Liens granted to Lender in connection herewith;

16.11   The Borrower shall fail to provide a Budget on a Budget Date, which failure is not cured by the Borrower within two (2) business days of the applicable Budget Date;

16.12   Any challenge in a legal proceeding to the validity or enforceability of this Agreement, or any Financing Order or any term hereunder or thereunder;

16.13   The Bidding Procedures Order (as defined in the APA) shall not have been entered by the Bankruptcy Court on or prior to February 19, 2010;

16.14   The Sale Order approving the Sale to Buyer shall not have been entered by the Bankruptcy Court on or prior to March 19, 2010; and

16.15   (i) the Bankruptcy Court authorizes or approves an Alternative Transaction (as defined in the APA), or (ii) the Borrower withdraws or seeks authority to withdraw its motion seeking approval of the transactions contemplated by the APA.

17.    **Remedies, Rights Upon Default**.

17.1    <u>Remedies</u>.  Upon the occurrence of an Event of Default, all Secured Obligations shall, at the option of the Lender, be immediately due and payable to the Lender and Lender may exercise all rights and remedies under this Agreement, and applicable law.  Upon an Event of Default, if after three (3) days written notice from the Lender to the Borrower the default has not been cured except for an Event of Default under <u>Sections 16.6</u> and <u>16.15</u> hereof which cannot be cured and therefore requires no notice, notwithstanding the provisions of section 362 of the Bankruptcy Code and without any application, motion, notice to or order from, the Bankruptcy Court:  (i) the Lender shall have, in addition to all other rights of the Lender, the rights and remedies of a secured party under the Loan Documents, the UCC and other applicable laws; (ii) the Lender may, at any time, take possession of the Collateral and keep it on the Borrower's premises, at no cost to the Lender, or remove any part of it to such other place or places as the Lender may desire, or the Borrower shall, upon the demand of the Lender, at the Borrower's cost, assemble the Collateral and make it available to the Lender at a place reasonably convenient to the Lender; and (iii) the Lender may sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Lender deems advisable, in its sole discretion, and may, if the Lender deems it reasonable, postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale without giving a new notice of sale.  Without in any way requiring notice to be given in the following manner, the Borrower agrees that any notice by the Lender of sale, disposition or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to the Borrower if such notice is transmitted to Borrower or its counsel identified herein either by telecopier to (212) 972-2245, electronic mail, registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt, at least three (3) days prior to such action to the Borrower's address.  If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Secured Obligations until the Lender receives payment, and if the buyer defaults in payment, the Lender may resell the Collateral without further notice to the Borrower.  In the event the Lender seeks to take possession of all or any portion of the Collateral by judicial process, the Borrower irrevocably waives:  (A) the posting of any bond, surety or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Lender retain possession and not dispose of any Collateral until after trial or final judgment.  The Borrower agrees that the Lender has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person.  The Lender is hereby granted a license or other right to use, without charge, the Borrower's labels, patents, copyrights, name, trade secrets, trade names, trademarks, and advertising matter, or any similar property, in completing production of, advertising or selling any Collateral, and the Borrower's rights

under all contracts, licenses and agreements shall inure to the Lender's benefit for such purpose.

17.2 <u>Fees and Expenses of Lender</u>. The Borrower agrees to pay for all reasonable fees and expenses incurred by the Lender in connection with the Loans and the enforcement of rights and remedies hereunder, including, without limitation, reasonable attorneys' and financial advisor's fees and expenses. All reasonable attorneys' fees and expenses incurred by the Lender for purposes of preparing, negotiating, drafting, executing, delivering, closing, administrating or obtaining final approval of the Loan Documents shall be payable by the Borrower upon demand without the need for an order of the Court ordering such payment.

17.3 <u>Waiver</u>. The Borrower hereby waives presentment, demand, protest or any notice not specifically required herein (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

17.4 <u>No Waiver of Rights by Lender</u>. No course of dealing or failure or delay on the part of the Lender in exercising any right, power or privilege hereunder or with respect to the Note shall operate as a waiver hereof or thereof, nor shall a single or partial exercise thereof preclude any other or further exercise or the exercise of any other right, power or privilege. The rights of the Lender with respect to the Note and the rights of the Lender under this Agreement are cumulative and not exclusive of any rights or remedies which the Lender would otherwise have.

18. **Representations and Warranties of Borrowers**. The Borrower hereby represents and warrants to the Lender that:

18.1 <u>Organization and Good Standing</u>. The Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York and has all requisite power and authority to carry on its business as now conducted.

18.2 <u>Authorization</u>. The execution, delivery and performance by the Borrower of this Agreement are within the Borrower's power; have been duly authorized by all necessary and proper action and, on the date of initial funding of the Loans hereunder and on each subsequent funding date, will be authorized by a Financing Order from the Bankruptcy Court which remains in full force and effect and has not been amended, stayed or vacated; will not violate any applicable law; does not require the consent or approval of any governmental authority or any other person (other than entry of the applicable Financing Order) and except such consents as have been obtained.

18.3 <u>Non-contravention of Other Instruments</u>. The Borrower is not in violation or default (i) of any provision of its operating agreement, certificate of formation or other organizational documents or (ii) of any post-Petition

instrument, judgment, order, writ, decree or contract to which it is a party or by which it is bound. The execution and delivery of this Note and the Security Agreement, the performance of the Borrower's obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby will not result in any violation or be in conflict with or constitute, with or without the passage of time and giving of notice, a default under any such operating agreement, certificate of formation or other organizational documents, post-Petition instrument, judgment, order, writ, decree or contract or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Borrower or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization, or approval applicable to the Borrower, its business or operations or any of its assets or properties.

18.4    <u>Title to Collateral</u>. Except as expressly provided otherwise in the Security Agreement, all assets and property of the Borrower are included in the Collateral. Borrower owns and holds good and marketable title to its assets and property, including, without limitation, intangible property and contract rights, constituting the Collateral. There are no Liens, claims or encumbrances on the Collateral other than the Permitted Liens and there are no licenses, assignments or other transfers of rights or interests, covenants not to sue, or adverse claims, with respect to such property and any maintenance fees with respect to such property are current.

18.5    <u>Budget</u>. The 6-week Budget commencing the date hereof and attached as <u>Exhibit A</u> hereto and each subsequent Budget represents the anticipated expenses, disbursements, receipts and revenues of the Borrower as of the dates set forth therein.

19.    **Miscellaneous**.

19.1    <u>Modification of Agreement</u>. No modification or waiver of any provision of this Agreement, and no consent to any departure by the Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Lender. Any such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in the same, similar or other circumstances.

19.2    <u>Waiver</u>. The Borrower waives presentment and demand for payment, notice of dishonor, protest and notice of protest of the Secured Obligations owed in connection with this Agreement, and shall pay all costs of collection when incurred, including, without limitation, reasonable attorneys' fees, costs and other expenses. The right to plead any and all statutes of limitations as a defense to any demands hereunder is hereby waived to the full extent permitted by law.

19.3    Successors and Assigns.  The provisions of this Agreement shall inure to the benefit of and be binding on any successor to the Borrower and to any successor or assign of the Lender.

19.4    Press Releases.  The Borrower will not use the Lender's or its affiliates' name(s) in any press release without Lender's prior written consent.

19.5    Assignments and Participations.  The Borrower agrees and acknowledges that the Lender has the right to sell participations in any of the Loans and assign its rights and interests hereunder to third parties.  The Borrower hereby consents to the sale by the Lenders of participations in the Loans

19.6    Notices.  All notices, requests and other communications hereunder and under the Note shall be in written (including telecopier) form and shall be given to the party to whom addressed, at its address, telecopier number or electronic mail address set forth below, or such other address or telecopier number as such party may hereafter specify for the purpose by notice to the other parties listed below.  Each such notice, request or communication shall be effective (a) if given by telecopier, when such communication is transmitted to the address specified below, (b) if given by mail, three (3) days after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid or (c) if given by any other means, when delivered at the address specified below.

If to the Borrower:

> Arena Media Networks, LLC
> 44 East 30th Street, 9th Floor
> New York, NY 10016
> Attention:  Chief Executive Officer
> Facsimile: (212) ___-____
> Email:  awilliams@arena-media.com

With a copy to:

> Klestadt & Winters, LLP
> 292 Madison Avenue, 17th Floor
> New York, NY 10017-6314
> Attn:  Ian R. Winters, Esq.
> Facsimile:  (212) 972-2485
> Email:  IWinters@Klestadt.com

If to Lender:

> Access 360 Media, Inc.
> 584 Broadway
> Suite 610
> New York, NY 10012

Attention: Lon Otremba
Facsimile:  (212) 941-5879
Email:  lon@access360media.com

With a copy to:

Sheppard, Mullin, Richter & Hampton, LLP
30 Rockefeller Plaza
24th Floor
New York, NY 10112
Attention:      David Sands
                        Carren B. Shulman
Email:  cshulman@sheppardmullin.com
Facsimile:  (212) 653-8701

19.7    <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE CONSTRUED, INTERPRETED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHT OF THE PARTIES SHALL BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE.

19.8    <u>WAIVER OF JURY TRIAL</u>.  THE BORROWER AND THE LENDER HEREBY WAIVE TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT OR THE VALIDITY, PROTECTION, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF, OR ANY OTHER CLAIM OR DISPUTE HOWSOEVER ARISING, BETWEEN THE BORROWER AND THE LENDER.

19.9    <u>Survival of Agreement</u>.  All covenants, agreements, representations and warranties made in this Agreement shall survive the delivery by the Borrower of the Note and shall continue in full force and effect so long as any Secured Obligations remain outstanding, the Note shall be unexpired or any sums offsetted or due hereunder or under the Note or any amount required to be reimbursed or paid by the Borrower hereunder or thereunder shall remain unpaid. Whenever in this Agreement Lender is referred to, such reference shall be deemed to include the successors and assigns of the Lender, and all covenants, promises and agreements by or on behalf of the Borrower which are contained in this Agreement or the Note shall inure to the benefit of the successors and assigns of the Lender.  The rights and duties of the Borrower, however, may not be assigned or transferred without the prior written consent of the Lender and any attempted assignment or transfer in violation hereof is void and of no force or effect.

19.10    <u>Severability</u>.  The provisions of this Agreement shall be deemed severable.  If any part of this Agreement shall be held unenforceable, by any court of competent jurisdiction, the remainder shall remain in full force and effect, and

such unenforceable provision shall be reformed by such court so as to give maximum legal effect to the intention of the parties as expressed therein.

19.11   <u>Headings</u>.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

19.12   <u>Counterparts</u>.  This Agreement may be executed simultaneously in two or more counterparts and by facsimile or other electronic means, each of which shall be deemed an original and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered in counterparts by their respective officers thereunto duly authorized as of the date first above written.

**ARENA MEDIA NETWORKS, LLC**


By: _____
Name:  Arthur Williams
Title:  Chief Executive Officer


**ACCESS 360 MEDIA, INC.**


By: _____
Name:  Lon Otremba
Title:  Chief Executive Officer

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered in counterparts by their respective officers thereunto duly authorized as of the date first above written.

**ARENA MEDIA NETWORKS, LLC**

By: _____
Name:  Arthur Williams
Title:  Chief Executive Officer


**ACCESS 360 MEDIA, INC.**


By:  _____
Name:  Lon Otremba
Title:  Chief Executive Officer

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered in counterparts by their respective officers thereunto duly authorized as of the date first above written.

**ARENA MEDIA NETWORKS, LLC**

By: _____

Name: Arthur Williams

Title: Chief Executive Officer

**ACCESS 360 MEDIA, INC.**

By: _____

Name: Lon Otremba

Title: Chief Executive Officer

[Loan and Security Agreement]

Schedule 1

Equipment Subject to the Diversified Senior Lien

[*See Attached*]



# DMG Quote

**DIVERSIFIED MEDIA GROUP**
*Connect easier. Communicate better.*

385 Market Street  Kenilworth, NJ 07033  (908) 445-2600

| | |
|---|---|
| Company | Arena Media Network |
| Address | 44 East 30th Street |
| | New York, NY 10016 |

| | |
|---|---|
| Contact | Art Williams |
| Phone | 212.779.2021 |
| Fax | 212.779.2612 |
| e-mail | awilliams@arenamedia.com |

| | |
|---|---|
| Company | |
| Project | |

| | |
|---|---|
| Project Name | AMN - Standard SD |
| | System |
| Quoted By | John Melillo |
| e-mail | jmelillo@dlvmedia.net |
| Phone | 908.445.2556 |

| | |
|---|---|
| Quote Date | |
| Revision Date | |

DMG Approval: _____ Date _____

| Item | Description | Manf. | Model | Qty | Unit Price | | Extended Price | | Sub Total |
|---|---|---|---|---|---|---|---|---|---|
| | **Hardware** | | | | | | | | |
| 1 | Channel ONE SD Single Channel Server | Harris | INSC1S3100 | 13 | $ | 16,150.00 | $ | 209,950.00 | |
| 2 | Channel ONE SD Clip Option | Harris | INSC1SCL | 13 | $ | 2,507.50 | $ | 32,597.50 | |
| 3 | AES to Analog Audio Converter | Harris | DAC8800+BC4AD | 13 | $ | 722.00 | $ | 9,386.00 | |
| 4 | Analog Audio to AES Converter | Harris | ADC8800+A4BCD | 13 | $ | 845.00 | $ | 10,985.00 | |
| 5 | Analog Video to SDU Converter | Harris | DES8800+D | 13 | $ | 1,440.00 | $ | 18,720.00 | |
| 6 | SDI to Analog Video Converter | Harris | ENS8801+D | 13 | $ | 1,695.00 | $ | 22,035.00 | |
| 7 | Frame - 2RU, W/ Ethernet SNMP | Harris | FR8822+F | 13 | $ | 1,720.56 | $ | 22,367.28 | |
| 8 | AC Power Source | Harris | 6800+AC | 13 | $ | 467.50 | $ | 6,077.50 | |
| 9 | 15 "Desktop Touchscreen Display | Elo | 1515L | 13 | $ | 498.00 | $ | 6,474.00 | |
| 10 | VPN / Firewall Security Bundle plus Feature Set | Cisco | 871-SEC-K9 | 13 | $ | 584.87 | $ | 7,603.31 | |
| 11 | HMX IQ Module, single Head | Avocent | HMIQHDD-001 | 13 | $ | 889.20 | $ | 11,559.60 | |
| 12 | HMX User Station, Single Head | Avocent | HMX2050-001 | 13 | $ | 907.20 | $ | 11,793.60 | |
| 13 | Short-Haul Modem, 4-wire Standalone | Black Box | ME800A-R3 | 26 | $ | 159.28 | $ | 4,141.28 | |
| 14 | Adapter, DB25 Male to RJ11 | Black Box | FA252 | 13 | $ | 10.46 | $ | 135.98 | |
| 15 | RJ-11 Modular Cable, 6-Wire Straight Pin, 4 ft. | Black Box | EL06MS-04 | 13 | $ | 3.56 | $ | 46.28 | |
| 16 | RS-232 Data Sharers, 2-Port | Black Box | TL601A-R2 | 13 | $ | 285.15 | $ | 3,707.00 | |
| 17 | 1000VA On-Line UPS | Black Box | n/a | 13 | $ | 670.00 | $ | 8,710.00 | |
| 18 | UPS Monitoring Card | Black Box | n/a | 13 | $ | 295.00 | $ | 3,835.00 | |
| 19 | Installation Hardware & Materials | DMG | n/a | 13 | $ | 125.00 | $ | 1,625.00 | |
| | | | | | | | $ | | 391,749.33 |

*Prices do not include freight or applicable sales tax.*

Project Total  $  391,749.33

AMN - SD System Quote.xlsx



# DMG Quote

**DIVERSIFIED**
M E D I A  G R O U P

*Connect easier. Communicate better.*

385 Market Street  Kenilworth, NJ 07033  (908) 445-2600

Company  Arena Media Network
Address  44 East 30th Street
New York, NY 10016

Contact  Art Williams
Phone  212.779.2021
Fax  212.779.2612
e-mail  awilliams@arenamedia.com

Company
Project

Project Name  AMN - HD System
Quoted By  John Melillo
e-mail  jmelillo@diwmedia.net
Phone  908.445.2556

Quote Date
Revision Date  Date

DMG Approval:

| Item | Description | Manf. | Model | Qty | Unit Price | Extended Price | Sub Total |
|------|-------------|-------|-------|-----|-----------|----------------|-----------|
| | **Hardware** | | | | | | |
| | **HD** | | | | | | |
| 1 | Channel ONE HD/SD Single Channel Server | Harris | INSC1H3100 | 7 | $ 28,895.00 | $ 202,265.00 | |
| 2 | Channel ONE HD clip Option | Harris | INSC1HCL | 7 | $ 3,825.00 | $ 26,775.00 | |
| 3 | Channel ONE Breakout Box | Harris | INSC1BOB | 7 | $ 4,250.00 | $ 29,750.00 | |
| 4 | Channel ONE HD/SD 2D DVE | Harris | INSC1HDDVE | 7 | $ 3,825.00 | $ 26,775.00 | |
| 5 | 15 " Desktop Touchscreen Display | Elo | 1515L | 7 | $ 498.00 | $ 3,486.00 | |
| 6 | VPN / Firewall Secruity Bundle plus Feature Set | Cisco | 871-SEC-K9 | 7 | $ 584.87 | $ 4,094.09 | |
| 7 | HMX IQ Module , single Head | Avocent | HMIQHDD-001 | 7 | $ 889.20 | $ 6,224.40 | |
| 8 | HMX User Station, Single Head | Avocent | HMX2050-001 | 7 | $ 907.20 | $ 6,350.40 | |
| 9 | Short-Haul Modem, 4-wire Standalone | Black Box | ME800A-R3 | 14 | $ 159.28 | $ 2,229.92 | |
| 10 | Adapter, DB25 Male to RJ11 | Black Box | FA252 | 7 | $ 10.46 | $ 73.22 | |
| 11 | RJ-11 Modular Cable, 6-Wire Straight Pin, 4 ft. | Black Box | EL06MS-04 | 7 | $ 3.56 | $ 24.92 | |
| 12 | RS-232 Data Sharers, 2-Port | Black Box | TL601A-R2 | 7 | $ 285.15 | $ 1,996.08 | |
| 13 | 1000VA On-Line UPS | Black Box | n/a | 7 | $ 670.00 | $ 4,690.00 | |
| 14 | UPS Monitoring Card | Black Box | n/a | 7 | $ 295.00 | $ 2,065.00 | |
| 15 | Installation Hardware & Materials | DMG | n/a | 7 | $ 125.00 | $ 875.00 | |
| | | | | | | $ | 317,674.03 |

