Klestadt & Winters, LLP
Ian R. Winters
Joseph C. Corneau
Samir P. Gebrael
292 Madison Avenue, 17th Floor
New York, NY 10017-6314
Tel. (212) 972-3000
Fax. (212) 972-2245

*Proposed Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ARENA MEDIA NETWORKS, LLC, | : | Case No.  10-10667(BRL) |
| | : | |
| Debtor. | : | |
| | : | |

**MOTION FOR ORDERS PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004 AND 6006:  (A)
FIXING THE TIME, DATE AND PLACE FOR THE BIDDING PROCEDURES
HEARING; (B)(i) ESTABLISHING BIDDING PROCEDURES AND BID
PROTECTIONS IN CONNECTION WITH THE SALE OF CERTAIN OF THE ASSETS
OF THE DEBTOR, (ii) APPROVING THE FORM AND MANNER OF NOTICES, (iii)
APPROVING THE ASSET PURCHASE AGREEMENT SUBJECT TO HIGHER AND
BETTER OFFERS AND (iv) SETTING A SALE HEARING DATE; AND (C)(i)
APPROVING THE SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND
CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (ii) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES AND
EXECUTORY CONTRACTS AND (iii) AUTHORIZING THE REJECTION OF NON-
ASSUMED UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (iv)
GRANTING RELATED RELIEF**

   1. Arena Media Networks, LLC, the above-captioned debtor and debtor in

possession (the "Debtor"), by its proposed counsel, Klestadt & Winters, LLP, makes this motion.

By this Motion, the Debtor seeks the following relief:

   a. That the Court enter an order substantially in the form attached hereto as
     Exhibit B (the "Bidding Procedures Order") (a) establishing bidding
     procedures and bid protections (the "Bidding Procedures"), (b) approving
     the form and manner of notices thereof (the "Bidding Procedures Notice"),

and (c) setting a hearing no later than February 19, 2010 (the "Bidding Procedures Hearing") to consider approval of the relief requested herein.

b. That the Court enter an order pursuant to section 105(a), 363 and 365 substantially in the form attached hereto as Exhibit C (the "Sale Order") (a) approving the Asset Purchase Agreement by and between the Debtor and Access 360 Media, Inc. (the "Purchaser" or "Access 360"), dated as of February 8, 2010, pursuant to which the Debtor proposes to sell certain of its assets to Purchaser free and clear of any and all liens, claims and encumbrances, subject to higher and better offers, (b) approving certain procedures in respect to the Debtor's assumption and assignment of certain executory contracts and unexpired leases and rejection of certain other executory contracts and unexpired leases, (c) approving the sale of the Assets (as defined in the Asset Purchase Agreement) free and clear of liens, claims and encumbrances, (d) setting a hearing no later than March 22, 2010 (the "Sale Hearing") to consider approval of the Sale Transaction, (e) approving the form and manner of notices thereof (the "Sale Notice"), and (f) granting related relief.

respectfully represents:

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this Motion (the "Sale Motion") pursuant to 28 U.S.C. §§ 157 and 1334, and the Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York, dated July 10, 1984, of the District Court Judge Robert T. Ward (Acting C.J.). Venue of this case is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 363 and 365 of the Bankruptcy Code and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

3. On February 8, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, and filed various motions and applications seeking certain typical "first day" relief.

4.     Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor has continued in the operation of its business and management of its property as a debtor in possession. No request has been made for the appointment of a trustee or examiner.

5.     Arena Media Networks, LLC is a limited liability company, organized under the laws of State of New York, with its principal place of business located at 44 East 30th Street, 9th Floor, New York, New York 10016.

6.     The Debtor is engaged in the business of broadcasting and utilizing sports-related media content through the operation of a digital media network at professional sports venues in the United States and related activities as currently conducted.

7.     The Debtor has consistently lost money since beginning operations. The Debtor's focus since its founding has been on expanding its network. Unfortunately, this expansion necessarily required significant capital.

8.     For the three year period 2007 through 2009, the Debtor's combined earnings before interest and taxes ("EBIT") loss was approximately $16.3 million.[1] Year to date 2010 losses are approximately $400,000.

9.     The Debtor's losses have been primarily funded by the sale of membership units in Arena as well as by secured financing provided by BNYH AMN Holdings, LLC ("BNYH"), pursuant to that certain Securities Purchase and Loan Agreement, dated on or about October 31, 2007. From November 2007 through November 2008, BNYH provided equity and debt financing on a secured basis to Arena.

---

[1] For year ending December 31, 2007, the Debtor's EBIT loss was approximately $2.6 million. For year ending December 31, 2008, the Debtor's EBIT loss was approximately $5.8 million. For the year ending December 31, 2009, the Debtor's EBIT loss was approximately $7.9 million.

10. The Debtor's operating losses limited its ability to make payments to its creditors and contract counterparties as they became due.

11. In or about November 2008, BNYH provided Arena with $3 million of additional financing and advised that it would not invest any additional funds in Arena or otherwise provide Arena with additional financing.[2] Without additional funding which was required to enable Arena to satisfy its obligations to creditors and contract counterparties, the Board determined that it was necessary to sell the business.

12. By seeking bankruptcy protection in order to facilitate the proposed sale transaction with Purchaser, subject to higher and better offers and in accordance with bidding and notices procedures to be approved by this Court, the Debtor will be able to protect and preserve the value of its assets and business for the benefit of its creditors and employees. These proceedings will enable the debtor to transition its business to a financially sound purchaser, maximize the value of the debtor's goodwill, provide for the assumption and assignment of numerous executory contracts and ensure the continued fulfillment of services in connection therewith, provide employment for certain of the Debtor's employees, and sustain a significant and trusted partner for its customer base.

## A. Marketing and Sale Process

13. Prior to the Petition Date, the Debtor worked to diligently examine and evaluate the assets, properties and rights held by the Debtor's estate.

