Exhibit "A"

_____

**ASSET PURCHASE AGREEMENT**

**dated as of**

**February 8, 2010**

**by and between**

**ARENA MEDIA NETWORKS, LLC**

**and**

**ACCESS 360 MEDIA, INC.**

_____

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is entered into as of February 8, 2010, by and between ARENA MEDIA NETWORKS, LLC, a New York limited liability company ("**Seller**"), and ACCESS 360 MEDIA, INC., a Delaware corporation ("**Purchaser**").

## W I T N E S S E T H:

**WHEREAS**, Seller is engaged in the business of broadcasting and utilizing sports-related media content (the "**Media Content**") through the operation of a digital media network at professional sports venues in the United States (the "**Network**") and related activities as currently conducted (the "**Business**");

**WHEREAS**, On February 8, 2010 (the "**Filing Date**"), Seller filed a voluntary petition for relief (the "**Bankruptcy Case**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, Seller has experienced significant reductions in cash flow and operating income and needs working capital to fund continued operations in the short term and, Purchaser is willing, upon approval of the Bankruptcy Court, to make available to the Seller the DIP Financing (as defined herein);

**WHEREAS**, Purchaser desires to purchase the Acquired Assets (as defined in Section 1.1 below) and Seller desires to sell the Acquired Assets to Purchaser on the terms and conditions set forth in this Agreement, in accordance with Sections 105, 363 and 365 of the Bankruptcy Code and in accordance with other applicable provisions of the Bankruptcy Code: and

**WHEREAS**, Seller has made diligent efforts to identify and solicit potential investors and purchasers for the Business and assets prior to the date hereof and has identified Purchaser as the party making the highest and best offer for the Acquired Assets to date; and

**WHEREAS**, Seller believes, upon consideration of available alternatives, that in light of the Seller's current liquidity and financial position, a sale of the Acquired Assets pursuant to this Agreement is necessary to maximize value and is in the best interest of Seller, Seller's creditors and Seller's equity holders.

**NOW, THEREFORE**, in consideration of the foregoing premises and of the mutual agreements and covenants hereinafter set forth, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1 <u>Certain Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

"**Acquired Assets**" has the meaning ascribed to it in <u>Section 2.1</u>.

"**Affiliate**" means, with respect to any Person, any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such Person. For purposes of this Agreement, "control" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise (and the terms "controlled by" and "under common control with" shall have correlative meanings).

"**Agreement**" has the meaning ascribed to it in the preamble hereto.

"**Alternative Transaction**" means any one of the following transactions with or by any Person or group (other than the Purchaser): (a) a merger, consolidation, recapitalization or similar transaction involving Seller, or (b) a sale, lease or other disposition directly or indirectly by merger, consolidation, recapitalization, tender offer, share exchange or otherwise of any asset of Seller included in the Acquired Assets.

"**Assumed Designated Contract Liability**" has the meaning ascribed to it in <u>Section 3.2</u>.

"**Assumed Diversified Media Liability**" has the meaning ascribed to it in <u>Section 3.3</u>.

"**Assumed Liabilities**" means collectively the Assumed Designated Contact Liability and the Assumed Diversified Media Liability.

"**Assumption Agreement**" means the Assumption Agreement, in substantially the form attached hereto as <u>Exhibit A</u>.

"**Auction**" has the meaning ascribed to it in <u>Section 10.2</u>.

"**Bankruptcy Case**" has the meaning ascribed to it in the recitals hereto.

"**Bankruptcy Code**" has the meaning ascribed to it in the recitals hereto.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals hereto.

"**Bankruptcy Rules**" has the meaning ascribed to it in <u>Section 10.1</u>.

"**Bill of Sale**" means the Bill of Sale, in substantially the form attached hereto as <u>Exhibit B</u>.

"**Break-up Fee**" has the meaning ascribed to it in <u>Section 10.2</u>.

"**Business**" has the meaning ascribed to it in the recitals hereto.

"**Business Day**" means any day other than a Saturday or Sunday or any day on which banks in New York City are authorized or required to close.

"**Closing**" has the meaning ascribed to it in <u>Section 4.3</u>.

"**Closing Date**" has the meaning ascribed to it in <u>Section 4.3</u>.

"**Consent**" means any consent, approval, authorization, license or order of, registration, declaration or filing with, or notice to, or waiver from, any Governmental Entity or any other Person, including, without limitation, any security holder or creditor which is necessary to be obtained, made or given in connection with the execution and delivery of this Agreement or any other Purchase Document, the performance by a Person of its obligations hereunder or thereunder and the consummation of the transactions contemplated hereby or thereby.

"**Contract**" means any contract, agreement, indenture, note, bond, loan, instrument, lease, sub-lease, deed of trust, conditional sales contract, mortgage, franchise, license, commitment or other binding arrangement, express or implied, currently in effect.

"**Copyrights**" means (a) all copyrights arising under the laws of the United States of America, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, all registrations, recordings and applications in the United States Copyright Office and (b) the right to obtain all renewals thereof.

"**Designated Contract**" has the meaning ascribed to it in <u>Section 2.1(d)</u>.

"**Designated Cure Costs**" means the payments to be made by the Purchaser to the counterparties to the Designated Contracts and the Diversified Media Agreements in connection with the assumption and assignment of such Designated Contracts and Diversified Media Agreements hereunder relating to the period prior to the Closing Date, as such amounts may be negotiated, reduced or otherwise modified by the Purchaser and such counterparties.

"**DIP Financing**" means the senior secured super-priority debtor in possession term loan in an aggregate principal amount of up to $800,000, plus the interest, fees and expenses of the Lender, provided to Seller by Purchaser pursuant to the terms of that certain DIP Loan and Security Agreement, of even date herewith, by and between Seller and Purchaser, as such agreement is amended, modified supplemented or restated from time to time.

"**Diversified Media Agreements**" means, collectively, (i) Ongoing Operating Agreement Letter dated October 3, 2008, (ii) Network Operating Services Agreement Letter dated August 18, 2008, and (iii) the letter agreement dated March 6, 2009, each by and between Diversified Media Group, LLC, a New Jersey limited liability company, and the Seller, in each case as such agreements may be amended, modified or supplemented from time to time..

"**Encumbrances**" means any charge, claim, community property interest, condition, easement, covenant, commitment, warrant, demand, encumbrance, equitable interest, lien, mortgage, charge, option, purchase right, pledge, security interest, right of first refusal, or other rights of third parties or restriction of any kind including, without limitation, any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" means any Person that would be deemed a "single employer" with Seller under Section 414(b), (c), (m) or (o) of the Tax Code or Section 4001 of ERISA.

"**Excluded Assets**" has the meaning ascribed to it in <u>Section 2.2</u>.

"**Excluded Contracts**" has the meaning ascribed to it in <u>Section 2.2(c)</u>.

"**Expense Reimbursement**" has the meaning ascribed to it in <u>Section 10.2</u>.

"**Filing Date**" has the meaning ascribed to it in the recitals hereto.

"**Final Order**" means an order or judgment of the Bankruptcy Court (a) which is not the subject of a pending appeal, petition for certiorari, or other proceeding for review, rehearing or reargument, (b) which has not been reversed, stayed, modified or amended and (c) for which the time to appeal from or petition for certiorari or to seek review, rehearing or reargument of such order shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules and other applicable law, and there shall not be in effect any preliminary or permanent injunction, stay or order or decree or ruling by any Governmental Entity preventing consummation of the transactions contemplated by this Agreement.

"**Financial Statements**" means the unaudited balance sheet of Seller as of December 31, 2009 and the related unaudited statements of operations, owner's equity and cash flows of Seller for the nine-month period then ended.

"**Governmental Entity**" means any federal, state, local or foreign government, political subdivision, legislature, court, agency, department, bureau, commission or other governmental, regulatory or administrative authority, body or instrumentality, including any industry or other non-governmental self-regulatory organizations.

"**Intellectual Property**" means all (a) Patents; (b) Trademarks; (c) Copyrights; (d) mask works and registrations and applications for registration thereof; (e) Software; (f) databases and *sui generis* database rights; (g) Trade Secrets, know-how, inventions, methods (including algorithms), discoveries, processes, and confidential or proprietary information, whether patentable or nonpatentable and whether or not reduced to practice, processes and techniques, research and development information; and (h) other proprietary rights relating to any of the foregoing (including, without limitation, associated goodwill and remedies against infringements thereof and rights of protection of an interest therein under applicable laws).

"**Liability**" means all liabilities of any kind whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due, and whether or not reflected or required by GAAP to be reflected on a balance sheet) including, without limitation, any direct or indirect guarantee of any Liability of any other Person.

"**Licensed Intellectual Property**" means all Intellectual Property that is licensed to the Seller.

"**Material Adverse Effect**" means any material adverse effect in or on the Business, operations, assets, properties, rights, condition or prospects (financial or otherwise) of Seller, or any occurrence, circumstance, or combination thereof which reasonably could be expected to result in any such material adverse effect, including, without limitation, the termination or modification for any reason of any of the Designated Contracts.

"**Media Content**" has the meaning ascribed to it in the recitals hereto.

"**Network**" has the meaning ascribed to it in the recitals hereto.

"**Network Employee**" has the meaning ascribed to it in <u>Section 5.14</u>.

"**Objection/Counter Bid Deadline**" means 5:00 pm (New York time) on the second Business Day prior to the date of the Sale Hearing.

"**Owned Intellectual Property**" means all Intellectual Property that is owned beneficially, or of record, by the Seller.

"**Patents**" means (a) all letters patent of the United States of America, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, (b) all applications for letters patent of the United States of America or any other country and all divisions, continuations and continuations-in-part thereof, and (c) all rights to obtain any reissues or extensions of the foregoing.

"**Permits**" means all franchises, licenses, permits, consents authorizations, approvals, and certificates of any Governmental Entity relating to the Business or the Acquired Assets.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or any other entity or organization.

"**Petsky Prunier**" means Petsky Prunier, LLC, a New York limited liability company.

"**Plan**" means any "employee benefit plan" (as defined in Section 3(3) of ERISA) or any other bonus, deferred compensation, pension, profit-sharing, retirement, stock purchase, stock option, stock appreciation, other forms of incentive or equity compensation, excess benefit, supplemental pension insurance, disability, medical, dental, vision, supplemental unemployment, other paid time-off, vacation benefits, payroll practice, fringe benefit, scholarship, sickness, accident, severance, legal or post-retirement compensation or benefit, welfare or any other employee benefit plan, arrangement or practice, whether written or oral.

"**Procedures Order**" has the meaning ascribed to it in <u>Section 10.2</u>.

"**Purchase Price**" has the meaning ascribed to it in <u>Section 4.1</u>.

"**Purchase Documents**" has the meaning ascribed to it in <u>Section 5.2</u>.

"**Purchased Accounts Receivable**" has the meaning ascribed to it in <u>Section 2.1(a)</u>.

"**Purchaser**" has the meaning ascribed to it in the preamble hereto.

"**Purchaser DIP Claim**" means the claims of Purchaser arising under or in connection with the DIP Financing, including the principal amount thereof and all accrued but unpaid interest, attorneys fees and expenses thereunder, determined as of the Closing Date, or such earlier date to the extent there is a Event of Default hereunder.

"**Qualifying Competing Bids**" has the meaning ascribed to it in <u>Section 10.2</u>.

"**Real Property Leases**" has the meaning ascribed to it in <u>Section 5.5</u>.

"**Sale Hearing**" has the meaning ascribed to it in <u>Section 10.2</u>.

"**Sale Order**" has the meaning ascribed to it in <u>Section 10.1</u>.

"**Seller**" has the meaning ascribed to it in the preamble hereto.

"**Seller Intellectual Property**" has the meaning ascribed to it in <u>Section 5.5(b)</u>.

"**Software**" means all software, object code, source code, html code, executable code, binary code, other programming code, objects, software development tools, methods and protocols, computer programs, instructions and routines, comments, screens, user interfaces, report formats, templates, databases, support logs, scripts, design notes, supporting technical and user documentation and media for all applications of any kind and all obsolete and unsupported versions as well as all currently-supported versions of the foregoing, together with all customizations, enhancements, modifications, updates, upgrades, patches and works-in-progress, and all intellectual property rights therein.

"**Straddle Period**" has the meaning ascribed to it in <u>Section 7.10(a)</u>.

"**Tax**" (or "**Taxes**" where the context requires) shall mean all federal, state, county, provincial, local, foreign and other taxes (including, without limitation, income, profits, premium, estimated, excise, sales, use, transfer, occupancy, gross receipts, franchise, ad valorem, severance, capital levy, production, transfer, withholding, employment and payroll related and property taxes and other governmental charges and assessments), whether attributable to statutory or nonstatutory rules and whether or not measured in whole or in part by net income, and including, without limitation, interest, additions to tax or interest, charges and penalties with respect thereto, and expenses associated with contesting any proposed adjustment related to any of the foregoing.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Tax Returns**" means each and every report, return, declaration, information return, statement or other information, and any schedule, attachment, or amendment thereto, filed or required to be filed with or supplied to a taxing or governmental authority with respect to any Tax or Taxes, including, without limitation, any combined, consolidated or unitary return for any group of entities including Seller.

"**Trademarks**" means (a) all trademarks, trade names, corporate names, company names, trade names, business names, fictitious business names, trade styles, service trademarks, domain names, logos and other source or business identifiers (and all variants of the foregoing) and, in each case, all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the USPTO or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, and (b) the right to obtain all renewals thereof.

"**Trade Secrets**" means all know-how, trade secrets, confidential information, customer lists, technical information, data process technology, plans, drawings and blue prints owned, used or licensed by Seller as a licensee or licensor.

"**Transfer Taxes**" has the meaning ascribed to it in Section 7.10(e).

"**URLs**" has the meaning ascribed to it in Section 5.6.

"**USPTO**" means the United States Patent and Trademark Office.

"**Websites**" has the meaning ascribed to it in Section 5.6.

# ARTICLE II
# PURCHASE AND SALE OF ASSETS

Section 2.1      Purchase and Sale of Acquired Assets. Upon and subject to the terms and conditions set forth in the Procedures Order, this Agreement and the Sale Order, on the Closing Date, Seller will sell, assign, convey, transfer and deliver to Purchaser pursuant to Sections 363(f) and 365 of the Bankruptcy Code, free and clear of all Encumbrances, and Purchaser will purchase and acquire from Seller, all of Seller's right, title and interest in, to and under the following assets, properties and rights used by Seller in the Business (collectively, the "**Acquired Assets**"):

(a)      all account, note, loan and other receivables, except to the extent related to any Excluded Asset (collectively, "**Purchased Accounts Receivable**");

(b)      all unearned or unrecouped advances, prepaid royalties, prepaid expenses, prepaid deposits, merchandise and equipment credits or other prepayments of similar nature relating to the Business, except to the extent related to any Excluded Asset;

(c)     all tangible personal property of the Seller, including, without limitation, computer hardware, equipment and Software, digital video display devices, and any other personal property, in each case owned by Seller, including but not limited to those items set forth on Schedule 2.1(c);

(d)     all rights of Seller under and in connection with all Contracts set forth on Schedule 2.1(d) hereto (collectively, the "**Designated Contracts**");

(e)     all customer (including, without limitation, advertiser, sponsor and purchaser of brokered air time) mailing lists and databases, wherever located, including, without limitation, all demographics, e-mail addresses and compilations thereof;

(f)     all sales, advertising, marketing and promotional audiovisual material and literature and manuals relating to the Media Content and any advertising lists and databases;

(g)     all Trademarks relating to or used in connection with the Business, including, without limitation, those set forth on Schedule 2.1(g) hereto, together with all associated goodwill, which shall specifically include the names "Arena Media Network," "AMNTV," "AMNds", the "AMNTV" logo, and the domain name <arena-media.com>;

(h)     all causes of action for the benefit of Seller, rights of recovery, rights of setoff and express and implied warranties relating to any of the Acquired Assets (other than any claims or causes of action under Chapter 5 of the Bankruptcy Code, including any state law claims under New York Debtor and Creditor Law Sections 273-276 or similar New York or other state law statutes);

(i)     all goodwill associated with the Acquired Assets.

In confirmation of the foregoing sale, assignment and transfer, Purchaser and Seller shall execute and deliver at the Closing the Bill of Sale, the Assignment of Copyrights and the Assignment of Trademarks.

Section 2.2     Excluded Assets.  Notwithstanding any other provision of this Agreement to the contrary, the following Assets of the Seller existing on the Closing Date (collectively, the "**Excluded Assets**") are not part of the sale and purchase contemplated hereunder, are excluded from the Acquired Assets and shall remain the property of the Seller after the Closing:

(a)     all minute books, seals, equity record books and equity transfer records of the Seller and Tax Returns and Tax records of the Seller and the books and records of the Seller relating exclusively to the Excluded Assets and the Excluded Liabilities;

(b)     all Real Property Leases and rights in and to the Leased Real Property and the security deposit related thereto;

(c)     all Contracts set forth on <u>Schedule 2.2(c)</u>, all employment agreements, employment offer letters and other employment Contracts that Seller is a party to or is otherwise subject to and all other Contracts that Seller is a party to or is otherwise subject to that are not Designated Contracts (collectively, the "**Excluded Contracts**");

(d)     all Permits held by Seller;

(e)     all personnel records and other records that the Seller is required by law to retain in its possession for its employees;

(f)     all claims for refunds of Taxes and other governmental charges of whatever nature to the extent relating to any Tax period (or portion thereof) ending on or prior to the Closing Date;

(g)     all rights and interests under or in connection with, and any assets of, any of the Plans and any related trusts or funding vehicles;

(h)     all causes of action, rights of recovery, rights of setoff and express and implied warranties relating to any of the Excluded Assets and any claims or causes of action under Chapter 5 of the Bankruptcy Code, including any state law claims under New York Debtor and Creditor Law Sections 273-276 or similar New York or other state law statutes;

(i)     all rights of the Seller under this Agreement; and

(j)     all other assets of the Seller that are not Acquired Assets.