*Prices do not include freight or applicable sales tax.*

Project Total  $  317,674.03

AMN - HD System Quote.xls

EXHIBIT A

**Initial 6-Week Budget**

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

|  | ACTUAL WE 2/5 | WE 2/12 | WE 2/19 | WE 2/26 | WE 3/5 | WE 3/12 | WE 3/19 | WE 3/26 |
|---|---|---|---|---|---|---|---|---|
| Receipts | 728.12 | 0.00 | 10,000.00 | 110,500.00 | 196,128.12 | 0.00 | 28,000.00 | 461,666.66 |
| **Disbursements** | | | | | | | | |
| Payroll, commissions and other employee costs | 2,293.97 | 81,015.29 | 2,293.97 | 79,693.11 | 1,356.47 | 72,305.63 | 1,356.47 | 43,615.00 |
| Vendor and team payments | 0.00 | 59,765.00 | 0.00 | 0.00 | 540,210.70 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 970.00 | 32,000.00 | 18,885.10 | 931.61 | 33,000.00 | - | 18,885.10 | 931.61 |
| Travel and other office expenses | 15,823.63 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 |
| Debtor's counsel | 5,000.00 | 35,000.00 | - | - | 35,000.00 | - | - | - |
| US Trustee fees | - | - | - | - | - | - | - | - |
| DIP interest and fees | - | - | - | - | 2,771.85 | - | - | - |
| **Total cash disbursements** | 24,087.60 | 216,780.29 | 26,679.07 | 89,624.72 | 617,839.02 | 81,305.63 | 25,741.57 | 53,546.61 |
| **Net cashflow** | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| Beginning cash balance | 15,286.68 | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) |
| Net cashflow | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| **Ending cash balance (DIP borrowing)** | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) | (313,294.94) |

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

| | WE 4/2 | WE 4/9 | WE 4/16 | WE 4/23 | WE 4/30 |
|---|---|---|---|---|---|
| **Receipts** | 20,728.12 | 0.00 | 20,000.00 | 0.00 | 81,666.66 |
| | | | | | |
| **Disbursements** | | | | | |
| Payroll, commissions and other employee costs | 72,584.10 | 1,078.00 | 72,584.10 | 0.00 | 72,584.10 |
| Vendor and team payments | 557,921.95 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 33,000.00 | - | 18,885.10 | 931.61 | 1,000.00 |
| Travel and other office expenses | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 |
| Debtor's counsel | 50,000.00 | - | - | - | - |
| US Trustee fees | 6,500.00 | - | - | - | - |
| DIP interest and fees | 10,940.95 | - | - | - | - |
| **Total cash disbursements** | 736,447.01 | 10,078.00 | 96,969.20 | 9,931.61 | 79,084.10 |
| | | | | | |
| **Net cashflow** | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| | | | | | |
| **Beginning cash balance** | (313,294.94) | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) |
| Net cashflow | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| **Ending cash balance (DIP borrowing)** | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) | (1,123,410.07) |

**EXHIBIT B**

**Interim DIP Order**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ARENA MEDIA NETWORKS, LLC | Case No. 10-10667(BRL) |
| Debtor. | |

## INTERIM ORDER APPROVING DEBTOR'S MOTION FOR ORDER (I) AUTHORIZING DEBTOR TO OBTAIN INTERIM POSTPETITION FINANCING AND TO GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d); AND (II) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C § 362

Upon the motion, dated February 8, 2010 (the "**Motion**"),[1] of Arena Media Networks, LLC, as debtor and debtor-in-possession in the above-captioned chapter 11 case (the "**Debtor**"), for interim and final orders (i) authorizing Debtor to obtain interim postpetition financing and to grant security interests and superpriority administrative expense status pursuant to section 105, 364(c) and 364(d) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"); (ii) modifying the automatic stay pursuant to section 362 of the Bankruptcy Code; and (iii) scheduling a final hearing pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and seeking DIP Orders to, *inter alia*:

       (i)       authorize the Debtor to obtain a senior secured superpriority term loan in an aggregate amount of $800,000, plus interest, fees and expenses (the "**DIP Loan**"), with up to $280,000 in financing available on an interim basis for a period through and including the date of the Final Hearing, from 360 Access

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Motion.

Media, Inc. (the "**Lender**") substantially on the terms and conditions set forth in the DIP Documents attached to the Motion as <u>Exhibit A</u>;

      (ii)     authorize the Debtor to enter into the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection with the DIP Documents;

      (iii)     grant the Lender superpriority administrative claim status, pursuant to section 364(c) of the Bankruptcy Code in respect of all of the Debtor's obligations under the DIP Documents (the "**DIP Obligations**");

      (iv)     grant the Lender a first-priority lien on all of the Debtor's assets, except that Lender's lien on the assets listed on <u>Exhibit A</u> hereto shall be subject to the lien of Diversified Media Group ("**Diversified**") up to the amount of $565,293;

      (v)     schedule, pursuant to Rule 4001 of the Bankruptcy Rules, an interim hearing (the "**Interim Hearing**") on the Motion to be held before this Court to consider entry of this Interim Order authorizing the Debtor, on an interim basis, to borrow under the Loan and Security Agreement of even date between the Debtor and the Lender (the "**DIP Loan and Security Agreement**") an amount up to $280,000 of loans, in accordance with the terms thereof, to be used for general expenditures and general corporate purposes of the Debtor pending the Final Hearing; and

      (vi)     schedule, pursuant to Rule 4001 of the Bankruptcy Rules, the Final Hearing to consider entry of an order (the "**Final Order**") authorizing the Debtor on a final basis to borrow the balance of the DIP Loan.

The Interim Hearing having been held on February __, 2010 with the appearances of all interested parties noted in the record of the Interim Hearing and upon all of the pleadings filed with the Court; and the Court having read and considered the Motion, objections to the Motion, if any, and arguments of any counsel appearing regarding the relief requested in the Motion at the Interim Hearing and the record of the Interim Hearing; and after due deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACTS AND CONCLUSIONS OF LAW:[2]**

A.    <u>**Petition**</u>.    On February 8, 2010 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, creating the Debtor's bankruptcy estate (the "**Estate**").  The Debtor has continued in possession of its properties and is operating and managing its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.    <u>**Jurisdiction and Venue**</u>.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. § 1408.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief herein are sections 105(a), 362, 364 and 507 of Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

C.    <u>**Necessity of Financing**</u>.    The Debtor submits that the proposed financing pursuant to the DIP Loan and Security Agreement will allow it to continue the operate its

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact pursuant to Fed. R. Bankr. P. 7052.  Any statements of the Court from the bench at the Interim Hearing shall constitute additional findings of fact and conclusions of law as appropriate and are expressly incorporated by reference into this Interim Order to the extent not inconsistent herewith.

Business and administer and preserve the value of its Estate, pending the sale of substantially all of the Debtor's assets. The ability of the Debtor to finance its operations prior to the sale of substantially all of its assets requires the availability of additional funds, the absence of which would immediately and irreparably harm the Debtor, the Estate and its creditors, and may result in the immediate liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code. Entry of this Interim Order approving the DIP Loan will benefit the Debtor, its Estate and creditors.

D. **Willingness to Lend**. The Lender is willing to make the DIP Loan available and to make the loans and advances thereunder pursuant to the terms of the DIP Loan and Security Agreement, only upon the condition that the Lender is granted, with respect to the DIP Obligations as provided herein and in the DIP Loan and Security Agreement, subject to the Carve-Out and the Diversified Senior Lien, (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim in this chapter 11 case, and (ii) a lien on the Collateral.

E. **No Credit Available on Other Terms**. The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.

F. **Consent To Lien By Pre-petition Lenders**. The Debtor has obtained the consent to the terms of the DIP Loan and Security Agreement and the proposed orders of pre-petition secured lender BNYH AMN Holdings, LLC and BNYH AMN Holdings, LLC (together, "**BNYH**"), which has a secured lien on all assets of the Debtor's estate in the amount of $15,826,441.13. The Debtor has also obtained the consent of its only other secured lender, Diversified, to a reduction of its secured lien on certain equipment as set forth above.

**G.**     **Business Judgment and Good Faith**.  The terms of the DIP Loan (including as outlined in the DIP Documents) are fair, just, and reasonable under the circumstances, are appropriate for secured financing to a debtor in possession, reflect the Debtor's exercise of its prudent business judgments consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms of the DIP Loan have been negotiated in good faith and at arms' length by and between the parties, with all parties represented by counsel. Any credit extended under the terms of the DIP Loan is being extended in good faith by the Lender as that term is used in section 364(e) of the Bankruptcy Code.  The Lender is also acting in good faith within the meaning of section 364(e) of the Bankruptcy Code in closing the transactions contemplated in the DIP Documents at any time after the entry of this Interim Order. The Lender is not an "insider" or "affiliate" of the Debtor (as such terms are defined in the Bankruptcy Code).  The Lender shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision herein is vacated, reversed or modified, on appeal or otherwise.

**H.**     **No Representations or Reliance**.  The Debtor stipulates that the Lender has made no representations, offered no opinions, and has taken no positions, either individually or collectively, regarding the value of any portion of the Collateral, and, in determining the value of the Collateral, the Debtor has not relied upon any representation, opinion or position of the Lender in regard thereto.

**I.**     **Property of the Estate**.  Each item of the Collateral constitutes property of the Estate of the Debtor.

**J.**     **Good Cause**.  The DIP Loan and relief requested in the Motion are necessary, essential, appropriate and in the best interest of the Debtor, its creditors and its Estate, as its

implementation will, among other effects, provide the Debtor with the necessary liquidity to (i) minimize disruption to Debtor's Business and on-going operations; (ii) preserve and maximize the value of the Estate for the benefit of all creditors of the Debtor; and (iii) avoid immediate irreparable harm to the Debtor, its creditors, Business, remaining employees and assets.

**K.** **Notice**. Pursuant to Rule 4001(c) of the Bankruptcy Rules, notice of the Final Hearing has been given to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) Arena 360 Media, Inc., as Lender; (iii) Sheppard, Mullin, Richter, & Hampton (Attn: Carren B. Shulman, Esq.), as counsel for the Lender; (iv) the holders of the 20 largest unsecured claims as set forth in the consolidated list filed with the Debtor's petitions, including BNYH and Diversified; (v) any known party interested in purchasing the Debtor's assets; (vi) the Office of the United States Attorney General for the Southern District of New York; (vii) the Internal Revenue Service and all other applicable federal, state and local taxing authorities; and (viii) all known holders of liens, encumbrances, or security interests in the Collateral. Based on the foregoing:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that:

1. The Motion is GRANTED. The Debtor is immediately authorized and, pursuant to the terms of this Interim Order and the terms and conditions of the DIP Loan and Security Agreement, empowered to borrow funds under the DIP Loan in such amount or amounts as may be available to or for the benefit of the Debtor from the Lender, which shall not exceed $280,000 upon entry of this Interim Order, in accordance with and for the purposes permitted under the DIP Loan and Security Agreement and this Interim Order or the Final Order, as applicable.

2. Any objections to the Motion with respect to entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

3. Except as set forth in this Interim Order, the terms and conditions of the DIP Loan and Security Agreement are hereby approved in all respects on an interim basis. All provisions in the DIP Loan and Security Agreement are binding and enforceable in full even if not expressly referenced in this Interim Order. The Debtor and the Lender may finalize, amend, modify, supplement or waive any provision of the DIP Loan and Security Agreement if such amendment, modification, supplement or waiver is permitted under the terms of the DIP Loan and Security Agreement and is not material (in the good faith judgment of the Lender and the Debtor) without any need to apply to, or receive further approval from, the Court.

4. The Debtor is hereby authorized to (i) do and perform all acts and to make, execute, and deliver all instruments and documents which may be requisite or necessary for the performance by the Debtor under the DIP Documents, and (ii) pay all principal, interest, reasonable fees and other expenses which may be required or necessary for the Debtor to perform all of the DIP Obligations. Each officer of the Debtor, and each such other individual as may be so authorized by the Board of Managers of the Debtor, acting singly, is hereby authorized to execute and deliver any and all of the DIP Documents and related documents, such execution and delivery to be conclusive of their respective authority to act in the name and on behalf of the Debtor.

5. In providing for the advancement of post-petition financing under the DIP Loan, each of the Debtor and the Lender acknowledges, stipulates and agrees that, in entering into the DIP Documents, and as consideration therefor, the Debtor has obtained all authorizations,

consents and approvals necessary from, and have made all filings with and given all notices (if any such notice was required) to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtor in connection with the execution, delivery, performance, validity and enforceability of the DIP Documents to which the Debtor is party.

6. Until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Documents and/or the Purchase Agreement, the Debtor shall not in any way prime or otherwise adversely affect the liens granted to the Lender under this Interim Order by providing a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim vis-à-vis the Lender pursuant to sections 364(d) or 507(b) of the Bankruptcy Code or otherwise.

7. Until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Loan and Security Agreement and/or the Purchase Agreement, the Debtor shall not in any way grant junior liens or encumbrances on the Collateral; and further, the Debtor agrees that it shall not otherwise encumber otherwise unencumbered assets.

8. No DIP Obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim, except as provided for in the Purchase Agreement.

## **Collateral Security**

9.     Pursuant to section 364(c) of the Bankruptcy Code, subject to the Carve-Out and the Diversified Senior Lien, and as protection to the Lender and to secure the repayment of the DIP Obligations, the Lender shall have and is hereby granted a valid, binding, and enforceable perfected first-priority lien on all of the Debtor's assets (excluding the Debtor's estate's claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law ("**Avoidance Actions**")), and a junior lien on the assets listed on Exhibit A which shall be subject to the Diversified Senior Lien.

10.     The liens granted to the Lender under this Interim Order and the DIP Documents shall continue to be at all times first-priority liens (except as set forth in paragraph 10), encumbrances or security interests of every kind and shall not be subordinate or *pari passu* with any other lien, encumbrance or security interest or right of setoff.

11.     This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Lender's liens on and its security interests in the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Lender's liens on and its security interests in the Collateral or to entitle the Lender to the priorities granted herein.  The Lender shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to perfect the liens and security interests granted by or pursuant to this Interim Order or the DIP Documents.

12.     Subject to the entry of the Final Order, pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more parties, or requires the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, or otherwise transfer any such interest or the proceeds thereof or other Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force and effect with respect to the transactions granting the Lender a senior security interest in such interest or the proceeds of any assignment and/or sale thereof by the Debtor in favor of the Lender in accordance with the terms of the DIP Documents and this Interim Order.

13.     Should the Lender, in its sole discretion (but not as a requirement hereunder), from time to time choose to file financing statements, mortgages, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate or perfect any such security interests or liens, the Debtor and its officers are hereby authorized and directed to execute any such documents or instruments as the Lender may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of the entry of this Interim Order.

14.     The Lender may, in its discretion, file a copy of this Interim Order as a financing statement with any recording officer designated to file financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), in such event, the applicable filing or recording officer or registrar is authorized and directed to accept, file and record such copy of this Interim Order.

15.     Lender is hereby granted relief from the automatic stay imposed under section 362(a) of the Bankruptcy Code for Borrower to grant the liens and security interests in favor of the Lender on the Collateral, as contemplated by the DIP Documents and this Interim Order, and further relief to the extent of the exercise by the Lender of any rights or remedies under the DIP Documents.

## Superpriority Administrative Expense Claim

16.     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute an allowed claim, subject to payment of the Carve-Out, as defined below (the "**Superpriority Claim**") against the Debtor, with priority over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, and which Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof (excluding proceeds of the Avoidance Actions and any assets that were subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code), subject only to the Diversified Senior Lien and payment of the Carve-Out to the extent specifically provided for herein.

W02-WEST:7JZQ1\402454452.2

17.     Notwithstanding the foregoing provisions of this Interim Order, the following amounts shall be payable from the DIP Loan and chargeable against the Collateral prior to the liens and security interests that are granted to the Lender hereunder (the "**Carve-Out**");

(i)     the unpaid fees due and payable to the Clerk of the Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; (the "**UST Fees**");

(ii)     the allowed professional fees and expenses of Debtor's counsel, in as set forth in the Debtor's 6-week budget annexed hereto as Exhibit B (the "**DIP Budget**"), until the earlier of (a) the occurrence of an Event of Default, or (b) the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, provided that payment of the Debtor's attorneys' fees shall be pursuant to properly filed fee applications or statements.