14. In or about December, 2008, Arena entered into a brokerage agreement with Petsky Prunier ("Petsky"), an investment banking firm that specializes in marketing, information

---

[2] Notwithstanding, at Arena's request, BNYH provided Arena with an additional $500,000 and final round of financing in March, 2009.

and digital media companies. Petsky served as Arena's exclusive broker with the objective of finding a buyer and/or investor for Arena.

15.     From December 2008 through February 2009, Petsky reached out to approximately one hundred and five (105) potential investors or buyers – ranging from financial institutions to venture funds. As a result of those efforts, approximately twenty-five (25) parties requested additional information but only four requested a management presentation.

16.     Of the four potential investors/buyers that Arena's management presented to, three submitted letters of intent which required additional due diligence. From March 2009 through July 2009, Arena supplied due diligence material and negotiated terms with each of those three parties. During the due diligence process, two of the three interested parties decided to withdraw because of the operating losses Arena was incurring and because of the perception that the deteriorating economy would negatively affect Arena's advertising revenue. The third and last potential investor identified by Petsky, a large financial institution, ultimately withdrew its offer, reportedly due to an internal reevaluation of its investment criteria. Petsky had exhausted its resources and could not complete a deal.

17.     Independent of Petsky's efforts, Arena's management began searching for an investor or buyer starting in July 2009. After speaking with approximately twenty-five to thirty (25-30) potential purchasers (separate from the parties identified by Petsky), Arena's management was able to identify four additional potential purchasers. These four interested parties did extensive due diligence on Arena from August 2009 to January 2010. Of the four interested parties that reviewed the company's due diligence information, only Access 360 made an offer.

18. In summary, after an exhaustive sale and marketing process that has lasted over 13 months, Access 360 has emerged as the only party presently willing to purchase Arena's assets.

19. The Debtor concluded that it is in the best interests of the Debtor's estate to sell certain of the assets and/or the operations of the Debtor. The Debtor conducted the sale process internally.

20. After completion of certain expedited due diligence, Purchaser made an offer to purchase the Assets from the Debtor for what will amount to more than $6 million. This is the only bid received to date for the purchase of the Assets and therefore constitutes the highest and best price offered for the Assets to date. The Purchase Price is comprised of the following:

21. An amount equal to the sum of the outstanding principal amount of the DIP Financing on the date of the Closing, not to exceed 800,000, plus the Purchaser/Lender's interest, fees and expenses, an amount representing the Designated Cure Costs (as defined in the annexed Asset Purchase Agreement (the "Asset Purchase Agreement"), which is expected to be between $3.6 and $5.2 million in the aggregate, $100,000 for remaining creditors, and a maximum of $50,000, plus access to Purchaser's back office resources and administrative services, to wind up the estate.

**B.     DIP Financing**

22. Concurrent with this motion, Debtor is filing a motion for an order to approve DIP Financing and the use of Cash Collateral (the "DIP Motion"). The DIP Motion requests an order authorizing the Debtor to borrow up to $800,000 from the Purchaser pursuant to the terms and conditions of a Loan and Security Agreement.

23. The Debtor does not have sufficient available sources of working capital to carry on the operation of its businesses without the DIP Financing and the use of the Cash Collateral.

The Debtor's ability to minimize disruption of its business and operations and permit it to pay operating expenses, maintain business relationships with, among others, its customers, providers, and suppliers, and to meet payroll and other operating expenses is essential to the Debtor's continued viability and the value of its business as a going concern. Simply put, in the absence of the DIP Financing and the use of the Cash Collateral, the continued operation of the Debtor's business would not be possible, and immediate and irreparable harm to the Debtor and its estate would occur. The immediate sale of the Assets is therefore critical to preserve and maintain the going concern value of the Debtor and its estate.

## RELIEF REQUESTED

### A.    The Proposed Sale

24.    The Asset Purchase Agreement sets forth the terms of the sale of certain of the Debtor's assets and business and related transactions, subject to higher and better offers, free and clear of liens, claims, interests and encumbrances. The following is a summary of certain salient provisions of the Asset Purchase Agreement and is qualified entirely by reference to the Asset Purchase Agreement itself.[3]

> (a)    Purchase Price. In consideration for the Acquired Assets, the purchase price for the Purchased Assets shall be (i) the value of the Purchaser DIP Claim (which will be extinguished as of the Closing) (ii) the assumption of the Assumed Liabilities, including the payment of the Designated Cure Costs, (iii) $100,000 for remaining creditors, and (iv) a maximum of $50,000, plus access to Purchaser's back office resources and administrative services, to wind up the estate.

> (b)    Purchased Assets. Under the Asset Purchase Agreement, the Debtor will transfer all right, title and interest in certain of its assets (described with more particularity in the Asset Purchase Agreement as Acquired Assets),

---

[3] The following summary of the Asset Purchase Agreement is provided for the convenience of the Court and the parties in interest. A copy of the Asset Purchase Agreement is attached hereto as **Exhibit A**. To the extent that there are any discrepancies between this summary and the Asset Purchase Agreement, the terms and language of the Asset Purchase Agreement shall govern. Unless defined herein, capitalized terms defined in the Asset Purchase Agreement shall have the meanings ascribed to them therein.

including all Purchased Accounts Receivable, all unearned or unrecouped advances, all tangible personal property, all rights of the Debtor under and in connection with the Designated Contracts, all customer mailing lists and databases, all sales and advertising audiovisual material and literature, all Trademarks relating to or used in connection with the Business, all causes of action for the benefit of the Debtor related to the Acquired Assets, and all goodwill associated with Acquired Assets, free and clear of any liens, claims or encumbrances, except as expressly permitted by the Asset Purchase Agreement.