Section 2.3     <u>Updates to Schedule of Designated Contracts</u>.  The Purchaser may (i) include in the definition of Designated Contracts (pursuant as described in <u>Schedule 2.1(d)</u>) any contract, lease, license or other agreement of Seller, that was not previously included in the schedules of Assigned Contracts, at any time prior to the thirtieth day after the Closing Date with the consent of the counterparty to such Designated Contract, or (ii) to exclude from the definition of Designated Contracts (<u>Schedule 2.1(d)</u>) any contract, lease, license or other agreement of Seller previously included in the schedule of Designated Contracts, at any time prior to the thirtieth day after the Closing Date; <u>provided</u>, that no such change, addition to or deletion from the schedules of Designated Contracts shall increase or reduce the amount of the Purchase Price.  If any contract, lease, license or other agreement is added to (or excluded from) the schedule of Designated Contracts as permitted by this <u>Section 2.3</u>, Seller shall promptly take such steps as are reasonably necessary, including prompt delivery of notice to the non-debtor counterparty, to cause such contracts, leases, licenses or other agreements that become Designated Contracts prior to the thirtieth day after the Closing Date to be assumed by Seller, and assigned to Purchaser.  Without limiting any of Purchaser's rights pursuant to this <u>Section 2.3</u>, in the event that the Sale Order does not approve the assignment or transfer of one or more of the Designated Contracts to Purchaser, Purchaser may, in its sole discretion, exclude any or all of such Designated Contracts from the schedules of Designated Contracts as its sole remedy with respect thereto.  Seller shall not reject any executory contract in the Bankruptcy Case after the

date hereof and prior to the earlier of (a) the thirty-first day after the Closing Date or (b) the date this Agreement is terminated, without the prior written consent of Purchaser.

<h1 style="text-align:center">ARTICLE III<br>ASSUMED LIABILITIES</h1>

Section 3.1 <u>No Assumed Liabilities</u>. Purchaser does not and shall not assume any liabilities or obligations of Seller, except for those liabilities and obligations specifically set forth in <u>Sections 3.2</u>(*Assumed Designated Contract Liability*) and <u>3.3</u> (*Assumed Diversified Media Liability*) below. For the avoidance of doubt, the Purchaser does not and shall assume any Liabilities (i) arising out of or relating to any act or omission of the Seller or event occurring on or prior to the Closing Date; (ii) under the Designated Contracts that arise out of or relate to any breach by the Seller of its obligations under the Designated Contracts or Diversified Media Agreements on or prior to the Closing Date, other than the Designated Cure Costs; (iii) for Taxes of the Seller; (iv) of the Seller or any ERISA Affiliate arising under or with respect to the Plans; (v) based upon the Seller's acts or omissions occurring after the Closing Date; (vi) of Seller relating to any post-petition administrative expenses; or (vii) arising from the failure to send any notices, make any filings or obtain any Consents in connection with the transactions contemplated by this Agreement.

Section 3.2 <u>Assumption of Designated Contracts</u>. Purchaser shall assume and agree to perform in accordance with their respective terms and conditions, all liabilities and obligations with respect to the Designated Contracts (as such Designated Contracts may be amended, modified or supplemented in connection with the transactions contemplated hereby or otherwise), including the Designated Cure Costs (the "**Assumed Designated Contract Liability**").

Section 3.3 <u>Assumption of Diversified Media Secured Claim</u>. Purchaser shall assume and agree to perform in accordance with its respective terms and conditions, all liabilities and obligations with respect to the Diversified Media Agreements (as such Diversified Media Agreements may be amended, modified or supplemented in connection with the transactions contemplated hereby or otherwise), subject to the understanding that the indebtedness under the Diversified Media Agreements will be reduced by fifty percent (50%) to $565,293 before Purchaser assumes the liability (the "**Assumed Diversified Media Liability**").

Section 3.4 <u>Assumption Agreements</u>. To effectuate the assumption of the Assumed Liabilities by Purchaser hereunder, Purchaser and Seller shall execute and deliver at or before the Closing the Assumption Agreement, unless Assumption is made part of the approved Sale Order.

<h1 style="text-align:center">ARTICLE IV<br>PAYMENT; CLOSING</h1>

Section 4.1 <u>Purchase Price</u>. In consideration for the Acquired Assets, the purchase price for the Purchased Assets shall be (i) the value of the Purchaser DIP Claim (which will be extinguished as of the Closing), (ii) the assumption of the Assumed Liabilities, including

the payment of the Designated Cure Costs, (iii) $100,000 for distribution to any remaining creditors, and (iv) a maximum of $50,000 for fees and expenses incurred by the Seller in connection with the wind down of Seller's bankruptcy estate, including but not limited to fees and expenses of the U.S. Trustee in the Bankruptcy Case and professional fees and expenses incurred by Seller's counsel in connection with services related to the preparation and confirmation of a liquidating plan (the "**Purchase Price**"). Pursuant to section 363(k) of the Bankruptcy Code, the Purchaser shall release Seller (and their respective successors and assigns) under the DIP Financing from any and all obligations, claims, rights, actions, causes of action, suits, liabilities, damages, debts, costs, expenses and demands whatsoever, in law or in equity, arising under, or otherwise relating to, the DIP Financing in an aggregate principal amount equal to the Purchaser DIP Claim.

Section 4.2 <u>Allocation of Purchase Price</u>. The aggregate Purchase Price shall be allocated by Seller and Purchaser among the Acquired Assets as set forth on <u>Schedule 4.2</u> hereto. Such agreed allocation is intended to comply with Section 1060 of the Tax Code and Purchaser and Seller hereby agree to report the transactions contemplated hereby for federal income Tax purposes in accordance with such allocation.

Section 4.3 <u>Date, Time and Place of Closing</u>. The transactions provided for by this Agreement shall be consummated (the "**Closing**") at 10:00 a.m., local time, at the offices of Sheppard, Mullin, Richter & Hampton, LLP, 30 Rockefeller Plaza, 24th Floor, New York, NY 10112, or remotely via the exchange of documents and signatures in PDF format or by facsimile, on the first Business Day following the date on which all of the conditions to the parties obligations set forth in Articles VIII, IX and X (other than conditions to be satisfied by the delivery of documents at the Closing, but subject to the satisfaction of such conditions at the Closing) have been satisfied or waived in writing by the or parties entitled to the benefit thereof, or such other date or place as may be agreed upon by the parties hereto. The date and time of Closing is hereinafter sometimes called the "**Closing Date**."

Section 4.4 <u>License for Use of Premises and Wind Down Services</u>**.** Purchaser hereby grants Seller a license to use a portion of its business premises reasonably necessary for Seller to continue to wind down its business operations and financial affairs. In connection therewith, during the Bankruptcy Case, Purchaser shall provide Seller with use of Purchaser's computers, storage for books and records, telephones, internet service, copiers, back office and administrative services, and any other resources available to Purchaser which are reasonably necessary to effectuate the wind down of Seller's business operations and financial affairs. Purchaser shall not receive any royalty, fee, expense reimbursement or any other form of consideration for such license or other resources provided by Purchaser to Seller.

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to Purchaser to enter into this Agreement and purchase the Acquired Assets and assume the Assumed Liabilities, Seller hereby represents and warrants to Purchaser as of the date hereof and as of the Closing Date that:

Section 5.1 <u>Organization and Qualification</u>. Seller is a limited liability company organized, validly existing and in good standing under the laws of the State of New York, and has full power and authority to own its properties and to carry on its business as presently conducted by it. Seller is duly qualified to do business and is in good standing in all other jurisdictions where the conduct of its business so requires, except where the failure to be so qualified and in good standing would not be reasonably likely to have a Material Adverse Effect.

Section 5.2 <u>Authority, Effective Agreement; No Breach</u>.

(a) Subject to the Procedures Order and the Sale Order, Seller has the requisite power and authority to execute and deliver this Agreement, to perform its obligations under this Agreement and any and all other agreements, documents or instruments to be executed and/or delivered in connection herewith (collectively, the "**Purchase Documents**") and to consummate the transactions contemplated herein and therein. Seller has taken all actions required by Seller to authorize the execution, delivery and performance of the Purchase Documents and the consummation of the transactions contemplated thereby. This Agreement has been duly and validly executed and delivered by Seller and, subject to entry of the Sale Order, constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(b) Except with regard to the contemplated approval and authorization of the Bankruptcy Court, and except as set forth on <u>Schedule 5.2(b)</u>, neither the execution and delivery of this Agreement or any other Purchase Document by Seller nor the consummation of any of the transactions contemplated herein or therein, nor the full performance by Seller of its obligations hereunder or thereunder do or will: (i) violate any provision of the certificate of incorporation, bylaws or similar organizational documents of Seller; (ii) conflict with, result in a breach or violation of, or constitute a default under (or an event which, with or without notice, lapse of time or both, would constitute a default) or result in the invalidity of, or accelerate the performance required by or cause or give rise to any right of acceleration or termination of any right or obligation pursuant to any agreement or commitment to which Seller is a party or by which Seller (or any of the Acquired Assets) is subject or bound; (iii) result in the creation of, or give any third party the right to create, any Encumbrance upon the Acquired Assets; (iv) conflict with, violate, result in a breach of or constitute a default under any writ, injunction, statute, law, ordinance, rule, regulation, judgment, award, Permit, decree, order, or process of any Governmental Entity to which Seller or any Acquired Assets are subject; (v) terminate or modify, or give any third party the right to terminate or modify, the provisions or terms of any contract or agreement to which Seller is a party or by which Seller or any of the Acquired Assets is subject or bound; (vi) require Seller to obtain any Consent, or (vii) result in or give to any Person any additional rights or entitlement to increased, additional, accelerated or guaranteed payments under any contract or agreement to which Seller is a party or by which any of the Acquired Assets is subject or bound.

Section 5.3      Purchased Accounts Receivable.  All of the Purchased Accounts Receivable represent sales actually made in the ordinary course of business consistent with past practice for goods or services delivered or rendered in bona fide arm's length transactions, constitute only valid, undisputed claims, have not been extended or rolled over in order to make them current and are collectible at their recorded amounts net of reserves for non-collectibility reflected on the Financial Statements.

Section 5.4      Title to Acquired Assets.  At the Closing, Seller will convey, and Purchaser will obtain, good and valid title to all of the Acquired Assets free and clear of any and all Encumbrances pursuant to Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code and as set forth in the Sale Order.

Section 5.5      Intellectual Property.

(a)      Schedule 5.5(a)(i) contains a true, correct and complete list of the Owned Intellectual Property.  Schedule 5.5(a)(ii) contains a true, correct and complete list of the Licensed Intellectual Property, except for off-the-shelf and click-through software available to the general public and other software that is generally available on standard terms for less than $5,000 per copy, seat, CPU or named user.

(b)      The Seller does not hold or use any Intellectual Property other than the Owned Intellectual Property and the Licensed Intellectual Property (the "**Seller Intellectual Property**").  The Seller Intellectual Property constitutes all material Intellectual Property that is necessary in order to conduct the Business as in effect on the date hereof and contains only those items and rights that are owned by the Seller or rightfully used by the Seller pursuant to a valid and enforceable license.

(c)      Seller does not use any Patents relating to the Network.  To Seller's knowledge, Seller does not infringe the patent rights of third parties.

(d)      Seller has no registered Copyrights.

Section 5.6      Websites.  Schedule 5.6 sets forth a true, accurate and complete list of all websites that are owned by Seller (the "**Websites**").  Except as set forth on Schedule 5.6, with respect to each Website, Seller (a) has obtained and presently possesses all legal rights to, and exclusive use of, the required Universal Resource Locator ("**URL**") with respect thereto; and (b) maintains what it believes are adequate computer resources to help ensure that no service outages will occur due to insufficient data-storage, memory, server or other related reasons.  Seller owns or licenses or will own or license as of the Closing Date all Intellectual Property necessary in any material respect for the operation of the Websites as currently being operated.

Section 5.7      Contracts.  (a) All material Contracts to which Seller is a party is set forth on Schedule 5.7(a).  Seller has delivered to Purchaser or otherwise provided Purchaser with access to true and complete copies of all material Contracts.

(b)    Each Designated Contract, including all amendments, modifications and supplements thereto, is listed on Schedule 2.1(d) hereof.  Each Designated Contract is valid and in full force and effect and constitutes a legal, valid and binding obligation of Seller and each other Person that is a party to such contract or agreement, and, to the knowledge of Seller, is enforceable in accordance with its terms, and will not cease to be valid and in full force and effect after the Closing Date.  Each other party to the Designated Contracts is in full compliance with all applicable terms and requirements of such Designated Contracts.  Seller has not received any notice that any other party to the Designated Contracts has cancelled or terminated such Designated Contract, or has a specific intention to cancel or terminate such Designated Contract, which cancellation or termination has not already been completed as of the date hereof.  Except as disclosed on Schedule 5.7(b), Seller has performed all obligations required to be performed by it to date under any of the Designated Contracts and Seller is not (with or without the lapse of time or the giving of notice, or both) in breach or default in any respect thereunder.

Section 5.8    Customers and Suppliers.  Schedule 5.8 sets forth the ten largest vendors and ten largest advertising customers of the Network during calendar year 2009.  The relationships of Seller with the Network's vendors and advertising customers are good commercial working relationships, Seller is not engaged in any dispute with any supplier or advertising customer of the Network, and none of those vendors or advertising customers has canceled or otherwise terminated, or threatened to cancel or otherwise terminate its relationship with the Network or has during the twelve (12) months ended December 31, 2009 decreased or threatened to decrease or limit, its services, supplies or materials provided to Seller or its purchase of advertising time on the Network, which dispute, cancellation, termination or decrease has had or would have, individually or in the aggregate, a Material Adverse Effect.  To Seller's knowledge, except as set forth on Schedule 5.8, no vendor or advertising customer of the Network intends to cancel or otherwise modify its relationship with the Network, to increase the prices charged to Seller (other than increases in the ordinary course of business consistent with past practices), or to decrease materially or limit its services, supplies or materials to Seller or its purchase of advertising time on the Network, which modification, cancellation or other action as aforesaid would reasonably be expected to cause, individually or in the aggregate, a Material Adverse Effect.

Section 5.9    Litigation.  Except (a) for matters before the Bankruptcy Court involving Seller, and (b) any matters that will otherwise be resolved by the Sale Order, there is no Action or Order pending or, to Seller's knowledge, overtly threatened against Seller that would have a material impact on the Acquired Assets or the transaction contemplated herein.

Section 5.10    Compliance with Law; Necessary Authorizations.  (a) Seller has, to the best of its knowledge, duly complied with all applicable laws, rules, regulations, orders, building and other codes or ordinances, Permits, authorizations, judgments and decrees of all Governmental Entities.  There are no restrictions imposed by any Governmental Entity in respect of the Business or affecting the Seller.  Except as set forth on Schedule 5.10, Seller is not aware of any present or past failure so to comply or of any past or present events, activities or practices of Seller which may be construed to indicate interference with or prevention of

continued compliance with any laws, rules or regulations or which may give rise to any common law or statutory liability, or otherwise form the basis of any material claim, action, suit, proceeding, hearing or investigation.  Except as set forth on <u>Schedule 5.10</u>, to the knowledge of Seller, neither Seller nor any of its directors, officers or employees is the subject of any investigation relating to the Business or Seller.

(b)     Seller has, to the best of its knowledge, duly obtained all Permits necessary for the conduct of its Business.  Each such Permit is set forth on <u>Schedule 5.10(b)</u> and is in full force and effect.  Seller is in compliance with all terms of all Permits and, except as set forth on <u>Schedule 5.10(b)</u>, there are no proceedings pending or, to the knowledge of Seller, threatened which may result in the revocation, cancellation, suspension or modification thereof, and Seller has no knowledge of any basis therefor.  Except as set forth on <u>Schedule 5.10(b)</u> the consummation of the transactions contemplated hereby will not result in any such revocation, cancellation, suspension or modification of any Permit nor require Seller or Purchaser to make any filing or take any action in order to maintain the validity of any Permit listed on <u>Schedule 5.10(b)</u>.

Section 5.11     <u>Finders</u>.  Except for Petsky Prunier, no agent, broker, person or firm has acted on behalf of Seller in connection with its efforts to effectuate a sale of its business and/or assets prior to the Filing Date.  No broker, person or firm has acted on behalf of Seller subsequent to the Filing Date and is, or will be, entitled to any commission, broker's or finder's fees from any party, or from any Affiliate of any party, in connection with any of the transactions contemplated by this Agreement.

Section 5.12     <u>Taxes</u>.  (a) All Tax Returns required to be filed on or before the date hereof by or with respect to Seller have been filed within the time and in the manner prescribed by applicable law.  All such Tax Returns are true, correct, and complete in all material respects, and all Taxes owed by Seller, whether or not shown on any Tax Return, have been paid when due.

(b)     There are no Encumbrances with respect to Taxes upon any of the assets or properties of Seller, other than with respect to Taxes not yet due and payable.

(c)     Seller has not been nor is it currently in violation (or, with or without notice or lapse of time or both, would be in violation) of any applicable law or regulation relating to the payment, collection, or withholding of Taxes, or the remittance thereof, and all withholding and payroll Tax requirements required to be complied with by the Seller up to and including the date hereof have been satisfied.

Section 5.13     <u>Disclosure</u>.  No representation or warranty by Seller in this Agreement, in any documents or papers furnished to Purchaser or its representatives by or on behalf of Seller, pursuant to this Agreement or any Purchase Document or any certificates delivered hereunder contains or will contain any untrue statement of material fact or omits to state a material fact required to be stated therein or necessary to make the statements contained

therein in light of the circumstances under which it was made, not false or misleading. All copies of contracts, agreements and other documents made available to Purchaser or any of its representatives pursuant hereto are complete and accurate.

Section 5.14    Schedule 5.14 contains a complete and accurate list, as of January 31, 2010, of the following information for each employee of Seller (individually, a "**Network Employee**"), including each such Network Employee on leave of absence or layoff status:  (i) name; (ii) job title; (iii) current compensation paid or payable and any change in compensation since December 31, 2009; (iv) accrued vacation and (v) other accrued leave.

# ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller on the date hereof and on the Closing Date that:

Section 6.1    Status.  Purchaser is a corporation duly formed and subsisting under the laws of the State of Delaware and has full power and authority to own its properties and to carry on the business presently conducted by it.

Section 6.2    Authority; Effective Agreement.  Purchaser has the requisite power and authority to execute and deliver this Agreement and, subject to the Procedures Order and the Sale Order, to perform its obligations under this Agreement and the Purchase Documents to which it is a party, and to consummate the transactions contemplated herein and therein. Purchaser has taken all actions required by Purchaser to authorize the execution, delivery and performance of the Purchase Documents and the consummation of the transactions contemplated thereby.  This Agreement has been duly and validly executed and delivered by Purchaser and constitutes a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

Section 6.3    No Violation; Consents.