18.     The Debtor shall not be permitted under any circumstance to pay, from the Carve-Out or otherwise, any fees or expenses incurred by any party, including the Debtor or any creditors' committee, in connection with (i) the investigation or litigation against the Lender, including, without limitation, challenging the amount, validity, priority or enforceability of, or asserting any defense, counterclaim, or offset to, the DIP Obligations or the Lender's liens in respect thereof, or (ii) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the Lender of any of its rights and remedies under the DIP Documents and this Interim Order, or the enforcement or realization upon any of the liens on or security interests in any Collateral.

19.     The Lender may, notwithstanding the provisions of section 362 of the Bankruptcy Code and without any further order of, application or motion to, this Court, in the event of the

occurrence of a curable Event of Default, as set forth in the DIP Loan and Security Agreement that is not cured after three (3) days' notice to the Debtor, and without, any restriction or restraint by any stay under section 362 of the Bankruptcy Code against the enforcement of the liens and security interests or any other rights granted pursuant to the DIP Documents, exercise its rights under and in accordance with the DIP Documents, provided that Lender will consent to an emergency hearing brought by the Debtor to object to the exercise of such rights.

20.     Upon entry of the Final Order, neither the Collateral nor the Lender shall be subject to surcharge, pursuant to sections 506(c) or 105 of the Bankruptcy Code or otherwise, by the Debtor or any other party in interest, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender in this Chapter 11 Cases, including but not limited to funding of the Debtor's ongoing operations by the Lender.

## Miscellaneous Provisions

21.     Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the Lender of any liability for any claims arising from the pre-petition or post-petition activities of the Debtor in the operation of the Business, or in connection with its efforts to sell its assets.  So long as the Lender complies with its obligations, if any, under applicable law (including the Bankruptcy Code), (i) the Lender shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (ii) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtor.

22.     The Lender is hereby relieved of the requirement to file proofs of claim in this chapter 11 case with respect to any DIP Obligations and any other claims or liens granted hereunder or created hereby.

23.     The Lender's liens, security interests, administrative priorities and other rights and remedies granted to the Lender by the provisions of this Interim Order and any actions taken pursuant hereto, as well as the Debtor's obligations to allow access to the Lender's representatives, provide information and otherwise comply with its undertakings and agreements set forth in the DIP Documents and this Interim Order, shall continue beyond and survive the expiration of this Interim Order and, to the extent permitted by applicable law, shall not be modified, altered or impaired in any manner by (i) any other financing or extension of credit or incurrence of indebtedness by the Debtor under section 364 of the Bankruptcy Code or otherwise (except as contemplated by the DIP Documents), or (ii) the entry of an order converting the chapter 11 case to a case under chapter 7 of the Bankruptcy Code or dismissing this chapter 11 case.

24.     The terms and provisions of this Interim Order and the DIP Documents, and the Liens and security interests granted to the Lender and the superpriority status of the administrative claims and payment provisions contained in this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash and/or otherwise satisfied as contemplated under the DIP Documents and/or the Purchase Agreement, and/or the DIP Loan and Security Agreement is terminated.

25.     It shall be considered an Event of Default under the DIP Documents if the Debtor seeks entry of an order providing for the sale of the Collateral under section 363 of the

Bankruptcy Code other than as provided for in the Sale Motion or as ordered by the Court pursuant to the Sale Order.

26.     To the extent of any conflict between or among the express terms or provisions of any of the DIP Documents, the Motion, any other order of this Court, or any other agreements and the terms and provisions of this Interim Order, unless such term or provisions herein is phrased in terms of "as defined in," "as described in," or words of similar import, the terms and provisions of this Interim Order shall govern.

27.     This Interim Order, including all findings herein, and DIP Documents shall be valid, binding and enforceable by the Lender against the Debtor, their successors and assigns, including, without limitation, any chapter 11 or chapter 7 trustee appointed as a representative of the Debtor's Estate; provided, however, that the Lender shall have no obligation to extend any financing to any such chapter 11 or chapter 7 trustee or similar person.

28.     Pending and subject in all respect to Final Hearing and Court approval in the Final Order, the Lender shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq*. as amended, or any similar federal or state statute).

29.     If any provision of this Interim Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal or stay shall not affect the validity and priority of any of the DIP Obligations incurred under this Interim Order and the DIP Documents, and prior to the effective date of any such modification, vacation, reversal or stay, the validity, enforceability or priority of the DIP

Obligations shall be governed in all respects by the original provisions of this Interim Order, and the Lender shall be entitled to all the rights, privileges and benefits granted herein. The transactions contemplated by the DIP Loan have been entered into by the Lender in good faith and, as a result, the Lender is entitled to the protections afforded by section 364(e) of the Bankruptcy Code in the event of any reversal or modification of this Interim Order.

30. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the Lender may have to bring or be heard on any matter brought before this Court.

31. This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Interim Order.

32. The Final Hearing on the Motion and DIP Documents shall be heard before this Court on [_____], 2010 at ____ p.m. in Courtroom __ at [_____]. Any party-in-interest objecting to the relief sought in the Final Order shall file with the Court (with a courtesy copy to chambers) its written objection and serve such objection (so as to be received) no later than [_____], 2010 by _____ local time (the "**Objection Deadline**"), on (i) the attorneys for the Debtor, Klestadt & Winters, LLP, 292 Madison Avenue, 17th Floor, New York, New York 10017 (Attn: Ian R. Winters, Esq.), (ii) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, NY 10004, (iii) the attorneys for the Lender, Sheppard, Mullin, Richter & Hampton, 30 Rockefeller Plaza, Suite 2400, New York, NY 10112 (Attn: Carren B. Shulman, Esq.).

33. The Debtor shall mail copies of this Interim Order and notice of the Final Hearing (including the Objection Deadline) to counsel for the Lender, the United States Trustee, and any counsel chosen to represent any official committee appointed in this chapter 11 case.

34. Notwithstanding Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

Dated: _____, 2010
New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

**Equipment Subject to Diversified Senior Lien**

[*See Attached*]



# DIVERSIFIED
## MEDIA GROUP
*Connect easier. Communicate better.*

385 Market Street Kenilworth, NJ 07033 (908) 445-2600

**DMG Quote**

| | |
|---|---|
| Company | Arena Media Network |
| Address | 44 East 30th Street |
| | New York, NY 10016 |

| Contact | Art Williams |
|---|---|
| Phone | 212.779.2021 |
| Fax | 212.779.2612 |
| e-mail | awilliams@arenamedia.com |

| | |
|---|---|
| Company | |
| Project | |

| Project Name | AMN - Standard SD |
|---|---|
| | System |
| Quoted By | John Melillo |
| e-mail | jmelillo@diwmedia.net |
| Phone | 908.445.2556 |

| Quote Date | |
|---|---|
| Revision Date | |

DMG Approval: _____ Date _____

| Item | Description | Manf. | Model | Qty | Unit Price | Extended Price | Sub Total |
|---|---|---|---|---|---|---|---|
| | **Hardware** | | | | | | |
| 1 | Channel ONE SD Single Channel Server | Harris | INSC1S3100 | 13 | $ 16,150.00 | $ 209,950.00 | |
| 2 | Channel ONE SD Clip Option | Harris | INSC1SCL | 13 | $ 2,507.50 | $ 32,597.50 | |
| 3 | AES to Analog Audio Converter | Harris | DAC8800+BC-A4D | 13 | $ 722.00 | $ 9,386.00 | |
| 4 | Analog Audio to AES Converter | Harris | ADC8800+A4BCD | 13 | $ 845.00 | $ 10,985.00 | |
| 5 | Analog Video to SDU Converter | Harris | DES8800+D | 13 | $ 1,440.00 | $ 18,720.00 | |
| 6 | SDI to Analog Video Converter | Harris | ENS8801+D | 13 | $ 1,695.00 | $ 22,035.00 | |
| 7 | Frame - 2RU, W/ Ethernet SNMP | Harris | FR8822+F | 13 | $ 1,720.56 | $ 22,367.28 | |
| 8 | AC Power Source | Harris | 6800+AC | 13 | $ 467.50 | $ 6,077.50 | |
| 9 | 15" Desktop Touchscreen Display | Elo | 1515L | 13 | $ 498.00 | $ 6,474.00 | |
| 10 | VPN / Firewall Security Bundle plus Feature Set | Cisco | 871-SEC-K9 | 13 | $ 584.87 | $ 7,603.31 | |
| 11 | HMX IQ Module, single Head | Avocent | HMIQHDD-001 | 13 | $ 889.20 | $ 11,559.60 | |
| 12 | HMX User Station, Single Head | Avocent | HMX2050-001 | 13 | $ 907.20 | $ 11,793.60 | |
| 13 | Short-Haul Modem, 4-wire Standalone | Black Box | ME800A-R3 | 26 | $ 159.28 | $ 4,141.28 | |
| 14 | Adapter, DB25 Male to RJ11 | Black Box | FA252 | 13 | $ 10.46 | $ 135.98 | |
| 15 | RJ-11 Modular Cable, 6-Wire Straight Pin, 4 ft. | Black Box | EL06MS-04 | 13 | $ 3.56 | $ 46.28 | |
| 16 | RS-232 Data Sharers, 2-Port | Black Box | TL601A-R2 | 13 | $ 285.15 | $ 3,707.00 | |
| 17 | 1000VA On-Line UPS | Black Box | n/a | 13 | $ 670.00 | $ 8,710.00 | |
| 18 | UPS Monitoring Card | Black Box | n/a | 13 | $ 295.00 | $ 3,835.00 | |
| 19 | Installation Hardware & Materials | DMG | n/a | 13 | $ 125.00 | $ 1,625.00 | |
| | | | | | | $ | 391,749.33 |

**Project Total** $ 391,749.33

*Prices do not include freight or applicable sales tax.*

AMN - SD System Quote.xlsx



# DMG Quote

**DIVERSIFIED**
MEDIA GROUP
*Connect easier. Communicate better.*

385 Market Street  Kenilworth, NJ 07033 (908) 445-2600

Company  Arena Media Network
Address  44 East 30th Street
New York, NY 10016

Contact  Art Williams
Phone  212.779.2021
Fax  212.779.2612
e-mail  awilliams@arenamedia.com

Company
Project

Project Name  AMN - HD System
Quoted By  John Melillo
e-mail  jmelillo@dmmedia.net
Phone  908.445.2556

Quote Date
Revision Date                                      Date:

DMG Approval:

| Item | Description | Manf. | Model | Qty | Unit Price | Extended Price | Sub Total |
|------|-------------|-------|-------|-----|-----------|----------------|-----------|
| | **Hardware** | | | | | | |
| | **HD** | | | | | | |
| 1 | Channel ONE HD/SD Single Channel Server | Harris | INSC1H3100 | 7 | $ 28,895.00 | $ 202,265.00 | |
| 2 | Channel ONE HD clip Option | Harris | INSC1HCL | 7 | $ 3,825.00 | $ 26,775.00 | |
| 3 | Channel ONE Breakout Box | Harris | INSC1BOB | 7 | $ 4,250.00 | $ 29,750.00 | |
| 4 | Channel ONE HD/SD 2D DVE | Harris | INSC1HDDVE | 7 | $ 3,825.00 | $ 26,775.00 | |
| 5 | 15 " Desktop Touchscreen Display | Elo | 1515L | 7 | $ 498.00 | $ 3,486.00 | |
| 6 | VPN / Firewall Secruity Bundle plus Feature Set | Cisco | 871-SEC-K9 | 7 | $ 584.87 | $ 4,094.09 | |
| 7 | HMX IQ Module , single Head | Avocent | HMIQHDD-001 | 7 | $ 889.20 | $ 6,224.40 | |
| 8 | HMX User Station, Single Head | Avocent | HMX2050-001 | 7 | $ 907.20 | $ 6,350.40 | |
| 9 | Short-Haul Modem, 4-wire Standalone | Black Box | ME800A-R3 | 14 | $ 159.28 | $ 2,229.92 | |
| 10 | Adapter, DB25 Male to RJ11 | Black Box | FA252 | 7 | $ 10.46 | $ 73.22 | |
| 11 | RJ-11 Modular Cable, 6-Wire Straight Pin, 4 ft. | Black Box | EL06MS-04 | 7 | $ 3.56 | $ 24.92 | |
| 12 | RS-232 Data Sharers, 2-Port | Black Box | TL601A-R2 | 7 | $ 285.15 | $ 1,996.08 | |
| 13 | 1000VA On-Line UPS | Black Box | n/a | 7 | $ 670.00 | $ 4,690.00 | |
| 14 | UPS Monitoring Card | Black Box | n/a | 7 | $ 295.00 | $ 2,065.00 | |
| 15 | Installation Hardware & Materials | DMG | n/a | 7 | $ 125.00 | $ 875.00 | |
| | | | | | | | $           317,674.03 |

*Prices do not include freight or applicable sales tax.*

Project Total  $           317,674.03

AMN - HD System Quote.xls

**Exhibit B**

**DIP Budget**

[*See Attached*]

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

| | ACTUAL WE 2/5 | WE 2/12 | WE 2/19 | WE 2/26 | WE 3/5 | WE 3/12 | WE 3/19 | WE 3/26 |
|---|---|---|---|---|---|---|---|---|
| **Receipts** | 728.12 | 0.00 | 10,000.00 | 110,500.00 | 196,128.12 | 0.00 | 28,000.00 | 461,666.66 |
| **Disbursements** | | | | | | | | |
| Payroll, commissions and other employee costs | 2,293.97 | 81,015.29 | 2,293.97 | 79,693.11 | 1,356.47 | 72,305.63 | 1,356.47 | 43,615.00 |
| Vendor and team payments | 0.00 | 59,765.00 | 0.00 | 0.00 | 540,210.70 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 970.00 | 32,000.00 | 18,885.10 | 931.61 | 33,000.00 | - | 18,885.10 | 931.61 |
| Travel and other office expenses | 15,823.63 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 |
| Debtor's counsel | 5,000.00 | 35,000.00 | - | - | 35,000.00 | - | - | - |
| US Trustee fees | - | - | - | - | - | - | - | - |
| DIP interest and fees | - | - | - | - | 2,771.85 | - | - | - |
| **Total cash disbursements** | 24,087.60 | 216,780.29 | 26,679.07 | 89,624.72 | 617,839.02 | 81,305.63 | 25,741.57 | 53,546.61 |
| **Net cashflow** | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| **Beginning cash balance** | 15,286.68 | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) |
| Net cashflow | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| **Ending cash balance (DIP borrowing)** | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) | (313,294.94) |

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

| | WE 4/2 | WE 4/9 | WE 4/16 | WE 4/23 | WE 4/30 |
|---|---|---|---|---|---|
| **Receipts** | 20,728.12 | 0.00 | 20,000.00 | 0.00 | 81,666.66 |
| | | | | | |
| **Disbursements** | | | | | |
| Payroll, commissions and other employee costs | 72,584.10 | 1,078.00 | 72,584.10 | 0.00 | 72,584.10 |
| Vendor and team payments | 557,921.95 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 33,000.00 | - | 18,885.10 | 931.61 | 1,000.00 |
| Travel and other office expenses | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 |
| Debtor's counsel | 50,000.00 | - | - | - | - |
| US Trustee fees | 6,500.00 | - | - | - | - |
| DIP interest and fees | 10,940.95 | - | - | - | - |
| **Total cash disbursements** | 736,447.01 | 10,078.00 | 96,969.20 | 9,931.61 | 79,084.10 |
| | | | | | |
| **Net cashflow** | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| | | | | | |
| **Beginning cash balance** | (313,294.94) | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) |
| Net cashflow | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| **Ending cash balance (DIP borrowing)** | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) | (1,123,410.07) |

**EXHIBIT C**

**Final DIP Order**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ARENA MEDIA NETWORKS, LLC | Case No.  10-10667(BRL) |
| Debtor. | |

### FINAL ORDER APPROVING DEBTOR'S MOTION FOR ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING AND TO GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d); AND (II) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C § 362

Upon the motion, dated February 8, 2010 (the "**Motion**"),[1] of Arena Media Networks, LLC, as debtor and debtor-in-possession in the above-captioned chapter 11 case (the "**Debtor**"), for interim and final orders (i) authorizing Debtor to obtain post-petition financing and to grant security interests and superpriority administrative expense status pursuant to section 105, 364(c) and 364(d) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"); (ii) modifying the automatic stay pursuant to section 362 of the Bankruptcy Code; and (iii) scheduling a final hearing pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and seeking DIP Orders to, *inter alia*:

  i.    authorize the Debtor to obtain a senior secured superpriority term loan in an aggregate amount of $800,000, plus interest, fees and expenses of the Lender (the "**DIP Loan**"), with up to $280,000 in financing available on an interim basis for a period through and including the date of the Final Hearing, from Arena 360 Media, Inc. (the "**Lender**") substantially on the terms and conditions set forth in the DIP Documents attached to the Motion as Exhibit A;

---

[1]  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Motion.

ii.     authorize the Debtor to enter into the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection with the DIP Documents;

iii.    grant the Lender superpriority administrative claim status, pursuant to section 364(c) of the Bankruptcy Code in respect of all of the Debtor's obligations under the DIP Documents (the "**DIP Obligations**");

iv.     grant the Lender a first-priority lien on all of the Debtor's assets, subject to a lien of Diversified Media Group on certain equipment identified in <u>Exhibit A</u> hereto, in an amount no greater than $565,293; and

v.      schedule, pursuant to Rule 4001 of the Bankruptcy Rules, a final hearing (the "**Final Hearing**") on the Motion to be held before this Court to consider entry of this Order authorizing the Debtor to borrow under the DIP Loan and Security Agreement an amount up to $800,000 of loans, plus interest, fees and expenses, in accordance with the terms thereof, to be used for general expenditures and general corporate purposes of the Debtor.