(c)     <u>Assumed Liabilities</u>.    Purchaser shall assume and the Designated Contract Liability and Diversified Media Liability up to $565,293, and agree to perform in accordance with their terms, the Designated Contracts including the Designated Cure Costs.    To effectuate the assumption of the Assumed Liabilities by Purchaser hereunder, Purchaser and Debtor shall execute and deliver at or before the Closing the Assumption Agreement or a Sale Order that includes approval of the Assumption of all Designated Contracts.

(d)     <u>Representations and Warranties</u>.    The Debtor has represented and warranted that it is the title owner to the Acquired Assets, and, subject to approval by the Court, it has the requisite legal authority to sell and assign such assets, Designated Contracts, together with certain of its assets and business to Purchaser, and that all of the other representations and warranties provided under the Asset Purchase Agreement are true and correct as detailed more fully in Article V of the Asset Purchase Agreement.    Purchaser has represented and warranted that it is a corporation duly formed under the laws of the State of Delaware, and subject to satisfaction of the conditions and requirements under the Asset Purchase Agreement, has the requisite power, authority, and financial capability to consummate the transactions contemplated hereunder, and that all of the other representations and warranties provided under the Asset Purchase Agreement are true and correct as detailed more fully in Article VI of the Asset Purchase Agreement.

(e)     <u>Termination Rights</u>.    The Asset Purchase Agreement may be terminated by written notice promptly given to the other party at any time prior to the Closing Date by either party by mutual consent, if a permanent injunction or other order is entered that prevents the consummation of the transactions contemplated thereunder, if the Procedures Order is not entered on or before February 19, 2010, if the Sale Order is not entered on or before March 23, 2010, if the transaction has not closed within fifteen (15) days after entry of the Sale Order, if the Court approves an Alternate Transaction (including higher and better offer) as defined in the Asset Purchase Agreement, upon the voluntary or involuntary dismissal of the Bankruptcy Case, if there has been a material breach of any of the representations, warranties, covenant or other agreements set forth in the Asset Purchase Agreement by either party which breach is not curable or is not cured within three (3) days of notice of such breach, and as more fully detailed in Article XII of the Asset Purchase Agreement.

25.     The proposed sale would result in the satisfaction of the entire DIP Loan up to $800,000, plus the Lender's interest, fees and expenses, the effect of which is to release the Debtor from significant secured obligations collateralizing the funds advanced by the Purchaser to fund the Debtor's operations during the case and the continuing advances necessary to sustain operations through a sale.   The proposed sale provides for the continuation of business operations, preservation of attendant jobs to the extent employees of the Debtor become employees of the Purchaser, and reduction in significant rejection damage claims which would accrue in the event that the company were liquidated.

26.     Furthermore, Arthur Williams and James McDade, Chief Executive Officer and Chief Financial Officer of the Debtor, respectively, have committed to assist the Debtor in connection with the wind up of the estate without charge or other compensation and Purchaser has consented to the provision of such services if Messrs, Williams and McDade become employees of the Purchaser.

## PROPOSED BIDDING PROCEDURES, AUCTION AND AUCTION PROCEDURES

27.     Consistent with the Asset Purchase Agreement, the Debtor is proposing the Bidding Procedures, which are designed to maximize the value of the Assets for the Debtor's estate, creditors and other interested parties.   Specifically, as discussed in more detail below, Purchaser has entered into the Asset Purchase Agreement, which is subject to higher and better offers.   In that regard, Purchaser has expended considerable time, effort and resources conducting due diligence and negotiating the Asset Purchase Agreement.   In addition, Purchaser's investors have advanced significant sums to the Debtor as part of the approved DIP Loan, while the Debtor continues to sustain significant cash flow and operating deficiencies. Accordingly, the Debtor seeks - and Purchaser requires - the immediate entry of the Bidding Procedures Order.

28.     The Debtor proposes that competing offers ("Competing Offers") for the Assets be governed by the following Bidding Procedures:[4]

29.     Any entity that wishes to make a bid for Assets must provide the Debtor with sufficient and adequate information to demonstrate, to the absolute satisfaction of the Debtor, that such Competing Offeror (i) has the financial wherewithal and ability to consummate the Sale Transaction including evidence of adequate financing, and including a financial guaranty, if appropriate, (ii) can provide all non-debtor contracting parties to the Designated Contracts with adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code; (iii) will be on substantially the same terms and conditions as the Asset Purchase Agreement except for price; (iv) will require the payment of a purchase price to the Debtor of not less than $7 million (the "Topping Price"); (v) will be accompanied by an earnest money deposit of 10% of the Competing Offer; and (vi) will be filed with the Bankruptcy Court and served upon the Debtor and Purchaser on or before March 16, 2010. Any party satisfying such criteria shall be designated as a "Qualified Party." Any Qualified Party shall be permitted to conduct reasonable due diligence for purposes of making a Competing Offer, subject to executing an appropriate confidentiality agreement.

30.     The Debtor shall entertain Competing Offers that are substantially the same terms and conditions as those terms set forth in the Asset Purchase Agreement and the documents set forth as exhibits thereto.

31.     BNYH has agreed that it will not submit a Competing Offer, including an offer to "bid-in" its secured debt, which is in excess of $15 million, as against Purchaser/Lender only.

---

[4] The summary description of the Bidding Procedures provided herein is provided for the convenience of the Court and parties in interest. To the extent that there are any discrepancies between this summary and the Bidding Procedures Order, the terms and language of the Bidding Procedures Order shall govern. Unless otherwise defined herein, capitalized terms defined in the Bidding Procedures shall have the meaning ascribed to them in the Bidding Procedures Order or the Asset Purchase Agreement.

BNYH has also acknowledged that it will release any rights to payment with respect to claims against the Debtor and the Debtor's estate in connection with a plan confirmed by this Court.