(a)    The execution and delivery by Purchaser of this Agreement and the other Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the constituent documents of Purchaser, (ii) conflict with, require the consent of a third party under, violate, result in the breach of, constitute a default under, or give rise to any right of acceleration, cancellation or termination of any material right or obligation of Purchaser under any material agreement or other instrument to which Purchaser is a party or by which Purchaser or any of its properties or assets are bound, (iii) violate any Order of any Governmental Authority to which Purchaser is bound or subject, or (iv) violate any Applicable Law.

(b)    No Order or Permit issued by, or declaration or filing with, or notification to, or waiver or consent from, any Governmental Authority is required on the part of Purchaser in connection with the execution and delivery of this Agreement, or the compliance or performance by Purchaser with any of the provisions contained in this Agreement.

Section 6.4 <u>Financial Capability</u>. Purchaser will have on the Closing Date sufficient unrestricted cash and cash equivalents and/or existing credit facilities with sufficient borrowing capacity thereunder (and, as of the date of this Agreement has provided Sellers with satisfactory evidence thereof) to purchase the Acquired Assets, pay the Purchase Price in full, and to consummate the transactions contemplated by this Agreement, including the payment of all fees and expenses contemplated hereunder.

Section 6.5 <u>Brokers or Finders</u>. No agent, broker, person or firm acting on behalf of Purchaser or any of its Affiliates is, or will be, entitled to any commission, broker's or finder's fees from any party, or from any Affiliate of any party, in connection with any of the transactions contemplated by this Agreement.

Section 6.6 <u>Litigation or Proceedings</u>. There is no litigation or other proceeding pending, or, to the knowledge of Purchaser, threatened, against Purchaser that could reasonably be expected to affect adversely Purchaser's ability to consummate the transactions contemplated by this Agreement.

Section 6.7 <u>No Application of HSR</u>. No filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, is required to be made in connection with the consummation of the transactions contemplated hereunder.

Section 6.8 <u>"As Is" Transaction</u>. Purchaser hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement, Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Business or to the Acquired Assets, including, income to be derived or expenses to be incurred in connection with the Business or the Acquired Assets, the physical condition of any personal or real property comprising a part of the Acquired Assets or the value of the Acquired Assets (or any portion thereof). Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Acquired Assets. Purchaser further acknowledges that it has had an opportunity to conduct an independent inspection and investigation of the physical condition of the Acquired Assets, made available by Seller. Accordingly, if the Closing occurs, Purchaser will accept the Acquired Assets at the Closing Date "AS IS," "WHERE IS," and "WITH ALL FAULTS," subject to the provisions of this Agreement and the Sale Order providing that the sale of the Transferred Assets is free and clear of all Liens and Claims. Without in any way limiting the foregoing, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SPECIFICALLY SET FORTH IN THIS AGREEMENT, SELLER HAS PROVIDED NO REPRESENTATIONS OR WARRANTIES AND SPECIFICALLY DISCLAIM ALL SUCH REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED, TO ANY IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE VII
## FURTHER COVENANTS AND AGREEMENTS

Section 7.1 <u>Access to Information</u>. From the date of this Agreement through the Closing Date, Seller shall give to Purchaser and its agents reasonable access during

normal business hours to the Acquired Assets and all of Seller's documents, books and records relating to the Acquired Assets and its current and past operations of the Business, and shall permit Purchaser and its agents to make copies thereof, and Seller shall permit Purchaser to interview Seller's employees during reasonable business hours and upon reasonable prior written notice.

Section 7.2      Cooperation.

(a)      Purchaser and Seller agree to execute and deliver all other instruments and take all such other actions that either party may reasonably request from time to time, before or after Closing and without payment of further consideration, to effectuate the transactions provided in this Agreement or any of the Purchase Documents and to confer to the parties hereto the benefits intended by such transactions.

(b)      Seller and Purchaser reasonably and in good faith shall cooperate fully with each other in preparing and filing all Tax Returns relating to the Acquired Assets, including maintaining and making available to each other all records of Seller to the extent necessary in connection with the preparation and filing of such Tax Returns or any audit, litigation, or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other party's request) the provision of records and information that are reasonably relevant to any such audit, litigation, or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation any material provided hereunder.  Seller agrees to turn over to Purchaser all books and records with respect to Tax matters pertinent to any Acquired Assets relating to any taxable period beginning before the Closing Date. Seller and Purchaser further agree, upon request, to use reasonable best efforts to obtain any certificate or other document from any Governmental Entity or any other Person as may be necessary to mitigate, reduce, or eliminate any Tax, fee, or other charge that could be imposed in connection with the transactions contemplated hereby.

(c)      Seller shall promptly forward any mail or other communications relating to the Acquired Assets or the Assumed Liabilities that are received by Seller after the Closing.

Section 7.3      Discontinuation of Business Relationships.  Seller shall use commercially reasonable efforts to prevent its managers and employees from seeking to induce or otherwise cause any customer, consultant or any other Person with whom Seller has a business relationship, whether by Contract or otherwise, to discontinue or alter in a manner adverse to the Acquired Assets, such business relationship.

Section 7.4      Preservation of Business.  From the date hereof through the Closing Date, Seller shall not take any affirmative action to terminate without cause the services of any employee of the Seller or interfere in any manner with Seller's relationship with any employee or independent contractor (including, without limitation, consultants and executive

personnel).  Nothing in this Agreement is intended to confer upon any employee of Seller any rights or remedies, including, without limitation, any rights of employment of any nature or kind whatsoever.

Section 7.5    Litigation.  From the date hereof through the Closing Date, Seller shall promptly notify Purchaser of any claims, which after the date hereof are threatened or commenced against Seller or against any manager, employee, consultant, agent, equity holder or other representative of Seller with respect to the Acquired Assets or the Business.

Section 7.6    Disclosure to Parties.  If any of the parties hereto becomes aware, prior to the Closing Date, that any of its representations, warranties, covenants or other agreements is inaccurate or incapable of being performed in any material respect, such party shall promptly give written notice of such inaccuracy or incapability to the other party; provided, however, that nothing contained in this Section 7.6 shall relieve the party bound by such representation, warranty, covenant or other agreement from complying with such representation, warranty, covenant or other agreement.

Section 7.7    Bankruptcy Matters.  In addition to the obligations of Seller under Article X, Seller shall use reasonable best efforts and proceed diligently and in good faith to, as promptly as practicable, obtain all authorizations, consents, orders and approvals of the Bankruptcy Court necessary for the consummation of the transactions contemplated by this Agreement, including, but not limited to, those set forth in Article X.

Section 7.8    Operation of Business and Acquired Assets.  Prior to the Closing, Seller will operate the Business and the Acquired Assets in the ordinary course of business of a chapter 11 debtor and to the fullest extent possible consistent with past practice in the same manner in which they have been operated prior to the date hereof.  Without limiting the foregoing, Seller shall not, without the prior written consent of Purchaser, (a) modify, amend, cancel, waive any right in respect of, or terminate any Designated Contract, (b) sell or otherwise dispose of, or grant any security interest in, any Acquired Asset, (c) fail to keep all of its insurable properties adequately insured on the terms and at the coverage limits currently in effect, (d) exercise or fail to exercise any option or renewal right material to the Business, (e) make or commit to make capital expenditures in excess of $5,000 in the aggregate, or (f) bring, settle, compromise or waive any claim or legal right included in the Acquired Assets.

Section 7.9    Public Announcement.  Purchaser and Seller shall consult with each other before issuing any press release or making any public statement or other public communication with respect to this Agreement or the transactions contemplated hereby except as permitted in this Section 7.9.  Purchaser and Seller shall not issue any such press release or make any such public statement or public communication without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; provided, however, that a party may, without the prior consent of the other party, issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable law or by any Governmental Entity with competent jurisdiction.

Section 7.10    Tax Matters.

-19-

(a)     Seller shall pay or cause to be paid, and shall be responsible for, any and all Taxes of or with respect to Seller or the Acquired Assets (i) for any taxable period ending on or before the Closing Date and (ii) with respect to any taxable period beginning before and ending after the Closing Date (a "**Straddle Period**"), the portion of such Straddle Period deemed to end on and include the Closing Date.

(b)     Purchaser shall pay or cause to be paid, and shall be responsible for, any and all Taxes of or with respect to the Acquired Assets (i) for any taxable period beginning after the Closing Date and (ii) with respect to any Straddle Period, the portion of such Straddle Period deemed to begin the day after the Closing Date and ending as of the last day of such Straddle Period.

(c)     The amount of Taxes for which Seller or Purchaser shall be responsible for any Straddle Period shall be allocated based on an interim closing of the books of Seller or, if closing of the books is not appropriate, based on the number of days in the Straddle Period for which Seller or Purchaser, as the case may be, is responsible compared to the number of days in the entire Straddle Period.

(d)     Purchaser shall prepare or cause to be prepared and file or cause to be filed all Tax Returns relating to the Acquired Assets for periods ending after the Closing Date.  Seller shall prepare or cause to be prepared and file or cause to be filed all Tax Returns relating to the Acquired Assets for periods ending on or prior to the Closing Date.

(e)     Seller shall bear the cost of any transfer, documentary, registration, stamp, or other similar tax (the "**Transfer Taxes**") payable by reason of the transfer and sale of the Acquired Assets, which shall be paid promptly after Closing.  The party which is obligated by law to make any filing with respect to Transfer Taxes shall, at its own expense, file all necessary returns or other documents required with respect to Transfer Taxes.

Section 7.11     <u>Post Closing Cooperation</u>.  To facilitate the orderly transition of ownership of the Acquired Assets, each party shall assist the other party with operating and transitional issues by providing information reasonably requested by such other party regarding the business and operations of Seller prior to the date hereof, including by providing, in the case of Seller, at the option of Purchaser in its sole discretion either (a) reasonable access at reasonable times during normal business hours to Seller's books and records included in the Acquired Assets for a period of one hundred and eighty (180) days following the Closing or (b) a copy, at Seller's expense, of such books and records.

Section 7.12     <u>Collections</u>.  On and after the Closing Date, the Purchaser shall have the sole right and authority to collect, for its own account and sole benefit, all monies payable in respect of the Acquired Assets including, without limitation, Purchased Accounts Receivable, no matter how or when earned.  If Seller (or its administrators) or any of its Affiliates shall receive any such monies, it shall hold all such monies in trust for the sole benefit

of the Purchaser.  Within five Business Days after receipt thereof, Seller (or its administrators) shall cause the transfer and delivery to the Purchaser of any monies or other property which Seller (or its administrators) may receive after the Closing Date in payment of Purchased Accounts Receivable or payment of other monies payable in respect of the Acquired Assets. Seller authorizes the Purchaser to endorse in Seller's name all notes, checks, drafts, money orders or other instruments of payment in respect of the foregoing which may come into the possession of the Purchaser, and Seller hereby ratifies all that the Purchaser shall lawfully do or cause to be done by virtue hereof.  This right shall become irrevocable upon Closing.

Section 7.13    Notice to Third Parties.  On the Closing Date, Seller shall execute and deliver to the Purchaser for use by the Purchaser with respect to any third party that currently has any rights whatsoever in or to the Acquired Assets, anywhere throughout the world, letters prepared jointly by, and mutually acceptable to, the Purchaser and Seller advising that (a) effective as at the Closing Date, the Purchaser owns Seller's interests in or to the Acquired Assets and (b) the Purchaser is entitled to receive all moneys, payments, receipts, revenues or income derived therefrom in accordance with this Agreement; and requesting that thereafter they render all required statements and activity reports and make payments of one hundred (100%) percent of all sums thereafter otherwise due in respect of any period, whether before or after Closing to Purchaser in accordance with this Agreement, and provide copies of all notices, claims or other correspondence, directly to the Purchaser.

## ARTICLE VIII
## CONDITIONS TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any or all of which Purchaser may waive in writing:

Section 8.1    Representations and Warranties.  Each of the representations and warranties of Seller set forth in this Agreement and any exhibit or schedule hereto shall be true and correct in all material respects on and as of the Closing Date (except for the representations and warranties which speak as of a specific date or time, which representations and warranties need only be true and correct as of such date or time).

Section 8.2    Covenants and Agreements.  Seller shall have performed and complied in all material respects with all of its covenants and agreements contained in this Agreement which are required to be performed or complied with on or prior to the Closing Date.

Section 8.3    Satisfaction of Certain Obligations.  Seller shall have satisfied the conditions of Sections 365(b)(1)(A)-(C) of the Bankruptcy Code to the extent necessary to permit the assignment to Purchaser of the Designated Contracts.

Section 8.4    Bankruptcy Matters.  All authorizations, consents, orders and approvals of the Bankruptcy Court necessary for the consummation of the transactions contemplated by this Agreement shall have been obtained, including, but not limited to, those set forth in Article X; and Purchaser shall have received from the Bankruptcy Court all other orders,

approvals and consents required to transfer the Acquired Assets and to consummate the transactions contemplated by this Agreement.

Section 8.5    No Injunctions.  No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the transactions contemplated hereby.

Section 8.6    Deliveries.  All documents required to be delivered by Seller at or prior to Closing shall have been delivered to Purchaser at Closing, including, without limitation, those contemplated by Section 11.1.

# ARTICLE IX
# CONDITIONS TO OBLIGATIONS OF SELLER

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any or all of which Seller may waive in writing:

Section 9.1    Representations and Warranties.  Each of the representations and warranties of Purchaser set forth in this Agreement and any exhibit hereto shall be true and correct in all material respects on and as of the Closing Date (except for the representations and warranties which speak as of a specific date or time, which representations and warranties need only be true and correct as of such date or time).

Section 9.2    Covenants and Agreements.  Purchaser shall have performed and complied in all material respects with all of its covenants and agreements contained in this Agreement which are required to be performed or complied with on or prior to the Closing Date.

Section 9.3    Bankruptcy Matters.  All authorizations, consents, orders and approvals of the Bankruptcy Court necessary for the consummation of the transactions contemplated by this Agreement shall have been obtained, including, but not limited to, those set forth in Article X; and Seller shall have received from the Bankruptcy Court all other orders, approvals and consents required to transfer the Acquired Assets and to consummate the transactions contemplated by this Agreement.

Section 9.4    No Injunctions.  No Governmental Entity shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order that is in effect on the Closing Date and prohibits the consummation of the transactions contemplated hereby.

Section 9.5    Deliveries.  All documents required to be delivered by Purchaser at or prior to Closing shall have been delivered to Seller at Closing, including, without limitation, those contemplated by Section 11.2.

## ARTICLE X
## BANKRUPTCY CONDITIONS

The obligations of each party to consummate the transactions contemplated hereby shall be subject to the fulfillment or waiver of each of the following conditions (any one or more of which may be waived in writing in whole or in part by the written consent of Purchaser):

Section 10.1     <u>Sale Order</u>.  The entry by the Bankruptcy Court of an order (the "**Sale Order**") in favor of Purchaser on or before March 22, 2010, which shall be in form and substance reasonably satisfactory to Purchaser and which shall approve the transactions contemplated by this Agreement including, but not limited to the sale of all of the Acquired Assets free and clear of all Encumbrances and shall, without limitation, contain findings of fact and conclusions of law that:  (a) Purchaser is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and the sale contemplated by this Agreement does not violate and is not subject to avoidance under Section 363(n) of the Bankruptcy Code; (b) all of the requirements of Sections 363 and 365 of the Bankruptcy Code have been satisfied; (c) the Acquired Assets are being sold free and clear of all Encumbrances except the Assumed Diversified Media Liability; (d) any Encumbrances on the Acquired Assets shall attach to the proceeds received by Seller pursuant to this Agreement to the same extent, and with the same validity, priority, perfection and enforceability, as such Encumbrances had with respect to the Acquired Assets; (e) notice of the hearing on the transactions contemplated by this Agreement (i) was given in accordance with the applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and (ii) constitutes such notice as is appropriate under the particular circumstances and in accordance with the Bankruptcy Code and applicable law; (f) neither Purchaser nor its designees shall be considered successors of Seller or any of Seller's Affiliates and none of Purchaser, any of Purchaser's Affiliates or any designee shall have any liability for any debts, liabilities or obligations of, or claims against Seller or any of Seller's Affiliates, except as expressly assumed in writing by Purchaser pursuant to this Agreement; (g) if the Bankruptcy Court determines that the law so permits, the transfer of the Acquired Assets shall not be subject to the imposition or payment of any transfer, stamp or similar tax, and there shall not be in effect any preliminary or permanent injunction, stay, order, decree or ruling limiting the effect of the Sale Order by a court of competent jurisdiction; and (h) provisions for the Bankruptcy Court's retention of jurisdiction over matters arising out of or related to this Agreement and the transactions contemplated hereby.

Section 10.2     <u>Procedures Order</u>.  Seller shall, not later than February 9, 2010, seek a hearing before the Bankruptcy Court on an expedited basis for approval of this Agreement and the transactions contemplated hereby, including, without limitation, the sale of Acquired Assets free and clear of Encumbrances, the assumption and assignment of Designated Contracts, and use its best efforts to obtain entry of an order substantially in form of <u>Exhibit C</u> attached hereto approving the provisions of this <u>Section 10.2</u> (the "**Procedures Order**").  The entry of the Procedures Order which shall be in form and substance reasonably satisfactory to Purchaser and which shall contain the following provisions:  (a) the proposed sale to the Purchaser shall be subject to better and higher competing bids; (b) to qualify as a better and higher competing bid ("**Qualifying Competing Bids**"), the competing bid must (i) be on substantially the same terms and conditions as this Asset Purchase Agreement, except for price;

(ii) require the payment of a purchase price to the Seller of not less than $7 million, inclusive of the Break-Up Fee and Expense Reimbursement to Purchaser; (iii) be accompanied by an earnest money deposit of 10% of the Competing Bid, and (iv) be filed with the Bankruptcy Court and served on the Seller and the Purchaser on or before the Objection/Counter Bid Deadline; (c) if there are any Qualifying Competing Bids on the Acquired Assets the Bankruptcy Court will then hold an open auction on the Acquired Assets on or before March 18, 2010 (the "**Auction**") and a sale hearing to be held on or before March 22, 2010 to consider the sale of the Acquired Assets (the "**Sale Hearing**") and the highest and best bid on the Acquired Assets will be determined by traditional auction procedures rather than the use of sealed bids consistent with the Bankruptcy Code; (d) at the Auction parties submitting Qualified Competing Bid(s), if any, and Purchaser may increase their respective bids for the subject assets provided each higher bid shall be in increments of not less than $150,000; (e) in the event that this Agreement is terminated pursuant to Sections 12.1(e) or 12.1(g), Seller shall pay Purchaser a fee of 3.0 percent of the Purchase Price inclusive of costs of assumption of debt currently estimated at $5.2 million and the Purchaser DIP Claim, with a floor of no less than $180,000 (the "**Break-Up Fee**"), plus reimbursement of Purchaser's expenses, including attorneys, investment banking, accounting and other professional fees and expenses incurred in pursuit of the transactions contemplated hereby up to an additional $750,000 (which reimbursement shall be in addition to the payment of the Break-up Fee) to compensate the Purchaser for its efforts in connection with it being the "stalking horse" bidder for the Acquired Assets, including the costs the Purchaser incurred in performing due diligence, negotiating and documenting the terms of this Agreement and the DIP Financing and representing its interests with respect to the proposed sale and Seller's Bankruptcy Case "**Expense Reimbursement**"); and (f) the Break-Up Fee and Expense Reimbursement constitute first priority administrated expenses of Seller pursuant to Section 503(b) and shall be paid at, or within two (2) days of, any closing in connection with the Acquired Assets and without further order of or application to the Bankruptcy Court.