Upon all of the pleadings filed with the Court to date; the Court having read and considered the Motion; the Interim Hearing having been held on February __, 2010, with the appearances of all interested parties noted in the record of the Interim Hearing; the Interim Order having been entered on February __, 2010; no objections having been made to the Motion; the Final Hearing having been held on February __, 2010; and the appearances of all interested parties and arguments of counsel appearing regarding the relief requested in the Motion having been noted in the record of the Final Hearing; and after due deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACTS AND CONCLUSIONS OF LAW**:[2]

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact pursuant to Fed. R. Bankr. P. 7052. Any statements of the Court from the bench at the Final Hearing shall constitute additional findings of fact and conclusions of law as appropriate and are expressly incorporated by reference into this Final Order to the extent not inconsistent herewith.

A.  **Petition**.  On February 8, 2010 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, creating the Debtor's bankruptcy estate (the "**Estate**").  The Debtor has continued in possession of its properties and is operating and managing its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.  **Jurisdiction and Venue**.  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. § 1408.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief herein are sections 105(a), 362, 364 and 507 of Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

C.  **Necessity of Financing**.  The Debtor submits that the proposed financing pursuant to the DIP Loan and Security Agreement has and will allow it to continue the operate its business and administer and preserve the value of its Estate, pending the sale of substantially all of the Debtor's assets.  The ability of the Debtor to finance its operations prior to the sale of substantially all of its assets requires the availability of additional funds, the absence of which would immediately and irreparably harm the Debtor, the Estate and its creditors, and may result in the immediate liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code.  Entry of this Final Order approving the DIP Loan will benefit the Debtor, its Estate and creditors.

D.  **Willingness to Lend**.  The Lender is willing to make the DIP Loan available and to make the loans and advances thereunder pursuant to the terms of the DIP Loan and Security Agreement, only upon the condition that the Lender is granted, with respect to the DIP Obligations as provided herein and in the DIP Loan and Security Agreement, subject to the Carve-out and the Diversified Senior Lien, (i) pursuant to section 364(c)(1) of the Bankruptcy

Code, a superpriority administrative expense claim in this chapter 11 case, and (ii) a lien on the Collateral.

       **E.**      **No Credit Available on Other Terms**.  The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.

       **F.**      **Consent To Lien By Pre-petition Lenders**.  The Debtor has obtained the consent to the terms of the DIP Loan and Security Agreement and the proposed orders of pre-petition secured lender BNYH AMN Holdings, LLC and BNYH AMN Holdings, LLC (together, "**BNYH**"), which has a secured lien on all assets of the Debtor's estate in the amount of $15,826,441.13.  The Debtor has also obtained the consent of its only other secured lender, Diversified, to a reduction of its secured lien on certain equipment as set forth above.

       **Business Judgment and Good Faith**.  The terms of the DIP Loan (including as outlined in the DIP Documents) are fair, just, and reasonable under the circumstances, are appropriate for secured financing to a debtor in possession, reflect the Debtor's exercise of its prudent business judgments consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms of the DIP Loan have been negotiated in good faith and at arms' length by and between the parties, with all parties represented by counsel.  Any credit extended under the terms of the DIP Loan is being extended in good faith by the Lender as that term is used in section 364(e) of the Bankruptcy Code.  The Lender is also acting in good faith within the meaning of section 364(e) of the Bankruptcy Code in closing the transactions contemplated in the DIP Documents at any time after the entry of this Interim Order.  The Lender is not an "insider" or "affiliate" of the Debtor (as such terms are defined in the Bankruptcy Code).  The Lender shall be entitled to the full protection of section 364(e) of the

Bankruptcy Code in the event that this Final Order or any provision herein is vacated, reversed or modified, on appeal or otherwise.

G.    **No Representations or Reliance**.  The Debtor stipulates that the Lender has made no representations, offered no opinions, and has taken no positions, either individually or collectively, regarding the value of any portion of the Collateral and, in determining the value of the Collateral, the Debtor has not relied upon any representation, opinion or position of the Lender in regard thereto.

H.    **Property of the Estate**.  Each item of the Collateral constitutes property of the Estate of the Debtor.

I.    **Good Cause**.  The DIP Loan and relief requested in the Motion are necessary, essential, appropriate and in the best interest of the Debtor, its creditors and its Estate, as its implementation will, among other effects, provide the Debtor with the necessary liquidity to: (i) make necessary payments to the Debtor's creditors in order to maintain on-going operations; (ii) preserve and maximize the value of the Estate for the benefit of all creditors of the Debtor; and (iii) avoid immediate irreparable harm to the Debtor, its creditors, business, employees and assets.

J.    **Notice**.  Pursuant to Rule 4001(c) of the Bankruptcy Rules, notice of the Final Hearing has been given to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) Arena 360 Media, Inc., as Lender; (iii) Sheppard, Mullin, Richter, & Hampton (Attn: Carren B. Shulman, Esq.), as counsel for the Lender; (iv) the holders of the 20 largest unsecured claims as set forth in the consolidated list filed with the Debtor's petitions, including BNYH and Diversified; (v) any known party interested in purchasing the Debtor's assets; (vi) the Office of the United States Attorney General for the Southern District of New

York; (vii) the Internal Revenue Service and any other applicable federal, state and local taxing authorities; and (viii) all known holders of liens, encumbrances, or security interests in the Collateral.

Based on the foregoing,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that:

1.      The Motion is GRANTED.  The Debtor is immediately authorized and, pursuant to the terms of this Final Order and the terms and conditions of the DIP Loan and Security Agreement, empowered to borrow funds under the DIP Financing in such amount or amounts as may be available to or for the benefit of the Debtor from the Lender, which shall not exceed the aggregate amount of $800,000, in accordance with and for the purposes permitted under the DIP Loan and Security Agreement and this Final Order.

2.      Any objections to the Motion with respect to entry of this Final Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

3.      Except as set forth in this Final Order, the terms and conditions of the DIP Loan and Security Agreement are hereby approved in all respects.  All provisions in the DIP Loan and Security Agreement are binding and enforceable in full even if not expressly referenced in this Final Order.  The Debtor and the Lender may finalize, amend, modify, supplement or waive any provision of the DIP Loan and Security Agreement if such amendment, modification, supplement or waiver is permitted under the terms of the DIP Loan and Security Agreement and is not material (in the good faith judgment of the Lender and the Debtor) without any need to apply to, or receive further approval from, the Court.

4.      The Debtor is hereby authorized to: (a) do and perform all acts and to make, execute, and deliver all instruments and documents which may be requisite or necessary for the performance by the Debtor under the DIP Loan and Security Agreement; and (b) pay all principal, interest, reasonable fees and other expenses which may be required or necessary for the Debtor to perform all of the DIP Obligations.  Each officer of the Debtor, and each such other individual as may be so authorized by the Board of Managers of the Debtor, acting singly, is hereby authorized to execute and deliver any and all of the DIP Documents and related documents, such execution and delivery to be conclusive of their respective authority to act in the name and on behalf of the Debtor.

5.      In providing for the advancement of post-petition financing under the DIP Loan and Security Agreement, each of the Debtor and the Lender acknowledges, stipulates and agrees that, in entering the DIP Documents, and as consideration therefor, the Debtor has obtained all authorizations, consents and approvals necessary from, and have made all filings with and given all notices (if any such notice was required) to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtor in connection with the execution, delivery, performance, validity and enforceability of the DIP Documents to which the Debtor is party.

6.      Until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Documents and/or the Purchase Agreement, the Debtor shall not in any way prime or otherwise adversely affect the liens granted to the Lender under this Final Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim vis-à-vis the Lender pursuant to sections 364(d) or 507(b) of the Bankruptcy Code or otherwise.

7.     Until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Loan and Security Agreement and/or the Purchase Agreement, the Debtor shall not in any way grant junior liens or encumbrances on the Collateral; and further, the Debtor agrees that it shall not otherwise encumber otherwise unencumbered assets.

8.     No DIP Obligation, payment, transfer or grant of security under the DIP Documents or this Final Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim, except as provided for in the Purchase Agreement.

## Collateral Security

9.     Pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, and as protection to the Lender and to secure the repayment of the DIP Obligations, the Lender shall have and is hereby granted a valid, binding, and enforceable perfected first priority lien on all of the Debtor's assets, whether now owned or hereafter acquired, now existing or hereafter created and wherever located (excluding the Debtor's estate's claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law ("**Avoidance Actions**")), provided that the Lender's Lien on the assets listed on <u>Exhibit A</u>, shall be subject to the Diversified Senior Lien.

10.     The liens granted to the Lender under this Final Order and the DIP Documents shall continue to be at all times first priority liens (except with respect to the Carve-Out and the Diversified Senior Lien), encumbrances or security interests of every kind and shall not be subordinate or *pari passu* with any other lien, encumbrance or security interest or right of setoff.

11. The DIP Lender's Liens, as described above, and security interests granted to the DIP Lender herein shall not (i) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor's Estates as a result of any avoidance actions or (ii) be subordinated to or made *pari passu* with any other lien or security interest under section 364(d) of the Bankruptcy Code or otherwise.

12. Pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more parties, or requires the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, or otherwise transfer any such interest, the proceeds thereof or other forms of Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force and effect with respect to the transactions granting the Lender a senior security interest therein or thereof by the Debtor in favor of the Lender in accordance with the terms of the DIP Documents and this Final Order.

13. This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Lender's liens on and its security interests in the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Lender's liens on and its security interests in the Collateral or to entitle the Lender to the priorities granted herein. The Lender shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to perfect the liens and security interests granted by or pursuant to this Final Order or the DIP Documents.

14. Should the Lender, in its sole discretion (but not as a requirement hereunder), from time to time choose to file financing statements, mortgages, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate or perfect any such security interests or liens, the Debtor and its officers are hereby authorized and directed to execute any such documents or instruments as the Lender may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of the entry of this Final Order.

15. The Lender may, in its discretion, file a copy of this Final Order as a financing statement with any recording officer designated to file financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), in such event, the applicable filing or recording officer or registrar is authorized and directed to accept, file and record such copy of this Final Order.

16. The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby lifted to grant the liens and security interests in favor of the Lender on the Collateral, as contemplated by the DIP Documents and this Final Order, and is further lifted to the extent of the exercise by the Lender of any rights or remedies under the DIP Documents.

**Superpriority Administrative Expense Claim**

17. As further protection to the Lender and to secure the repayment of the DIP Obligations, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute an allowed claim (the "**Superpriority Claim**"), subject to payment of the Carve-Out and the Diversified Senior Lien to the extent specifically provided for herein against the Debtor, with priority over any and all administrative expenses, diminution claims, and all other

claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, and which Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof (excluding proceeds of the Avoidance Actions and any assets that were subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code).

18.     Notwithstanding the foregoing provisions of this Final Order, the following amounts shall be payable from and chargeable against the Collateral prior to the liens and security interests that are granted to the Lender hereunder (the "**Carve-Out**"):

      i.      the unpaid fees due and payable to the Clerk of the Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; (the "**UST Fees**"); and

      ii.     the allowed professional fees and expenses of Debtor's counsel, as set forth in the Debtor's Budget annexed as <u>Exhibit B</u> hereto (the "**Priority Professional Expenses**") until the earlier of (x) the occurrence of an Event of Default, or (y) the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, provided that approval and allowance of professionals fees shall be pursuant to properly filed fee applications or statements.

19.     The Debtor shall not be permitted under any circumstance to pay, from the Carve-Out or otherwise, any fees or expenses incurred by any party, including the Debtor or any creditors' committee, in connection with (i) the investigation, filing, prosecution or defense of any claims, causes of action, adversary proceedings or other litigation against the Lender, including, without limitation, challenging the amount, validity, priority or enforceability of, or

asserting any defense, counterclaim, or offset to, the DIP Obligations or the Lender's liens in respect thereof, or (ii) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the Lender of any of its rights and remedies under the DIP Documents and this Final Order, or the enforcement or realization upon any of the liens on or security interests in any Collateral.

20.    No other liens shall have priority superior to or *pari passu* with that granted by this Final Order to the Lender, or shall be granted while any portion of the DIP Obligations under the DIP Documents remains outstanding, absent the express written consent of the Lender.

21.    The Lender may, notwithstanding the provisions of section 362 of the Bankruptcy Code and without any further order of, or application or motion to, this Court, in the event of the occurrence of a curable Event of Default, as set forth in the DIP Loan and Security Agreement, that is not cured after three (3) days' notice to the Debtor, and without any restriction or restraint by any stay under section 362 of the Bankruptcy Code against the enforcement of the liens and security interests or any other rights granted pursuant to the DIP Documents, exercise its rights under and in accordance with the DIP Documents, provided that Lender will consent to an emergency hearing brought by the Debtor to object to the exercise of such rights.

22.    Upon entry of this Final Order, neither the Collateral nor the Lender shall be subject to surcharge, pursuant to sections 506(c) or 105 of the Bankruptcy Code or otherwise, by the Debtor or any other party in interest, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender in this Chapter 11 Case, including but not limited to funding of the Debtor's ongoing operations by the Lender.

### Miscellaneous Provisions

23.    Nothing in this Final Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the

imposition upon the Lender of any liability for any claims arising from the pre-petition or post-petition activities of the Debtor in the operation of its business, or in connection with its efforts to sell its assets. So long as the Lender complies with its obligations, if any, under applicable law (including the Bankruptcy Code), (i) the Lender shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (ii) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtor.

24.     The Lender is hereby relieved of the requirement to file proofs of claim in the Chapter 11 Case with respect to any DIP Obligations and any other claims or liens granted hereunder or created hereby.

25.     Until the DIP Obligations are satisfied pursuant to the DIP Documents and/or the Purchase Agreement, the Lender's liens, security interests, administrative priorities and other rights and remedies granted to the Lender by the provisions of this Final Order and any actions taken pursuant hereto, as well as the Debtor's obligations to allow access to the Lender's representatives, provide information and otherwise comply with its undertakings and agreements set forth in the DIP Documents and this Final Order, shall continue beyond and survive the expiration of this Final Order and, to the extent permitted by applicable law, shall not be modified, altered or impaired in any manner by (a) any other financing or extension of credit or incurrence of indebtedness by the Debtor under section 364 of the Bankruptcy Code or otherwise (except as contemplated by the DIP Documents), or (b) the entry of an order converting this case to a case under chapter 7 of the Bankruptcy Code or dismissing this Chapter 11 Case.

26.     The terms and provisions of this Final Order and the DIP Documents, the liens and security interests granted to the Lender, the Superpriority Claim and the payment provisions contained in this Final Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash or satisfied as contemplated under the DIP Documents and/or the Purchase Agreement.

27.     The Superpriority Claim, the payment provisions contained in this Final Order and the DIP Documents, and any and all liens and security interests granted to the Lender, shall be immediately, automatically and completely released upon indefeasible payment and/or satisfaction of the DIP Obligations as contemplated under the DIP Documents and/or the Purchase Agreement.

28.     It shall be considered an Event of Default under the DIP Documents if the Debtor seeks entry of an order providing for the sale of the Collateral under section 363 of the Bankruptcy Code other than as provided for in the Sale Motion or as ordered by the Court pursuant to the Sale Order.

29.     To the extent of any conflict between or among the express terms or provisions of any of the DIP Documents, the Motion, the Interim Order, any other order of this Court or any other agreements, on the one hand, and the terms and provisions of this Final Order, on the other, the terms and provisions of this Final Order shall govern.

30.     This Final Order, including all findings of fact herein, and DIP Documents shall be valid, binding and enforceable by the Lender against the Debtor, its successors and assigns, including, without limitation, any chapter 11 or chapter 7 trustee appointed as a representative of the Debtor's Estates; provided, however, that the Lender shall have no obligation to extend any financing to any such chapter 11 or chapter 7 trustee or similar person.

31.     If any provision of this Final Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal or stay shall not affect the validity and priority of any of the DIP Obligations incurred under this Final Order and the DIP Documents, and prior to the effective date of any such modification, vacation, reversal or stay, the validity, enforceability or priority of the DIP Obligations shall be governed in all respects by the provisions of this Final Order, and the Lender shall be entitled to all the rights, privileges and benefits granted herein.  The transactions contemplated by the DIP Loan have been entered into by the Lender in good faith and, as a result, the Lender is entitled to the protections afforded by section 364(e) of the Bankruptcy Code in the event of any reversal or modification of this Final Order.

32.     This Final Order shall not be construed in any way as a waiver or relinquishment of any rights the Lender may have to bring or be heard on any matter brought before this Court.

33.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Final Order.