32. Competing Offers related to the Debtor must (a) be in writing and (b) be received by Ian R. Winters, Esq. of Klestadt & Winters, LLP, 292 Madison Avenue, 17th Floor, New York, New York 10017 so that such bid is received by such parties no later than March 16, 2010 at 5 p.m. (the "Competing Offer Deadline"). Parties not submitting Competing Offers by the Competing Offer Deadline shall not be permitted to participate at the Auction.

33. Competing Offers must be accompanied by a good faith deposit in the amount of 10% of the Competing Offer, in the form of a certified or cashier's check made payable to KLESTADT & WINTERS, LLP ESCROW MANAGEMENT ACCOUNT. All such deposits shall be retained by the Debtor pending the hearing to consider the Sale Motion and shall be returned ten (10) days after entry of an order by the Court approving the Sale, except that the Debtor shall hold the deposit of the winning bidder (as determined by the Debtor and accepted by the Court) ("Winning Bidder") and apply such deposit to the Purchase Price at closing. As provided above, Purchaser has funded $280,000 of advances made to the Debtor, and will have expended up to $800,000 before the Sale Hearing if the Final Order is approved for the DIP, and Purchaser has expended significant costs in its due diligence to review and analyze the assets, the structure of the business, leases and contracts in connection with the purchase, as well as its legal and other professional costs to negotiate and draft the Asset Purchase Agreement and Motion, and accordingly, is not required to post a deposit.

34. Any Competing Offer by a Qualified Party conforming to the within requirement shall be considered at the auction to be held at the auction to be held at the Offices of Klestadt & Winters, LLP, 292 Madison Avenue, 17th Floor, New York, NY 10017-6314, in a room to be

announced, or in such manner and at such alternative location as the Debtor may determine or the Court may direct, on March 18, 2010 commencing at 10:00a.m. (EST) (the "Auction").

35.     The Debtor shall, after the Competing Offer Deadline and prior to the Auction, evaluate all bids received, and determine which bid reflects the highest or best offer for the Assets.  The Debtor shall announce such determination at the commencement of the Auction and then the Debtor shall conduct the Auction among the parties submitting Competing Offers to determine if any higher or better offer might be obtained.  Any further bids made at the Auction shall be in increments of at least $150,000 greater than the preceding bid.

36.     If there is a successful Competing Offer for the Assets, such successful bidder shall be bound by all of the terms and conditions of the Agreement with appropriate modifications for (i) the identity of the successful bidder and (ii) the purchase price as the same shall have been increased at the Auction.

37.     In the event that the Asset Purchase Agreement is terminated because the Court approves an Alternative Transaction or an Alternative Transaction is consummated or there has been a material breach by the Debtor in closing on the Asset Purchase Agreement as detailed in Article XI of the Asset Purchase Agreement, the Debtor shall pay Purchaser a fee of 3.0 percent of the Purchase Price inclusive of costs of assumption of debt currently estimated at $5.2 million and the Purchase DIP Claim, with a floor of no less than $180,000 (the "Break-Up Fee"), plus reimbursement of Purchaser's expenses, including attorneys, investment banking, accountant and other professional fees and expense incurred in pursuit of its bid and preparation of the Asset Purchase Agreement and related documents ("Expense Reimbursement"), to compensate the Purchaser for its efforts in connection with it being the "stalking horse" bidder for the Acquired Assets, including the costs of the Purchaser incurred in performing due diligence, negotiating

and documenting the terms of this Agreement and the DIP Financing and representing its interests with respect to the proposed sale and the Debtor's Bankruptcy Case. The Break-Up Fee and Reimbursement Expense shall constitute a first priority administrative expense of the Debtor pursuant to Section 503(b) and shall be paid within two (2) days of any closing in connection with the Acquired Assets and without further order or application to the Bankruptcy Court.

38. In the event that a Competing Offer is the Winning Bidder and such Winning Bidder fails to consummate the proposed transaction by the Closing Date, such bidder's deposit shall be forfeited to the Debtor (but not as liquidated damages, the Debtor reserving the right to pursue all remedies that may be available to it) and the Debtor shall be free to consummate the proposed transaction with the next highest bidder at the final price bid by such bidder at the Auction (or, if that bidder is unable to consummate the transaction at that price, the Debtor may consummate the transaction with the next higher bidder, and so forth) without the need for an additional hearing or order of the Bankruptcy Court.

39. All bids for the purchase of the Debtor's assets shall be subject to approval of the Bankruptcy Court.

40. No bids shall be considered by the Debtor or the Bankruptcy Court unless a party submitted a Competing Offer in accordance with the Bidding Procedures and participated in the Auction. The Debtor, in its absolute discretion, may reject any Competing Offers not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules of the Court, or contrary to the best interests of the Debtor and parties of interest.

41. All bids are irrevocable until the earlier to occur of: (i) the closing of the Sale Transaction, or (ii) fifteen (15) days following the last date of the Auction (as may be adjourned).

42.     All bids are subject to such other terms and conditions as are announced by the Debtor at the outset of the Auction.

## BID PROTECTIONS

43.     By and through this Motion the Debtor is seeking the authority to implement the Break-Up Fee and Expense Reimbursement (as defined above and in the Asset Purchase Agreement) and topping bid (collectively, the "Bid Protections"). The Debtor believes that the Bid Protections are fair and reasonable (a) in view of the intense analysis and negotiation undertaken by the Purchaser in connection with the transaction contemplated by the Asset Purchase Agreement and (b) because the efforts of the Purchaser have increased the chances that the Debtor will receive the highest or otherwise best offer for the Assets by establishing a minimum bid for other bidders, subjecting the Assets to an open auction and serving as a catalyst for other potential or actual bidders. Thus, the Bid Protections benefit the Debtor, its estate, its creditors and all other parties in interest.