Section 10.3      Final Order. The Sale Order shall have become a Final Order; provided, however, that this condition may be waived in a writing signed by both parties hereto. Seller shall seek entry of an order waiving any stay requirement under, *inter alia*, Federal Rules of Bankruptcy Procedure 6004 and 6006.

## ARTICLE XI
## CLOSING

Section 11.1      Seller's Deliveries. At the Closing, Seller shall deliver or cause to be delivered to Purchaser each of the following:

(a)      a Bill of Sale, duly executed by Seller;

(b)      an Assumption Agreement, duly executed by Seller;

(c)      resolutions of the Board of Directors of Seller, certified by the Seller's Secretary, evidencing Seller's authority to (i) execute and deliver this Agreement and the Purchase Documents, and (ii) consummate the transactions contemplated herein and therein;

(d)      an incumbency certificate of Seller, certified by Seller's Secretary, certifying the accuracy of the specimen signature of the authorized representative of Seller executing this Agreement and the Purchase Documents;

(e)      a certificate of a duly authorized officer of the Seller to the effect that each of the conditions specified in <u>Sections 8.1</u> and <u>8.2</u> has been satisfied, in form and substance reasonably acceptable to Purchaser;

(f)      copy of the Sale Order in form acceptable to Purchaser, providing for the sale of the Acquired Assets, assumption and assignment of the Designated Contracts; and

(g)      such other documents and agreements as shall vest in Purchaser the Seller's right, title and interest in and to the Acquired Assets or as Purchaser shall reasonably request to further evidence consummation of the transactions contemplated by this Agreement.

Section 11.2      <u>Purchaser's Deliveries</u>.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller each of the following:

(a)      a release evidencing the satisfaction in full of the Purchaser DIP Claim and the security interests granted by the Seller in favor of the Purchaser in connection therewith;

(b)      the Assumption Agreement, duly executed by Purchaser;

(c)      resolutions, certified by the Chief Executive Officer of Purchaser, evidencing Purchaser's authority to (i) execute and deliver this Agreement and the Purchase Documents, and (ii) consummate the transactions contemplated herein and therein;

(d)      an incumbency certificate of Purchaser, certified by a duly authorized officer of Purchaser, certifying the accuracy of the specimen signature of the authorized representative of Purchaser executing this Agreement and the Purchase Documents;

(e)      certificate of a duly authorized officer of Purchaser to the effect that each of the conditions specified in <u>Sections 9.1</u> and <u>9.2</u> are satisfied, in form and substance reasonably satisfactory to Seller;

(f)      the Purchaser Agreements, duly executed by Purchaser; and

(g)      such other documents or instruments as Seller shall reasonably request to further evidence consummation of the transactions contemplated by this Agreement.

# ARTICLE XII
# TERMINATION OF AGREEMENT

Section 12.1 <u>Termination</u>. This Agreement may be terminated by written notice promptly given to the other party hereto, at any time prior to the Closing Date:

(a) by mutual consent of Purchaser and Seller;

(b) by either Purchaser or Seller, if any permanent injunction or other order of any Governmental Entity which prevents the consummation of the transactions contemplated hereby shall have become final and non-appealable;

(c) by Purchaser, if (i) the Sale Order is not entered by the Bankruptcy Court on or before by March 23, 2010, (ii) the Sale Order is not a Final Order by April 3, 2010, or (iii) the Procedures Order is not entered by the Bankruptcy Court on or before February 19, 2010;

(d) by either Purchaser or Seller, if the Closing has not occurred by the date which is five (5) days after the date on which the condition set forth in <u>Section 10.3</u> hereof has been satisfied or waived in writing by the Purchaser;

(e) by either Purchaser or Seller, if the Bankruptcy Court authorizes or approves an Alternative Transaction or an Alternative Transaction is consummated;

(f) by Purchaser, upon the voluntary or involuntary dismissal of the Bankruptcy Case;

(g) by Purchaser, so long as Purchaser is not then in breach of its obligations hereunder in any material respect, if there has been a material breach by Seller of any of its representations, warranties, covenants or other agreements set forth herein, which breach is not curable, or if curable, is not cured within three (3) days after notice of such breach is given by Purchaser to Seller, or if any of the conditions set forth in Article VIII are incapable of being met;

(h) by Seller, so long as Seller is not then in breach of its obligations under this Agreement in any material respect, if there has been a material breach by Purchaser of any of its representations, warranties, covenants or other agreements set forth herein, which breach is not curable, or if curable, is not cured within three (3) days after notice of such breach is given by Seller to Purchaser, or if any of the conditions set forth in Article IX are incapable of being met; or

(i) an Event of Default occurs under the documents governing the DIP Financing.

Section 12.2 <u>Effect of Termination</u>. If this Agreement is validly terminated pursuant to <u>Section 12.1(a), (b) or (h)</u>, this Agreement shall become wholly void and of no further force and effect without liability to Purchaser or Seller, or any of their respective

Representatives, and each shall be fully released and discharged from any liability or obligation under or resulting from this Agreement and Purchaser shall have no other remedy or cause of action under or relating to this Agreement or any Applicable Law.  The same shall be true if this Agreement is terminated pursuant to Section 12.1 (c), (d), (e), (f), (g) and (i), except that Purchaser shall be entitled to the Breakup Fee and Expenses set forth herein and in the Procedures Order, as well as the Purchaser DIP Claim calculated as of the date of Termination.

## ARTICLE XIII
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES; SURVIVAL OF COVENANTS; SELLER'S REPRESENTATIVE

Section 13.1     Survival of Representations and Warranties.  The representations and warranties of each party set forth herein shall not survive the Closing and consummation of the transactions contemplated hereby.

Section 13.2     Survival of Covenants.  The covenants and agreements to be performed by the parties set forth herein shall survive the Closing and consummation of the transactions contemplated hereby until complied with in full.

Section 13.3     Investigations.  Notwithstanding any right of either party hereto to investigate the affairs of the other party hereto and notwithstanding any knowledge of facts determined or determinable by such party pursuant to such investigation or right of investigation, such party has the right to rely fully upon the representations, warranties, covenants and agreements of the other party herein contained in this Agreement, any Purchase Document or in any certificate, schedule or exhibit delivered pursuant to this Agreement.

## ARTICLE XIV
## GENERAL

Section 14.1     Notices.  All notices and other communications hereunder shall be in writing and shall be sent by certified mail, postage prepaid, return receipt requested; by an overnight express courier service that provides written confirmation of delivery; or by facsimile with confirmation, addressed as follows:

|  |  |
|---|---|
| If to Seller: | Arena Media Networks, LLC<br>44 East 30th Street, 9th Floor<br>New York, NY 10016<br>Attention:  Administrator<br>Facsimile No.:  (212) 779-2612 |
| With a copy to: | Klestadt & Winters, LLP<br>292 Madison Avenue, 17th Floor<br>New York, NY 10017-6314<br>Attn:  Ian R. Winters, Esq.<br>Facsimile:  (212) 972-2245 |
| If to Purchaser: | Access 360 Media, Inc.<br>584 Broadway |

Suite 610
New York, NY 10012
Attention: Lon Otremba
Facsimile:  (212) 941-5879

With a copy to:          Sheppard, Mullin, Richter & Hampton, LLP
30 Rockefeller Plaza
24th Floor
New York, NY 10112
Attention:          David Sands
                            Carren B. Shulman
Facsimile:  (212) 653-8701

Any party may change its address for receiving notice by giving notice of a new address in the manner provided herein.  Any notice so given, shall be deemed to be delivered on the second Business Day after the same is deposited in the United States mail, on the next Business Day if sent by overnight courier, or on the same Business Day if sent by facsimile before the close of business, or the next Business Day, if sent by facsimile after the close of business.

Section 14.2          Entire Agreement.  This Agreement and the other Purchase Documents, together with exhibits and schedules attached to this Agreement, constitute the entire agreement between the parties pertaining to this subject matter and supersede all prior or contemporaneous agreements and understandings of the parties relating to the same.  This Agreement may be amended only in writing signed by the parties hereto.

Section 14.3          Severability.  If any term or provision of this Agreement or any application thereof shall be invalid or unenforceable, the remainder of this Agreement and any other application of such term or provision shall not be affected thereby.

Section 14.4          Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of law principles.

Section 14.5          JURISDICTION, WAIVER OF JURY TRIAL.

(a)          THE BANKRUPTCY COURT (AS DEFINED HEREIN) WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER PURCHASE DOCUMENT; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE SUPREME COURT OF THE STATE OF NEW YORK IN NEW YORK COUNTY AND THE UNITED STATES OF AMERICA DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK WILL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR

RELATING TO THIS AGREEMENT OR ANY OTHER PURCHASE
DOCUMENT.  ANY PARTY MAKING AN INITIAL FILING IN SUPREME
COURT MUST DESIGNATE THE CASE OF ASSIGNMENT TO THE
COMMERCIAL DIVISION OF THAT COURT.

(b)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY
WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE
LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL
PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT
OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 14.6      Waiver.  Any of the terms or conditions of this Agreement
may be waived at any time by the party entitled to the benefit thereof, but only by written notice
signed by the party waiving such terms or conditions.

Section 14.7      Expenses.  Except as expressly provided herein, Purchaser and
Seller shall each bear their respective expenses relating to or arising out of this Agreement,
including, but not limited to, fees for attorneys, accountants and other advisors.

Section 14.8      Assignability; Binding Effect.  This Agreement may not be
assigned by Seller without the prior written consent of Purchaser.  Seller may assign its rights
and obligations under this Agreement to any of its Affiliates, including a subsidiary formed for
purposes of consummating the transactions contemplated by this Agreement, without the prior
consent of the Seller.  Subject to the foregoing, this Agreement shall be binding upon and inure
to the benefit of the parties hereto and their respective successors and assigns.

Section 14.9      Counterpart Execution.  This Agreement may be executed in
any number of counterparts, each of which shall be deemed an original, but all of which together
shall constitute one and the same instrument.  Any counterpart signature page delivered by
facsimile or other electronic transmission shall be deemed to be and have the same force and
effect as an originally executed signature page.  This Agreement shall become binding when one
or more counterparts hereof, individually or taken together, shall bear the signatures of all of the
parties reflected hereon as the signatories.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused a duly authorized representative to execute this Agreement on the day and year first above written.

**ARENA MEDIA NETWORKS, INC,**

By: _____
Name:  Arthur Williams
Title:  Chief Executive Officer


**ACCESS 360 MEDIA, LLC**

By: _____
Name:  Lon Otremba
Title:  Chief Executive Officer

SCHEDULES TO

ASSET PURCHASE AGREEMENT

dated as of

February 8, 2010

by and between

ARENA MEDIA NETWORKS, LLC

and

ACCESS 360 MEDIA, INC.

(*updated as of March 19, 2010*)

These Schedules are delivered pursuant to the Asset Purchase Agreement (the "**_Agreement_**"), dated as of February 8, 2010, by and between ARENA MEDIA NETWORKS LLC, a New York limited liability company, and ACCESS 360 MEDIA, INC., a Delaware corporation. Capitalized terms used but not defined herein have the meanings given to them in the Agreement.

These Schedules may include items or information that the Seller is not required to disclose under the Agreement. Inclusion of information herein shall not be construed as an admission that such information is material to the business, financial position or results of operation of the Seller. The information contained herein is disclosed solely for the purposes of the Agreement, and no information contained herein shall be deemed to be an admission by the Seller to any third party of any matter whatsoever, including without limitation, any violation of law or breach of any agreement.

**<u>Schedule 2.1(c) – Tangible Personal Property</u>**

[*See attached list*]