34.     Notwithstanding Rules 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

Dated: [_____], 2010                    _____
         New York, New York                             UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

**Equipment Subject to Diversified Senior Lien**

[*See Attached*]



# DMG Quote

**DIVERSIFIED**
MEDIA GROUP
*Connect easier. Communicate better.*

385 Market Street  Kenilworth, NJ 07033  (908) 445-2600

**Company** Arena Media Network
**Address** 44 East 30th Street
New York, NY 10016

**Contact** Art Williams
**Phone** 212.779.2021
**Fax** 212.779.2612
**e-mail** awilliams@arenamedia.com

**Company**
**Project**

**Project Name** AMN - Standard SD System
**Quoted By** John Melillo
**e-mail** jmelillo@dlwmedia.net
**Phone** 908.445.2556

**Quote Date**
**Revision Date**

DMG Approval: _____  Date _____

| Item | Description | Manf. | Model | Qty | Unit Price | | Extended Price | | Sub Total |
|---|---|---|---|---|---|---|---|---|---|
| | **Hardware** | | | | | | | | |
| 1 | Channel ONE SD Single Channel Server | Harris | INSC1S3100 | 13 | $ | 16,150.00 | $ | 209,950.00 | |
| 2 | Channel ONE SD Clip Option | Harris | INSC1SCL | 13 | $ | 2,507.50 | $ | 32,597.50 | |
| 3 | AES to Analog Audio Converter | Harris | DAC8800+BCA4D | 13 | $ | 722.00 | $ | 9,386.00 | |
| 4 | Analog Audio to AES Converter | Harris | ADC8800+A4BCD | 13 | $ | 845.00 | $ | 10,985.00 | |
| 5 | Analog Video to SDU Converter | Harris | DES8800+D | 13 | $ | 1,440.00 | $ | 18,720.00 | |
| 6 | SDI to Analog Video Converter | Harris | ENS8801+D | 13 | $ | 1,695.00 | $ | 22,035.00 | |
| 7 | Frame - 2RU, W/ Ethernet SNMP | Harris | FR6822+F | 13 | $ | 1,720.56 | $ | 22,367.28 | |
| 8 | AC Power Source | Harris | 6800+AC | 13 | $ | 467.50 | $ | 6,077.50 | |
| 9 | 15" Desktop Touchscreen Display | Elo | 1515L | 13 | $ | 498.00 | $ | 6,474.00 | |
| 10 | VPN / Firewall Security Bundle plus Feature Set | Cisco | 871-SEC-K9 | 13 | $ | 584.87 | $ | 7,603.31 | |
| 11 | HMX IQ Module, single Head | Avocent | HMIQHDD-001 | 13 | $ | 889.20 | $ | 11,559.60 | |
| 12 | HMX User Station, Single Head | Avocent | HMX2050-001 | 13 | $ | 907.20 | $ | 11,793.60 | |
| 13 | Short-Haul Modem, 4-wire Standalone | Black Box | ME800A-R3 | 26 | $ | 159.28 | $ | 4,141.28 | |
| 14 | Adapter, DB25 Male to RJ11 | Black Box | FA252 | 13 | $ | 10.46 | $ | 135.98 | |
| 15 | RJ-11 Modular Cable, 6-Wire Straight Pin, 4 ft. | Black Box | EL06MS-04 | 13 | $ | 3.56 | $ | 46.28 | |
| 16 | RS-232 Data Sharers, 2-Port | Black Box | TL601A-R2 | 13 | $ | 285.15 | $ | 3,707.00 | |
| 17 | 1000VA On-Line UPS | Black Box | n/a | 13 | $ | 670.00 | $ | 8,710.00 | |
| 18 | UPS Monitoring Card | Black Box | n/a | 13 | $ | 295.00 | $ | 3,835.00 | |
| 19 | Installation Hardware & Materials | DMG | n/a | 13 | $ | 125.00 | $ | 1,625.00 | |
| | | | | | | | $ | 391,749.33 | |

*Prices do not include freight or applicable sales tax.*

**Project Total** $ 391,749.33

AMN - SD System Quote.xlsx



# DMG Quote

**DIVERSIFIED**
MEDIA GROUP
*Connect easier. Communicate better.*

385 Market Street  Kenilworth, NJ 07033  (908) 445-2600

Company  Arena Media Network
Address  44 East 30th Street
         New York, NY 10016

Contact  Art Williams
Phone    212.779.2021
Fax      212.779.2612
e-mail   awilliams@arenamedia.com

Company
Project

Project Name   AMN - HD System
Quoted By      John Melillo
e-mail         jmelillo@divmedia.net
Phone          908.445.2556

Quote Date
Revision Date                                    Date

DMG Approval-

| Item | Description | Manf. | Model | Qty | Unit Price | Extended Price | Sub Total |
|------|-------------|-------|-------|-----|-----------|----------------|-----------|
|  | **Hardware** | | | | | | |
|  | **HD** | | | | | | |
| 1 | Channel ONE HD/SD Single Channel Server | Harris | INSC1H3100 | 7 | $ 28,895.00 | $ 202,265.00 | |
| 2 | Channel ONE HD clip Option | Harris | INSC1HCL | 7 | $ 3,825.00 | $ 26,775.00 | |
| 3 | Channel ONE Breakout Box | Harris | INSC1BOB | 7 | $ 4,250.00 | $ 29,750.00 | |
| 4 | Channel ONE HD/SD 2D DVE | Harris | INSC1HDDVE | 7 | $ 3,825.00 | $ 26,775.00 | |
| 5 | 15 " Desktop Touchscreen Display | Elo | 1515L | 7 | $ 498.00 | $ 3,486.00 | |
| 6 | VPN / Firewall Secruity Bundle plus Feature Set | Cisco | 871-SEC-K9 | 7 | $ 584.87 | $ 4,094.09 | |
| 7 | HMX IQ Module , single Head | Avocent | HMIQHDD-001 | 7 | $ 889.20 | $ 6,224.40 | |
| 8 | HMX User Station, Single Head | Avocent | HMX2050-001 | 7 | $ 907.20 | $ 6,350.40 | |
| 9 | Short-Haul Modem, 4-wire Standalone | Black Box | ME800A-R3 | 14 | $ 159.28 | $ 2,229.92 | |
| 10 | Adapter, DB25 Male to RJ11 | Black Box | FA252 | 7 | $ 10.46 | $ 73.22 | |
| 11 | RJ-11 Modular Cable, 6-Wire Straight Pin, 4 ft. | Black Box | EL06MS-04 | 7 | $ 3.56 | $ 24.92 | |
| 12 | RS-232 Data Sharers, 2-Port | Black Box | TL601A-R2 | 7 | $ 285.15 | $ 1,996.08 | |
| 13 | 1000VA On-Line UPS | Black Box | n/a | 7 | $ 670.00 | $ 4,690.00 | |
| 14 | UPS Monitoring Card | Black Box | n/a | 7 | $ 295.00 | $ 2,065.00 | |
| 15 | Installation Hardware & Materials | DMG | n/a | 7 | $ 125.00 | $ 875.00 | |
| | | | | | | $ | 317,674.03 |

*Prices do not include freight or applicable sales tax.*

Project Total  $         317,674.03

AMN - HD System Quote.xls

**Exhibit B**

**DIP Budget**

[*See Attached*]

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

| | ACTUAL WE 2/5 | WE 2/12 | WE 2/19 | WE 2/26 | WE 3/5 | WE 3/12 | WE 3/19 | WE 3/26 |
|---|---|---|---|---|---|---|---|---|
| **Receipts** | 728.12 | 0.00 | 10,000.00 | 110,500.00 | 196,128.12 | 0.00 | 28,000.00 | 461,666.66 |
| | | | | | | | | |
| **Disbursements** | | | | | | | | |
| Payroll, commissions and other employee costs | 2,293.97 | 81,015.29 | 2,293.97 | 79,693.11 | 1,356.47 | 72,305.63 | 1,356.47 | 43,615.00 |
| Vendor and team payments | 0.00 | 59,765.00 | 0.00 | 0.00 | 540,210.70 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 970.00 | 32,000.00 | 18,885.10 | 931.61 | 33,000.00 | - | 18,885.10 | 931.61 |
| Travel and other office expenses | 15,823.63 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 |
| Debtor's counsel | 5,000.00 | 35,000.00 | - | - | 35,000.00 | - | - | - |
| US Trustee fees | - | - | - | - | - | - | - | - |
| DIP interest and fees | - | - | - | - | 2,771.85 | - | - | - |
| **Total cash disbursements** | 24,087.60 | 216,780.29 | 26,679.07 | 89,624.72 | 617,839.02 | 81,305.63 | 25,741.57 | 53,546.61 |
| | | | | | | | | |
| **Net cashflow** | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| | | | | | | | | |
| **Beginning cash balance** | 15,286.68 | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) |
| **Net cashflow** | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| **Ending cash balance (DIP borrowing)** | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) | (313,294.94) |

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

| | WE 4/2 | WE 4/9 | WE 4/16 | WE 4/23 | WE 4/30 |
|---|---|---|---|---|---|
| **Receipts** | 20,728.12 | 0.00 | 20,000.00 | 0.00 | 81,666.66 |
| | | | | | |
| **Disbursements** | | | | | |
| Payroll, commissions and other employee costs | 72,584.10 | 1,078.00 | 72,584.10 | 0.00 | 72,584.10 |
| Vendor and team payments | 557,921.95 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 33,000.00 | - | 18,885.10 | 931.61 | 1,000.00 |
| Travel and other office expenses | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 |
| Debtor's counsel | 50,000.00 | - | - | - | - |
| US Trustee fees | 6,500.00 | - | - | - | - |
| DIP interest and fees | 10,940.95 | - | - | - | - |
| **Total cash disbursements** | 736,447.01 | 10,078.00 | 96,969.20 | 9,931.61 | 79,084.10 |
| | | | | | |
| **Net cashflow** | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| | | | | | |
| **Beginning cash balance** | (313,294.94) | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) |
| Net cashflow | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| **Ending cash balance (DIP borrowing)** | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) | (1,123,410.07) |

**Exhibit B**

**(DIP Budget)**

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

| | ACTUAL WE 2/5 | WE 2/12 | WE 2/19 | WE 2/26 | WE 3/5 | WE 3/12 | WE 3/19 | WE 3/26 |
|---|---|---|---|---|---|---|---|---|
| Receipts | 728.12 | 0.00 | 10,000.00 | 110,500.00 | 196,128.12 | 0.00 | 28,000.00 | 461,666.66 |
| | | | | | | | | |
| **Disbursements** | | | | | | | | |
| Payroll, commissions and other employee costs | 2,293.97 | 81,015.29 | 2,293.97 | 79,693.11 | 1,356.47 | 72,305.63 | 1,356.47 | 43,615.00 |
| Vendor and team payments | 0.00 | 59,765.00 | 0.00 | 0.00 | 540,210.70 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 970.00 | 32,000.00 | 18,885.10 | 931.61 | 33,000.00 | - | 18,885.10 | 931.61 |
| Travel and other office expenses | 15,823.63 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 |
| Debtor's counsel | 5,000.00 | 35,000.00 | - | - | 35,000.00 | - | - | - |
| US Trustee fees | - | - | - | - | - | - | - | - |
| DIP interest and fees | - | - | - | - | 2,771.85 | - | - | - |
| **Total cash disbursements** | 24,087.60 | 216,780.29 | 26,679.07 | 89,624.72 | 617,839.02 | 81,305.63 | 25,741.57 | 53,546.61 |
| | | | | | | | | |
| **Net cashflow** | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| | | | | | | | | |
| Beginning cash balance | 15,286.68 | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) |
| Net cashflow | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| **Ending cash balance (DIP borrowing)** | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) | (313,294.94) |

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
Assumes 2/8 filing
**Team payments according to workout plan**

| | WE 4/2 | WE 4/9 | WE 4/16 | WE 4/23 | WE 4/30 |
|---|---|---|---|---|---|
| **Receipts** | 20,728.12 | 0.00 | 20,000.00 | 0.00 | 81,666.66 |
| | | | | | |
| **Disbursements** | | | | | |
| Payroll, commissions and other employee costs | 72,584.10 | 1,078.00 | 72,584.10 | 0.00 | 72,584.10 |
| Vendor and team payments | 557,921.95 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 33,000.00 | - | 18,885.10 | 931.61 | 1,000.00 |
| Travel and other office expenses | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 |
| Debtor's counsel | 50,000.00 | - | - | - | - |
| US Trustee fees | 6,500.00 | - | - | - | - |
| DIP interest and fees | 10,940.95 | - | - | - | - |
| **Total cash disbursements** | 736,447.01 | 10,078.00 | 96,969.20 | 9,931.61 | 79,084.10 |
| | | | | | |
| **Net cashflow** | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| | | | | | |
| **Beginning cash balance** | (313,294.94) | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) |
| Net cashflow | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| **Ending cash balance (DIP borrowing)** | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) | (1,123,410.07) |

**Exhibit C**

**(Proposed Interim Order)**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ARENA MEDIA NETWORKS, LLC | Case No.  10-10667(BRL) |
| Debtor. | |

### INTERIM ORDER APPROVING DEBTOR'S MOTION FOR ORDER (I) AUTHORIZING DEBTOR TO OBTAIN INTERIM POSTPETITION FINANCING AND TO GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d); AND (II) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C § 362

Upon the motion, dated February 8, 2010 (the "**Motion**"),[1] of Arena Media Networks, LLC, as debtor and debtor-in-possession in the above-captioned chapter 11 case (the "**Debtor**"), for interim and final orders (i) authorizing Debtor to obtain interim postpetition financing and to grant security interests and superpriority administrative expense status pursuant to section 105, 364(c) and 364(d) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"); (ii) modifying the automatic stay pursuant to section 362 of the Bankruptcy Code; and (iii) scheduling a final hearing pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and seeking DIP Orders to, *inter alia*:

(i)      authorize the Debtor to obtain a senior secured superpriority term loan in an aggregate amount of $800,000, plus interest, fees and expenses (the "**DIP Loan**"), with up to $280,000 in financing available on an interim basis for a period through and including the date of the Final Hearing, from 360 Access

---

[1]   Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Motion.

W02-WEST:7JZQ1\402454452.2

Media, Inc. (the "**Lender**") substantially on the terms and conditions set forth in the DIP Documents attached to the Motion as <u>Exhibit A</u>;

(ii)     authorize the Debtor to enter into the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection with the DIP Documents;

(iii)     grant the Lender superpriority administrative claim status, pursuant to section 364(c) of the Bankruptcy Code in respect of all of the Debtor's obligations under the DIP Documents (the "**DIP Obligations**");

(iv)     grant the Lender a first-priority lien on all of the Debtor's assets, except that Lender's lien on the assets listed on <u>Exhibit A</u> hereto shall be subject to the lien of Diversified Media Group ("**Diversified**") up to the amount of $565,293;

(v)     schedule, pursuant to Rule 4001 of the Bankruptcy Rules, an interim hearing (the "**Interim Hearing**") on the Motion to be held before this Court to consider entry of this Interim Order authorizing the Debtor, on an interim basis, to borrow under the Loan and Security Agreement of even date between the Debtor and the Lender (the "**DIP Loan and Security Agreement**") an amount up to $280,000 of loans, in accordance with the terms thereof, to be used for general expenditures and general corporate purposes of the Debtor pending the Final Hearing; and

(vi)     schedule, pursuant to Rule 4001 of the Bankruptcy Rules, the Final Hearing to consider entry of an order (the "**Final Order**") authorizing the Debtor on a final basis to borrow the balance of the DIP Loan.

The Interim Hearing having been held on February ___, 2010 with the appearances of all interested parties noted in the record of the Interim Hearing and upon all of the pleadings filed with the Court; and the Court having read and considered the Motion, objections to the Motion, if any, and arguments of any counsel appearing regarding the relief requested in the Motion at the Interim Hearing and the record of the Interim Hearing; and after due deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACTS AND CONCLUSIONS OF LAW:[2]**

A.    **Petition**.    On February 8, 2010 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, creating the Debtor's bankruptcy estate (the "**Estate**").    The Debtor has continued in possession of its properties and is operating and managing its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.    **Jurisdiction and Venue**.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.    Venue is proper pursuant to 28 U.S.C. § 1408.    This is a core proceeding pursuant to 28 U.S.C. § 157(b).    The statutory predicates for the relief herein are sections 105(a), 362, 364 and 507 of Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

C.    **Necessity of Financing**.    The Debtor submits that the proposed financing pursuant to the DIP Loan and Security Agreement will allow it to continue the operate its

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact pursuant to Fed. R. Bankr. P. 7052.  Any statements of the Court from the bench at the Interim Hearing shall constitute additional findings of fact and conclusions of law as appropriate and are expressly incorporated by reference into this Interim Order to the extent not inconsistent herewith.

Business and administer and preserve the value of its Estate, pending the sale of substantially all of the Debtor's assets. The ability of the Debtor to finance its operations prior to the sale of substantially all of its assets requires the availability of additional funds, the absence of which would immediately and irreparably harm the Debtor, the Estate and its creditors, and may result in the immediate liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code. Entry of this Interim Order approving the DIP Loan will benefit the Debtor, its Estate and creditors.

D.     **Willingness to Lend**.  The Lender is willing to make the DIP Loan available and to make the loans and advances thereunder pursuant to the terms of the DIP Loan and Security Agreement, only upon the condition that the Lender is granted, with respect to the DIP Obligations as provided herein and in the DIP Loan and Security Agreement, subject to the Carve-Out and the Diversified Senior Lien, (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim in this chapter 11 case, and (ii) a lien on the Collateral.

E.     **No Credit Available on Other Terms**.  The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.

F.     **Consent To Lien By Pre-petition Lenders**.  The Debtor has obtained the consent to the terms of the DIP Loan and Security Agreement and the proposed orders of pre-petition secured lender BNYH AMN Holdings, LLC and BNYH AMN Holdings, LLC (together, "**BNYH**"), which has a secured lien on all assets of the Debtor's estate in the amount of $15,826,441.13.  The Debtor has also obtained the consent of its only other secured lender, Diversified, to a reduction of its secured lien on certain equipment as set forth above.

**G.** **Business Judgment and Good Faith**. The terms of the DIP Loan (including as outlined in the DIP Documents) are fair, just, and reasonable under the circumstances, are appropriate for secured financing to a debtor in possession, reflect the Debtor's exercise of its prudent business judgments consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms of the DIP Loan have been negotiated in good faith and at arms' length by and between the parties, with all parties represented by counsel. Any credit extended under the terms of the DIP Loan is being extended in good faith by the Lender as that term is used in section 364(e) of the Bankruptcy Code. The Lender is also acting in good faith within the meaning of section 364(e) of the Bankruptcy Code in closing the transactions contemplated in the DIP Documents at any time after the entry of this Interim Order. The Lender is not an "insider" or "affiliate" of the Debtor (as such terms are defined in the Bankruptcy Code). The Lender shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision herein is vacated, reversed or modified, on appeal or otherwise.