44.     The Purchaser is unwilling to commit to hold open its offer to purchase the Assets under the terms of the Asset Purchase Agreement and to provide DIP Financing unless the Bid Protections are approved. Accordingly, the Debtor requests that the Court approve the Bid Protections and authorize payment of the Break-Up Fee and Expense Reimbursement pursuant to the terms and conditions of the Asset Purchase Agreement.

## ASSUMPTION AND ASSIGNMENT AND REJECTION OF EXECUTORY CONTRACTS AND LEASES

### A.     Assigned Contracts

45.     In connection with the Sale Transaction, the Debtor seeks authority under section 365 of the Bankruptcy Code to (a) assume and assign the Designated Contracts, and (b) execute and deliver to the Purchaser (or the Winning Bidder, as the case may be) such documents or

other instruments as may be necessary to assign and transfer the Designated Contracts as of the date of the Closing on the Asset Purchase Agreement (and expressly subject to Closing).

46.     By and through this Motion, the Debtor is seeking authority to assume any and all Designated Contracts (as defined in the Asset Purchase Agreement) following and subject to the Closing, and to assign all such contracts to the Purchaser.  The Debtor has reviewed its books and records and believes that the aggregate amounts necessary to cure all of the Designated Contracts are not greater than $5.2 million.  The Debtor seeks the authority to assume and assign to the Purchaser any and all of the Designated Contracts which the Purchaser in its sole discretion elects to assume and gives notice of the same to the Debtor. As to all other unexpired leases and executory contracts, as well as any Designated Contracts which the Purchaser notifies the Debtor prior to the closing that it elects, in its sole discretion, not to assume, each and every such lease and contract shall not be assumed by the Purchaser and shall be rejected.

47.     Under the Asset Purchase Agreement, the Purchaser would not be liable as to any obligation under or with respect to any Designated Contract arising on account of or with respect to any time prior to the Closing other than the Cure Amount.

48.     Cure notices will be sent to each of the counterparties to the Designated Contracts on a confidential basis (the "Cure Notices").  The Debtor anticipates that the Cure Amounts will have been agreed to by the counterparties in advance of the Sale Hearing or the contract likely will be removed from the Designated Contract list at or before the Sale Hearing; however, any non-debtor party who objects to its Cure Amount set forth in its Cure Notices must file an objection to the Cure Amount with respect to such Designated Contract, state with specificity the nature of the objection and the amount of the alleged Cure Amount and include appropriate supporting documentation demonstrating the calculation of the cure amounts as claimed not later

than the Cure Objection Deadline as provided for below. Any such objections must be (a) filed with the Court and (b) served upon (i) the attorneys for the Debtor, Klestadt & Winters, LLP, 292 Madison Avenue, 17th Floor, New York, New York 10017 (Attn: Ian R. Winters, Esq.), (ii) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, NY 10004 and (iii) the attorneys for the Purchaser, Sheppard, Mullin, Richter & Hampton, 30 Rockefeller Plaza, Suite 2400, New York, NY 10112 (Attn: Carren B. Shulman, Esq.), so as to be actually received no later than 12:00 Noon (EST) on March 16, 2010 (the "Cure Objection Deadline").

49.     If no objection to the Cure Amounts is timely received in accordance with the preceding paragraph, or if a timely objection is received but is not in compliance with the foregoing requirements, any non-debtor party to a Designated Contract shall be barred and permanently enjoined from asserting any amounts in excess of the Cure Amount set forth in its Cure Notices. Any objection to any Cure Amount shall be heard at the Sale Hearing.

50.     Any non-debtor party to a Designated Contract shall have the right to request adequate assurance of performance by the Purchaser of such a Designated Contract either by contacting the Purchaser through its attorneys, or filing, prior to the deadline for objecting to the proposed Sale Order, such request with the Court and serving (i) the attorneys for the Debtor, Klestadt & Winters, LLP, 292 Madison Avenue, 17th Floor, New York, New York 10017 (Attn: Ian R. Winters, Esq.), (ii) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, NY 10004 and (iii) the attorneys for the Purchaser, Sheppard, Mullin, Richter & Hampton, 30 Rockefeller Plaza, Suite 2400, New York, NY 10112 (Attn: Carren B. Shulman, Esq.), indicating what adequate assurance it requires from the Purchaser.

51.     If no such requests for adequate assurance are timely made or filed, the Purchaser shall be deemed to have provided adequate assurance as required by section 365(f)(2)(B) of the

Bankruptcy Code. If any such requests are filed, the Court, at the Sale Hearing, shall determine whether the Purchaser has provided adequate assurance as required by section 365(f)(2)(B) of the Bankruptcy Code.

52.     The Debtor believes that those procedures and deadlines are fair and reasonable, and will provide sufficient notice to the non-debtor parties to the Designated Contracts. These procedures are designed to provide certainty to the Debtor and the non-debtor parties to the Designated Contracts regarding their obligations and rights in respect of the Cure Amounts. Accordingly, the Debtor requests that the Court approve the foregoing procedures and deadlines.

## NOTICE OF SALE, AUCTION AND BIDDING PROCEDURES

53.     Assuming the Court enters the proposed Bidding Procedures Order, the Debtor, no later than three days after entry of the Bidding Procedures Order, will serve a copy of this Motion, the proposed Bidding Procedures Order, the proposed Sale Order and all exhibits to such orders upon the following persons by first-class mail, postage prepaid: (i) The Office of the United States Trustee; (ii) the attorneys for the Purchaser; (iii) all counterparties to the Designated Contracts; (iv) all parties who have made written expressions of interest in acquiring the Assets or the Business within twelve (12) months prior to the date of the Motion; (v) all known persons holding a lien on any of the Assets; (vi) all taxing authorities that have jurisdiction over the Assets; and (vii) parties listed on the Debtor's list of twenty (20) largest creditors (collectively, the "Bidding Procedures Parties").