**ARENA MEDIA NETWORKS, LLC**
**FIXED ASSET LEDGER**
**12/31/2009**

| Group | Asset | Location | Property Description | Date | Cost | Less: Disposals | Remaining Cost | 2005 | Depreciation 2006 | 2007 | 2008 | 2009 | Accumulated depreciation | 2009 | Accumulated depreciation | Disposals | Accumulated depreciation | Monthly entry |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Computer equipment** | | | | | | | | | | | | | | | | | | |
| | 23 | 404 Park Ave, NY | Computers | 12/1/2005 | 12,800.00 | | 12,800.00 | 106.67 | 2,560.00 | 2,560.00 | 2,560.00 | 2,559.96 | | 10,346.59 | 10,346.59 | | 10,346.59 | 213.33 |
| | Jan-07 | 404 Park Ave, NY | Computers | 1/1/2007 | 4,247.32 | | 4,247.32 | | | 2,973.15 | 849.46 | 849.46 | | 2,973.15 | 2,973.15 | | 2,973.15 | 70.79 |
| | Jun-07 | 404 Park Ave, NY | Computers | 6/20/2007 | 2,275.85 | | 2,275.85 | | | 265.52 | 455.16 | 455.16 | | 1,175.84 | 1,175.84 | | 1,175.84 | 37.93 |
| | Nov-07 | 404 Park Ave, NY | Computers | 11/1/2007 | 2,493.90 | | 2,493.90 | | | 205.25 | 498.84 | 498.84 | | 1,203.08 | 1,203.08 | | 1,203.08 | 41.57 |
| | Dec-07 | 404 Park Ave, NY | Computers | 12/1/2007 | 2,828.85 | | 2,828.85 | | | 47.15 | 565.80 | 565.80 | | 1,178.75 | 1,178.75 | | 1,178.75 | 47.15 |
| | Mar-08 | 404 Park Ave, NY | Computers | 3/31/2008 | 10,223.76 | | 10,223.76 | | | | 1,704.00 | 2,044.80 | | 3,748.80 | 3,748.80 | | 3,748.80 | 170.40 |
| | Apr-08 | 404 Park Ave, NY | Computers | 4/30/2008 | 3,342.78 | | 3,342.78 | | | | 531.45 | 468.60 | | 1,240.05 | 1,240.05 | | 1,240.05 | 39.05 |
| | May-08 | 404 Park Ave, NY | Computers | 5/31/2008 | 8,603.68 | | 8,603.68 | | | | 1,147.12 | 1,720.68 | | 2,867.80 | 2,867.80 | | 2,867.80 | 143.39 |
| | Jun-08 | 404 Park Ave, NY | Computers | 6/30/2008 | 7,597.38 | | 7,597.38 | | | | 863.10 | 1,503.48 | | 2,542.51 | 2,542.51 | | 2,542.51 | 125.29 |
| | Jul-08 | 404 Park Ave, NY | Computers | 7/31/2008 | 2,522.80 | | 2,522.80 | | | | 252.30 | 504.60 | | 756.90 | 756.90 | | 756.90 | 42.05 |
| | Aug-08 | 404 Park Ave, NY | Computers | 8/31/2008 | 1,312.25 | | 1,312.25 | | | | 109.35 | 262.44 | | 371.79 | 371.79 | | 371.79 | 21.87 |
| | Sep-08 | 404 Park Ave, NY | Computers | 9/30/2008 | 6,291.32 | | 6,291.32 | | | | 419.44 | 1,258.12 | | 1,677.76 | 1,677.76 | | 1,677.76 | 104.86 |
| | Oct-08 | 404 Park Ave, NY | Computers | 10/31/2008 | 1,355.52 | | 1,355.52 | | | | 67.77 | 271.08 | | 338.85 | 338.85 | | 338.85 | 22.50 |
| | Jan-09 | 404 Park Ave, NY | Computers | 1/30/2009 | 1,383.73 | | 1,383.73 | | | | | 476.72 | | 476.72 | 476.72 | | 476.72 | 122.06 |
| | Mar-09 | 404 Park Ave, NY | Computers | 3/31/2009 | 1,766.64 | | 1,766.64 | | | | | 284.40 | | 284.40 | 284.40 | | 284.40 | 29.44 |
| | | | | | 68,845.98 | | 68,845.98 | 106.67 | 2,994.73 | 3,905.45 | 10,636.78 | 14,060.76 | | 27,573.99 | 27,573.99 | | 27,573.99 | 1,290.77 |
| **Development costs** | | | | | | | | | | | | | | | | | | |
| DC | Dec 08 | AMN office | Equipment | 12/31/2006 | 101,000.00 | | 101,000.00 | | | 653.55 | 653.55 | 7,840.20 | | 8,493.95 | 8,493.95 | | 8,493.95 | 653.55 |
| | | | | | 101,000.00 | | 101,000.00 | | | 653.55 | 653.55 | 7,840.20 | | 8,493.95 | 8,493.95 | | 8,493.95 | 653.55 |
| **Equipment** | | | | | | | | | | | | | | | | | | |
| EQ | Dec 08 | AMN office | Equipment | 12/31/2006 | 39,201.21 | | 39,201.21 | | | 653.55 | 653.55 | 7,840.20 | | 8,493.95 | 8,493.95 | | 8,493.95 | 653.55 |
| EQ | Mar 08 | Atlanta, GA | Equipment | 3/31/2008 | 154,814.40 | | 154,814.40 | | | | 23,769.10 | 30,922.92 | | 56,692.02 | 56,692.02 | | 56,692.02 | 2,576.91 |
| EQ | May 08 | Atlanta, GA | Equipment | 5/31/2008 | 44,560.28 | | 44,560.28 | | | | 5,934.72 | 8,872.08 | | 14,786.80 | 14,786.80 | | 14,786.80 | 739.34 |
| EQ | May 09 | Atlanta, GA | Equipment | 6/30/2009 | 101,072.56 | | 101,072.56 | | | | | 11,809.91 | | 11,809.91 | 11,809.91 | | 11,809.91 | 1,684.53 |
| EQ | Dec 08 | Atlanta - Phillips | Equipment | 12/31/2006 | 300,202.24 | | 300,202.24 | | | | 1,685.82 | 51,464.91 | | 51,464.91 | 51,464.91 | | 51,464.91 | 5,003.38 |
| EQ | | | | | 54,823.51 | | 54,823.51 | | | | 913.73 | 10,964.76 | | 11,878.49 | 11,878.49 | | 11,878.49 | 913.73 |
| EQ | 10 | Boston, MA - Garden | Sony Plasma Screen | 1/2/2009 | 92,708.92 | | 92,708.92 | | 8,557.78 | 8,557.78 | 18,557.76 | 18,557.76 | | 92,708.89 | 92,708.89 | | 92,708.89 | 1,546.68 |
| EQ | 49 | Boston, MA - Garden | Equipment | 7/31/2006 | 1,445.75 | | 1,445.75 | | 144.58 | 289.15 | 289.20 | 289.20 | | 1,012.13 | 1,012.13 | | 1,012.13 | 24.10 |
| EQ | 48 | Boston, MA - Garden | Equipment | 1/28/2008 | 1,126.13 | | 1,126.13 | | 0.00 | 0.00 | 225.23 | 225.24 | | 450.47 | 450.47 | | 450.47 | 18.77 |
| EQ | 47 | Boston, MA - Garden | Equipment | 7/31/2006 | 2,636.90 | | 2,636.90 | | 0.00 | 0.00 | 439.48 | 478.20 | | 916.55 | 916.55 | | 916.55 | 43.95 |
| EQ | 46 | Boston, MA - Garden | Equipment | 5/31/2008 | 1,622.05 | | 1,622.05 | | 0.00 | 0.00 | 216.27 | 324.36 | | 540.63 | 540.63 | | 540.63 | 27.03 |
| EQ | | | | | 99,539.34 | | 99,539.34 | 8,557.78 | 17,136.94 | 17,136.94 | 19,846.51 | 19,846.51 | | 95,598.61 | 95,598.61 | | 95,598.61 | 1,660.53 |
| EQ | 40 | Boston, MA - Fenway | Equipment | 4/15/2006 | 114,512.92 | (114,512.92) | | | 17,176.94 | 22,902.58 | 22,902.58 | 0.00 | | 62,982.12 | 62,982.12 | (62,982.12) | | 0.00 |
| EQ | 41 | Boston, MA - Fenway | Equipment | 4/1/2007 | 4,543.58 | | 4,543.58 | | 0.00 | 681.24 | 908.28 | 908.28 | | 2,497.80 | 2,497.80 | | 2,497.80 | 75.69 |
| EQ | 42 | Boston, MA - Fenway | Equipment | 1/28/2008 | 13,216.88 | | 13,216.88 | | 0.00 | 0.00 | 2,643.35 | 2,643.36 | | 5,286.71 | 5,286.71 | | 5,286.71 | 220.28 |
| EQ | 43 | Boston, MA - Fenway | Equipment | 2/29/2008 | 7,993.13 | | 7,993.13 | | 0.00 | 0.00 | 1,483.87 | 1,560.04 | | 3,039.91 | 3,039.91 | | 3,039.91 | 132.17 |
| EQ | 44 | Boston, MA - Fenway | Equipment | 5/31/2008 | 26,381.65 | | 26,381.65 | | 0.00 | 0.00 | 3,884.75 | 4,927.20 | | 8,423.95 | 8,423.95 | | 8,423.95 | 440.00 |
| EQ | | | | | 103,098.23 | | 103,098.23 | | 0.00 | 0.00 | 1,384.95 | 13,734.40 | | 13,734.40 | 13,734.40 | | 13,734.40 | 1,716.80 |
| EQ | | | | | 357,385.31 | (114,512.92) | 163,315.04 | | 17,176.94 | 23,583.82 | 29,338.72 | 23,973.28 | | 95,532.92 | 95,532.92 | (62,982.12) | 32,550.80 | 2,277.88 |
| EQ | | 58 St. Louis, MO | Equipment | 3/31/2007 | 159,072.56 | | 159,072.56 | | 21,278.76 | 27,934.56 | 27,934.56 | 27,934.56 | | 79,147.88 | 79,147.88 | | 79,147.88 | 2,327.88 |
| EQ | | 60 St. Louis, MO | Equipment | 4/1/2007 | 172,049.11 | | 172,049.11 | | 23,624.14 | 25,290.08 | 25,290.08 | 25,290.08 | | 74,204.30 | 74,204.30 | | 74,204.30 | 2,867.48 |
| EQ | | | | | 331,121.67 | | 331,121.67 | | 45,402.90 | 53,224.64 | 53,224.64 | 53,224.64 | | 153,352.18 | 153,352.18 | | 153,352.18 | 5,195.36 |
| EQ | 29 | Charlotte, NC | 15 Sony 50" Black Plasma Screen | 4/5/2006 | 185,771.31 | | 185,771.31 | | 27,865.70 | 37,154.26 | 37,154.26 | 37,154.26 | | 139,328.52 | 139,328.52 | | 139,328.52 | 3,096.19 |
| EQ | | 28 Charlotte, NC | Equipment | 1/28/2008 | 4,561.07 | | 4,561.07 | | 0.00 | 2,032.20 | 2,032.20 | 2,032.20 | | 2,032.20 | 2,032.20 | | 2,032.20 | 344.35 |
| EQ | | Feb 08 Charlotte, NC | Equipment | 2/29/2008 | 10,565.02 | | 10,565.02 | | 0.00 | 2,112.96 | 2,112.96 | 2,112.96 | | 2,112.96 | 2,112.96 | | 2,112.96 | 176.08 |
| EQ | | May 09 Charlotte, NC | Equipment | 5/31/2009 | 14,600.04 | | 14,600.04 | | 0.00 | 1,460.04 | 1,460.04 | 1,460.04 | | 1,460.04 | 1,460.04 | | 1,460.04 | 2,010.00 |
| EQ | | | | | 216,707.44 | | 216,707.44 | | 27,865.70 | 42,743.36 | 42,743.36 | 41,759.46 | | 151,042.76 | 151,042.76 | | 151,042.76 | 3,606.62 |
| EQ | 41 | Chicago, IL | Equipment | 4/15/2006 | 457,816.60 | | 457,816.60 | | 68,672.49 | 91,563.36 | 91,563.36 | 91,563.36 | | 343,362.51 | 343,362.51 | | 343,362.51 | 7,630.28 |
| EQ | 47 | Chicago, IL | Equipment | 1/28/2008 | 10,742.81 | | 10,742.81 | | 0.00 | 2,089.66 | 2,089.66 | 2,089.66 | | 90,701.38 | 90,701.38 | | 90,701.38 | 208.33 |
| EQ | 45 | Chicago, IL | Equipment | 7/31/2007 | 12,500.00 | | 12,500.00 | | 1,250.00 | 2,499.96 | 2,499.96 | 2,499.96 | | 6,249.92 | 6,249.92 | | 6,249.92 | 208.33 |
| EQ | 44 | Chicago, IL | Equipment | 1/28/2008 | 19,024.81 | | 19,024.81 | | 0.00 | 3,804.96 | 3,804.96 | 3,804.96 | | 7,281.12 | 7,281.12 | | 7,281.12 | 303.38 |
| EQ | 42 | Chicago, IL | Equipment | 2/29/2008 | 10,921.90 | | 10,921.90 | | 0.00 | 2,184.36 | 2,184.36 | 2,184.36 | | 4,186.69 | 4,186.69 | | 4,186.69 | 182.03 |
| EQ | 43 | Chicago, IL | Equipment | 2/29/2008 | 6,894.98 | | 6,894.98 | | 0.00 | 2,070.84 | 2,070.84 | 2,070.84 | | 1,619.76 | 1,619.76 | | 1,619.76 | 134.98 |
| EQ | | Chicago, IL - Wrigley | Equipment | 5/31/2009 | 46,284.11 | | 46,284.11 | | 0.00 | 0.00 | 6,165.95 | 6,165.95 | | 6,165.95 | 6,165.95 | | 6,165.95 | 770.07 |
| EQ | | Chicago, IL - US Cellular | Equipment | 5/31/2009 | 47,522.50 | | 47,522.50 | | 0.00 | 0.00 | 6,297.04 | 6,297.04 | | 6,297.04 | 6,297.04 | | 6,297.04 | 787.13 |
| EQ | | | | | 604,805.95 | | 604,805.95 | | 69,922.49 | 113,773.61 | 117,553.61 | 14,571.63 | | 459,866.28 | 459,866.28 | | 459,866.28 | 10,224.53 |
| EQ | | Dec 08 Chicago - United Center | Equipment | 12/31/2006 | 66,502.35 | | 66,502.35 | | 0.00 | 1,091.37 | 1,091.37 | 13,322.44 | | 14,421.61 | 14,421.61 | | 14,421.61 | 1,091.37 |
| EQ | | | | | 66,502.35 | | 66,502.35 | | 0.00 | 1,091.37 | 1,091.37 | 13,322.44 | | 14,421.61 | 14,421.61 | | 14,421.61 | 1,091.37 |
| EQ | 38 | Cincinnati, OH | Equipment | 3/31/2006 | 211,484.40 | | 211,484.40 | | 27,695.35 | 37,154.44 | 42,296.88 | 42,296.88 | | 77,544.28 | 77,544.28 | | 77,544.28 | 3,524.74 |
| EQ | | May 08 Cincinnati, OH | Equipment | 5/31/2008 | 10,062.97 | | 10,062.97 | | 0.00 | 0.00 | 1,340.65 | 2,012.50 | | 3,353.15 | 3,353.15 | | 3,353.15 | 167.72 |
| EQ | | | | | 221,546.37 | | 221,546.37 | | 27,695.35 | 37,154.44 | 43,311.24 | 54,392.64 | | 97,503.88 | 97,503.88 | | 97,503.88 | 4,532.72 |
| EQ | 42 | Cleveland, OH | Equipment | 4/1/2007 | 184,609.00 | | 184,609.00 | | 26,665.08 | 56,921.84 | 56,921.84 | 56,921.84 | | 101,855.03 | 101,855.03 | | 101,855.03 | 3,076.82 |
| EQ | | Aug 08 Cleveland Browns | Equipment | 8/31/2008 | 28,511.81 | | 28,511.81 | | 0.00 | 0.00 | 5,312.36 | 5,522.20 | | 5,912.92 | 5,912.92 | | 5,912.92 | 2,926.59 |
| EQ | | Sep 08 Cleveland Browns | Equipment | 9/30/2008 | 48,591.98 | | 48,591.98 | | 0.00 | 4,572.90 | 5,516.17 | 5,513.08 | | 6,899.62 | 6,899.62 | | 6,899.62 | 1,143.20 |
| EQ | | | | | 261,712.79 | | 261,712.79 | | 26,665.08 | 42,238.64 | 57,656.04 | 55,966.04 | | 262,178.21 | 262,178.21 | | 262,178.21 | 8,358.07 |
| EQ | 38 | Arlington, TX | Equipment | 4/15/2006 | 185,773.30 | | 185,773.30 | | 27,865.60 | 37,154.64 | 37,154.64 | 37,154.64 | | 139,329.90 | 139,329.90 | | 139,329.90 | 3,096.22 |
| EQ | | Nov 07 Dallas, TX | Equipment | 11/1/2007 | 78,468.00 | | 78,468.00 | | 0.00 | 2,616.00 | 15,696.00 | 15,696.00 | | 34,008.00 | 34,008.00 | | 34,008.00 | 1,308.00 |
| EQ | | Dec 07 Dallas, TX | Equipment | 12/31/2007 | 158,660.00 | | 158,660.00 | | 0.00 | 0.00 | 31,732.00 | 31,732.00 | | 65,464.00 | 65,464.00 | | 65,464.00 | 2,644.33 |
| EQ | | Jan 08 Dallas, TX | Equipment | 1/28/2008 | 26,573.40 | | 26,573.40 | | 0.00 | 0.00 | 5,314.68 | 5,314.68 | | 10,629.36 | 10,629.36 | | 10,629.36 | 442.89 |
| EQ | | Feb 08 Dallas, TX | Equipment | 2/29/2008 | 26,160.00 | | 26,160.00 | | 0.00 | 0.00 | 4,360.00 | 5,232.00 | | 9,592.00 | 9,592.00 | | 9,592.00 | 436.00 |
| EQ | | Jun 09 Dallas, TX | Equipment | 6/30/2009 | 27,591.36 | | 27,591.36 | | 0.00 | 0.00 | 0.00 | 3,219.02 | | 3,219.02 | 3,219.02 | | 3,219.02 | 459.86 |
| EQ | | | | | 503,226.06 | | 503,226.06 | | 27,865.60 | 41,586.92 | 93,617.96 | 98,548.34 | | 262,178.21 | 262,178.21 | | 262,178.21 | 8,358.07 |
| EQ | 66 | Denver, CO | Equipment | 4/1/2007 | 179,830.21 | | 179,830.21 | | 0.00 | 33,966.04 | 33,966.04 | 33,966.04 | | 98,906.61 | 98,906.61 | | 98,906.61 | 2,997.17 |
| EQ | | Jan 09 Denver, CO | Equipment | 6/30/2009 | 52,853.40 | | 52,853.40 | | 0.00 | 0.00 | 0.00 | 6,166.23 | | 6,166.23 | 6,166.23 | | 6,166.23 | 880.89 |
| EQ | | | | | 232,683.61 | | 232,683.61 | | 0.00 | 33,966.04 | 33,966.04 | 40,132.27 | | 105,072.84 | 105,072.84 | | 105,072.84 | 3,878.06 |
| **EW** | 30 | Detroit, MI | Electrical Work | 4/3/2006 | 18,500.00 | | 18,500.00 | | 2,775.00 | 3,700.00 | 3,700.00 | 3,700.00 | | 13,874.92 | 13,874.92 | | 13,874.92 | 308.33 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EW EQ | 51 Detroit, MI | Electrical Work | Equipment | 10/4/2006 | 77,581.89 | 77,581.89 | 0.00 | 3,879.10 | 15,516.36 | 15,516.36 | 50,428.20 | 50,428.20 | 1,293.03 | | |
| EQ | 41 Detroit, MI | | Equipment | 4/1/2007 | 1,500.00 | 1,500.00 | | | | 300.00 | 825.00 | 825.00 | 25.00 | | |
| EQ | 42 Detroit, MI | | Equipment | 4/15/2006 | 147,170.51 | 147,170.51 | 2,080.00 | 22,075.58 | 29,434.10 | 29,434.08 | 110,777.84 | 110,777.84 | 2,452.84 | | |
| EQ | 128/2008 Detroit, MI | | Equipment | 1/28/2008 | 40,509.78 | 40,509.78 | 9,929.99 | 0.00 | 8,101.92 | 8,101.92 | 16,396.14 | 16,396.14 | 675.16 | | |
| EQ | May 09 Detroit, MI | | Equipment | 5/31/2009 | 14,093.60 | 14,093.60 | 0.00 | 0.00 | 1,879.12 | 1,879.12 | 2,818.68 | 2,818.68 | 234.89 | | |
| | | | | | | | | | | | | | | | |
| EQ | Dec 08 E. Rutherford GDZD | Equipment | | 12/31/2008 | 296,353.78 | 296,353.78 | 0.00 | 26,729.68 | 44,875.48 | 44,875.48 | 96,607.60 | 96,607.60 | 4,089.25 | | |
| EQ | May 09 E. Rutherford GDZD | Equipment | | 5/31/2009 | 32,070.41 | 32,070.41 | | | 534.66 | 534.66 | 6,918.52 | 6,918.52 | 534.66 | | |
| | | | | | 18,158.55 | 18,158.55 | | | | 2,421.12 | 2,421.12 | 2,421.12 | 2,421.12 | 302.64 | | |
| | | | | | | | 0.00 | | | | | | 0.00 | | |
| EQ | 16 Flushing, NY | | Equipment | 5/1/2005 | 15,600.00 | 15,600.00 | 2,080.00 | 3,120.00 | 3,120.00 | 3,120.00 | 11,440.00 | 11,440.00 | 0.00 | (11,440.00) | |
| PS | 14 Flushing, NY | Convergent | Equipment | 5/1/2005 | 111,965.78 | 111,965.78 | 27,937.92 | 14,929.90 | 22,393.16 | 22,393.14 | 99,355.98 | 99,355.98 | (87,392.96) | (99,715.58) | |
| PS | 17 Flushing, NY | 22 SONY Plasma Screens | Equipment | 5/1/2005 | 209,534.41 | 209,534.41 | 9,931.99 | 41,906.88 | 41,906.88 | 41,906.88 | 171,731.28 | 171,731.28 | (87,392.96) | (45,510.41) | |
| PS | 18 Flushing, NY | Installation of SONY Plasma Screens | Equipment | 5/1/2005 | 74,332.46 | 74,332.46 | | 14,866.49 | 14,866.49 | 14,866.49 | 54,249.41 | 54,249.41 | 0.00 | | |
| EQ | Jan 08 Flushing, NY | | Equipment | 1/28/2008 | 21,664.16 | 21,664.16 | 0.00 | 0.00 | 4,332.84 | 4,332.84 | 8,665.68 | 8,665.68 | 361.07 | | |
| EQ | Feb 08 Flushing, NY | | Equipment | 2/29/2008 | 23,310.94 | 23,310.94 | (1,646.77) | 0.00 | 4,273.72 | 4,273.72 | 8,386.16 | 8,386.16 | 361.07 | | |
| EQ | May 09 Flushing, NY | | Equipment | 5/31/2009 | 22,972.90 | 22,972.90 | (12,183.52) | 0.00 | 1,485.00 | 1,485.00 | 4,897.20 | 4,897.20 | 1,677.00 | | |
| | | | | | 478,411.05 | 478,411.05 | 143,510.48 | 74,832.27 | 82,286.73 | 93,826.08 | 319,566.99 | 319,566.99 | 104,582.53 | 2,293.85 | |
| | | | | | 590,376.68 | | | | | | | | | | |
| EW | 31 Houston, TX | Electrical Work | Equipment | 8/14/2007 | 4,862.92 | 4,862.92 | 4,862.92 | 0.00 | 486.29 | 972.60 | 972.60 | 2,431.49 | 2,431.49 | 81.05 | |
| EQ | Jan 08 Houston, TX | | Equipment | 1/28/2008 | 10,954.90 | 10,954.90 | 0.00 | 0.00 | 2,190.96 | 2,190.96 | 4,381.92 | 4,381.92 | 182.58 | | |
| EQ | May 09 Houston, TX | | Equipment | 5/31/2009 | 6,915.53 | 6,915.53 | 0.00 | 0.00 | 1,314.60 | 1,314.60 | 2,726.05 | 2,726.05 | 139.51 | | |
| | | | | | 22,733.35 | 22,733.35 | 4,862.92 | 0.00 | 29,577.15 | 4,478.16 | 4,478.16 | 9,539.46 | 9,539.46 | 3,543.50 | |
| EQ | 11 Indianapolis, IN | Sony Plasma Screens | Equipment | 1/2/2005 | 95,414.45 | 95,414.45 | 19,082.90 | 19,082.90 | 19,082.90 | 19,082.90 | 108,100.00 | 108,100.00 | 116,100.00 | 1,790.25 | |
| EQ | 128/2008 Indianapolis, IN | | Equipment | 1/28/2008 | 1,072.50 | 1,072.50 | 0.00 | 0.00 | 214.50 | 214.50 | 429.12 | 429.12 | 17.88 | | |
| EQ | Feb 08 Indianapolis, IN | | Equipment | 2/29/2008 | 2,233.10 | 2,233.10 | 0.00 | 0.00 | 446.60 | 446.60 | 893.20 | 893.20 | 37.95 | | |
| EQ | May 09 Indianapolis, IN | | Equipment | 5/31/2009 | 2,313.65 | 2,313.65 | 0.00 | 0.00 | 308.48 | 442.72 | 771.20 | 771.20 | 38.56 | | |
| | | | | | 101,078.18 | 101,078.18 | 19,082.90 | 19,082.90 | 20,052.48 | 20,021.49 | 97,688.14 | 97,688.14 | 1,684.64 | | |
| | | | | | 103,391.68 | | | | | | | | | | |
| EW | 31 Los Angeles, CA | Electrical Work | Equipment | 4/3/2006 | 24,254.63 | 24,254.63 | 0.00 | 19,092.90 | 19,092.90 | 5,843.26 | 5,843.26 | 22,515.05 | 22,515.05 | 2,515.40 | |
| EQ | 43 Los Angeles, CA | | Equipment | 4/15/2006 | 183,272.52 | 183,272.52 | 27,490.88 | 27,490.88 | 36,654.50 | 36,654.48 | 137,454.34 | 137,454.34 | 3,034.54 | | |
| EQ | 129/2008 Los Angeles, CA | | Equipment | 4/30/2008 | 13,813.39 | 13,813.39 | 0.00 | 3,453.17 | 2,762.68 | 3,457.52 | 5,873.04 | 5,873.04 | 286.46 | | |
| EQ | Apr 08 Los Angeles, CA | | Equipment | 4/30/2008 | 43,512.17 | 43,512.17 | 0.00 | 8,702.40 | 6,826.80 | 8,702.40 | 15,229.20 | 15,229.20 | 725.20 | | |
| EQ | May 08 Los Angeles, CA | | Equipment | 5/31/2008 | 57,525.21 | 57,525.21 | 0.00 | 11,505.00 | 10,354.56 | 57,524.00 | 40,267.60 | 40,267.60 | 2,876.04 | | |
| EQ | Jun 08 Los Angeles, CA | | Equipment | 6/30/2008 | 33,389.05 | 33,389.05 | 0.00 | 3,918.74 | 3,918.74 | 6,717.84 | 10,656.58 | 10,656.58 | 559.82 | | |
| EQ | Jul 08 Los Angeles, CA | | Equipment | 7/31/2008 | 43,516.94 | 43,516.94 | 0.00 | 4,359.66 | 4,359.66 | 8,703.32 | 13,055.02 | 13,055.02 | 725.28 | | |
| EQ | Jan 09 Los Angeles, CA | | Equipment | 1/31/2009 | 32,945.76 | 32,945.76 | 0.00 | 6,001.44 | 6,001.44 | 6,001.44 | 8,045.93 | 8,045.93 | 899.68 | | |
| EQ | Jun 09 Los Angeles, CA | | Equipment | 6/30/2009 | 5,932.04 | 5,932.04 | | | 438.72 | 438.72 | 457.78 | 457.78 | 65.54 | | |
| | | | | | 577,061.29 | 577,061.29 | | | 83,734.74 | 83,734.74 | 290,941.25 | 290,941.25 | 11,723.04 | | |
| EQ | May 09 Los Angeles Angels | Equipment | | 5/31/2009 | 35,582.15 | 35,582.15 | 0.00 | 0.00 | 2,397.00 | 2,397.00 | 7,197.00 | 7,197.00 | 999.20 | | |
| | | | | | 35,582.15 | | | | | | | | | | |
| EQ | 8 Miami, FL | Sony Plasma Screens | Equipment | 1/2/2005 | 91,173.02 | 91,173.02 | 18,234.60 | 18,234.60 | 18,234.60 | 18,234.60 | 91,173.00 | 91,173.00 | 1,519.55 | | |
| EQ | 13 Miami, FL | Cables to Plasma displays | Equipment | 1/2/2005 | 3,083.74 | 3,083.74 | 616.75 | 616.75 | 616.75 | 616.80 | 3,083.85 | 3,083.85 | 51.40 | | |
| EQ | 9 Miami, FL | Equipment | | 3/30/2005 | 9,576.96 | 9,576.96 | 1,915.40 | 1,915.40 | 1,873.72 | 5,514.55 | 5,514.55 | 3,830.04 | 3,830.04 | 186.31 | |
| EQ | Feb 08 Miami, FL | | Equipment | 6/1/2007 | 8,426.25 | 8,426.25 | 0.00 | 983.06 | 983.06 | 1,685.28 | 4,353.62 | 4,353.62 | 140.44 | | |
| EQ | Feb 08 Miami, FL | | Equipment | 2/29/2008 | 1,147.50 | 1,147.50 | 0.00 | 229.50 | 229.50 | 229.56 | 491.12 | 491.12 | 19.13 | | |
| EQ | May 08 Miami, FL | | Equipment | 5/31/2008 | 2,436.50 | 2,436.50 | 0.00 | 446.71 | 446.71 | 487.32 | 934.03 | 934.03 | 40.61 | | |
| EQ | Jun 08 Miami, FL | | Equipment | 6/30/2008 | 1,436.12 | 1,436.12 | | | 191.52 | 191.52 | 287.28 | 287.28 | 23.94 | | |
| EQ | May 09 (moved to Washington on Sep 09) | Equipment | | 5/31/2009 | 19,695.57 | 19,695.57 | (19,695.37) | | | 1,312.90 | 1,312.90 | 107,089.06 | 107,089.06 | 1,951.38 | |
| EQ | 61 Milwaukee, WI | Equipment | | 4/1/2007 | 116,777.50 | 116,777.50 | 15,426.06 | 18,851.35 | 21,397.55 | 23,390.19 | 67,951.46 | 67,951.46 | 2,573.58 | | |
| EQ | Jul 07 Milwaukee, WI | | Equipment | 7/31/2007 | 24,259.40 | 24,259.40 | 2,462.16 | 2,584.00 | 2,584.00 | 29,568.04 | 91,105.24 | 91,105.24 | 2,442.17 | | |
| | | | | | 15,425.90 | 15,425.90 | 3,932.61 | 1,057.39 | 7,303.58 | 7,303.58 | 7,303.58 | | | 280.82 | |
| EQ | May 09 New York - Clifford | Equipment | | 5/31/2009 | 140,237.40 | 140,237.40 | 0.00 | 42,849.74 | 42,849.74 | 176,451.00 | 176,451.00 | 0.00 | 3,370.06 | |
| EQ | Dec 08 New York - MSG | Equipment | | 12/31/2008 | 121,782.99 | 121,782.99 | 0.00 | 2,063.05 | 2,063.05 | 24,756.60 | 26,819.65 | 26,819.65 | 2,063.05 | | |
| EQ | May 09 New York - MSG | Equipment | | 5/31/2009 | 83,483.31 | 83,483.31 | 0.00 | 525.12 | 525.12 | 709.16 | 709.16 | 10,571.96 | 10,571.96 | 709.16 | |
| | | | | | 205,266.30 | 205,266.30 | 0.00 | | 25,465.72 | 320,566.85 | 320,566.85 | 37,390.81 | | | |
| EW | 34 Oakland, CA | Electrical Work | Equipment | 4/3/2006 | 42,250.00 | 42,250.00 | 0.00 | 6,487.50 | 8,650.00 | 8,649.96 | 32,587.62 | 32,587.62 | 720.83 | | |
| EQ | 1 Oakland, CA | | Equipment | 1/1/2000 | 12,000.00 | 12,000.00 | 2,400.00 | 2,400.00 | 2,400.00 | 2,400.00 | 12,000.00 | 12,000.00 | 200.00 | | |
| EQ | 1/2 Oakland, CA | | Equipment | 1/2/2005 | 11,187.00 | 11,187.00 | 2,685.40 | 2,685.40 | 2,685.40 | 13,477.00 | 13,417.00 | 223.62 | | | |
| EQ | 12 Oakland, CA | | Equipment | 1/2/2005 | 22,284.24 | 22,284.24 | | 22,284.24 | 22,284.24 | 22,284.24 | 22,284.24 | 22,284.24 | 371.40 | | |
| EQ | 27 Oakland, CA | TVM Sony 50 PRDDfps 1 b | Equipment | 2/15/2006 | 7,652.47 | 7,652.47 | 1,530.49 | 1,530.49 | 1,530.49 | 1,530.48 | 5,994.40 | 5,994.40 | 127.54 | | |
| EQ | 44 Oakland, CA | Electrical Work | Equipment | 4/15/2006 | 62,500.00 | 62,500.00 | 0.00 | 12,500.00 | 12,500.00 | 12,500.00 | 47,136.46 | 47,136.46 | 1,356.48 | | |
| EQ | 44 Oakland, CA | | Equipment | 4/15/2006 | 125,080.66 | 125,080.66 | 18,852.10 | 25,136.16 | 25,136.16 | 25,136.14 | 94,260.56 | 94,260.56 | 2,094.68 | | |
| EQ | Jan 08 Oakland, CA | | Equipment | 1/28/2008 | 15,250.39 | 15,250.39 | 0.00 | 3,051.72 | 3,051.72 | 5,569.87 | 5,569.87 | 254.31 | | | |
| EQ | Feb 08 Oakland, CA | | Equipment | 2/29/2008 | 13,568.36 | 13,568.36 | 0.00 | 1,812.32 | 1,812.32 | 2,651.76 | 7,692.80 | 7,692.80 | 254.31 | | |
| EQ | May 09 Oakland, CA | | Equipment | 5/31/2009 | 13,235.80 | 13,235.80 | 0.00 | 961.60 | 961.60 | 961.60 | 4,198.62 | 4,198.62 | 320.98 | | |
| EQ | May 09 Oakland, CA | | Equipment | 9/30/2008 | 3,842.60 | 3,842.60 | 0.00 | 2,504.89 | 1,502.89 | 3,104.72 | 7,302.80 | 7,302.80 | 942.85 | | |
| | | | | | 54,771.07 | 54,771.07 | | 57,100.71 | 57,100.71 | 312,523.71 | 312,523.71 | 17,580.33 | | | |
| | | | | | 440,009.31 | 440,009.31 | 27,367.62 | 55,055.07 | 67,100.71 | 73,155.11 | 73,155.11 | | | | |
| | | | | | | | | 0.00 | | | | | | 0.00 | |
| EQ | Dec 08 Orlando | Equipment | | 12/31/2008 | 51,978.82 | 51,978.82 | 0.00 | 10,393.72 | 10,393.72 | 10,393.72 | 11,262.03 | 11,262.03 | 866.31 | | |
| EQ | Jan 09 Orlando | Equipment | | 1/31/2009 | 2,261.08 | 2,261.08 | | | 453.16 | 453.16 | 622.56 | 622.56 | 37.68 | | |
| | | | | | 54,239.90 | 54,239.90 | 0.00 | 0.00 | | 866.31 | 10,393.72 | 11,714.59 | 11,714.59 | 903.99 | |
| EW | 38 Phoenix, AZ | Electrical Work | Equipment | 4/3/2006 | 3,500.62 | 3,500.62 | (3,500.62) | 0.00 | | 708.16 | 700.30 | 1,825.40 | 1,825.40 | 37.68 | |
| EQ | 45 El Paso, CA | | Equipment | 4/15/2006 | 215,385.93 | 215,385.93 | 4,492.50 | 7,712.50 | 43,709.76 | 43,709.76 | 120,566.85 | 120,566.85 | 3,746.53 | | |
| | | | | | 218,848.85 | 218,848.85 | (215,385.03) | | | 43,709.76 | 130,566.85 | 130,566.85 | 0.00 | | |
| EQ | 1 San Antonio, TX | Sony Plasma Screens | Equipment | 1/2/2005 | 106,561.20 | 106,561.20 | 21,312.24 | 21,312.24 | 21,312.24 | 21,312.24 | 106,562.70 | 106,562.70 | 1,776.02 | | |
| EQ | May 09 San Antonio, TX | | Equipment | 5/31/2009 | 1,591.96 | 1,591.96 | | | 318.36 | 318.36 | 580.40 | 580.40 | 70.67 | | |
| EQ | May 09 San Antonio, TX | | Equipment | 6/30/2008 | 908.00 | 908.00 | | | 100.80 | 100.80 | 302.40 | 302.40 | 26.55 | | |
| | | | | | 108,053.16 | 108,053.16 | 21,312.24 | 21,312.24 | 15,256.66 | 22,884.72 | 21,731.44 | 21,731.44 | 15,852.16 | | |
| EQ | 5/1/2006 San Diego, CA | | Equipment | 5/1/2006 | 114,423.51 | 114,423.51 | 100,000.00 | 83,500.00 | 83,500.00 | 83,500.00 | 83,500.00 | 83,500.00 | 1,907.06 | | |