**H.** **No Representations or Reliance**. The Debtor stipulates that the Lender has made no representations, offered no opinions, and has taken no positions, either individually or collectively, regarding the value of any portion of the Collateral, and, in determining the value of the Collateral, the Debtor has not relied upon any representation, opinion or position of the Lender in regard thereto.

**I.** **Property of the Estate**. Each item of the Collateral constitutes property of the Estate of the Debtor.

**J.** **Good Cause**. The DIP Loan and relief requested in the Motion are necessary, essential, appropriate and in the best interest of the Debtor, its creditors and its Estate, as its

implementation will, among other effects, provide the Debtor with the necessary liquidity to (i) minimize disruption to Debtor's Business and on-going operations; (ii) preserve and maximize the value of the Estate for the benefit of all creditors of the Debtor; and (iii) avoid immediate irreparable harm to the Debtor, its creditors, Business, remaining employees and assets.

**K.** **Notice**. Pursuant to Rule 4001(c) of the Bankruptcy Rules, notice of the Final Hearing has been given to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) Arena 360 Media, Inc., as Lender; (iii) Sheppard, Mullin, Richter, & Hampton (Attn: Carren B. Shulman, Esq.), as counsel for the Lender; (iv) the holders of the 20 largest unsecured claims as set forth in the consolidated list filed with the Debtor's petitions, including BNYH and Diversified; (v) any known party interested in purchasing the Debtor's assets; (vi) the Office of the United States Attorney General for the Southern District of New York; (vii) the Internal Revenue Service and all other applicable federal, state and local taxing authorities; and (viii) all known holders of liens, encumbrances, or security interests in the Collateral. Based on the foregoing:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that:

1. The Motion is GRANTED. The Debtor is immediately authorized and, pursuant to the terms of this Interim Order and the terms and conditions of the DIP Loan and Security Agreement, empowered to borrow funds under the DIP Loan in such amount or amounts as may be available to or for the benefit of the Debtor from the Lender, which shall not exceed $280,000 upon entry of this Interim Order, in accordance with and for the purposes permitted under the DIP Loan and Security Agreement and this Interim Order or the Final Order, as applicable.

2.     Any objections to the Motion with respect to entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

3.     Except as set forth in this Interim Order, the terms and conditions of the DIP Loan and Security Agreement are hereby approved in all respects on an interim basis.  All provisions in the DIP Loan and Security Agreement are binding and enforceable in full even if not expressly referenced in this Interim Order.  The Debtor and the Lender may finalize, amend, modify, supplement or waive any provision of the DIP Loan and Security Agreement if such amendment, modification, supplement or waiver is permitted under the terms of the DIP Loan and Security Agreement and is not material (in the good faith judgment of the Lender and the Debtor) without any need to apply to, or receive further approval from, the Court.

4.     The Debtor is hereby authorized to (i) do and perform all acts and to make, execute, and deliver all instruments and documents which may be requisite or necessary for the performance by the Debtor under the DIP Documents, and (ii) pay all principal, interest, reasonable fees and other expenses which may be required or necessary for the Debtor to perform all of the DIP Obligations.  Each officer of the Debtor, and each such other individual as may be so authorized by the Board of Managers of the Debtor, acting singly, is hereby authorized to execute and deliver any and all of the DIP Documents and related documents, such execution and delivery to be conclusive of their respective authority to act in the name and on behalf of the Debtor.

5.     In providing for the advancement of post-petition financing under the DIP Loan, each of the Debtor and the Lender acknowledges, stipulates and agrees that, in entering into the DIP Documents, and as consideration therefor, the Debtor has obtained all authorizations,

consents and approvals necessary from, and have made all filings with and given all notices (if any such notice was required) to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtor in connection with the execution, delivery, performance, validity and enforceability of the DIP Documents to which the Debtor is party.

6.     Until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Documents and/or the Purchase Agreement, the Debtor shall not in any way prime or otherwise adversely affect the liens granted to the Lender under this Interim Order by providing a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim vis-à-vis the Lender pursuant to sections 364(d) or 507(b) of the Bankruptcy Code or otherwise.

7.     Until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Loan and Security Agreement and/or the Purchase Agreement, the Debtor shall not in any way grant junior liens or encumbrances on the Collateral; and further, the Debtor agrees that it shall not otherwise encumber otherwise unencumbered assets.

8.     No DIP Obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim, except as provided for in the Purchase Agreement.

**Collateral Security**

9.      Pursuant to section 364(c) of the Bankruptcy Code, subject to the Carve-Out and the Diversified Senior Lien, and as protection to the Lender and to secure the repayment of the DIP Obligations, the Lender shall have and is hereby granted a valid, binding, and enforceable perfected first-priority lien on all of the Debtor's assets (excluding the Debtor's estate's claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law ("**Avoidance Actions**")), and a junior lien on the assets listed on Exhibit A which shall be subject to the Diversified Senior Lien.

10.      The liens granted to the Lender under this Interim Order and the DIP Documents shall continue to be at all times first-priority liens (except as set forth in paragraph 10), encumbrances or security interests of every kind and shall not be subordinate or *pari passu* with any other lien, encumbrance or security interest or right of setoff.

11.      This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Lender's liens on and its security interests in the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Lender's liens on and its security interests in the Collateral or to entitle the Lender to the priorities granted herein.  The Lender shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to perfect the liens and security interests granted by or pursuant to this Interim Order or the DIP Documents.

12.     Subject to the entry of the Final Order, pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more parties, or requires the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, or otherwise transfer any such interest or the proceeds thereof or other Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force and effect with respect to the transactions granting the Lender a senior security interest in such interest or the proceeds of any assignment and/or sale thereof by the Debtor in favor of the Lender in accordance with the terms of the DIP Documents and this Interim Order.

13.     Should the Lender, in its sole discretion (but not as a requirement hereunder), from time to time choose to file financing statements, mortgages, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate or perfect any such security interests or liens, the Debtor and its officers are hereby authorized and directed to execute any such documents or instruments as the Lender may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of the entry of this Interim Order.

14.     The Lender may, in its discretion, file a copy of this Interim Order as a financing statement with any recording officer designated to file financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), in such event, the applicable filing or recording officer or registrar is authorized and directed to accept, file and record such copy of this Interim Order.

15.     Lender is hereby granted relief from the automatic stay imposed under section 362(a) of the Bankruptcy Code for Borrower to grant the liens and security interests in favor of the Lender on the Collateral, as contemplated by the DIP Documents and this Interim Order, and further relief to the extent of the exercise by the Lender of any rights or remedies under the DIP Documents.

### Superpriority Administrative Expense Claim

16.     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute an allowed claim, subject to payment of the Carve-Out, as defined below (the "**Superpriority Claim**") against the Debtor, with priority over any and all administrative expenses, diminution claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, and which Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof (excluding proceeds of the Avoidance Actions and any assets that were subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code), subject only to the Diversified Senior Lien and payment of the Carve-Out to the extent specifically provided for herein.

17. Notwithstanding the foregoing provisions of this Interim Order, the following amounts shall be payable from the DIP Loan and chargeable against the Collateral prior to the liens and security interests that are granted to the Lender hereunder (the "**Carve-Out**");

      (i)     the unpaid fees due and payable to the Clerk of the Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; (the "**UST Fees**");

      (ii)    the allowed professional fees and expenses of Debtor's counsel, in as set forth in the Debtor's 6-week budget annexed hereto as <u>Exhibit B</u> (the "**DIP Budget**"), until the earlier of (a) the occurrence of an Event of Default, or (b) the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, provided that payment of the Debtor's attorneys' fees shall be pursuant to properly filed fee applications or statements.

18. The Debtor shall not be permitted under any circumstance to pay, from the Carve-Out or otherwise, any fees or expenses incurred by any party, including the Debtor or any creditors' committee, in connection with (i) the investigation or litigation against the Lender, including, without limitation, challenging the amount, validity, priority or enforceability of, or asserting any defense, counterclaim, or offset to, the DIP Obligations or the Lender's liens in respect thereof, or (ii) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the Lender of any of its rights and remedies under the DIP Documents and this Interim Order, or the enforcement or realization upon any of the liens on or security interests in any Collateral.

19. The Lender may, notwithstanding the provisions of section 362 of the Bankruptcy Code and without any further order of, application or motion to, this Court, in the event of the

occurrence of a curable Event of Default, as set forth in the DIP Loan and Security Agreement that is not cured after three (3) days' notice to the Debtor, and without, any restriction or restraint by any stay under section 362 of the Bankruptcy Code against the enforcement of the liens and security interests or any other rights granted pursuant to the DIP Documents, exercise its rights under and in accordance with the DIP Documents, provided that Lender will consent to an emergency hearing brought by the Debtor to object to the exercise of such rights.

20.     Upon entry of the Final Order, neither the Collateral nor the Lender shall be subject to surcharge, pursuant to sections 506(c) or 105 of the Bankruptcy Code or otherwise, by the Debtor or any other party in interest, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender in this Chapter 11 Cases, including but not limited to funding of the Debtor's ongoing operations by the Lender.

## **Miscellaneous Provisions**

21.     Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the Lender of any liability for any claims arising from the pre-petition or post-petition activities of the Debtor in the operation of the Business, or in connection with its efforts to sell its assets.  So long as the Lender complies with its obligations, if any, under applicable law (including the Bankruptcy Code), (i) the Lender shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (ii) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtor.

22.     The Lender is hereby relieved of the requirement to file proofs of claim in this chapter 11 case with respect to any DIP Obligations and any other claims or liens granted hereunder or created hereby.

23.     The Lender's liens, security interests, administrative priorities and other rights and remedies granted to the Lender by the provisions of this Interim Order and any actions taken pursuant hereto, as well as the Debtor's obligations to allow access to the Lender's representatives, provide information and otherwise comply with its undertakings and agreements set forth in the DIP Documents and this Interim Order, shall continue beyond and survive the expiration of this Interim Order and, to the extent permitted by applicable law, shall not be modified, altered or impaired in any manner by (i) any other financing or extension of credit or incurrence of indebtedness by the Debtor under section 364 of the Bankruptcy Code or otherwise (except as contemplated by the DIP Documents), or (ii) the entry of an order converting the chapter 11 case to a case under chapter 7 of the Bankruptcy Code or dismissing this chapter 11 case.

24.     The terms and provisions of this Interim Order and the DIP Documents, and the Liens and security interests granted to the Lender and the superpriority status of the administrative claims and payment provisions contained in this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash and/or otherwise satisfied as contemplated under the DIP Documents and/or the Purchase Agreement, and/or the DIP Loan and Security Agreement is terminated.

25.     It shall be considered an Event of Default under the DIP Documents if the Debtor seeks entry of an order providing for the sale of the Collateral under section 363 of the

Bankruptcy Code other than as provided for in the Sale Motion or as ordered by the Court pursuant to the Sale Order.

26.     To the extent of any conflict between or among the express terms or provisions of any of the DIP Documents, the Motion, any other order of this Court, or any other agreements and the terms and provisions of this Interim Order, unless such term or provisions herein is phrased in terms of "as defined in," "as described in," or words of similar import, the terms and provisions of this Interim Order shall govern.

27.     This Interim Order, including all findings herein, and DIP Documents shall be valid, binding and enforceable by the Lender against the Debtor, their successors and assigns, including, without limitation, any chapter 11 or chapter 7 trustee appointed as a representative of the Debtor's Estate; provided, however, that the Lender shall have no obligation to extend any financing to any such chapter 11 or chapter 7 trustee or similar person.

28.     Pending and subject in all respect to Final Hearing and Court approval in the Final Order, the Lender shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq*. as amended, or any similar federal or state statute).

29.     If any provision of this Interim Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal or stay shall not affect the validity and priority of any of the DIP Obligations incurred under this Interim Order and the DIP Documents, and prior to the effective date of any such modification, vacation, reversal or stay, the validity, enforceability or priority of the DIP

Obligations shall be governed in all respects by the original provisions of this Interim Order, and the Lender shall be entitled to all the rights, privileges and benefits granted herein. The transactions contemplated by the DIP Loan have been entered into by the Lender in good faith and, as a result, the Lender is entitled to the protections afforded by section 364(e) of the Bankruptcy Code in the event of any reversal or modification of this Interim Order.

30. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the Lender may have to bring or be heard on any matter brought before this Court.

31. This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Interim Order.

32. The Final Hearing on the Motion and DIP Documents shall be heard before this Court on [_____], 2010 at ____ p.m. in Courtroom __ at [_____]. Any party-in-interest objecting to the relief sought in the Final Order shall file with the Court (with a courtesy copy to chambers) its written objection and serve such objection (so as to be received) no later than [_____], 2010 by _____ local time (the "**Objection Deadline**"), on (i) the attorneys for the Debtor, Klestadt & Winters, LLP, 292 Madison Avenue, 17th Floor, New York, New York 10017 (Attn: Ian R. Winters, Esq.), (ii) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, NY 10004, (iii) the attorneys for the Lender, Sheppard, Mullin, Richter & Hampton, 30 Rockefeller Plaza, Suite 2400, New York, NY 10112 (Attn: Carren B. Shulman, Esq.).

33. The Debtor shall mail copies of this Interim Order and notice of the Final Hearing (including the Objection Deadline) to counsel for the Lender, the United States Trustee, and any counsel chosen to represent any official committee appointed in this chapter 11 case.

34.     Notwithstanding Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

Dated: _____, 2010
New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

**Equipment Subject to Diversified Senior Lien**

[*See Attached*]



# DIVERSIFIED
MEDIA GROUP
*Connect easier. Communicate better.*

385 Market Street  Kenilworth, NJ 07033  (908) 445-2600

**Company** Arena Media Network
**Address** 44 East 30th Street
New York, NY 10016

**Contact** Art Williams
**Phone** 212.779.2021
**Fax** 212.779.2612
**e-mail** awilliams@arenamedia.com

# DMG Quote

**Company**
**Project**

**Project Name** AMN - Standard SD System
**Quoted By** John Melillo
**e-mail** jmelillo@divmedia.net
**Phone** 908.445.2556

**Quote Date**
**Revision Date**

DMG Approval: _____  Date _____

| Item | Description | Manf. | Model | Qty | Unit Price | Extended Price | Sub Total |
|------|-------------|-------|-------|-----|------------|----------------|-----------|
| | **Hardware** | | | | | | |
| 1 | Channel ONE SD Single Channel Server | Harris | INSC1S3100 | 13 | $ 16,150.00 | $ 209,950.00 | |
| 2 | Channel ONE SD Clip Option | Harris | INSC1SCL | 13 | $ 2,507.50 | $ 32,597.50 | |
| 3 | AES to Analog Audio Converter | Harris | DAC8800+BC-A4D | 13 | $ 722.00 | $ 9,386.00 | |
| 4 | Analog Audio to AES Converter | Harris | ADC8800+A4BCD | 13 | $ 845.00 | $ 10,985.00 | |
| 5 | Analog Video to SDU Converter | Harris | DES8800+D | 13 | $ 1,440.00 | $ 18,720.00 | |
| 6 | SDI to Analog Video Converter | Harris | ENS8801+D | 13 | $ 1,695.00 | $ 22,035.00 | |
| 7 | Frame - 2RU, W/ Ethernet SNMP | Harris | FR6822+F | 13 | $ 1,720.56 | $ 22,367.28 | |
| 8 | AC Power Source | Harris | 6800+AC | 13 | $ 467.50 | $ 6,077.50 | |
| 9 | 15" Desktop Touchscreen Display | Elo | 1515L | 13 | $ 498.00 | $ 6,474.00 | |
| 10 | VPN / Firewall Security Bundle plus Feature Set | Cisco | 871-SEC-K9 | 13 | $ 584.87 | $ 7,603.31 | |
| 11 | HMX IQ Module, single Head | Avocent | HMIQHDD-001 | 13 | $ 889.20 | $ 11,559.60 | |
| 12 | HMX User Station, Single Head | Avocent | HMX2050-001 | 13 | $ 907.20 | $ 11,793.60 | |
| 13 | Short-Haul Modem, 4-wire Standalone | Black Box | ME800A-R3 | 26 | $ 159.28 | $ 4,141.28 | |
| 14 | Adapter, DB25 Male to RJ11 | Black Box | FA252 | 13 | $ 10.46 | $ 135.98 | |
| 15 | RJ-11 Modular Cable, 6-Wire Straight Pin, 4 ft. | Black Box | EL06MS-04 | 13 | $ 3.56 | $ 46.28 | |
| 16 | RS-232 Data Sharers, 2-Port | Black Box | TL601A-R2 | 13 | $ 285.15 | $ 3,707.00 | |
| 17 | 1000VA On-Line UPS | Black Box | n/a | 13 | $ 670.00 | $ 8,710.00 | |
| 18 | UPS Monitoring Card | Black Box | n/a | 13 | $ 295.00 | $ 3,835.00 | |
| 19 | Installation Hardware & Materials | DMG | n/a | 13 | $ 125.00 | $ 1,625.00 | |
| | | | | | | $ | 391,749.33 |

**Project Total** $ 391,749.33

*Prices do not include freight or applicable sales tax.*

AMN - SD System Quote.xlsx



# DMG Quote

**DIVERSIFIED**
M E D I A   G R O U P
*Connect easier. Communicate better.*

385 Market Street  Kenilworth, NJ 07033  (908) 445-2600

| | |
|---|---|
| Company | Arena Media Network |
| Address | 44 East 30th Street |
| | New York, NY 10016 |

| | |
|---|---|
| Contact | Art Williams |
| Phone | 212.779.2021 |
| Fax | 212.779.2612 |
| e-mail | awilliams@arenamedia.com |