54.     In addition, no later than three days after entry of the Bidding Procedures Order, the Debtor shall cause the form of sale notice, a copy of which is annexed hereto as Exhibit D, to be (i) served upon the Bidding Procedures Parties, and (ii) served upon all known creditors and all known parties in interest in this chapter 11 case (collectively, the "Auction Notice Parties").

55.     The Debtor believes that the foregoing notice to the Auction Notice Parties is sufficient to provide effective notice of the Bidding Procedures, the Auction and the proposed Sale to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest possible participation in the Auction while minimizing the costs to the estate. Accordingly, the Debtor requests that the Court find that notice in this manner is sufficient and that no further notice of the Auction, the Bidding Procedures or the proposed Sale is required.

## BASIS FOR RELIEF REQUESTED

**A.    The Proposed Sale is Within the Debtor's Sound Business Judgment and Should Therefore Be Approved**

56.     The Debtor submits that ample authority exists for the approval of the Sale Transaction to the Purchaser pursuant to the Asset Purchase Agreement, or to such other purchaser submitting a higher and better offer for the Assets.  Section 363(b) of the Bankruptcy Code permits a debtor to sell assets outside the ordinary course of its business.  That section provides in pertinent part, "[t]he trustee,[5] after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  While Section 363(b) is devoid of any standards to be applied to a debtor's request to sell assets, a wide body of case law has evolved containing the judicial standards governing sales of assets.

57.     In In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983), one of the seminal and most widely followed cases dealing with asset sales, the Second Circuit determined that a sale of assets could be approved if the debtor could demonstrate an "articulated business justification" for the sale.  722 F.2d at 1070.  The Court further held that the factors to be considered in determining whether a sound business reason exists include the following:

---

[5]Pursuant to Section 1107(a) of the Bankruptcy Code, the debtor in possession has all of the powers of a trustee (except the power to investigate the debtor's own financial affairs).

the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, *most importantly perhaps, whether the asset is increasing or decreasing in value*.

Id. at 1071 (emphasis supplied).

58.     The Lionel decision has been widely accepted and applied by numerous other courts facing a debtor's request to sell assets, including requests to approve a sale of certain of the assets of a debtor's estate.  See, e.g., In re the Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991); In re Eng'g Prod. Co., 121 B.R. 246 (Bankr. E.D. Wis. 1990); In re Thomson McKinnon Sec., Inc., 120 B.R. 301 (Bankr. S.D.N.Y. 1990); In re Channel One Communications, Inc., 117 B.R. 493 (Bankr. E.D. Mo. 1990); In re Brethren Care, 98 B.R. 927 (Bankr. N.D. Ind. 1989).  As will be demonstrated below, application of the above-listed factors demonstrates that approval of the Asset Purchase Agreement is warranted at this time.

59.     In addition to requiring sound business reasons to approve a sale pursuant to section 363(b) of the Bankruptcy Code, many courts have required a showing that the price to be obtained for assets be fair and reasonable; that the sale to the proposed purchaser was negotiated in good faith; and that it does not unfairly benefit insiders, the purchaser, or a certain creditor or class of creditors.  See, e.g., In re Channel One Communications, 117 B.R. at 494-97; In re Indus. Valley Refrig. & Air Cond. Supplies, Inc., 77 B.R. 15 (Bankr. E.D. Pa. 1987).

60.     The Debtor and Purchaser negotiated in good faith, at arms' length, and with a view towards maximizing the value of the Debtor's estate for all creditors, rather than to benefit insiders or a particular creditor.

61. The Debtor is confident that the Purchase Price is the best achievable under the present circumstances. Nonetheless, the Asset Purchase Agreement is subject to higher and better offers, thereby ensuring that the best possible offer has been or will be received.

62. The Asset Purchase Agreement does not dictate the terms of a plan of reorganization, as it does not attempt to restructure the rights of creditors. In point of fact, it is the Debtor's intention to prepare and file a plan of liquidation at a later date. A sale of assets will not be approved where such sale dictates the terms of a plan of reorganization, thereby denying creditors the procedural protections of the plan process. In re Continental Air Lines, Inc., 780 F.2d 1223, 1227-28 (5th Cir. 1986); In re Braniff Airways, Inc., 700 F.2d 935, 939-940 (5th Cir. 1983); see also In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888-90 (Bankr. S.D.N.Y. 1990).

63. For example, the court in Braniff refused to approve a sale where, under the terms of the sale, secured creditors were required to vote a portion of their deficiency claim in favor of any future plan and where part of the consideration to be received from the sale was required to be distributed only to certain employees and creditors. Braniff, 700 F.2d at 939-40.

64. In contrast, in the case at bar, there are no sale conditions which predetermine the rights of creditors under a plan. Moreover, as discussed above, the notice provisions complied with by the Debtor ensure that full and fair disclosure, as well as the opportunity to object, will be afforded to all creditors.

65. Many courts require that "fair and accurate notice" be given of the proposed sale under section 363(b) of the Bankruptcy Code. See, e.g., In re Delaware & Hudson Ry., 124 B.R. 169, 176 (D. Del. 1991); Channel One 117 B.R. at 496 (Bankr. E.D. Mo. 1990); Naron & Wagner, Chartered, 88 B.R. 85, 88 (Bankr. D.Md. 1988). Fair and accurate notice should inform

all interested parties of the liquidation of the debtor's business; disclose accurately the terms of the sale; explain the effect of the sale upon the debtor's business; and explain why the sale is in the best interests of the debtor's estate. Delaware & Hudson, 124 B.R. at 180; see also, Naron & Wagner, 88 B.R. at 88.

66.     The Debtor submits that the notice given here alerted parties in interest to the sale contemplated by the Asset Purchase Agreement, described and explained all material terms thereof, and explained the effect of the sale on the Debtor's business.