| | Date | Location | Type | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EQ | Jan 07 | San Diego, CA | Equipment | | | | | 17,014.28 | 17,014.28 | | | 3,402.84 | 3,402.84 | | 8,790.68 | 283.57 |
| EQ | Jan 08 | San Diego, CA | Equipment | | | | | 6,469.57 | 6,469.57 | | | 1,293.89 | 1,293.89 | | 3,235.27 | 144.49 |
| EQ | May 08 | San Diego, CA | Equipment | | | | | 22,146.15 | 22,146.15 | | | 4,429.20 | 4,429.20 | | 7,382.00 | 369.10 |
| | | | | | | | | 60,825.55 | 60,825.55 | | | 3,426.64 | 3,426.64 | | 19,408.05 | 2,704.22 |
| EQ | Jul 06 | 53. San Francisco, CA | Equipment | (107,318.91) | (107,318.91) | | 10,731.90 | 0.00 | 0.00 | 21,463.78 | 21,463.78 | 5,365.95 | 59,025.43 | (59,025.43) | 0.00 | 0.00 |
| EQ | Jan 08 | San Francisco, CA | Equipment | 14,823.78 | 14,823.78 | | | 0.00 | 0.00 | 2,964.72 | 741.18 | 3,705.90 | (3,705.90) | | 0.00 | 0.00 |
| EQ | Feb 08 | San Francisco, CA | Equipment | 13,221.98 | 13,221.98 | | | 0.00 | 0.00 | 1,338.52 | 661.16 | 4,019.68 | (4,019.68) | | 0.00 | 0.00 |
| EQ | May 08 | San Francisco, CA | Equipment | 12,495.13 | 12,495.13 | | | 0.00 | 0.00 | 1,666.00 | 624.75 | 2,290.75 | (2,290.75) | | 0.00 | 0.00 |
| EQ | Jun 08 | San Francisco, CA | Equipment | 65,074.76 | 65,074.76 | | | 0.00 | 0.00 | 0.00 | 8,676.64 | 8,676.64 | | 65,074.76 | 8,676.64 |
| | | | | (153,885.28) | | | | 65,074.76 | 65,074.76 | 29,252.84 | 29,252.84 | 16,293.98 | 77,718.40 | (69,041.76) | 8,675.44 | 1,084.58 |
| EQ | Dec 08 | St. Pete Times, FL | Equipment | 51,728.11 | 51,728.11 | | | 0.00 | 0.00 | 862.15 | 10,345.80 | 11,207.95 | | 11,207.95 | 862.15 |
| EQ | Mar 08 | Tampa, FL | Equipment | 122,125.99 | 129,125.99 | | | 0.00 | 862.15 | 21,135.80 | 25,846.56 | 47,482.36 | 81,643.63 | 5,531.67 |
| EQ | Mar 08 | Tampa, FL | Equipment | 62,485.47 | 62,485.47 | | | 0.00 | 8,331.50 | 12,077.04 | 20,308.54 | 22,137.08 | 1,041.42 |
| EQ | Jun 08 | Tampa, FL | Equipment | 54,748.69 | 54,748.69 | | | 0.00 | 4,387.34 | 17,317.12 | 17,317.12 | 912.48 |
| EQ | Oct 08 | Tampa, FL | Equipment | 18,346.93 | 18,346.93 | | | 0.00 | 907.44 | 3,669.16 | 3,669.16 | 312.48 |
| EQ | Jun 09 | Tampa, FL | Equipment | 42,248.42 | 42,248.42 | | | 0.00 | 7,364.32 | 7,364.32 | 1,037.76 |
| | | | | 357,141.80 | | | | 37,464.35 | 97,341.80 | 37,425.12 | 1,390.90 |
| EQ | Dec 08 | Tampa - Bank Atlantic | Equipment | 52,577.96 | 52,577.96 | | | 0.00 | 876.30 | 10,515.60 | 11,391.90 | 11,391.90 | 876.30 |
| | | | | 52,577.96 | | | | 876.30 | 10,515.60 | 11,391.90 | 876.30 |
| EQ | Jan 08 | 26 Toyota Center, Houston ( AFF TX005 Plasma Based Digital | Equipment | 4,803.82 | 4,803.82 | 7,320.13 | 7,685.60 | 960.72 | 3,602.77 | 3,602.77 | 90.06 |
| EQ | Mar 08 | 37 Toyota Center, Houston Plasma-based Digital Signage System | Equipment | 8,910.47 | 8,910.47 | 729.57 | 960.76 | 1,586.77 | 2,788.84 | 665.47 |
| EQ | Feb 09 | 22 Toyota Center, Houston T-54 DNT M87U - BLACK PLASMA | Equipment | 9,033.47 | 9,033.47 | 0.00 | 453.03 | 5,380.95 | 5,380.95 | 385.06 |
| EQ | Jun 09 | 53 Toyota Center, Houston Equipment | 8,840.78 | 8,840.78 | 0.00 | 1,178.90 | 1,768.20 | 2,947.00 | 147.35 |
| | | | | 42,608.08 | | | | 43,906.77 | 45,906.77 | 12,617.48 | 1,288.04 |
| EQ | Mar 08 | 34 Washington Nationals | Equipment | 249,865.09 | 249,865.09 | 41,643.80 | 49,972.56 | 91,616.56 | 91,616.56 | 4,164.38 |
| EQ | Mar 08 | Washington Nationals | Equipment | 67,809.79 | 67,809.79 | 9,041.26 | 13,561.92 | 22,603.20 | 22,603.20 | 1,130.16 |
| EQ | May 08 | Washington Nationals | Equipment | 59,907.02 | 59,907.02 | 0.00 | 7,989.66 | 7,989.66 | 59,907.00 | 799.56 |
| | | | | 377,070.10 | | | | 50,685.06 | 63,524.48 | 114,219.56 | 5,294.54 |
| EQ | May 09 | Washington Redskins | Equipment | 4,517.50 | 4,517.50 | 0.00 | 301.17 | 301.17 | 4,517.50 | 225.29 |
| EQ | May 09 | Washington Redskins | Equipment (enclosed from Miami FL) | 76,699.71 | 76,699.71 | 0.00 | 10,226.64 | 10,226.64 | 66,473.07 | 1,278.33 |
| EQ | Sep 09 | Washington Redskins | Equipment (installation) | 21,503.90 | 21,503.90 | 0.00 | 1,435.72 | 1,435.72 | 20,068.16 | 497.13 |
| | | | | 108,046.71 | | | | 12,617.48 | 12,617.48 | 12,617.48 | 1,000.75 |
| EQ | Jan 07 | 6 Washington, DC | Equipment | 12,091.38 | 12,091.38 | 12,369.14 | 24,738.28 | 24,738.28 | 24,738.20 | 111,221.38 | 2,061.52 |
| EQ | Jan 08 | Washington, DC | Equipment | 8,803.85 | 8,803.85 | 0.00 | 400.80 | 400.80 | 7,965.05 | 33.40 |
| EQ | Feb 08 | Washington, DC | Equipment | 19,904.90 | 19,904.90 | 0.00 | 3,981.00 | 7,820.25 | 7,630.25 | 331.75 |
| EQ | Sep 08 | Washington, DC | Equipment | 1,170.00 | 1,170.00 | 0.00 | 3,113.83 | 390.00 | 390.00 | 910.00 | 108.46 |
| EQ | Jan 07 | Washington, DC | Equipment | 31,170.87 | 31,170.87 | 0.00 | 4,156.08 | 6,234.12 | 10,390.20 | 10,390.20 | 123.95 |
| | | | | 157,910.48 | | | | 42,738.28 | 42,738.28 | 45,940.12 | 959.51 |
| EW | AIE4 | 12/2006 | Yankee Stadium | Electrical Work | (12,000.00) | (12,000.00) | | 0.00 | 2,400.00 | 2,400.00 | 5,600.00 | 5,600.00 | 0.00 | 0.00 |
| EW | 6/2006 | Yankee Stadium | Equipment | 227,760.41 | (226,426.35) | 1,274.16 | 34,155.06 | 45,540.08 | 2,254.80 | 17,689.06 | (119,034.47) | (119,034.47) | 8,655.59 | 187.90 |
| EW | Aug 07 | Yankee Stadium | Equipment | 4,631.90 | (1,256.60) | 56,721.31 | 49.53 | 0.00 | 0.00 | 732.26 | 22,144.80 | (300.00) | (300.00) | 965.56 |
| EW | Aug 07 | Yankee Stadium | Equipment | 90,114.36 | (33,595.05) | 56,721.31 | 5,599.53 | 18,022.92 | 1,344.12 | 56,876.77 | (9,661.56) | 23,615.59 |
| EW | Aug 07 | Yankee Stadium | Equipment | 1,170.56 | (1,355.60) | 0.00 | 0.00 | 1,203.23 | 3,371.81 | 3,371.81 | (300.00) | 180.46 |
| EW | Oct 07 | Yankee Stadium | Equipment | 9,062.87 | (1,625.65) | 7,437.25 | 453.00 | 1,812.00 | 1,487.40 | 3,753.14 | (406.41) | 3,346.75 | 123.95 |
| EW | Jan 08 | Yankee Stadium | Equipment | 6,172.78 | | 6,172.78 | 0.00 | 1,234.52 | 612.92 | 1,809.94 | 4,777.79 | 208.46 |
| EW | Jan 08 | Yankee Stadium | Equipment | 12,101.67 | | 12,101.67 | 0.00 | 2,285.02 | 2,492.76 | 4,777.79 | 4,777.79 | 207.73 |
| EW | Feb 08 | Yankee Stadium | Equipment | 8,309.11 | | 8,309.11 | 0.00 | 1,107.92 | 1,661.88 | 2,769.80 | 2,769.80 | 138.49 |
| EW | May 08 | Yankee Stadium | Equipment | 19,583.43 | (1,786.73) | 0.00 | 0.00 | 290.46 | 290.46 | | 208.46 |
| EW | May 08 | Yankee Stadium | Equipment | 132,717.53 | | 132,717.53 | 0.00 | 17,695.68 | 17,695.68 | 2,211.96 |
| | | | | 766,713.10 | (267,872.32) | 564,571.09 | 56,880.17 | 1,376,097.87 | 121,010.40 | 122,384.03 | 4,321.52 |
| EQ | 1/2005 | 4 404 Park Ave, NY | Convergent Media Systems | 60,511.89 | 60,511.89 | 12,101.38 | 12,101.38 | 12,110.40 | 60,511.94 | 1,009.20 |
| EQ | 7/2005 | 404 Park Ave, NY | Convergent Deposit | 70,935.90 | 70,935.90 | 14,187.18 | 0.00 | 14,110.34 | 60,035.92 | 99.55 |
| | | | | 70,935.90 | | | | 14,110.34 | 14,110.34 | 99.10 | 1,179.57 |
| F&F | Feb 09 | Diversified | ANNTX equipment - deposit | 510,951.23 | 510,951.23 | 25,547.55 | 25,547.55 | 25,547.55 | 485,403.68 | 9.55 |
| F&F | Feb 09 | Diversified | ANNTX equipment - credit amt drtives | (383,211.40) | (383,211.40) | (19,160.07) | (19,160.07) | (19,160.07) | (364,051.33) | 0.00 |
| F&F | Jan 09 | Diversified | ANNTX equipment - orbital | (127,737.80) | (127,737.80) | (6,386.98) | (6,386.98) | (6,386.90) | (6,386.90) | 130.15 |
| F&F | Mar 09 | Diversified | Equipment | 1,391.40 | 1,391.40 | 287.28 | 1,391.93 | 1,077.38 | 1,077.38 | 23.94 |
| F&F | Apr 09 | Diversified | ANNTX equipment - accrual (Diversified) | 417,297.40 | 417,297.40 | 2,969.60 | 5,693.33 | 5,693.35 | 5,091.35 | 247.45 |
| F&F | May 09 | Diversified | Reversal of accrual (Diversified) | (417,297.40) | (417,297.40) | 6,054.96 | 6,054.96 | 6,954.96 | (6,954.96) | 130.91 |
| F&F | Apr 09 | Diversified | Retrofit - accrual (CRI) | 76,513.80 | 76,513.80 | 6,094.96 | 6,054.96 | 6,954.96 | (6,954.96) | 130.91 |
| | | | | 253,500.59 | | | | 14,399.38 | 34,599.38 | 50,900.00 | 4,225.60 |
| F&F | 7/2005 | 9 Manual roll-up solar shades | Refrigerator | 2,425.92 | 2,425.92 | 121.30 | 485.18 | 485.18 | 2,062.01 | 40.43 |
| F&F | 7/2005 | | Stove | 548.92 | 548.92 | 27.45 | 109.78 | 109.78 | 466.60 | 9.15 |
| F&F | 7/2005 | | Furniture & chairs | 898.16 | 898.16 | 44.94 | 179.62 | 179.62 | 663.63 | 14.95 |
| F&F | 7/2005 | | Computers | 646.08 | 646.08 | 32.30 | 129.22 | 129.22 | 549.19 | 10.77 |
| F&F | 3/30/2006 | | Equipment | 2,100.91 | 2,100.91 | 105.96 | 496.93 | 496.23 | 1,518.72 | 41.55 |
| F&F | 14/2008 | | Television display | 1,456.56 | 1,456.56 | 215.48 | 287.31 | 287.31 | 1,077.38 | 23.94 |
| F&F | Feb 08 | | Wiring | 14,846.98 | 14,846.98 | 1,650.00 | 2,731.90 | 2,731.90 | 5,593.75 | 247.45 |
| F&F | 4/30/2008 | | Furniture | 81,215.60 | 81,215.60 | 285.00 | 12,182.31 | 12,182.31 | 28,425.29 | 1,353.59 |
| F&F | 4/30/2008 | | Furniture | 6,776.77 | 6,776.77 | 0.00 | 2,609.22 | 2,609.22 | 5,567.20 | 1,592.30 |
| F&F | 6/30/2008 | | Furniture | 115,758.54 | 115,758.54 | 0.00 | 13,505.17 | 13,505.17 | 36,656.89 | 1,929.31 |
| F&F | 7/31/2008 | | Furniture | 3,615.80 | 3,615.80 | 0.00 | 723.12 | 723.12 | 2,892.68 | 180.65 |
| F&F | Sep 08 | | Tenant improvements | 5,723.67 | 5,723.67 | 0.00 | 381.58 | 381.96 | 1,526.34 | 95.39 |
| | | | | 66,972.45 | | | | 1,657.68 | 1,657.68 | 88,952.13 | 4,225.60 |
| **Leasehold improvements** | | | | | | | | | | | | | | | | |
| LI | Jan 08 | 44 E 30th Street, NY | Wiring | 16,727.20 | 16,727.20 | 0.00 | 3,334.40 | 6,709.20 | 279.95 |
| LI | Feb 08 | 44 E 30th Street, NY | Various | 35,883.66 | 35,883.66 | 0.00 | 5,759.58 | 5,759.58 | 200.00 |
| LI | Apr 08 | 44 E 30th Street, NY | Alarm System | 7,251.17 | 7,251.17 | 0.00 | 1,265.46 | 40.26 |
| LI | Sep 08 | 44 E 30th Street, NY | Tenant improvements | 8,240.00 | 8,240.00 | 0.00 | 1,526.34 | 515.50 |
| | | | | 66,972.45 | | | | 13,394.40 | 21,962.24 | 1,116.20 |
| **Total** | | | | 9,573,965.49 | (1,110,761.00) | 8,463,286.49 | | | 8,561,384 | | | | | | 4,110,322.87 | 140,003.48 |