Company
Project

| Project Name | AMN - HD System |
|---|---|
| Quoted By | John Melillo |
| e-mail | jmelillo@divmedia.net |
| Phone | 908.445.2556 |

Quote Date
Revision Date                    Date

DMG Approval:

| Item | Description | Manf. | Model | Qty | Unit Price | | Extended Price | | Sub Total |
|---|---|---|---|---|---|---|---|---|---|
| | **Hardware** | | | | | | | | |
| | **HD** | | | | | | | | |
| 1 | Channel ONE HD/SD Single Channel Server | Harris | INSC1H3100 | 7 | $ | 28,895.00 | $ | 202,265.00 | |
| 2 | Channel ONE HD clip Option | Harris | INSC1HCL | 7 | $ | 3,825.00 | $ | 26,775.00 | |
| 3 | Channel ONE Breakout Box | Harris | INSC1BOB | 7 | $ | 4,250.00 | $ | 29,750.00 | |
| 4 | Channel ONE HD/SD 2D DVE | Harris | INSC1HDDVE | 7 | $ | 3,825.00 | $ | 26,775.00 | |
| 5 | 15 " Desktop Touchscreen Display | Elo | 1515L | 7 | $ | 498.00 | $ | 3,486.00 | |
| 6 | VPN / Firewall Secruity Bundle plus Feature Set | Cisco | 871-SEC-K9 | 7 | $ | 584.87 | $ | 4,094.09 | |
| 7 | HMX IQ Module . single Head | Avocent | HMIQHDD-001 | 7 | $ | 889.20 | $ | 6,224.40 | |
| 8 | HMX User Station, Single Head | Avocent | HMX2050-001 | 7 | $ | 907.20 | $ | 6,350.40 | |
| 9 | Short-Haul Modem, 4-wire Standalone | Black Box | ME800A-R3 | 14 | $ | 159.28 | $ | 2,229.92 | |
| 10 | Adapter, DB25 Male to RJ11 | Black Box | FA252 | 7 | $ | 10.46 | $ | 73.22 | |
| 11 | RJ-11 Modular Cable, 6-Wire Straight Pin, 4 ft. | Black Box | EL06MS-04 | 7 | $ | 3.56 | $ | 24.92 | |
| 12 | RS-232 Data Sharers, 2-Port | Black Box | TL601A-R2 | 7 | $ | 285.15 | $ | 1,996.08 | |
| 13 | 1000VA On-Line UPS | Black Box | n/a | 7 | $ | 670.00 | $ | 4,690.00 | |
| 14 | UPS Monitoring Card | Black Box | n/a | 7 | $ | 295.00 | $ | 2,065.00 | |
| 15 | Installation Hardware & Materials | DMG | n/a | 7 | $ | 125.00 | $ | 875.00 | |
| | | | | | | | $ | | 317,674.03 |

*Prices do not include freight or applicable sales tax.*

Project Total  $            317,674.03

AMN - HD System Quote.xls

**Exhibit B**

**DIP Budget**

[*See Attached*]

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

|  | ACTUAL WE 2/5 | WE 2/12 | WE 2/19 | WE 2/26 | WE 3/5 | WE 3/12 | WE 3/19 | WE 3/26 |
|---|---|---|---|---|---|---|---|---|
| **Receipts** | 728.12 | 0.00 | 10,000.00 | 110,500.00 | 196,128.12 | 0.00 | 28,000.00 | 461,666.66 |
| **Disbursements** | | | | | | | | |
| Payroll, commissions and other employee costs | 2,293.97 | 81,015.29 | 2,293.97 | 79,693.11 | 1,356.47 | 72,305.63 | 1,356.47 | 43,615.00 |
| Vendor and team payments | 0.00 | 59,765.00 | 0.00 | 0.00 | 540,210.70 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 970.00 | 32,000.00 | 18,885.10 | 931.61 | 33,000.00 | - | 18,885.10 | 931.61 |
| Travel and other office expenses | 15,823.63 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 |
| Debtor's counsel | 5,000.00 | 35,000.00 | - | - | 35,000.00 | - | - | - |
| US Trustee fees | - | - | - | - | - | - | - | - |
| DIP interest and fees | - | - | - | - | 2,771.85 | - | - | - |
| **Total cash disbursements** | 24,087.60 | 216,780.29 | 26,679.07 | 89,624.72 | 617,839.02 | 81,305.63 | 25,741.57 | 53,546.61 |
| **Net cashflow** | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| **Beginning cash balance** | 15,286.68 | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) |
| Net cashflow | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| **Ending cash balance (DIP borrowing)** | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) | (313,294.94) |

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

| | WE 4/2 | WE 4/9 | WE 4/16 | WE 4/23 | WE 4/30 |
|---|---|---|---|---|---|
| **Receipts** | 20,728.12 | 0.00 | 20,000.00 | 0.00 | 81,666.66 |
| | | | | | |
| **Disbursements** | | | | | |
| Payroll, commissions and other employee costs | 72,584.10 | 1,078.00 | 72,584.10 | 0.00 | 72,584.10 |
| Vendor and team payments | 557,921.95 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 33,000.00 | - | 18,885.10 | 931.61 | 1,000.00 |
| Travel and other office expenses | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 |
| Debtor's counsel | 50,000.00 | - | - | - | - |
| US Trustee fees | 6,500.00 | - | - | - | - |
| DIP interest and fees | 10,940.95 | - | - | - | - |
| **Total cash disbursements** | 736,447.01 | 10,078.00 | 96,969.20 | 9,931.61 | 79,084.10 |
| | | | | | |
| **Net cashflow** | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| | | | | | |
| **Beginning cash balance** | (313,294.94) | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) |
| Net cashflow | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| **Ending cash balance (DIP borrowing)** | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) | (1,123,410.07) |

**Exhibit D**

**(Proposed Final Order)**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ARENA MEDIA NETWORKS, LLC | Case No.  10-10667(BRL) |
| Debtor. | |

**FINAL ORDER APPROVING DEBTOR'S MOTION FOR ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING AND TO GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 364(c) AND 364(d); AND (II) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C § 362**

Upon the motion, dated February 8, 2010 (the "**Motion**"),[1] of Arena Media Networks, LLC, as debtor and debtor-in-possession in the above-captioned chapter 11 case (the "**Debtor**"), for interim and final orders (i) authorizing Debtor to obtain post-petition financing and to grant security interests and superpriority administrative expense status pursuant to section 105, 364(c) and 364(d) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"); (ii) modifying the automatic stay pursuant to section 362 of the Bankruptcy Code; and (iii) scheduling a final hearing pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and seeking DIP Orders to, *inter alia*:

    i.      authorize the Debtor to obtain a senior secured superpriority term loan in an aggregate amount of $800,000, plus interest, fees and expenses of the Lender (the "**DIP Loan**"), with up to $280,000 in financing available on an interim basis for a period through and including the date of the Final Hearing, from Arena 360 Media, Inc. (the "**Lender**") substantially on the terms and conditions set forth in the DIP Documents attached to the Motion as <u>Exhibit A</u>;

---

[1]  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Motion.

ii.      authorize the Debtor to enter into the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection with the DIP Documents;

iii.     grant the Lender superpriority administrative claim status, pursuant to section 364(c) of the Bankruptcy Code in respect of all of the Debtor's obligations under the DIP Documents (the "**DIP Obligations**");

iv.      grant the Lender a first-priority lien on all of the Debtor's assets, subject to a lien of Diversified Media Group on certain equipment identified in <u>Exhibit A</u> hereto, in an amount no greater than $565,293; and

v.       schedule, pursuant to Rule 4001 of the Bankruptcy Rules, a final hearing (the "**Final Hearing**") on the Motion to be held before this Court to consider entry of this Order authorizing the Debtor to borrow under the DIP Loan and Security Agreement an amount up to $800,000 of loans, plus interest, fees and expenses, in accordance with the terms thereof, to be used for general expenditures and general corporate purposes of the Debtor.

Upon all of the pleadings filed with the Court to date; the Court having read and considered the Motion; the Interim Hearing having been held on February __, 2010, with the appearances of all interested parties noted in the record of the Interim Hearing; the Interim Order having been entered on February __, 2010; no objections having been made to the Motion; the Final Hearing having been held on February __, 2010; and the appearances of all interested parties and arguments of counsel appearing regarding the relief requested in the Motion having been noted in the record of the Final Hearing; and after due deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACTS AND CONCLUSIONS OF LAW**:[2]

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact pursuant to Fed. R. Bankr. P. 7052. Any statements of the Court from the bench at the Final Hearing shall constitute additional findings of fact and conclusions of law as appropriate and are expressly incorporated by reference into this Final Order to the extent not inconsistent herewith.

**A.**     <u>**Petition**</u>.  On February 8, 2010 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code, creating the Debtor's bankruptcy estate (the "**Estate**").  The Debtor has continued in possession of its properties and is operating and managing its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**B.**     <u>**Jurisdiction and Venue**</u>.  The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. § 1408.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief herein are sections 105(a), 362, 364 and 507 of Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

**C.**     <u>**Necessity of Financing**</u>.  The Debtor submits that the proposed financing pursuant to the DIP Loan and Security Agreement has and will allow it to continue the operate its business and administer and preserve the value of its Estate, pending the sale of substantially all of the Debtor's assets.  The ability of the Debtor to finance its operations prior to the sale of substantially all of its assets requires the availability of additional funds, the absence of which would immediately and irreparably harm the Debtor, the Estate and its creditors, and may result in the immediate liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code.  Entry of this Final Order approving the DIP Loan will benefit the Debtor, its Estate and creditors.

**D.**     <u>**Willingness to Lend**</u>.  The Lender is willing to make the DIP Loan available and to make the loans and advances thereunder pursuant to the terms of the DIP Loan and Security Agreement, only upon the condition that the Lender is granted, with respect to the DIP Obligations as provided herein and in the DIP Loan and Security Agreement, subject to the Carve-out and the Diversified Senior Lien, (i) pursuant to section 364(c)(1) of the Bankruptcy

Code, a superpriority administrative expense claim in this chapter 11 case, and (ii) a lien on the Collateral.

   **E.**  <u>**No Credit Available on Other Terms**</u>.  The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.

   **F.**  <u>**Consent To Lien By Pre-petition Lenders**</u>.  The Debtor has obtained the consent to the terms of the DIP Loan and Security Agreement and the proposed orders of pre-petition secured lender BNYH AMN Holdings, LLC and BNYH AMN Holdings, LLC (together, "**BNYH**"), which has a secured lien on all assets of the Debtor's estate in the amount of $15,826,441.13.  The Debtor has also obtained the consent of its only other secured lender, Diversified, to a reduction of its secured lien on certain equipment as set forth above.

   <u>**Business Judgment and Good Faith**</u>.  The terms of the DIP Loan (including as outlined in the DIP Documents) are fair, just, and reasonable under the circumstances, are appropriate for secured financing to a debtor in possession, reflect the Debtor's exercise of its prudent business judgments consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms of the DIP Loan have been negotiated in good faith and at arms' length by and between the parties, with all parties represented by counsel.  Any credit extended under the terms of the DIP Loan is being extended in good faith by the Lender as that term is used in section 364(e) of the Bankruptcy Code.  The Lender is also acting in good faith within the meaning of section 364(e) of the Bankruptcy Code in closing the transactions contemplated in the DIP Documents at any time after the entry of this Interim Order.  The Lender is not an "insider" or "affiliate" of the Debtor (as such terms are defined in the Bankruptcy Code).  The Lender shall be entitled to the full protection of section 364(e) of the

Bankruptcy Code in the event that this Final Order or any provision herein is vacated, reversed or modified, on appeal or otherwise.

G. **No Representations or Reliance**. The Debtor stipulates that the Lender has made no representations, offered no opinions, and has taken no positions, either individually or collectively, regarding the value of any portion of the Collateral and, in determining the value of the Collateral, the Debtor has not relied upon any representation, opinion or position of the Lender in regard thereto.

H. **Property of the Estate**. Each item of the Collateral constitutes property of the Estate of the Debtor.

I. **Good Cause**. The DIP Loan and relief requested in the Motion are necessary, essential, appropriate and in the best interest of the Debtor, its creditors and its Estate, as its implementation will, among other effects, provide the Debtor with the necessary liquidity to: (i) make necessary payments to the Debtor's creditors in order to maintain on-going operations; (ii) preserve and maximize the value of the Estate for the benefit of all creditors of the Debtor; and (iii) avoid immediate irreparable harm to the Debtor, its creditors, business, employees and assets.

J. **Notice**. Pursuant to Rule 4001(c) of the Bankruptcy Rules, notice of the Final Hearing has been given to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) Arena 360 Media, Inc., as Lender; (iii) Sheppard, Mullin, Richter, & Hampton (Attn: Carren B. Shulman, Esq.), as counsel for the Lender; (iv) the holders of the 20 largest unsecured claims as set forth in the consolidated list filed with the Debtor's petitions, including BNYH and Diversified; (v) any known party interested in purchasing the Debtor's assets; (vi) the Office of the United States Attorney General for the Southern District of New

York; (vii) the Internal Revenue Service and any other applicable federal, state and local taxing authorities; and (viii) all known holders of liens, encumbrances, or security interests in the Collateral.

Based on the foregoing,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that:

1.       The Motion is GRANTED.  The Debtor is immediately authorized and, pursuant to the terms of this Final Order and the terms and conditions of the DIP Loan and Security Agreement, empowered to borrow funds under the DIP Financing in such amount or amounts as may be available to or for the benefit of the Debtor from the Lender, which shall not exceed the aggregate amount of $800,000, in accordance with and for the purposes permitted under the DIP Loan and Security Agreement and this Final Order.

2.       Any objections to the Motion with respect to entry of this Final Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

3.       Except as set forth in this Final Order, the terms and conditions of the DIP Loan and Security Agreement are hereby approved in all respects.  All provisions in the DIP Loan and Security Agreement are binding and enforceable in full even if not expressly referenced in this Final Order.  The Debtor and the Lender may finalize, amend, modify, supplement or waive any provision of the DIP Loan and Security Agreement if such amendment, modification, supplement or waiver is permitted under the terms of the DIP Loan and Security Agreement and is not material (in the good faith judgment of the Lender and the Debtor) without any need to apply to, or receive further approval from, the Court.

4.	The Debtor is hereby authorized to: (a) do and perform all acts and to make, execute, and deliver all instruments and documents which may be requisite or necessary for the performance by the Debtor under the DIP Loan and Security Agreement; and (b) pay all principal, interest, reasonable fees and other expenses which may be required or necessary for the Debtor to perform all of the DIP Obligations.  Each officer of the Debtor, and each such other individual as may be so authorized by the Board of Managers of the Debtor, acting singly, is hereby authorized to execute and deliver any and all of the DIP Documents and related documents, such execution and delivery to be conclusive of their respective authority to act in the name and on behalf of the Debtor.

5.	In providing for the advancement of post-petition financing under the DIP Loan and Security Agreement, each of the Debtor and the Lender acknowledges, stipulates and agrees that, in entering the DIP Documents, and as consideration therefor, the Debtor has obtained all authorizations, consents and approvals necessary from, and have made all filings with and given all notices (if any such notice was required) to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtor in connection with the execution, delivery, performance, validity and enforceability of the DIP Documents to which the Debtor is party.

6.	Until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Documents and/or the Purchase Agreement, the Debtor shall not in any way prime or otherwise adversely affect the liens granted to the Lender under this Final Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim vis-à-vis the Lender pursuant to sections 364(d) or 507(b) of the Bankruptcy Code or otherwise.

7.      Until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Loan and Security Agreement and/or the Purchase Agreement, the Debtor shall not in any way grant junior liens or encumbrances on the Collateral; and further, the Debtor agrees that it shall not otherwise encumber otherwise unencumbered assets.

8.      No DIP Obligation, payment, transfer or grant of security under the DIP Documents or this Final Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim, except as provided for in the Purchase Agreement.

### Collateral Security

9.      Pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, and as protection to the Lender and to secure the repayment of the DIP Obligations, the Lender shall have and is hereby granted a valid, binding, and enforceable perfected first priority lien on all of the Debtor's assets, whether now owned or hereafter acquired, now existing or hereafter created and wherever located (excluding the Debtor's estate's claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law ("**Avoidance Actions**")), provided that the Lender's Lien on the assets listed on Exhibit A, shall be subject to the Diversified Senior Lien.

10.     The liens granted to the Lender under this Final Order and the DIP Documents shall continue to be at all times first priority liens (except with respect to the Carve-Out and the Diversified Senior Lien), encumbrances or security interests of every kind and shall not be subordinate or *pari passu* with any other lien, encumbrance or security interest or right of setoff.

11.     The DIP Lender's Liens, as described above, and security interests granted to the DIP Lender herein shall not (i) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor's Estates as a result of any avoidance actions or (ii) be subordinated to or made *pari passu* with any other lien or security interest under section 364(d) of the Bankruptcy Code or otherwise.

12.     Pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more parties, or requires the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, or otherwise transfer any such interest, the proceeds thereof or other forms of Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force and effect with respect to the transactions granting the Lender a senior security interest therein or thereof by the Debtor in favor of the Lender in accordance with the terms of the DIP Documents and this Final Order.

13.     This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Lender's liens on and its security interests in the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Lender's liens on and its security interests in the Collateral or to entitle the Lender to the priorities granted herein.  The Lender shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to perfect the liens and security interests granted by or pursuant to this Final Order or the DIP Documents.

14.     Should the Lender, in its sole discretion (but not as a requirement hereunder), from time to time choose to file financing statements, mortgages, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate or perfect any such security interests or liens, the Debtor and its officers are hereby authorized and directed to execute any such documents or instruments as the Lender may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of the entry of this Final Order.