**B.     The Purchaser is a Good Faith Purchaser and is Entitled to the Protections of Section 363(m) of the Bankruptcy Code**

67.     Section 363(m) of the Bankruptcy Code provides:  "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."  11 U.S.C. § 363(m).

Although the Bankruptcy Code does not define "good faith," in In re Colony Hill Assocs., 111 F.3d 269 (2d Cir. 1997) the Second Circuit held that:

> The "good faith" component of the test under § 363(m) speaks to the equity of [the bidder's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.
>
> 111 F.3d at 276 (quoting In re Rock Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)) (internal quotations omitted).

68.     As set forth above, the Purchaser was selected by the Debtor after aggressively seeking other potential purchasers, engaging in extensive negotiations and determining that the terms of the Purchaser's bid were the most favorable option.  The Asset Purchase Agreement is a

product of extensive arms-length negotiations and was not in any way tainted by fraud, collusion or bad faith. Accordingly, the Debtor requests that the Court make a finding that the Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code.

69. The executive officers and directors/managers of BNYH and Purchaser have no existing or former business or commercial relationship.

70. The executive officers and directors/managers of Debtor and Purchaser have no existing or former business or commercial relationship. However, certain members of the Debtor's senior management are currently in negotiations with Purchaser to become employees of Purchaser. As of the date of this Motion, however, no such agreements have been confirmed, finalized or memorialized in writing.

**C.** **The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, Encumbrances and Interests**

71. The Debtor seeks authorization to sell the Assets to Purchaser free and clear of all liens, claims and encumbrances, except as expressly permitted by the Asset Purchase Agreement. Nonetheless, the Assets may be sold free and clear of liens in accordance with section 363(f) of the Bankruptcy Code, which provides, in pertinent part:

> (f)     The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if
>
> applicable non-bankruptcy law permits sale of such    property free and clear of such interest;
>
> such entity consents;
>
> such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> such interest is in bona fide dispute; or
>
> such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

72.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will be sufficient to permit the Sale Transaction free and clear of liens, claims, encumbrances, pledges, mortgages, security interests, charges, options, and other interests.  The Debtor submits that, the Asset Purchase Agreement provides that all liens, to the extent that any such liens exist, will attach to the proceeds of sale in the order of their priority and to the extent of their validity.  As such, the rights of secured creditors are preserved.  Thus, the Assets may be sold free and clear of such liens pursuant to section 363(f)(3) of the Bankruptcy Code.  In re General Bearing Corp., 136 B.R. 361 (Bankr. S.D.N.Y. 1992); In re Oneida Lake Development, Inc., 114 B.R. 352 (Bankr.  N.D.N.Y. 1990).

73.     Notwithstanding the foregoing, the Debtor believes that both its Purchaser and its prepetition secured creditors shall consent to the proposed Sale Transaction.

**D.      The Court Should Waive or Reduce the Ten Day Stay Periods Required by Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure**

74.     Pursuant to Bankruptcy Rule 6004(g), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 10 days after entry of the order.  Fed. R. Bankr. P. 6004(g).  The purpose of Bankruptcy Rule 6004(g) is to provide sufficient time for an objecting party to appeal before the order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(g).

75.     Although Bankruptcy Rule 6004(g) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, Collier suggested that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."   10

Collier on Bankruptcy 15th Ed. Rev., 6004.09 (L. King, 15th rev. ed. 2005). Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

76. Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for 10 days, unless the court orders otherwise.

77. To preserve the value of the Assets and limit the costs of administering and preserving the Assets, it is critical that the Debtor close the Sale Transaction as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtor hereby requests that the Court waive the 10 day stay periods under Bankruptcy Rules 6004(g) and 6006(d), or in the alternative, if an objection to the sale or to the assignment of a contract or lease is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal to allow the sale to close as provided under the Asset Purchase Agreement.

**E.** **The Assumption and Assignment of Designated Contracts Should be Authorized and the Balance of Leases/Contracts Should be Rejected**

78. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(f) of the Bankruptcy Code provides that a debtor in possession may assign an executory contract or unexpired lease of the debtor only if (a) the debtor in possession assumes such contract or lease in accordance with the provisions of section 365, and (b) adequate assurance of future performance by the assignee of such contract or lease is provided. 11 U.S.C. § 365(f)(2).

79.     Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory lease or executory contract of a debtor. This subsection provides:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
>
> (A) cures or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provide adequate assurance of future performance under such contract or lease.
>
> 11 U.S.C. § 365(b)(1).

80.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir.1993).

81.     When an executory contract or lease is to be assumed and assigned, adequate assurance may be provided by, among other things, demonstrating the financial health of the assignee and its experience and ability in managing the type of enterprise or property assigned. See e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when a prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of success).

82.     All of Debtor's trade accounts, notes and other receivables shall be included in the authorization of assumption and assignment as requested relief herein. Pursuant to the Asset

Purchase Agreement, to the extent that any account receivable is unable to be assigned or assumed because of any applicable law or regulation, the Debtor acknowledges and agrees that the receipt by the Purchaser of any account receivable shall be held in trust for Purchaser and immediately be endorsed over and remitted to Purchaser.

83. To the extent that any defaults exist under any Designated Contracts, the Debtor will cure, or provide adequate assurance of cure of, such defaults within the meaning of section 365(b)(1)(A) and in accordance with the Asset Purchase Agreement. Moreover, the Debtor will demonstrate facts at the Sale Hearing that show the Purchaser's (or the Winning Bidder's, as the case may be) financial credibility, experience in the industry, and willingness and ability to perform under the Designated Contracts. Therefore, the Sale Hearing will provide the Court and other interested parties with an opportunity to evaluate and, if necessary, challenge the ability of the Purchaser (or the Winning Bidder, as the case may be) to provide adequate assurance of future performance under the Designated Contracts. Accordingly, the Debtor submits that the assumption and assignment of the Designated Contracts as set forth herein should be approved.