## Schedule 2.1(d) – Designated Contracts

Each of the following Contracts (including all amendments, modifications and supplements thereto) shall constitute a Designated Contract:

1.  Independent Contractor Agreement with Wayne Aaronson dated October 1, 2009.

2.  Independent Contractor Agreement with Scott Kain dated October 1, 2009.

3.  Independent Contractor Agreement with Troy Miller dated January 6, 2010.

4.  Operating agreement with Diversified Media Group dated October 3, 2008.

5.  Network operating services agreement with Diversified Systems / Media Group dated September 5, 2008.

6.  Letter Agreement with Diversified Media Group dated March 6, 2009.

7.  General Services Agreement with Creative Realities effective January 15, 2008.

8.  Agreement with Creative Realities dated March 24, 2009.

9.  Agreement with Avaya Financial Services dated August 18, 2005 (and addendums).

10. Agreement with Byron Media dated May 5, 2008.

11. Agreement with STATS LLC dated December 2, 2009.

12. Agreement with Anaheim Ducks Hockey Club, LLC dated October 26, 2009 (Anaheim Ducks).

13. Agreement with Arena Sports Marketing dated January 6, 2009 (Atlanta Hawks/Thrashers)(unsigned).

14. Agreement with Angels Baseball LP dated April 17, 2009 (Los Angeles Angels).

15. Agreement with Atlanta National League Baseball Club, Inc. dated January 1, 2008 (Atlanta Braves).

16. Agreement with Atlanta Braves dated February 2009 (unsigned)(Atlanta Braves).

17. Agreement with Boston Red Sox Baseball Club Limited Partnership dated February 6, 2006 (Boston Red Sox).

18. Agreement with Boston Red Sox dated January 2009 (unsigned)(Boston Red Sox).

19. Agreement with Charlotte Bobcats and Charlotte Bobcats Arena dated October 12, 2005 (Charlotte Bobcats).

20. Agreement with Cavaliers Operating Company, LLC dated December 1, 2009 (Cleveland Cavaliers)(unsigned).

21. Agreement with United Center Joint Venture dated October 1, 2008 (Chicago Bulls/Blackhawks).

22. Agreement with Chicago National League Ball Club, Inc. dated March 31, 2009 (Chicago Cubs).

23. Agreement with Chicago White Sox, Ltd. dated December 15, 2005 (Chicago White Sox).

24. Agreement with Chicago White Sox dated March 2009 (unsigned)(Chicago White Sox).

25. Agreement with Cincinnati Reds L.L.C. dated March 31, 2008 (Cincinnati Reds).

26. Agreement with Cleveland Indians, Inc. dated February 1, 2007 (Cleveland Indians).

27. Agreement with Center Operating Company, L.P. dated April 1, 2004 (term ended)(Dallas Mavericks/Stars).

28. Agreement with The Dallas Cowboys dated August 2009 (unsigned)(Dallas Cowboys).

29. Agreement with Detroit Tigers, Inc. dated January 1, 2006 (Detroit Tigers).

30. Agreement with DC Arena L.P. dated December 17, 2003 and renewal proposal dated November 1, 2007 (Washington Wizards/Capitals).

31. Agreement with Florida Panthers Hockey Club, Ltd. dated November 1, 2008 (Florida Panthers).

32. Agreement with Rocket Ball Ltd., Handsome L.P. and Clutch City Sports & Entertainment dated July 1, 2005 (Houston Rockets).

33. Agreement with Kansas City Royals dated March 4, 2009 (Kansas City Royals).

34. Agreement with Los Angeles Dodgers L.L.C. dated December 15, 2005 (unsigned)(Los Angeles Dodgers).

35. Agreement with Los Angeles Dodgers dated February 2009 (unsigned)(Los Angeles Dodgers).

36. Agreement with Minnesota Timberwolves and Target Center dated October 12, 2005 (term ended) (Minnesota Timberwolves).

37. Agreement with New Jersey Sports & Exposition Authority dated November 1, 2008 (New Jersey Nets).

38. Agreement with New York Islanders Hockey Club, L.P. dated August 15, 2006 (term ended)(New York Islanders).

39. Agreement with Queens Ballpark Company L.L.C. dated July 3, 2007 (New York Mets).

40. Agreement with Madison Square Garden, L.P. dated February 1, 2009 (New York Knicks/Rangers).

41. Agreement with New York Yankees dated November 2008 (unsigned)(New York Yankees).

42. Agreement with Athletics Investment Group L.L.C. dated February 1, 2009 (Oakland As).

43. Agreement with The St. Louis Cardinals, L.L.C. dated January 1, 2007 (St. Louis Cardinals).

44. Agreement with San Francisco Baseball Associates, L.P. dated March 1, 2009 (San Francisco Giants).

45. Agreement with Seattle Mariners Baseball Club dated April 29, 2009 (Seattle Mariners)(unsigned).

46. Agreement with Tampa Bay Arena L.P. d/b/a the St. Pete Times Forum dated November 1, 2008 (Tampa Bay Lightning).

47. Agreement with Tampa Bay Devil Rays Baseball Ltd. dated January 1, 2009 (Tampa Bay Rays).

48. Agreement with Texas Rangers Baseball Partners dated December 1, 2007 (Texas Rangers).

49. Proposal to Utah Jazz (undated)(unsigned)(Utah Jazz).

50. Agreement with Washington Nationals Stadium, LLC effective January 28, 2008 (Washington Nationals).

51. Agreement with Washington Nationals Baseball Club dated January 1, 2009 (unsigned)(Washington Nationals).

52. Agreement with Pro-Football Inc. d/b/a The Washington Redskins dated August 13, 2009 (Washington Redskins).

53. Agreement with GEICO dated October 13, 2009.

54. Agreement with The Richards Group re: GoRving Coalition dated December 10, 2009.

55. Agreements with NBC Everywhere re: RE/MAX International (undated).

56. Agreement with Merkley & Partners re: Ruth Chris.

57. Agreements with CACI re: Army National Guard dated December 23, 2009 and January 20, 2010.

58. Agreements with NBC Everywhere re: Time Warner (undated).

59. Agreement with Universal McCann re: US Army dated December 9, 2009.

60. Agreement with Berdon L.L.P. dated November 24, 2008.

61. Agreement with Davis & Gilbert L.L.P. dated November 24, 2008.

62. Agreement with NBC Universal Inc. dated June 28, 2007 and amendment dated June 30, 2008.

63. Agreement with Sony Electronics Inc. dated July 28, 2008.

64. Maintenance agreement with Avaya for the IP Office phone system dated June 21, 2006.

65. Lease agreement with Avaya Financial Services for the IP Office phone system dated September 1, 2005.

66. Agreements with Covad dated April 2 and 22, 2009 (1 year terms) which provide broadband access to the Oakland A's, Los Angeles Dodgers and San Francisco Giants venues (other agreements with Covad are on a month to month basis).