15.     The Lender may, in its discretion, file a copy of this Final Order as a financing statement with any recording officer designated to file financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), in such event, the applicable filing or recording officer or registrar is authorized and directed to accept, file and record such copy of this Final Order.

16.     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby lifted to grant the liens and security interests in favor of the Lender on the Collateral, as contemplated by the DIP Documents and this Final Order, and is further lifted to the extent of the exercise by the Lender of any rights or remedies under the DIP Documents.

**Superpriority Administrative Expense Claim**

17.     As further protection to the Lender and to secure the repayment of the DIP Obligations, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute an allowed claim (the "**Superpriority Claim**"), subject to payment of the Carve-Out and the Diversified Senior Lien to the extent specifically provided for herein against the Debtor, with priority over any and all administrative expenses, diminution claims, and all other

claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, and which Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof (excluding proceeds of the Avoidance Actions and any assets that were subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code).

18. Notwithstanding the foregoing provisions of this Final Order, the following amounts shall be payable from and chargeable against the Collateral prior to the liens and security interests that are granted to the Lender hereunder (the "**Carve-Out**"):

    i. the unpaid fees due and payable to the Clerk of the Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; (the "**UST Fees**"); and

    ii. the allowed professional fees and expenses of Debtor's counsel, as set forth in the Debtor's Budget annexed as <u>Exhibit B</u> hereto (the "**Priority Professional Expenses**") until the earlier of (x) the occurrence of an Event of Default, or (y) the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, provided that approval and allowance of professionals fees shall be pursuant to properly filed fee applications or statements.

19. The Debtor shall not be permitted under any circumstance to pay, from the Carve-Out or otherwise, any fees or expenses incurred by any party, including the Debtor or any creditors' committee, in connection with (i) the investigation, filing, prosecution or defense of any claims, causes of action, adversary proceedings or other litigation against the Lender, including, without limitation, challenging the amount, validity, priority or enforceability of, or

asserting any defense, counterclaim, or offset to, the DIP Obligations or the Lender's liens in respect thereof, or (ii) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the Lender of any of its rights and remedies under the DIP Documents and this Final Order, or the enforcement or realization upon any of the liens on or security interests in any Collateral.

20.     No other liens shall have priority superior to or *pari passu* with that granted by this Final Order to the Lender, or shall be granted while any portion of the DIP Obligations under the DIP Documents remains outstanding, absent the express written consent of the Lender.

21.     The Lender may, notwithstanding the provisions of section 362 of the Bankruptcy Code and without any further order of, or application or motion to, this Court, in the event of the occurrence of a curable Event of Default, as set forth in the DIP Loan and Security Agreement, that is not cured after three (3) days' notice to the Debtor, and without any restriction or restraint by any stay under section 362 of the Bankruptcy Code against the enforcement of the liens and security interests or any other rights granted pursuant to the DIP Documents, exercise its rights under and in accordance with the DIP Documents, provided that Lender will consent to an emergency hearing brought by the Debtor to object to the exercise of such rights.

22.     Upon entry of this Final Order, neither the Collateral nor the Lender shall be subject to surcharge, pursuant to sections 506(c) or 105 of the Bankruptcy Code or otherwise, by the Debtor or any other party in interest, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender in this Chapter 11 Case, including but not limited to funding of the Debtor's ongoing operations by the Lender.

## Miscellaneous Provisions

23.     Nothing in this Final Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the

imposition upon the Lender of any liability for any claims arising from the pre-petition or post-petition activities of the Debtor in the operation of its business, or in connection with its efforts to sell its assets.  So long as the Lender complies with its obligations, if any, under applicable law (including the Bankruptcy Code), (i) the Lender shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (ii) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtor.

24.     The Lender is hereby relieved of the requirement to file proofs of claim in the Chapter 11 Case with respect to any DIP Obligations and any other claims or liens granted hereunder or created hereby.

25.     Until the DIP Obligations are satisfied pursuant to the DIP Documents and/or the Purchase Agreement, the Lender's liens, security interests, administrative priorities and other rights and remedies granted to the Lender by the provisions of this Final Order and any actions taken pursuant hereto, as well as the Debtor's obligations to allow access to the Lender's representatives, provide information and otherwise comply with its undertakings and agreements set forth in the DIP Documents and this Final Order, shall continue beyond and survive the expiration of this Final Order and, to the extent permitted by applicable law, shall not be modified, altered or impaired in any manner by (a) any other financing or extension of credit or incurrence of indebtedness by the Debtor under section 364 of the Bankruptcy Code or otherwise (except as contemplated by the DIP Documents), or (b) the entry of an order converting this case to a case under chapter 7 of the Bankruptcy Code or dismissing this Chapter 11 Case.

26.     The terms and provisions of this Final Order and the DIP Documents, the liens and security interests granted to the Lender, the Superpriority Claim and the payment provisions contained in this Final Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash or satisfied as contemplated under the DIP Documents and/or the Purchase Agreement.

27.     The Superpriority Claim, the payment provisions contained in this Final Order and the DIP Documents, and any and all liens and security interests granted to the Lender, shall be immediately, automatically and completely released upon indefeasible payment and/or satisfaction of the DIP Obligations as contemplated under the DIP Documents and/or the Purchase Agreement.

28.     It shall be considered an Event of Default under the DIP Documents if the Debtor seeks entry of an order providing for the sale of the Collateral under section 363 of the Bankruptcy Code other than as provided for in the Sale Motion or as ordered by the Court pursuant to the Sale Order.

29.     To the extent of any conflict between or among the express terms or provisions of any of the DIP Documents, the Motion, the Interim Order, any other order of this Court or any other agreements, on the one hand, and the terms and provisions of this Final Order, on the other, the terms and provisions of this Final Order shall govern.

30.     This Final Order, including all findings of fact herein, and DIP Documents shall be valid, binding and enforceable by the Lender against the Debtor, its successors and assigns, including, without limitation, any chapter 11 or chapter 7 trustee appointed as a representative of the Debtor's Estates; provided, however, that the Lender shall have no obligation to extend any financing to any such chapter 11 or chapter 7 trustee or similar person.

31.     If any provision of this Final Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal or stay shall not affect the validity and priority of any of the DIP Obligations incurred under this Final Order and the DIP Documents, and prior to the effective date of any such modification, vacation, reversal or stay, the validity, enforceability or priority of the DIP Obligations shall be governed in all respects by the provisions of this Final Order, and the Lender shall be entitled to all the rights, privileges and benefits granted herein.  The transactions contemplated by the DIP Loan have been entered into by the Lender in good faith and, as a result, the Lender is entitled to the protections afforded by section 364(e) of the Bankruptcy Code in the event of any reversal or modification of this Final Order.

32.     This Final Order shall not be construed in any way as a waiver or relinquishment of any rights the Lender may have to bring or be heard on any matter brought before this Court.

33.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Final Order.

34.     Notwithstanding Rules 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

Dated: [_____], 2010
      New York, New York                                       _____
                                               UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

**Equipment Subject to Diversified Senior Lien**

[*See Attached*]



# DIVERSIFIED
MEDIA GROUP

*Connect easier. Communicate better.*

385 Market Street  Kenilworth, NJ 07033  (908) 445-2600

**DMG Quote**

Company Arena Media Network
Address 44 East 30th Street
New York, NY 10016

Contact  Art Williams
Phone  212.779.2021
Fax  212.779.2612
e-mail  awilliams@arenamedia.com

| | | Company | |
| | | Project | |
| | | Project Name | AMN - Standard SD |
| | | | System |
| | | Quoted By | John Melillo |
| | | e-mail | jmelillo@diwmedia.net |
| | | Phone | 908.445.2556 |
| | | Quote Date | |
| | | Revision Date | |

DMG Approval: _____  Date _____

| Item | Description | Manf. | Model | Qty | Unit Price | | Extended Price | | Sub Total |
|------|-------------|-------|-------|-----|-----------|--|---------------|--|-----------|
| | **Hardware** | | | | | | | | |
| 1 | Channel ONE SD Single Channel Server | Harris | INSC1S3100 | 13 | $ | 16,150.00 | $ | 209,950.00 | |
| 2 | Channel ONE SD Clip Option | Harris | INSC1SCL | 13 | $ | 2,507.50 | $ | 32,597.50 | |
| 3 | AES to Analog Audio Converter | Harris | DAC8800+BCA4D | 13 | $ | 722.00 | $ | 9,386.00 | |
| 4 | Analog Audio to AES Converter | Harris | ADC8800+A4BCD | 13 | $ | 845.00 | $ | 10,985.00 | |
| 5 | Analog Video to SDU Converter | Harris | DES8800+D | 13 | $ | 1,440.00 | $ | 18,720.00 | |
| 6 | SDI to Analog Video Converter | Harris | ENS8801+D | 13 | $ | 1,695.00 | $ | 22,035.00 | |
| 7 | Frame - 2RU, W/ Ethernet SNMP | Harris | FR6822+F | 13 | $ | 1,720.56 | $ | 22,367.28 | |
| 8 | AC Power Source | Harris | 6800+AC | 13 | $ | 467.50 | $ | 6,077.50 | |
| 9 | 15" Desktop Touchscreen Display | Elo | 1515L | 13 | $ | 498.00 | $ | 6,474.00 | |
| 10 | VPN / Firewall Security Bundle plus Feature Set | Cisco | 871-SEC-K9 | 13 | $ | 584.87 | $ | 7,603.31 | |
| 11 | HMX IQ Module, single Head | Avocent | HMIQHDD-001 | 13 | $ | 889.20 | $ | 11,559.60 | |
| 12 | HMX User Station, Single Head | Avocent | HMX2050-001 | 13 | $ | 907.20 | $ | 11,793.60 | |
| 13 | Short-Haul Modem, 4-wire Standalone | Black Box | ME800A-R3 | 26 | $ | 159.28 | $ | 4,141.28 | |
| 14 | Adapter, DB25 Male to RJ11 | Black Box | FA252 | 13 | $ | 10.46 | $ | 135.98 | |
| 15 | RJ-11 Modular Cable, 6-Wire Straight Pin, 4 ft. | Black Box | EL06MS-04 | 13 | $ | 3.56 | $ | 46.28 | |
| 16 | RS-232 Data Sharers, 2-Port | Black Box | TL601A-R2 | 13 | $ | 285.15 | $ | 3,707.00 | |
| 17 | 1000VA On-Line UPS | Black Box | n/a | 13 | $ | 670.00 | $ | 8,710.00 | |
| 18 | UPS Monitoring Card | Black Box | n/a | 13 | $ | 295.00 | $ | 3,835.00 | |
| 19 | Installation Hardware & Materials | DMG | n/a | 13 | $ | 125.00 | $ | 1,625.00 | |
| | | | | | | | $ | 391,749.33 | |

**Project Total $  391,749.33**

*Prices do not include freight or applicable sales tax.*

AMN - SD System Quote.xlsx



# DMG Quote

**DIVERSIFIED**
MEDIA GROUP
*Connect easier. Communicate better.*

385 Market Street  Kenilworth, NJ 07033  (908) 445-2600

Company  Arena Media Network
Address  44 East 30th Street
New York, NY 10016

Contact  Art Williams
Phone  212.779.2021
Fax  212.779.2612
e-mail  awilliams@arenamedia.com

Company
Project

Project Name  AMN - HD System
Quoted By  John Melillo
e-mail  jmelillo@divmedia.net
Phone  908.445.2556

Quote Date
Revision Date  Date

DMG Approval:

| Item | Description | Manf. | Model | Qty | Unit Price | | Extended Price | | Sub Total |
|---|---|---|---|---|---|---|---|---|---|
| | **Hardware** | | | | | | | | |
| | **HD** | | | | | | | | |
| 1 | Channel ONE HD/SD Single Channel Server | Harris | INSC1H3100 | 7 | $ | 28,895.00 | $ | 202,265.00 | |
| 2 | Channel ONE HD clip Option | Harris | INSC1HCL | 7 | $ | 3,825.00 | $ | 26,775.00 | |
| 3 | Channel ONE Breakout Box | Harris | INSC1BOB | 7 | $ | 4,250.00 | $ | 29,750.00 | |
| 4 | Channel ONE HD/SD 2D DVE | Harris | INSC1HDDVE | 7 | $ | 3,825.00 | $ | 26,775.00 | |
| 5 | 15 " Desktop Touchscreen Display | Elo | 1515L | 7 | $ | 498.00 | $ | 3,486.00 | |
| 6 | VPN / Firewall Secruity Bundle plus Feature Set | Cisco | 871-SEC-K9 | 7 | $ | 584.87 | $ | 4,094.09 | |
| 7 | HMX IQ Module , single Head | Avocent | HMIQHDD-001 | 7 | $ | 889.20 | $ | 6,224.40 | |
| 8 | HMX User Station, Single Head | Avocent | HMX2050-001 | 7 | $ | 907.20 | $ | 6,350.40 | |
| 9 | Short-Haul Modem, 4-wire Standalone | Black Box | ME800A-R3 | 14 | $ | 159.28 | $ | 2,229.92 | |
| 10 | Adapter, DB25 Male to RJ11 | Black Box | FA252 | 7 | $ | 10.46 | $ | 73.22 | |
| 11 | RJ-11 Modular Cable, 6-Wire Straight Pin, 4 ft. | Black Box | EL06MS-04 | 7 | $ | 3.56 | $ | 24.92 | |
| 12 | RS-232 Data Sharers, 2-Port | Black Box | TL601A-R2 | 7 | $ | 285.15 | $ | 1,996.08 | |
| 13 | 1000VA On-Line UPS | Black Box | n/a | 7 | $ | 670.00 | $ | 4,690.00 | |
| 14 | UPS Monitoring Card | Black Box | n/a | 7 | $ | 295.00 | $ | 2,065.00 | |
| 15 | Installation Hardware & Materials | DMG | n/a | 7 | $ | 125.00 | $ | 875.00 | |
| | | | | | | | $ | | 317,674.03 |

*Prices do not include freight or applicable sales tax.*

Project Total  $  317,674.03

AMN - HD System Quote.xls

**Exhibit B**

**DIP Budget**

[*See Attached*]

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

| | ACTUAL<br>WE 2/5 | WE 2/12 | WE 2/19 | WE 2/26 | WE 3/5 | WE 3/12 | WE 3/19 | WE 3/26 |
|---|---|---|---|---|---|---|---|---|
| **Receipts** | 728.12 | 0.00 | 10,000.00 | 110,500.00 | 196,128.12 | 0.00 | 28,000.00 | 461,666.66 |
| **Disbursements** | | | | | | | | |
| Payroll, commissions and other employee costs | 2,293.97 | 81,015.29 | 2,293.97 | 79,693.11 | 1,356.47 | 72,305.63 | 1,356.47 | 43,615.00 |
| Vendor and team payments | 0.00 | 59,765.00 | 0.00 | 0.00 | 540,210.70 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 970.00 | 32,000.00 | 18,885.10 | 931.61 | 33,000.00 | - | 18,885.10 | 931.61 |
| Travel and other office expenses | 15,823.63 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 |
| Debtor's counsel | 5,000.00 | 35,000.00 | - | - | 35,000.00 | - | - | - |
| US Trustee fees | - | - | - | - | - | - | - | - |
| DIP interest and fees | - | - | - | - | 2,771.85 | - | - | - |
| **Total cash disbursements** | 24,087.60 | 216,780.29 | 26,679.07 | 89,624.72 | 617,839.02 | 81,305.63 | 25,741.57 | 53,546.61 |
| **Net cashflow** | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| **Beginning cash balance** | 15,286.68 | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) |
| Net cashflow | (23,359.48) | (216,780.29) | (16,679.07) | 20,875.28 | (421,710.90) | (81,305.63) | 2,258.43 | 408,120.05 |
| **Ending cash balance (DIP borrowing)** | (8,072.80) | (224,853.09) | (241,532.16) | (220,656.88) | (642,367.79) | (723,673.42) | (721,414.99) | (313,294.94) |

**Arena Media Networks**
**DIP Budget**
**February 8, 2010**
**Assumes 2/8 filing**
**Team payments according to workout plan**

| | WE 4/2 | WE 4/9 | WE 4/16 | WE 4/23 | WE 4/30 |
|---|---|---|---|---|---|
| **Receipts** | 20,728.12 | 0.00 | 20,000.00 | 0.00 | 81,666.66 |
| | | | | | |
| **Disbursements** | | | | | |
| Payroll, commissions and other employee costs | 72,584.10 | 1,078.00 | 72,584.10 | 0.00 | 72,584.10 |
| Vendor and team payments | 557,921.95 | 0.00 | 0.00 | 0.00 | 0.00 |
| Rent, utilities and insurance | 33,000.00 | - | 18,885.10 | 931.61 | 1,000.00 |
| Travel and other office expenses | 5,500.00 | 9,000.00 | 5,500.00 | 9,000.00 | 5,500.00 |
| Debtor's counsel | 50,000.00 | - | - | - | - |
| US Trustee fees | 6,500.00 | - | - | - | - |
| DIP interest and fees | 10,940.95 | - | - | - | - |
| **Total cash disbursements** | 736,447.01 | 10,078.00 | 96,969.20 | 9,931.61 | 79,084.10 |
| | | | | | |
| **Net cashflow** | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| | | | | | |
| **Beginning cash balance** | (313,294.94) | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) |
| Net cashflow | (715,718.89) | (10,078.00) | (76,969.20) | (9,931.61) | 2,582.56 |
| **Ending cash balance (DIP borrowing)** | (1,029,013.82) | (1,039,091.82) | (1,116,061.02) | (1,125,992.63) | (1,123,410.07) |