84. To the extent an unexpired lease or executory contract is not assumed and assigned under the Asset Purchase Agreement, the Debtor requests that any and all such remaining leases and contracts be rejected as of the date of the Sale Order pursuant to Section 365 of the Bankruptcy Code or, at the latest, upon confirmation of a plan of liquidation. This will cut off any continuing liabilities that may accrue under any such agreements. In addition, the Purchaser has required that the Debtor obtain an order of rejection as to all leases and executory contracts that are not being assumed under the Asset Purchase Agreement so as to make clear that no such additional leases and contracts have been or are being assumed and that Purchaser has no liability thereunder.

**F.    Conducting an Auction Pursuant to the Bidding Procedures is in the Best Interests of the Debtor's Estate and Creditors**

85.    In order to maximize the value of the Assets for the benefit of the Debtor, its creditors and its chapter 11 estate, the Debtor seeks to implement a competitive bidding process typical for transactions of this size and nature and designed to generate a maximum recovery. The Debtor believes that the Auction and proposed Bidding Procedures will encourage participation by financially capable bidders that demonstrate the ability to close a transaction. Furthermore, the Bidding Procedures are consistent with other procedures previously approved by this Court, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  See e.g., In re Kmart, Case No. 02-B02474 (SPS) (Bankr. N.D. 111 May 10, 2002); In re Global Crossing, Case No. 02-40188 (S.D.N.Y. March 25, 2002) (REG); In re Randall's Island Family Golf Ctrs., Inc., 261 B.R. 96 (S.D.N.Y. 2001); In re Integrated Resources, Inc., 147 B.R. 650 (S.D.N.Y. 1992).

**G.    Bid Protections Are Warranted**

86.    The Debtor proposes that if overbidding occurs at the Auction, the Purchaser shall have the right, but not the obligation, to participate in the overbidding subject only to the limitations provided by the Bidding Procedures.  However, to compensate the Purchaser for serving as a "stalking horse," thereby subjecting its bid to better or higher offers, the Debtor and the Purchaser seek authority for the Debtor to pay the Purchaser the Break-Up Fee and Expense Reimbursement if an Alternative Transaction is approved or consummated or there is a material breach by the Debtor preventing a Closing as provided in the Asset Purchase Agreement.  The Debtor and the Buyer believe that the Bid Protections are (a) fair and reasonable, given the benefits to the estate of having a definitive Asset Purchase Agreement and the risk to the

Purchaser that a third-party offer may ultimately be accepted and (b) are necessary to preserve the value of the Debtor's estate.

87.     Bidding incentives such as the Break-Up Fee and Expense Reimbursement encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. See e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); In re Marrose Corp., 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "[a]greements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

88.     The Debtor submits that the Bid Protections are a normal and necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code. See e.g., In re Kmart, Case No. 02 B02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and bid protections for potential bidders); In re Comdisco, Inc., Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, *inter alia*, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate, and a necessary inducement for, and a condition to, the proposed purchaser's entry into the Asset Purchase Agreement); In re Integrated Resources, Inc., 147 B.R. at 660 (noting that break up fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs, and the risks such bidder faces by having its offer held open, subject to higher and better offers);

In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal to the approved break up fee); In re Kupp Acquisition Corp., Case No. 96 1223 (PJW) (Bankr. D. Del. March 3, 1997).

89.     Here, the proposed Break-up Fee is 3.0 percent with a floor of $180,000, plus Purchaser's additional expenses for performing its due diligence, negotiating and documenting the terms of the Asset Purchase Agreement and the DIP Financing. Thus, the Break-up Fee and Expense Reimbursement are within the range of fees typically paid in other significant sales transactions that have been consummated in a bankruptcy setting. See e.g., Consumer News & Bus. Channel P'ship v. Financial News Network, Inc. (In re Financial News Network, Inc.), 980 F.2d 165, 167 (2d Cir. 1992) (noting that transaction at issue provided for a $8.2 million breakup fee on a $149.3 million transaction (5.5%)); Doehring v. Crown Corp. (In re Crown Corp.), 679 F.2d 774 (9th Cir. 1982) (bid protection of 4.9% approved).  Further, the amount of the Break-Up Fee and Expense Reimbursement is reasonably calculated to compensate the Purchaser (a) for committing the time to perform due diligence, (b) for lost opportunity in being bound to a transaction that could be topped in a competitive auction process and (c) for serving as a "stalking horse" to encourage the submission of other bids. Accordingly, the Debtor believes that the Bid Protections should be approved.

## WAIVER OF MEMORANDUM OF LAW

90.     Because this Motion presents no novel issues of law and the authorities relied upon by the Debtor set forth herein, the Debtor respectfully requests that the Court waive the requirement for the filing of a separate memorandum of law in support of this Motion pursuant to Local Bankruptcy Rule 9013-1(b).

## NOTICE

91.     Notice of this Motion will be given in accordance with the notice procedures set forth herein.  The Debtor submits that such notice is sufficient and requests that this Court find that no other or further notice is necessary.

## NO PRIOR REQUEST

92.     No previous application for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that this Court enter orders, substantially in the form annexed hereto, granting the Motion and such other relief as may be just and proper.

Dated: New York, New York
February 10, 2010

KLESTADT & WINTERS, LLP
Arena Media Networks, LLC
Debtor and Debtor in Possession

By /s/ Ian R. Winters
Ian R. Winters (IW-5102)
Joseph C. Corneau (JC-1721)
Samir Gebrael (SG-8915)
292 Madison Avenue, 17th Floor
New York, New York 10017
Telephone No. (212) 972-3000