## <u>Schedule 2.1(g) – Trademarks</u>

1. Arena Media Networks

2. AMNtv

3. AMNds

4. the AMN logo

5. the domain name arena-media.com

6. the domain name arenamedianetworks.com

<u>**Schedule 2.2(c) – Excluded Contracts**</u>

1. Amended and Restated Employment Agreement with Thomas Kiernan dated October 31, 2007.

2. Termination of Employment with Thomas Kiernan dated January 23, 2009.

3. Employment Agreement with James McDade dated June 6, 2007.

4. Agreement with James McDade dated December 8, 2008.

5. Amended and Restated Employment Agreement with David Roberts dated October 31, 2007.

6. Amended and Restated Employment Agreement with Arthur Williams dated October 31, 2007.

7. Independent Contractor Agreement with David Dehaen dated October 1, 2009 (unsigned).

8. Independent Contractor Agreement with Martin Mylott dated April 18, 2008.

9. Independent Contractor Agreement with Karen Brownstein Ritterman dated July 8, 2009.

10. Independent Contractor Agreement with Anthony Sedita dated June 1, 2009.

11. Securities Purchase and Loan Agreement with BNYH AMN Holdings L.L.C. and BNYH AMN Parallel Holdings L.L.C. dated October 31, 2007 and amendments dated July 7, 2008, October 10, 2008, November 14, 2008 and March 30, 2009. Pledge and Security Agreement with BNYH AMN Holdings L.L.C. dated October 31, 2007.

12. Agreement with Cleveland Browns dated January 27, 2009 (term ended)(Cleveland Browns).

13. Agreement with Pacers Basketball Corporation dated October 1, 2004 (term ended)(Indianapolis Pacers).

14. Agreement with Golden State Warriors dated August 20, 2004 (Golden State Warriors).

15. Agreement with San Antonio Spurs L.L.C. dated November 1, 2004 (San Antonio Spurs).

16. Agreement with San Diego Ballpark Funding, L.L.C. dated February 1, 2006.

17. Agreement with Icon International Inc. dated June 17, 2008.

18. Agreement with Klestadt & Winters LLP dated January 26, 2010.

19. Agreement with the Nielsen Company dated March 30, 2009.

20. Agreement with Petsky Prunier L.L.C. dated June 17, 2008.

21. Agreement with Squire Sanders dated August 28, 2009.

22. Agreement with Oxford Health Insurance Inc. dated December 1, 2008.

23. Agreement with CSNK Working Capital Finance Corp. d/b/a Bay View Funding dated June 24, 2009 (terminated).

24. Agreement with Paetec Communications dated May 11, 2006 and amendments dated January 25, 2008.

25. Agreement with InfoHighway Communications (Broadview) dated May 25, 2007.

26. Agreement with New Boston Garden Corporation, dated September 1, 2004 (term ended)(Boston Celtics/Bruins).

27. Agreement with Colorado Rockies Baseball Club, Ltd. dated April 13, 2007 (Colorado Rockies).

28. Agreement with Colorado Rockies Baseball Club dated May 2009 (unsigned)(Colorado Rockies).

29. Agreement with Houston Astros, L.L.C. dated February 20, 2007 (unsigned)(Houston Astros).

30. Agreement with South Florida Stadium Corporation dated December 1, 2004 (Miami Dolphins).

31. Agreement with Milwaukee Brewers Baseball Club Limited Partnership dated November 1, 2006 (Milwaukee Brewers).

32. Agreement with Orlando Magic, Ltd. dated November 30, 2008 (Orlando Magic).


Note: The Agreement between Seller and Brook L.L.P., dated January 9, 2009, is neither being assumed or rejected as of the Closing.

## Schedule 4.2(c) – Purchase Price Allocation

Within ninety (90) days after the Closing Date, the Purchaser and the Seller shall use commercially reasonable efforts to agree upon an allocation of the Purchase Price conforming with the requirements of Section 1060 of the Internal Revenue Code.  The Seller and the Purchaser each agree that, to the extent permitted by applicable law, it will adopt and utilize the amounts so allocated to each asset or class of assets for purposes of all federal, state and other income Tax Returns of any nature filed by it and that it will not voluntarily take any position inconsistent therewith upon examination of any such Tax Returns, in any claim for refund, in any litigation or otherwise with respect to such Tax Returns.  Should the parties fail to agree, each shall be free to establish its own allocation for all purposes, including its own Tax filings.

## Schedule 5.2(b) – Consents

The Fourth Amended and Restated Limited Liability Company Agreement of Arena Media Networks LLC requires the affirmative written consent of the Preferred Unitholders holding a majority of the outstanding Preferred Units prior to consummation of the proposed transaction.  A written consent authorizing the execution of this Asset Purchase Agreement was received from BNYH AMN Holdings LLC on February 8, 2010.

## Schedule 5.5(a)(i) – Owned Intellectual Property

1.  The Company owns the domain names arena-media.com and arenamedianetworks.com.

2.  Following payment, the Company will own the graphical user interface ("***GUI***") developed by Diversified Media Group for the AMNtv product.  The GUI was work made for hire and was coded in C#.NET as a Microsoft "WinForms" application under the Operating agreement with Diversified Media Group dated October 3, 2008.

<u>**Schedule 5.5(a)(ii) – Licensed Intellectual Property**</u>

The Company has limited rights to use third-party trademarks and logos under the following agreements:

1.  Agreement with Anaheim Ducks Hockey Club, LLC dated October 26, 2009.

2.  Agreement with Arena Sports Marketing dated January 6, 2009 (Atlanta Hawks/Thrashers)(unsigned).

3.  Agreement with Angels Baseball LP dated April 17, 2009.

4.  Agreement with Atlanta National League Baseball Club, Inc. dated January 1, 2008.

5.  Agreement with Atlanta Braves dated February 2009 (unsigned).

6.  Agreement with New Boston Garden Corporation, dated September 1, 2004 (term ended).

7.  Agreement with Boston Red Sox Baseball Club Limited Partnership dated February 6, 2006.

8.  Agreement with Boston Red Sox dated January 2009 (unsigned).

9.  Agreement with Charlotte Bobcats and Charlotte Bobcats Arena dated October 12, 2005.

10. Agreement with Cavaliers Operating Company, LLC dated December 1, 2009.

11. Agreement with United Center Joint Venture dated October 1, 2008.

12. Agreement with Chicago National League Ball Club, Inc. dated March 31, 2009.

13. Agreement with Chicago White Sox, Ltd. dated December 15, 2005.

14. Agreement with Chicago White Sox dated March 2009 (unsigned).

15. Agreement with Cincinnati Reds L.L.C. dated March 31, 2008.

16. Agreement with Cleveland Browns dated January 27, 2009 (term ended).

17. Agreement with Cleveland Indians, Inc. dated February 1, 2007.

18. Agreement with Colorado Rockies Baseball Club, Ltd. dated April 13, 2007.

19. Agreement with Colorado Rockies Baseball Club dated May 2009 (unsigned).

20. Agreement with Center Operating Company, L.P. dated April 1, 2004 (term ended).

21. Agreement with The Dallas Cowboys dated August 2009 (unsigned).

22. Agreement with Detroit Tigers, Inc. dated January 1, 2006.

23. Agreement with DC Arena L.P. dated December 17, 2003 and renewal proposal dated November 1, 2007.

24. Agreement with Florida Panthers Hockey Club, Ltd. dated November 1, 2008.

25. Agreement with Golden State Warriors dated August 20, 2004.

26. Agreement with Houston Astros, L.L.C. dated February 20, 2007 (unsigned).

27. Agreement with Rocket Ball Ltd., Handsome L.P. and Clutch City Sports & Entertainment dated July 1, 2005.

28. Agreement with Kansas City Royals dated March 4, 2009.

29. Agreement with Los Angeles Dodgers L.L.C. dated December 15, 2005 (unsigned).

30. Agreement with Los Angeles Dodgers dated February 2009 (unsigned).

31. Agreement with South Florida Stadium Corporation dated December 1, 2004.

32. Agreement with Milwaukee Brewers Baseball Club Limited Partnership dated November 1, 2006.

33. Agreement with Minnesota Timberwolves and Target Center dated October 12, 2005 (term ended).

34. Agreement with New Jersey Sports & Exposition Authority dated November 1, 2008.

35. Agreement with New York Islanders Hockey Club, L.P. dated August 15, 2006 (term ended).

36. Agreement with Pacers Basketball Corporation dated October 1, 2004 (term ended).

37. Agreement with Queens Ballpark Company L.L.C. dated July 3, 2007.

38. Agreement with Madison Square Garden, L.P. dated February 1, 2009.

39. Agreement with New York Yankees dated November 2008 (unsigned).

40. Agreement with Athletics Investment Group L.L.C. dated February 1, 2009 (Oakland As).

41. Agreement with Orlando Magic, Ltd. dated November 30, 2008.

42. Agreement with The St. Louis Cardinals, L.L.C. dated January 1, 2007.

43. Agreement with San Antonio Spurs L.L.C. dated November 1, 2004.

44. Agreement with San Diego Ballpark Funding, L.L.C. dated February 1, 2006.

45. Agreement with San Francisco Baseball Associates, L.P. dated March 1, 2009. Agreement with Seattle Mariners Baseball Club dated April 29, 2009 (Seattle Mariners)(unsigned).

46. Agreement with Tampa Bay Arena L.P. d/b/a the St. Pete Times Forum dated November 1, 2008.

47. Agreement with Tampa Bay Devil Rays Baseball Ltd. dated January 1, 2009.

48. Agreement with Texas Rangers Baseball Partners dated December 1, 2007.

49. Proposal to Utah Jazz (undated)(unsigned).

50. Agreement with Washington Nationals Stadium, LLC effective January 28, 2008.

51. Agreement with Washington Nationals Baseball Club dated January 1, 2009 (unsigned).

52. Agreement with Pro-Football Inc. d/b/a The Washington Redskins dated August 13, 2009.

53. Agreement with GEICO dated October 13, 2009.

54. Agreement with The Richards Group re: GoRving Coalition dated December 10, 2009.

55. Agreements with NBC Everywhere re: RE/MAX International (undated).

56. Agreement with Merkley & Partners re: Ruth Chris.

57. Agreements with CACI re: Army National Guard dated December 23, 2009 and January 20, 2010.

58. Agreements with NBC Everywhere re: Time Warner (undated).

59. Agreement with Universal McCann re: US Army dated December 9, 2009.

60. Agreement with NBC Universal Inc. dated June 28, 2007 and amendment dated June 30, 2008.

## Schedule 5.6(a)(ii) – Websites

The Company owns the domain names arena-media.com and arenamedianetworks.com.

## <u>Schedule 5.7 (a) – Material Contracts</u>

1.      <u>Schedule 2.1(d)</u> (*Designated Contracts*) and <u>Schedule 2.2(c)</u> (*Excluded Contracts*) are incorporated herein by reference.

<u>**Schedule 5.7(b) – Breach or default**</u>

The Company is not in compliance with the payment provisions of many of its team agreements, vendor obligations and severance obligations and has received the following notices of default and non-compliance:

1.  The Company received a letter from Angels Baseball LP dated February 3, 2010 which identifies that the Company is in material breach of the Agreement for failure to pay $75,000 by December 31, 2010.

2.  The Company received a letter from the Atlanta National League Baseball Club, Inc. ("***ANLBC***") dated January 1, 2010 demanding that the Company pay $225,000 no later than March 31, 2010, otherwise, ANLBC will terminate the Agreement for material breach.

3.  The Company entered into a stipulation of settlement with Brook LLC on December 17, 2009 which acknowledged a $108,332.03 past due obligation and execution of a warrant of eviction was stayed for the Company to make monthly payments of $18,055.34 between February 1 and July 1, 2010 in addition to current rent.

4.  The Company received an email from the Cincinnati Reds on November 5, 2009 identifying that the Company is in default of the agreement and that it has thirty days to cure the default.

5.  The Company received a letter from the Chicago Cubs Baseball Club, LLC dated January 12, 2010 notifying the Company of its intention to terminate the agreement if payment of $262,500 is not received on or before January 27, 2010.

6.  The Company received a letter from the Cleveland Browns dated December 11, 2009 identifying that if the $75,000 balance due is not received by January 15, 2010, the Cleveland Browns may be forced to take legal action.

7.  The Company received a letter from Icon International Inc. dated July 14, 2009 in relation to past due balances of $255,400.00.  The letter identifies that Icon shall pursue all rights and remedies available unless payment of the past due amount is received on or before July 21, 2009.  Since this date, the Company has paid $40,334.50 in relation to equipment purchased from Icon.

8.  The Company was summoned to answer a complaint filed by Thomas Kiernan on January 25, 2010 in relation to damages for breach of contract seeking damages in excess of $117,187.

9.  The Company received a letter from Kenneth Kirschner, Esquire on behalf of Nielsen Media Research dated January 20, 2010 in relation to a $10,000 debt.

10. The Company received a letter from Lyon Collection Services on behalf of Nielsen Media Research dated December 28, 2009 in relation to a $15,000 debt.

11. The Company received a letter from Brian Oberman on behalf of Nielsen Media Research dated January 10, 2010 in relation to a $10,000 debt.

12. The Company was summoned on February 10, 2010 to answer a complaint filed by Pacers Sports & Entertainment in relation to breach of contract. The complaint seeks unspecified damages.

13. The Company received a letter from Marcus & Partners, Inc. in relation to an obligation to Sage Software of $1,297.

14. The Company received a letter from Bracewell & Giuliani LLP, legal counsel for the San Antonio Spurs, LLC (the "Spurs") dated September 15, 2009 in relation to outstanding and past due balances of $75,000. The letter provides ten day notice to cure all amounts in default under the Agreement. Under the agreement, the Spurs may terminate the agreement if AMN materially breaches the agreement and fails to cure such breach within 10 days written notice.

15. The Company received a letter from Biehl & Biehl dated December 7, 2009 and a letter from Meyers, Saxon & Cole dated January 7, 2010 in relation to the $50,000 owed to the St. Louis Cardinals.

* * *

The following agreements either prohibit assignment, identify that a bankruptcy filing by the Company represents an event of default or allow the team to terminate in the event of a bankruptcy filing:

1. Agreement with Arena Sports Marketing ("ASM") dated January 6, 2009 (Atlanta Hawks/Thrashers)(unsigned) prohibits assignment and provides that ASM may terminate the agreement immediately if any petition is filed by or against Company and such petition is not dismissed within twenty days after the date of such filing.

2. Agreement with Atlanta National League Baseball Club, Inc. dated January 1, 2008 provides that the Agreement may be terminated by ANLBC if any petition is filed by or against the Company under any bankruptcy law and such petition is not dismissed within twenty days after the date of such filing.

3. Agreement with Boston Red Sox Baseball Club Limited Partnership ("BRS") dated February 6, 2006 provides that BRS may terminate the agreement if the Company shall file a petition in voluntary bankruptcy.

4. Agreement with Colorado Rockies Baseball Club, Ltd. ("CR") dated April 13, 2007 provides that CR may terminate the agreement if any petition is filed by or against Company and such petition is not dismissed within twenty days after the date of such filing.

5.   Agreement with Houston Astros, L.L.C. dated February 20, 2007 (unsigned) provides that either party may terminate the agreement if the other party files a petition seeking relief under the Unites States Bankruptcy Code.

6.   Agreement with Pacers Basketball Corporation ("PBC") dated October 1, 2004 (term ended) provides that the agreement is not assignable without the prior written consent of PBC and the Company is in default if it takes the benefit of any insolvency act.

7.   Agreement with Los Angeles Dodgers L.L.C. dated December 15, 2005 (unsigned) provides that the Dodgers have the right to terminate with five days notice if the other party becomes subject to any proceeding under any bankruptcy or insolvency law.

8.   Agreement with New York Yankees dated November 2008 (unsigned) provides that an event of default if the Company voluntarily files for bankruptcy.

9.   Agreement with Pro-Football Inc. d/b/a The Washington Redskins dated August 13, 2009 provides that the filing of a voluntary petition in bankruptcy is an event of default and The Washington Redskins may terminate the agreement by written notice.

10. General Services Agreement with Creative Realities effective January 15, 2008 provides that either party may terminate for cause upon the commencement of a bankruptcy.

11. Agreement with CSNK Working Capital Finance Corp. d/b/a Bay View Funding dated June 24, 2009 (terminated) provides an event of default if a case is commenced under the United States Bankruptcy Code.

12. Letter Agreement with Diversified Media Group dated March 6, 2009 provides an event of default if the Company sold all or a substantial portion of its respective assets or the Compnay filed a voluntary petition in bankruptcy.

13. Agreement with NBC Universal Inc. dated June 28, 2007 provides that the agreement can not be assigned without the prior written consent of the other party.

14. Securities Purchase and Loan Agreement with BNYH AMN Holdings L.L.C. and BNYH AMN Parallel Holdings L.L.C. dated October 31, 2007 provides an event of default upon the commencement of a bankruptcy proceeding.

## Schedule 5.7(b) – Largest Vendors and Advertising Customers

**Ten Largest Vendors**

> Atlanta Braves
> Boston Red Sox
> Brook LLC
> Chicago Bulls
> Chicago Cubs
> Chicago White Sox
> Creative Realities
> New York Mets
> New York Yankees
> San Francisco Giants (China Basin Ballpark Company)

Refer to <u>Schedule 5.7(b)</u> with respect to the Atlanta Braves and Brook LLC for vendors which have threatened to cancel or otherwise terminate their relationship with the Company.

**Ten Largest Advertising Customers**

> Army
> GEICO
> GoRV
> Hilton
> Novartis
> Jim Beam
> Fox Broadcasting
> BP
> Epix
> Bank of America

Advertising time on the Company's network for the customers listed above is typically purchased in flights which range from a month to a season. To date for 2010, there has been no advertising time purchased by Hilton, Novartis, Jim Beam, BP, Epix or Bank of America.

W02-WEST:7GGM1\402477220.1

## Schedule 5.10 – Compliance Failures

None.

## **Schedule 5.10(b) – Permits**

None.

## Schedule 5.14 – Employees

[Schedule 5.14 contains confidential information and has been intentionally omitted. A copy of this schedule may be obtained from the Seller on a confidential basis.]